1 | HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
2 | (E-mail: Hilary_Potashner@fd.org)
CUAUHTEMOC ORTEGA(Bar No.257443)
3 | Deputy Federal Public Defender
(E-Mail: Cuauhtemoc_Ortega@fd.org)
4 | ANDREA JACOBS (Bar No. 236892)
Deputy Federal Public Defender
5 | (E-mail: Andrea_Jacobs@fd.org)
411 West Fourth Street, Suite 7110
6 | Santa Ana, California  92701-4598
Telephone:  (714) 338-4500
7 | Facsimile:  (714) 338-4520

8 | Attorneys for Defendant
TODD CHRISTIAN HARTMAN

9

10

11 | **UNITED STATES DISTRICT COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA**

13 | **SOUTHERN DIVISION**

14

| | |
|---|---|
| 15  UNITED STATES OF AMERICA, | Case No. SA CR 15-63-JLS |
| 16              Plaintiff, | **NOTICE OF MOTION; MOTION TO SUPPRESS EVIDENCE;** |
| 17       v. | **MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION** |
| 18  TODD CHRISTIAN HARTMAN, | **OF TODD CHRISTIAN HARTMAN; DECLARATION OF COUNSEL;** |
| 19              Defendant. | **EXHIBITS A-C** |
| 20 | Hearing:  October 16, 2015 |
| 21 | Time:      11:30 a.m. |

22

23

24

25

26

27

28

TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................3

II. ARGUMENT ....................................................................................................5

      A.    THE COURT SHOULD SUPPRESS MR. HARTMAN'S STATEMENTS ............................................................................................5

          1.    Legal Standard ................................................................................5

              a.    *Miranda* ......................................................................5

              b.    *Craighead* and Interrogations in the Home ..........................6

          2.    Application of *Craighead* Factors to Mr. Hartman's Case ..............7

              a.    Number of Law Enforcement Personnel and Whether They Were Armed ................................................................7

              b.    Whether the Suspect Was at Any Point Restrained, Either by Physical Force or Threats ......................................8

              c.    Whether the Suspect Was Isolated from Others....................11

              d.    Whether the Suspect Was Informed that He Was Free to Leave ..........................................................................12

      B.    Any Evidence Obtained As a Result of Mr. Hartman's Statements Must Also Be Suppressed ..............................................................15

III. CONCLUSION................................................................................................15

1

# TABLE OF AUTHORITIES

2

**PAGE**

**FEDERAL CASES**

3

4

*Brown v. Illinois,*
    422 U.S. 590 (1975) ................................................................................. 15

5

*District of Columbia v. Heller,*
    554 U.S. 570,

6

    128 S. Ct. 2783,
    171 L. Ed. 2d 637  (2008) ......................................................................... 4

7

8

*Miranda v. Arizona,*
    384 U.S. 436 (1966) ........................................................................... *passim*

9

*Rhode Island v. Innis,*
    446 U.S. 291 (1980)  ................................................................................... 6

10

11

*Sprosty v. Buchler,*
    79 F.3d 635 (7th Cir.1996) ........................................................................ 7

12

*Stanley v. Georgia,*
    394 U.S. 557,

13

    89 S. Ct. 1243,
    22 L. Ed. 2d 542 (1969)............................................................................ 4

14

15

*Stansbury v. California,*
    511 U.S. 318 (1994)  ................................................................................ 10

16

*Taylor v. Alabama,*
    457 U.S. 687 (1982) ................................................................................. 15

17

18

*United States v. Blanford,*
    467 Fed. Appx. 624, 625 (9th Cir. 2012) ............................................... 10

19

*United States v. Brobst,*
    558 F.3d 982 (9th Cir. 2009) ............................................................... 8, 10

20

21

*United States v. Craighead,*
    539 F.3d 1073 (9th Cir. 2008) ........................................................... *passim*

22

*United States v. Griffin,*
    922 F.2d 1343 (8th Cir. 1990) ............................................................. 7, 11

23

24

*United States v. Harrison,*
    34 F.3d 886 (9th Cir. 1994) ....................................................................... 6

25

*United States v. Mittel-Carey,*
    493 F.3d 36 (1st Cir. 2007) ....................................................................... 6

26

27

*United States v. Revels,*
    510 F.3d 1269 (10th Cir. 2007) ............................................................ 6,10

28

*Withrow v. Williams,*
    507 U.S. 680 (1993) ................................................................................... 5

**TABLE OF AUTHORITIES**

**PAGE**

**FEDERAL CASES**

*Wong Sun v. United States,*
    371 U.S. 471 (1963) ..................................................................................... 15

**STATE CASES**

*United States v. Gladney,*
    2009 WL 175157 (C.D. Cal. Jan. 23, 2009)..................................................... 8, 14

*United States v. Salceda,*
    2012 WL 763583 (C.D. Cal. Feb. 27, 2012)...................................................*passim*

*United States v. Williams,*
    2010 WL 3420325 (N.D.Ohio Aug. 27, 2010) ................................................. 15

**FEDERAL STATUTES**

18 U.S.C. § 3501 ......................................................................................................... 5

1  HILARY POTASHNER (Bar No. 167060)
   Federal Public Defender
2  (E-mail: Hilary_Potashner@fd.org)
   CUAUHTEMOC ORTEGA (Bar No. 257443)
3  Deputy Federal Public Defender
   (E-mail: Cuauhtemoc_Ortega@fd.org)
4  ANDREA JACOBS (Bar No. 236892)
   Deputy Federal Public Defender
5  (E-mail: Andrea_Jacobs@fd.org)
   411 West Fourth Street, Suite 7110
6  Santa Ana, California  92701-4598
   Telephone:  (714) 338-4500
7  Facsimile:  (714) 338-4520

8  Attorneys for Defendant
   TODD CHRISTIAN HARTMAN

9

10                **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                     **SOUTHERN DIVISION**

13

14 | UNITED STATES OF AMERICA, | Case No. SA CR 15-63-JLS |
   |---|---|
15 | Plaintiff, | **NOTICE OF MOTION; MOTION TO SUPPRESS EVIDENCE;** |
16 | v. | **MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION** |
17 | TODD CHRISTIAN HARTMAN, | **OF TODD CHRISTIAN HARTMAN; DECLARATION OF COUNSEL;** |
18 | Defendant. | **EXHIBITS A-C** |
19 | | Hearing:  October 16, 2015 |
   | | Time:      11:30 a.m. |
20

21

22  TO UNITED STATES ATTORNEY EILEEN DECKER AND ASSISTANT UNITED

23  STATES ATTORNEY ANNE GANNON:

24         PLEASE TAKE NOTICE that on October 16, 2015, at 11:30 a.m., or as soon

25  thereafter as counsel may be heard, in the courtroom of the Honorable Josephine L.

26  Staton, United States District Judge, defendant Todd Christian Hartman will move as

27  follows:

28

                                    1

MOTION

Defendant Todd Christian Hartman, through his counsel of record, Cuauhtémoc Ortega and Andrea Jacobs, Deputy Federal Public Defenders, hereby moves this Honorable Court for an order suppressing all evidence of statements made by Mr. Hartman to state and federal law-enforcement officers on February 5, 2015, as these statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), and were not voluntary.  Mr. Hartman also moves to suppress any and all evidence obtained as a result of these statements; this includes, but is not necessarily limited to, statements made by witnesses who were contacted after they were identified by Mr. Hartman during his interrogation.  This motion is based on the attached Memorandum of Points and Authorities, declarations, exhibits, all files and records in this case, and any further evidence presented prior to or at the hearing on this motion.  Mr. Hartman requests an evidentiary hearing on this motion.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED:  September 18, 2015          By  */s/ Cuauhtemoc Ortega & Andrea Jacobs*
                                              CUAUHTÉMOC ORTEGA
                                              ANDREA JACOBS
                                              Deputy Federal Public Defenders

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

### I. INTRODUCTION[1]

3      On February 5, 2015, early in the morning, approximately fourteen law

4  enforcement officers from the Newport Beach Police Department (NBPD) and the

5  Department of Homeland Security arrived at the two-bedroom apartment where Todd

6  Christian Hartman lived with his mother.[2]  Mr. Hartman opened the door to find a

7  military-style rifle pointed directly at him.  (*See* Declaration of Todd Christian Hartman

8  ¶ 2 (hereinafter, "Hartman Decl.")).  The rifle was then pressed to Mr. Hartman's chest,

9  causing him to fear for his life.  (*Id.*).  At the officers' command, he walked backward

10  into the apartment.  (*Id.*).   He was ordered to put his hands up in the air; he complied.

11  (*Id.* ¶ 3).  Inside the home, David Syvock, an NBPD detective, lowered Mr. Hartman's

12  hands and placed them behind his back.  (*Id.*).  Holding Mr. Hartman's hands in place,

13  Detective Syvock walked him outside, in his underwear, within sight of the neighbors,

14  who were observing the commotion. [3] (*Id.*).  The other officers set up a perimeter and

15  began searching Mr. Hartman's apartment, including examining his electronic devices.

16      During the course of the search, Detective Syvock and a second officer

17  interrogated Mr. Harman multiple times in a bedroom with the door closed, away from

18  his mother.[4]  (*Id.* ¶ 6).  Mr. Hartman was interrogated in the bedroom despite stating

19  that he preferred if officers spoke to him in the common kitchen area.  (*Id.* ¶ 4).  During

20  the interrogation, Detective Syvock described to Mr. Hartman the investigation and

---

[1] The facts set forth in this Introduction are derived from the discovery provided to defense counsel by the government, the attached declarations and exhibits, and any other evidence presented to the Court at, prior to, or during the hearing on this matter.

[2] *See* Declaration of Counsel ¶¶ 2, 3;  Exhibit A (excerpt from Department of Homeland Security's enforcement operation plan, provided to defense counsel in discovery, reflecting personnel to be involved in execution of search warrant (redactions were made by the government)); Exhibit B (diagram of Mr. Hartman's apartment sketched by law enforcement and appended to return to search warrant; the diagram was produced by the government in discovery).

[3] Mr. Hartman was provided clothing after he was taken outside.

[4] Judy Hartman, Mr. Hartman's mother, was intercepted by law enforcement in her vehicle shortly before the search; she returned to her home upon learning of the search warrant and was present for the search.

3

1    evidence against him.  Though Detective Syvock told Mr. Hartman that he was not

2    under arrest and could leave, he never advised Mr. Hartman regarding his *Miranda*

3    rights to remain silent and consult an attorney, nor did he warn him that his statements

4    could be used against him in Court.  Detective Syvock's goal that morning was to get

5    Mr. Hartman to incriminate himself.  Ensuring that Mr. Hartman was aware of his

6    constitutional rights was not on the agenda.

7          Detective Syvock may have mouthed the words "free to leave" or "not under

8    arrest," but his and the other officers' actions dictated otherwise.  It is implausible that

9    Mr. Hartman, or anyone else, would have felt free to leave, minutes after the aggressive

10   "takedown" manner in which his home was overtaken.  Officers kept a perimeter on the

11   apartment as it was being searched, and Mr. Hartman was told to not walk around the

12   apartment when he has not being interrogated.  (*Id.* ¶ 6).  When Mr. Hartman briefly

13   tried to exit the apartment to use a public restroom nearby, he was not allowed to leave.

14   (*Id.* ¶¶ 5, 6).  Thus, Detective Syvock's invitation to Mr. Hartman to leave if he wanted

15   to was meaningless in this context.  In any case, where was he supposed to go?  "He

16   [was] already in the most constitutionally protected place on earth."  *United States v.*

17   *Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008)   As noted by the *Craighead* Court:

18                    The home occupies a special place in the pantheon of

19                    constitutional rights. Under the First Amendment, the 'State

20                    has no business telling a man, sitting alone in his house, what

21                    books he may read or what films he may watch.' *Stanley v.*

22                    *Georgia*, 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542

23                    (1969). The Second Amendment prohibits a federal 'ban on

24                    handgun possession in the home.' *District of Columbia v.*

25                    *Heller*, 554 U.S. 570, 128 S.Ct. 2783, 2822, 171 L.Ed.2d 637

26                    (2008). The Third Amendment forbids quartering soldiers 'in

27                    any house' in time of peace "without the consent of the

28                    Owner." U.S. Const. amend. III. The Fourth Amendment

4

1          protects us against unreasonable searches or seizures in our

2                 'persons, houses, papers, and effects.' *Id.* amend. IV.

3     *Id.* at 1077.  "To be 'free' to leave is a hollow right if the one place the suspect cannot

4     go is his own home."  *Id.*

5          This case is analogous to, and governed by, the Ninth Circuit's decision in

6     *Craighead*.  Like the defendant in that case, Mr. Hartman was in custody at the time of

7     his interrogation and should have been advised of his *Miranda* rights, but was not.  His

8     statements to officers on February 5, 2015, and any evidence tied to or obtained as a

9     result of his statements must be suppressed.  Mr. Hartman requests an evidentiary

10    hearing on this motion.

11                              **II.  ARGUMENT**

12    **A.     THE COURT SHOULD SUPPRESS MR. HARTMAN'S STATEMENTS**

13            **1.     Legal Standard**

14                    **a.     *Miranda***

15          Because the Fifth Amendment privilege against self-incrimination is

16    "jeopardized" during a custodial interrogation, the Supreme Court has adopted

17    "[p]rocedural safeguards ... to protect the privilege."  *Miranda*, 384 U.S. at 478-79.

18    These procedural safeguards require that the person be advised "that he has the right to

19    remain silent, that anything he says can be used against him in a court of law, that he

20    has the right to the presence of an attorney, and that if he cannot afford an attorney one

21    will be appointed for him prior to any questioning if he so desires."  *Id*. at 479.

22          It is only "[a]fter such warnings have been given ... [that] the individual may

23    knowingly and intelligently waive these rights and agree to answer questions or make a

24    statement."  *Id*.  "[U]nless and until such warnings and waiver are demonstrated by the

25    prosecution at trial, no evidence obtained as a result of interrogation can be used

26    against him."  *Id*.; *see also Withrow v. Williams*, 507 U.S. 680, 690 (1993) (*Miranda*

27    requires the prosecution to "demonstrate the warnings and waivers as threshold

28    matters"); *see also* 18 U.S.C. § 3501 (statements containing confessions must be

1   voluntary to be admissible); *United States v. Harrison*, 34 F.3d 886, 890 (9th Cir. 1994)

2   ("The government must prove by a preponderance of the evidence that the statement

3   was voluntary.").

4          Mr. Hartman submits that the government bears the burden of demonstrating that

5   valid *Miranda* warnings were given prior to a custodial interrogation and that

6   statements were made in a voluntary manner.  Unless the government meets this

7   burden, Mr. Hartman's statements must be suppressed.

8          *Miranda* warnings are required prior to custodial interrogation.  Custodial

9   interrogation is questioning initiated by law enforcement officers after a person has

10  been taken into custody or otherwise deprived of his freedom of action in any

11  significant way.  *Craighead*, 539 F.3d at 1082.  Interrogation, for purposes of *Miranda*,

12  is defined as any activity by law enforcement officers "reasonably likely to elicit an

13  incriminating response."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

14         As in *Craighead*, it should be undisputed that Mr. Hartman was not advised of

15  his *Miranda* rights and that he was interrogated.  539 F.3d at 1082.  Therefore "the only

16  issue before [the Court] is whether [Mr. Hartman] was in custody at the time of his

17  interrogation."  *Id.*

18              **b.      *Craighead* and Interrogations in the Home**

19         Mr. Hartman was interrogated at home.  Where the home becomes a police-

20  dominated environment, a defendant is in custody for *Miranda* purposes.  *Id.  See also*

21  *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (suppressing statements

22  after concluding that the suspect's home had become a "police-dominated

23  environment" and noting that "the facts belie[d] any conclusion that [the suspect's]

24  home, on the morning of the questioning at issue, was the traditional comfortable

25  environment that we normally would consider a neutral location for questioning.");

26  *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding suspect was in

27  custody in his home because of the "level of physical control that the agents exercised

28  over" the suspect, namely, that the agents restricted defendant's movement to a seated

6

1   position in his living room and permitted him to move around the home only with an

2   escort); *Sprosty v. Buchler,* 79 F.3d 635, 641 (7th Cir.1996) ("More important than the

3   familiarity of the surroundings where [the suspect] was being held is the degree to

4   which the police dominated the scene."); *United States v. Griffin*, 922 F.2d 1343, 1354-

5   55 (8th Cir. 1990) ("Questioning which occurs in the suspect's own home may provide

6   a margin of comfort, but ... the setting of the interrogation is not so important to the

7   inquiry as the question of police domination of that setting.").

8        The *Craighead* court set out the factors to be weighed in determining whether a

9   reasonable person would have felt free to leave during an in-home interrogation:

10            (1) the number of law enforcement personnel and whether

11            they were armed; (2) whether the suspect was at any point

12            restrained, either by physical force or by threats; (3) whether

13            the suspect was isolated from others; and (4) whether the

14            suspect was informed that he was free to leave or terminate

15            the interview, and the context in which any such statements

16            were made.

17   *Craighead*, 539 F.3d at 1077-88.  Each factor here weighs in favor of a finding that Mr.

18   Hartman was in custody.

19        **2.**    **Application of *Craighead* Factors to Mr. Hartman's Case**

20          **a.**    **Number of Law Enforcement Personnel and Whether They**

21               **Were Armed**

22        "The presence of a large number of visibly armed law enforcement officers goes

23   a long way towards making the suspect's home a police-dominated atmosphere." *Id.* at

24   1085.  "When the number of law enforcement personnel far outnumber the suspect, the

25   suspect may reasonably believe that, should he attempt to leave, he will he stopped by

26   one of the many officers he will encounter on the way out." *Id.*  It appears from records

27   produced in discovery that approximately fourteen law enforcement personnel from at

28   least two agencies participated in the execution of the search warrant at Mr. Hartman's

1   small two-bedroom apartment.  (Exhibit A).  Fourteen bodies easily saturate a two-

2   bedroom apartment.  (Exhibit B).  Such a high number of officers leaves "no police-

3   free rooms or spaces to which the suspect may retreat should he wish to terminate the

4   interrogation."  *Craighead*, 539 F.3d at 1085.

5          The officers were armed.  Mr. Hartman saw that the officers were armed when

6   the officers arrived at his home.  (Hartman Decl. ¶ 2).  The officers pointed a military-

7   style rifle at him, then pressed it against his chest.  (*Id.*).  They ordered Mr. Hartman to

8   put his hands over his head, then restrained his hands behind his back, and marched

9   him nearly nude out of his home.  (*Id.* ¶¶ 2, 3).  Still images captured from the video-

10  recording of Mr. Hartman's interview show that the two officers who interrogated him

11  were carrying visible firearms.  (Exhibit C).

12         These facts go well beyond the facts of *Craighead*, where there is no indication

13  that any firearm was ever directly pointed at the defendant.  539 F.3d at 1078.  There

14  were also only eight officers in *Craighead* – almost half the number present here.  *Id.*

15  Thus, this factor weighs in favor of a finding of custody.  *See also United States v.*

16  *Brobst*, 558 F.3d 982, 988 (9th Cir. 2009) (finding defendant was in custody during his

17  in-home interrogation by two officers who did not brandish or point their concealed

18  weapons at defendant); *United States v. Salceda*, CR 10-274-CAS, 2012 WL 763583, at

19  * 4 (C.D. Cal. Feb. 27, 2012) (applying *Craighead* and finding the presence of "eight

20  armed ICE agents and two additional local police escorts" weighed in favor of finding

21  that defendant was in custody in his own home); *United States v. Gladney*, CR-080686-

22  RHW, 2009 WL 175157, at * 6 (C.D. Cal. Jan. 23, 2009) (suppressing statements

23  where "at least a dozen armed law enforcement personnel" entered defendant's

24  apartment and where defendant "stated that he was terrified that he would be either

25  killed or hurt by the agents").

26              **b.     Whether the Suspect Was at Any Point Restrained, Either**

27                       **by Physical Force or Threats**

28         The fact that Mr. Hartman was not handcuffed is not dispositive with regard to

1   this factor.  In *Craighead,* the defendant was never handcuffed, nor does it appear from

2   the text of the Court's opinion that his hands were otherwise restrained.  *Craighead*,

3   539 at 1086.  The *Craighead* opinion also does not state that law enforcement ordered

4   the defendant to put his hands up.  *Id.* at 1078.  Mr. Hartman, on the contrary, was

5   ordered to put his hands up at *gun point*.  (Hartman Decl. ¶ 3).  His hands were then

6   lowered and placed behind his back by Detective Syvock.  *Id.*  He was then walked out

7   of his apartment, in his underwear.  *Id.*  To a lay person, these actions are all consistent

8   with the process of being arrested.

9       Even though Craighead was not handcuffed, the Court nonetheless found that

10  this factor supported a finding of custody.  This was because, for his interrogation,

11  Craighead was "escorted to a back storage room and the door was closed behind him."

12  *Craighead*, 539 at 1086.  Craighead testified that he did not feel free to leave in part

13  because one of the officers present during his interrogation leaned against the door

14  permitting exit.  *Id.*  In the Court's view, Craighead's "freedom of action was restrained

15  in a way that increased the likelihood that Craighead would succumb to police pressure

16  to incriminate himself."  *Id.*  The Court concluded that "it was certainly objectively

17  reasonable for Craighead to believe he was under guard" under the circumstances of the

18  case.  *Id.*

19      There was no law enforcement officer leaning against the door permitting exit

20  from the bedroom where the interrogation took place in this case, as there was in

21  *Craighead*.  But that specific detail is not what is required.  The question is whether

22  Mr. Hartman's "freedom of action was restrained in a way that increased the likelihood

23  that [he] would succumb to police pressure to incriminate himself."  *Craighead*, 539 at

24  1086.  Here, Mr. Hartman was taken into his mother's bedroom by Detective Syvock

25  and another law enforcement officer, despite Mr. Hartman stating that he preferred to

26  speak in the common kitchen area.  (Hartman Decl. ¶¶ 4,6).  The door to the bedroom

27  was closed, isolating Mr. Hartman from his mother.  (*Id.*).  Detective Syvock then

28  proceeded to lay out for Mr. Hartman the investigation against him, at certain points

1    becoming aggressively accusatory.  *See Stansbury v. California,* 511 U.S. 318, 325

2    (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are

3    conveyed, by word or deed, to the individual being questioned. . . . Those beliefs are

4    relevant only to the extent they would affect how a reasonable person in the position of

5    the individual being questioned would gauge the breadth of his or her freedom of

6    action." (internal quotations omitted)); see also *Brobst*, 558 F.3d at 988-89 (finding

7    defendant in custody during in-home interrogation where, *inter alia*, agents confronted

8    defendant with evidence against him including providing him with a copy of the search

9    warrant); *United States v. Blanford,* 467 Fed. Appx. 624, 625 (9th Cir. 2012) (finding

10   defendant in custody where, *inter alia* agents "confronted [defendant] with substantial

11   evidence of his guilt"); *United States v. Revels*, 510 F.3d 1269, 1276 (10th Cir. 2007)

12   ("After being confronted with the drugs in an accusatory manner, we have no doubt

13   that [the suspect] would have reasonably felt compelled to cooperate with the police")

14   (citing *United States v. Rith*, 164 F.3d 1323, 1332 (10th Cir.1999) (holding that a

15   suspect was in custody at "the point at which he was confronted with [an] illegal

16   shotgun")).

17        In addition, the manner in which the police initially entered Mr. Hartman's home

18   shortly before his interrogation—brandishing and pointing firearms, then setting up a

19   perimeter and overtaking his apartment—would "certainly" have made it "objectively

20   reasonable for [Mr. Hartman] to believe he was under guard." *Craighead*, 539 at 1084,

21   1086.  Added to this is the manner in which Mr. Hartman was physically handled upon

22   entry and the residual effect it would have had on his mental state.  (Hartman Decl. ¶

23   3).  As stated above, having a person raise his hands in the air at gunpoint, then

24   restraining his hands behind his back, is universally associated with arrest by lay

25   persons.  The fact that Mr. Hartman was taken outside in his underwear where his

26   neighbors could see him certainly would also contribute to Mr. Hartman feeling that he

27   lacked self-dominion.  The likelihood that the average person would "succumb to

28   police pressure to incriminate himself" after being similarly subjugated and humiliated

1    would doubtless be great.  *Craighead*, 539 F.3d at 1086.

2        Notably, during the times he was not being interrogated, Mr. Hartman was

3    confined to the couch in his living room.  (Hartman Decl. ¶ 7).  Detective Syvock told

4    him he was not free to walk around his apartment, which further contributed to Mr.

5    Hartman's impression that he was "under guard."  *Craighead*, 539 F.3d at 1086.  Mr.

6    Hartman tried twice to use a public restroom, but when he approached the exits, he was

7    not permitted to leave.  (Hartman Decl. ¶¶ 5, 6).

8        Given the totality of the circumstances, this factor, too, weighs in favor of a

9    finding that Mr. Hartman was in custody for *Miranda* purposes.  *See Salceda*, 2012 WL

10   763583, at *4 (finding factor weighed in favor of finding of custody even where

11   defendant was not restrained but "he and his wife were monitored and escorted

12   throughout their home during the duration of the agents' search").

### c.    Whether the Suspect Was Isolated from Others

14       Mr. Hartman was kept isolated in a bedroom with the door closed during his

15   interrogation, even though his mother was present during the search and available to

16   provide him with emotional support.  (Hartman Decl. ¶ 6).  As the Ninth Circuit noted

17   in *Craighead*, "[t]he Supreme Court highlighted isolation from the outside world as

18   perhaps the crucial factor that would tend to lead a suspect to feel compelled to provide

19   self-incriminating statements."  539 F.3d at 1086-87 (citing *Miranda*); *see Griffin*, 922

20   F.2d at 1352 ("A frequently recurring example of police domination concerns the

21   removal of the suspect from the presence of family . . . who might lend moral support

22   during the questioning and deter a suspect from making inculpatory statements . . . .").

23   Having his mother's support during the interrogation would have been particularly

24   helpful to Mr. Hartman on that day, since, as he suffers from insomnia, he had not slept

25   in days and felt mentally foggy.  (Hartman Decl. ¶ 10).

26       Likely, the officers in this case will claim that Mr. Hartman was isolated from his

27   mother as a courtesy to provide him with privacy.  The officers in *Craighead* made

28   similar claims, but the Ninth Circuit afforded this argument little credence.  *Id.* at 1078-

11

79, 1087.  If providing Mr. Hartman privacy was a concern, the officers could have simply waited until the search was over to interview Mr. Hartman at a place of his choosing.  Moreover, there is no evidence that Mr. Hartman expressed privacy concerns when he was *inside his home*; to the contrary, Mr. Hartman specifically asked to remain in a common area--the kitchen--when speaking with law enforcement officers.  (Hartman Decl. ¶ 4).

This factor, therefore, also weighs in favor of a finding that Mr. Hartman was in custody.  *See Salceda*, 2012 WL 763583, at * 4 (finding factor weighed in favor of finding of custody where "defendant was isolated from his wife and child prior to being interrogated").

### d.  Whether the Suspect Was Informed that He Was Free to Leave

Detective Syvock told Mr. Hartman that he was not under arrest and could leave.  (Hartman Decl. ¶ 7).  This is just as in *Craighead*, where an agent testified that she had told Craighead he was not under arrest and free to leave.  539 at 1089.  However, "[t]he mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial *per se*.  [The Court] must consider the delivery of these statements within the context of the scene as a whole."  *Id.* at 1088.  In simple terms, actions speak louder than words.

With regard to the "context," at issue here is an in-home interrogation.  Home interrogations present more unique circumstances than other *Miranda*-related contexts, as the Ninth Circuit noted in *Craighead*:

> [a]pplying th[e] [*Miranda*] standard to an interrogation conducted within the home presents some analytical challenges . . . and presents an issue on which our court thus far has said little. The usual inquiry into whether the suspect reasonably believed he could "leave" the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's home. "Home," said Robert Frost, "is the

12

place where, when you go there, they have to take you in." . .
. . If a reasonable person is interrogated inside his own home
and is told he is "free to leave," where will he go? The
library? The police station? He is already in the most
constitutionally protected place on earth. To be "free" to leave
is a hollow right if the one place the suspect cannot go is his
own home . . . .   Similarly, a reasonable person interrogated
inside his own home may have a different understanding of
whether he is truly free 'to terminate the interrogation' if his
home is crawling with law enforcement agents conducting a
warrant-approved search. He may not feel that he can
successfully terminate the interrogation if he knows that he
cannot empty his home of his interrogators until they have
completed their search.

*Id.* at 1082-83.  In the "context of the scene as a whole," *id.* at 1088, Mr. Hartman could
not possibly have felt free to leave on the morning of February 5, 2015, for the reasons
discussed in this motion.  A team of law enforcement officers had just stormed into his
house, guns drawn, with a military-style rifle pointed at him; they ordered him to put
his hands up, restrained his hands, took him outside in his underwear, and isolated him
from family to interrogate him. (Hartman Decl. ¶¶ 2, 3, 4, 6).  When he tried to use a
public restroom outside of his home, he was prevented from leaving—this occurred
*before* and in between his interrogations. (*Id.* ¶¶ 5, 6).  During his interrogations, his
"home was crawling with law enforcement agents conducting a warrant-approved
search." *Craighead*, 539 at 1083.  At one point, Mr. Hartman heard his mother ask if
Mr. Hartman had an obligation to answer the officers' question, only to be sarcastically
rebuffed by one of the officers, who asked his mother, "What, are you his attorney?"
(Hartman Decl. ¶ 9).  Mr. Hartman's having heard this is important to understanding
his mental state during the process of the search and interrogation.

1    Under these circumstances, Detective Syvock's statement to Mr. Hartman that he

2  was not under arrest and could leave was meaningless lip service.  It was not true to

3  Mr. Hartman, and it would not have been true to anyone in Mr. Hartman's shoes.

4  Detective Syvock "mere[ly] recit[ed]" to Mr. Hartman that he was not under arrest and

5  free to leave so that the detective could later claim the interview was voluntary.

6  *Craighead*, 539 F.3d at 1088.  Once he "checked off" that box, the detective moved on

7  to accomplishing his predetermined objective:  to get Mr. Hartman to incriminate

8  himself.  Else, why not simply recite the *Miranda* warnings to Mr. Hartman prior to

9  interviewing him?  What would have been the harm, even if the detective truly thought

10  Mr. Hartman was not "in custody?"  One has to imagine that Detective Syvock is

11  familiar with what *Miranda* warnings are; it would have taken less than 30 seconds to

12  issue them.  Detective Syvock simply did not care to do it. [5]

13    The facts of this case clearly establish that Mr. Hartman was in custody.  *See*

14  *Salceda*, 2012 WL 763583, at *4 (finding factors weighed in favor of finding of

15  custody even where defendant was told he was not under arrest); *Gladney*, 2009 WL

16  175157, at *7 (same where defendant was told he was not under arrest and free to

17  leave; noting that "this only begs the question as to where he was suppose[d] to go" and

18  noting that "the apartment was teeming with law enforcement personnel" and that

19  "[g]iven that Defendant was taken to the back room, was under constant guard[], and

20  was not interviewed in the living room, or kitchen, the Court finds that a reasonable

21  person in Defendant's position would not have actually 'felt' he was free to leave.").

22    As a result, Mr. Hartman's February 5, 2015 statements must be suppressed.

23

24

25

26    [5] Detective Syvock video recorded the interview of Mr. Hartman without Mr.
27  Hartman's knowledge.  Had he told Mr. Hartman that he was recording the interview,
  Mr. Hartman might not have consented to the interview.  There was no other purpose
28  for video recording the interview, other than to prepare evidence that would be "used
  against [Mr. Hartman] in a court of law." *Miranda*, 384 U.S. at 478-79.  Detective
  Syvock should have warned Mr. Hartman about his intentions.

14

**B.** **Any Evidence Obtained As a Result of Mr. Hartman's Statements Must Also Be Suppressed**

If Mr. Hartman's February 5, 2015 statements are suppressed, any evidence which was inextricably connected to his statements must also be suppressed.  *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *Taylor v. Alabama,* 457 U.S. 687 (1982); *Brown v. Illinois*, 422 U.S. 590 (1975); *United States v. Williams*, 2010 WL 3420325, at *2-3 (N.D.Ohio Aug. 27, 2010) ("if [the officer's] seizure of the material from the floorboard from the floorboard of the Durango was unjustified, the seized firearm and Defendant's later incriminating statements must be suppressed as the fruits of an unlawful search").  This includes statements made by witnesses who were contacted after they were identified by Mr. Hartman during his interrogation. The government has confirmed that it may seek to admit some of these witness statements at trial, but the Court should suppress such statements since they were obtained as a result of Mr. Hartman's unlawful interrogation. [6]

### III.  CONCLUSION

For the foregoing reasons, Mr. Hartman respectfully requests that the Court suppress any and all statements that he made to law enforcement officers on February 5, 2015, and all evidence that was obtained as a result of those statements.  Mr. Hartman requests an evidentiary hearing on this motion.

                                         Respectfully submitted,

                                         HILARY POTASHNER
                                         Federal Public Defender

DATED:  September 18, 2015          By  */s/ Cuauhtemoc Ortega & Andrea Jacobs*
                                         CUAUHTÉMOC ORTEGA
                                         ANDREA JACOBS
                                         Deputy Federal Public Defenders

---

[6] If the government produces additional evidence that Mr. Hartman has reason to believe was acquired as a result of his unlawful interrogation, Mr. Hartman will supplement this motion.

15