EILEEN M. DECKER
United States Attorney
DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Office
ANNE C. GANNON (Cal. Bar No. 214198)
Assistant United States Attorney
     411 West Fourth Street, Suite 8000
     Santa Ana, California 92701
     Telephone: (714) 338-3548
     Facsimile: (714) 338-3561
     E-mail:    anne.gannon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. SA CR 15-63(A)-JLS |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE; DECLARATIONS; EXHIBIT FILED SEPARATELY UNDER SEAL |
| v. | |
| TODD CHRISTIAN HARTMAN, | MOTIONS HEARING:    10/16/15 |
| Defendant. |                    11:00 A.M. |
| | ESTIMATE:           1 HOUR |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby files its opposition to defendant's September 18, 2015 motion to suppress evidence.  This motion is based on the attached Memorandum of Points and Authorities, attached declarations,

\\
\\
\\
\\
\\
\\

Exhibit 1 filed separately under seal, the files and records in this case and any further evidence or argument as may be presented at the hearing on the motion.

Dated: September 24, 2015                Respectfully submitted,

                                         EILEEN M. DECKER
                                         United States Attorney

                                         DENNISE D. WILLETT
                                         Assistant United States Attorney
                                         Chief, Santa Ana Office


                                         _____/s/_____
                                         ANNE C. GANNON
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

**I.    INTRODUCTION**.......................................................... 3

**II.   STATEMENT OF FACTS**................................................... 3

**III. ARGUMENT**............................................................. 9

      1. Law Enforcement's Questioning of Defendant on
February 5, 2015 Did Not Constitute Custodial
Interrogation and, Therefore, Did Not Require a Miranda
Advisement............................................................ 10

**VI. CONCLUSION**........................................................ 15

i

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                 <u>PAGE</u>

**<u>FEDERAL CASES:</u>**

<u>Berkemer v. McCarty</u>,
        468 U.S. 420 (1984).......................................... 10

<u>Miranda v. Arizona</u>,
        384 U.S. 436 (1966).......................................... 10

<u>Illinois v. Perkins</u>,
        496 U.S. 292 (1990).......................................... 10

<u>Stansbury v. California</u>,
        511 U.S. 318 (1994).......................................... 10

<u>United States v. Bassignani</u>,
        575 F.3d 879 (9th Cir. 2009)................................. 14

<u>United States v. Butler</u>,
        249 F.3d 1094 (9th Cir. 2001)................................ 11

<u>United States v. Craighead</u>,
        539 F.3d 1073 (9th Cir. 2008)................................ 12

<u>United States v. Hernandez</u>,
        476 F.3d 791 (9th Cir. 2007)................................. 11

<u>United States Constitution:</u>

U.S. Const. amend V...................................... 9, 10

MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant is currently charged in the first superseding indictment with two counts of transportation of child pornography, in violation of Title 18, United States Code, Section 2252A(a)(1), (b)(1) and one count of possession of child pornography, in violation of Title 18, United States Code, Section 2252A(a)(5)(B), (b)(2). Trial is scheduled for October 27, 2015. On September 18, 2015, defendant filed a motion to suppress evidence arguing that all evidence of statements made by defendant, and evidence derived from those statements, be suppressed because they were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and were not voluntary. (Def. Mot. at 2). Defendant was not in custody at the time the statements were made, therefore, an advisement of rights pursuant to Miranda was not required. Accordingly, defendant's motion to suppress evidence should be denied.

## II. STATEMENT OF FACTS

On February 5, 2015, state and federal law enforcement executed a search warrant at defendant's residence. (Decl. Speakman ¶ 3; Decl. Syvock ¶ 3.) Members of the Newport Beach Police Department ("NBPD") and Department of Homeland Security, Homeland Security Investigations ("HSI") were present. (Id.) HSI Special Agent ("SA") Kim Speakman and NBPD Detective David Syvock participated in an operational briefing at 6:30 a.m. and the execution of the search warrant. (Id.)

SA Speakman was assigned to be the first person on the entry team and, in that role, was tasked with carrying a long gun, specifically, an M-4 rifle. (Decl. Speakman ¶¶ 3, 8.) An entry team

1   is a designated group of officers and agents who are assigned to
2   enter the premises in order to secure the location and determine how
3   many people are inside the residence.  (Id. ¶ 4.)  Having eight
4   members to an entry team is typical, in part, because at least two
5   agents are needed to clear and secure each room.  (Id.)  Here, eight
6   individuals were designated as ET or entry team.  (Def. Mot., Ex. A.)
7   It is typical for the first person on the entry team to be a long gun
8   operator due to the uncertainty of the number and reaction of the
9   occupants of the residence.  (Id. ¶ 6.)  A long gun can be either a
10  rifle or a shotgun.  (Id.)  Suspects in child exploitation
11  investigations have committed suicide when confronted by law
12  enforcement or engaged officers in gun fire.  (Id.)

13      Detective Syvock was assigned to be a member of the perimeter
14  team during the execution of the search warrant at defendant's
15  residence.  (Decl. Syvock ¶ 3.)  A perimeter team is designated to
16  ensure the entry team's safety, the safety of members of the public
17  who may approach who may approach the location by chance, due to
18  curiosity or with intent to disrupt the operation.  (Decl. Speakman ¶
19  5.)  The perimeter team also monitors anyone departing the residence.
20  (Id.)  In this case, five agents and officers were assigned to the
21  perimeter team.  (Id.)

22      Prior to the execution of the search warrant, Detective Syvock
23  obtained a key to the residence from Judy Hartman and provided it to
24  the entry team.  (Decl. Syvock ¶ 4.)  The key was obtained to assist
25  with entry and minimize property damage.  (Decl. Speakman ¶ 7.)  The
26  entry team proceeded to the front door and HSI SA Ron Perez knocked
27  on the door and announced police presence.  (Decl. Speakman ¶ 8.)
28  Initially, no one answered the door.  (Id.)  As a result, SA Perez

4

used the key to open the door.  (Id.)  SA Speakman was standing directly in front of the door as it opened with his government-issued M-4 rifle at his shoulder pointed at the door.  (Id.)  SA Speakman was the only member of the entry team tasked with having a long gun that day.  (Id.)  As the door opened, SA Speakman took approximately one step inside the residence and observed defendant in the back of the home.  (Id.)  SA Speakman initially told defendant not to move saying "Police, don't move."  (Id.)  SA Speakman then told defendant to put his hands up and then to put his hands up higher and directed defendant to come out of the home.  (Id.)  SA Speakman instructed defendant to raise his hands so that he could not do any harm to the officers present.  (Id.)

Defendant was directed to move past the entry team onto the patio.  At this time, Detective Syvock recognized the person exiting the home as defendant Hartman.  (Decl. Syvock ¶ 5.)  As defendant was exiting the residence, Detective Syvock contacted him on the patio just outside the front door.  (Decl. Syvock ¶ 6.)  Upon initial contact, Detective Syvock saw that defendant was wearing shorts and a t-shirt.  (Decl. Syvock ¶ 7.)  Due to the cool climate, Detective Syvock requested that a member of the search team retrieve a sweatshirt for defendant to wear as they waited on the patio.  (Id.)  Detective Syvock did not see any neighbors watching as he spoke with defendant on the patio.  (Id.)  After the entry team had secured the residence, Detective Syvock identified himself to defendant as a Detective from NBPD and as a Task Force Officer with the Orange County Child Exploitation Task Force.  (Decl. Syvock ¶ 8.)  Detective Syvock advised defendant that he was not under arrest and was free to leave.  (Id.)

1    At no time during Detective Syvock's contact with defendant,

2    either initially outside or during the interviews inside, did

3    defendant request to use the restroom.  (Decl. Syvock ¶ 9.)  At no

4    time during Detective Syvock's contact with defendant did defendant

5    suggest discussing the investigation in his kitchen which was

6    occupied by agents and officers.  (Id.)  The interviews with

7    defendant were conducted in his mother's bedroom as it was the only

8    room in the residence where agents were not searching for evidence.

9    (Id.)  During the interviews, defendant always sat closest to the

10   door without obstruction to leave.  (Id.)  NBPD Detective Kristin Fox

11   was present in the room and sat across from Detective Syvock without

12   obstructing defendant's access to the door.  (Id.)

13   SA Speakman never directed defendant to the kitchen area of the

14   residence.  (Decl. Speakman ¶ 9.)  The M-4 rifle never physically

15   touched defendant's chest or any other part of defendant's body.

16   (Id.)  After defendant was directed past SA Speakman, SA Speakman,

17   along with other members of the entry team, entered the residence and

18   conducted a sweep of the residence.  (Decl. Speakman ¶ 10.)  Once the

19   residence was secure, SA Speakman went to his car and put away his M-

20   4 rifle.  (Id.)  SA Speakman returned to the residence and assisted

21   with the search of the residence.  (Id.)  SA Speakman never told

22   defendant he could not use the bathroom.  (Decl. Speakman ¶ 9.)  SA

23   Speakman and Detective Syvock never handcuffed defendant or otherwise

24   physically restrained him.  (Decl. Speakman ¶ 9; Decl. Syvock ¶ 9.)

25   They never told defendant that he was not free to leave or told his

26   mother, "What, are you his attorney."  (Decl. Speakman ¶ 9; Decl.

27   Syvock ¶ 6.)  The interviews were conducted with defendant only after

28

1  he indicated that he wanted to speak with Detective Syvock about the

2  investigation.  (Decl. Syvock 12.)

3      Detective Syvock recorded his interviews of defendant.  (Ex. 1,

4  filed separately under seal).[1]  The video of the interview is

5  separated into three digital files.  (<u>Id.</u>)  File RECO0003 runs from

6  time stamp 07:14:51 to 07:44:51.  (<u>Id.</u>)  File RECO0004 runs from time

7  stamp 07:44:52 to 07:48:42.  (<u>Id.</u>)  File RECO0005 runs from time

8  stamp 07:56:00 to 08:24:28.  (<u>Id.</u>)  The video begins at 07:14:51 and

9  defendant walks into the room at 07:15:36.  (<u>Id.</u>)  From the time

10  defendant enters the room until 07:19:10, less than four minutes,

11  Detective Syvock introduces himself and explains the situation.

12  (<u>Id.</u>)  At 07:19:10, the following exchange occurs:

13  SYVOCK:    And I made it clear to you, right.  You are not under

14         arrest, right.  If you want to get out and walk out of

15         here right now, please do.  I would like to share my

16         investigation with you. If you do leave, just let us

17         know how we can secure your house.  We are going to do

18         our investigation.  But like I said, I want to share

19         my investigation with you and hopefully get an

20         understanding from you as to why you were doing this.

21         Was it curiosity?  I mean, do you, have you gone out

22         and met kids?

23  HARTMAN:   No, no. It's as basic as can be, just curiosity.

24         Just, . . .

25  SYVOCK:    Okay.

26

27

───────────

[1] The recording is being filed under seal because it contains
personal identifying information of minors.

28

7

1   HARTMAN:   strange predilection that I obviously deleted,
2              reinstalled, deleted, reinstalled.
3   SYVOCK:    Okay, I would like to hear.  But, if you don't mind
4              sharing it with me.  I would like to hear.
5   HARTMAN:   I have never contacted kids.  I don't, I don't con . .
6              . chat with people.
7   SYVOCK:    So, it sounds like you are willing . . . you don't
8              have any place to go right now.
9   HARTMAN:   No.
10  SYVOCK:    So, I am not holding you up, or anything, right.
11  HARTMAN:   No.
12  SYVOCK:    So tell me when did you first start using the peer to
13             peer network.  How many years ago?
14  HARTMAN:   A long time ago.  Probably 2000.
15  (Id.)  This exchange ends at time stamp 07:20:18.  (Id.)  Defendant
16  makes statements regarding his involvement with child pornography
17  until time stamp 07:32:30.  (Id.)  Then, defendant answers Detective
18  Syvock's questions regarding defendant's interactions with children
19  until time stamp 07:37:15 when it switches back to a discussion of
20  defendant's viewing of child pornography until time stamp 07:38:00.
21  (Id.)  At this point, defendant answers questions about a child
22  depicted on defendant's social media account until 07:43:08 when the
23  following exchange occurs:
24  SYVOCK:    Do you have any questions for us?
25  HARTMAN:   No, thanks, pretty straight forward.
26  SYVOCK:    We got to finish doing our search and stuff like that
27             so we are going to be here for a little bit.  You are
28

8

1          free to stay, you can't wander throughout the house

2          just because we have investigators in the house.

3   HARTMAN:  Can I get a glass of water?

4   SYVOCK:   Yeah, sure, absolutely.  Do you want to sit out on the

5          front balcony?  Is that, would you be more comfortable

6          there?

7   HARTMAN:  I would rather not be outside where my neighbors are

8          going to . . .

9   SYVOCK:   Okay, okay, fair enough, I get that.  So we haven't

10          searched this room yet.  Whose room is this?

11   HARTMAN:  My mom's room.

12   SYVOCK:   Okay, so what I would have to do, is, cause, so I can

13          have you sit on the couch out there if you want to do

14          that.  I can't leave you in a room that hasn't been

15          secured, if that makes sense to you.

16   HARTMAN:  Definitely.

17   (<u>Id.</u>)  This exchange ends at time stamp 07:43:50.  (<u>Id.</u>)  The

18   remainder of the interview involves defendant's interactions with

19   children he knows.  (<u>Id.</u>)

20       Throughout the interview, Detective Syvock's tone is

21   professional and calm.  (<u>Id.</u>)  Defendant does not appear to be

22   distressed, confused or disoriented.  (<u>Id.</u>)  Detective Syvock did not

23   see any indications that defendant was suffering from lack of sleep

24   or that defendant displayed symptoms of recent alcohol intoxication.

25   (Decl. Syvock ¶ 13.)

26       III. ARGUMENT

27       The Fifth Amendment provides that [n]o person... shall be

28   compelled in any criminal case to be a witness against himself.  U.S.

9

Const. amend. V.   In <u>Miranda v. Arizona</u>, the Supreme Court established a prohylactic, procedural mechanism of advising defendants of certain rights to safeguard the core of the Fifth Amendment: a privilege against the inherently coercive nature of custodial interrogation.  384 U.S. 436, 444 (1966).  Miranda warnings must be given only when a suspect is both in custody and subject to state interrogation.  <u>See Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990) ([i]t is the premise of <u>Miranda</u> that the danger of coercion results from the interrogation of custody and official interrogation).  Custody involves the deprivation of freedom of action in any significant way.  <u>Miranda</u>, 384 U.S. at 444.  To determine whether a suspect is in custody a court assesses the objective circumstances of the situation from the perspective of a reasonable person in the suspect's position.  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984).  Whether an arrestee is in custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogation officers or the persons being questioned.  <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994).

> **A.  Law Enforcement's Questioning of Defendant on February 5, 2015 Did Not Constitute Custodial Interrogation and, Therefore, Did Not Require a Miranda Advisement**

The February 5, 2015 interview at defendant's home was consensual and non-custodial.  Facts relevant to the determination of whether a person is in custody "include the language used by the officers, the physical characteristics of the place where the questioning occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which

10

the person was confronted with evidence of guilt." <u>United States v. Hernandez</u>, 476 F.3d 791, 796 (9th Cir. 2007) (quoting <u>United States v. Butler</u>, 249 F.3d 1094, 1099 (9th Cir.2001)).  Here, there is no evidence, other than his own self-serving statements, that defendant was in custody and did not consent to speak with the investigators. The government contends the entire duration of the interviews is admissible.  However, at trial, the government only intends on introducing from time stamp 07:14:51 to 07:32:30, 07:37:15 to 07:38:00, and 07:43:08 to 07:43:50 in its case-in-chief.  The government reserves the right to move for the introduction of other portions of the interview if they become relevant or for impeachment purposes.  The government is submitting, and requests that the Court review, the entire duration of the interview video recording because it demonstrates the physical setting of the room, Detective Syvock's actions, tone, and demeanor, and that defendant did not appear intimidated, distressed or anxious to terminate the interview.

As to the first factor used to determine if an individual is in custody, the language used by the officers, Detective Syvock employed a calm tone and his questioning was not aggressive.  After conducting introductions and an explanation of the investigation, Detective Syvock reiterated what he had previously told defendant, that defendant was not under arrest and was free to leave.

SYVOCK:   And I made it clear to you, right.  You are not under arrest, right.  If you want to get out and walk out of here right now, please do.  I would like to share my investigation with you. If you do leave, just let us know how we can secure your house.  We are going to do our investigation.  But like I said, I want to share

11

my investigation with you and hopefully get an

understanding from you as to why you were doing this. (Ex. 1 at time stamp 07:19:10.)  Detective Syvock reinforced that he was serious that defendant could leave by inviting defendant to leave, "[i]f you want to get out and walk out of here right now, please do" and explained to defendant what would happen if defendant left, law enforcement would take steps to secure the residence. (Id.)  Defendant Syvock invites, rather than orders, defendant to share information about his involvement with child pornography, "if you don't mind sharing it with me.  I would like to hear."  (Id.) Defendant confirms that the interview is not preventing him from going anywhere or holding him up.  (Id.)

The second factor is the physical surroundings of the interrogation.  Here, the questioning occurred in defendant's home during the execution of the search warrant.  An entry and perimeter team were necessary to secure the residence and protect the officers and the public.  (Decl. Speakman ¶¶ 4, 5.)  This case is distinguishable from United States v. Craighead, 539 F.3d 1073 (9th Cir. 2008), cited by defendant.  In Craighead, the defendant was a member of the military and eight different armed officers representing three different law enforcement agencies were present during the execution of the search warrant at his residence.  Id. at 1085.  The fact the numerous officers were from different agencies, including both civilian and military law enforcement, was relevant because Craighead was unclear whether the agencies were acting in coordination.  It also caused Craighead to doubt whether a particular agent spoke for all the agencies.  Here, while there were fourteen law enforcement officers and agents, there is no evidence defendant

1   was confused regarding Detective Syvock's authority.  At no time

2   during the recorded interview does defendant express to Detective

3   Syvock that defendant wants to leave or that someone told him not to

4   leave.  Defendant claims he needed to use the restroom.  However,

5   defendant did not tell Detective Syvock that he needed to use the

6   restroom and when defendant asks for a glass of water, Detective

7   Syvock's response is "[y]eah, sure, absolutely."  (Ex. 1 at

8   approximate time stamp 07:43:08.)  This response is not consistent

9   with defendant's claim that his movement was restricted or that the

10  search team resisted his requests for basic needs.

11      While Craighead was not handcuffed or physically restrained, he

12  was interviewed by two agents in a back storage closet, alone, with

13  an armed agent wearing a "raid vest" blocking his exit.  In contrast,

14  as the video demonstrates, defendant spoke to investigators in his

15  mother's room, not a closet, had a clear method of egress that was

16  not blocked by law enforcement and Detective Syvock's clothing was

17  casual.  When offered the option of going to sit on the front

18  balcony, defendant told Detective Syvock that he would rather not be

19  outside.  (Ex. 1 at time stamp 07:43:08-07:43:50.)  This demonstrates

20  defendant's understanding that he had the option to move outside the

21  apartment.  When faced with prosecution, defendant claims that he

22  felt isolated from his mother, however, at no time during the video

23  recorded interview did defendant ask for his mother to be present or

24  to take a break to speak with her.  Throughout the recorded

25  interview, defendant's body language and demeanor is relaxed.  While

26  SA Speakman did utilize a rifle as part of entering and securing the

27  residence, its use was limited in duration and scope.  (Decl.

28  Speakman ¶¶ 8-10.)  Defendant was only briefly in the presence of the

13

1   rifle while he existed the front door and SA Speakman was not the

2   person who interviewed defendant.

3          The third factor, the degree of pressure applied to detain the

4   individual, also weighs in favor of a finding that defendant was not

5   in custody.  While Detective Syvock questioned defendant when he

6   believed defendant was not being truthful, the overall tone of the

7   interview was amiable and calm.  No undue pressure was put on

8   defendant to remain in the apartment or participate in the interview.

9          The fourth factor is the duration of the interview.  The

10  interview was of a limited duration, approximately 90 minutes with a

11  break approximately halfway through the interview.  (Ex. 1.)

12  Furthermore, the statements the government seeks to introduce

13  occurred primarily during the first twenty-five minutes of the

14  interview.

15         Finally, the extent to which the person was confronted with

16  evidence of guilt did not convert the interview into a custodial

17  interrogation.  While defendant was asked about some items found on

18  his social media and computer, the record clearly shows that there

19  was nothing oppressive, coercive, deceptive, or overbearing in the

20  agents' questioning.  See United States v. Bassignani, 575 F.3d 879,

21  884 (9th Cir. 2009).  Furthermore, defendant was asked about children

22  he had contact with after he made the incriminating statements

23  regarding child pornography that the government intends to introduce

24  at trial. Defendant's incriminating statements were not made under

25  the degree of restraint associated with formal arrest.  Therefore, no

26  Miranda advisement was required and defendant's motion as to his

27  February 5, 2015 statements should be denied.

28

IV.   CONCLUSION

For the reasons set forth above, the defendant's September 18, 2015 motion to suppress evidence should be denied.