HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
(E-mail: Hilary_Potashner@fd.org)
CUAUHTEMOC ORTEGA (Bar No. 257443)
Deputy Federal Public Defender
(E-mail: Cuauhtemoc_Ortega@fd.org)
ANDREA JACOBS (Bar No. 236892)
Deputy Federal Public Defender
(E-mail: Andrea_Jacobs@fd.org)
411 West Fourth Street, Suite 7110
Santa Ana, California  92701-4598
Telephone:  (714) 338-4500
Facsimile:  (714) 338-4520

Attorneys for Defendant
TODD CHRISTIAN HARTMAN

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TODD CHRISTIAN HARTMAN,<br><br>　　　　Defendant. | Case No. SA CR 15-63-JLS<br><br>**REPLY TO GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS EVIDENCE; DECLARATION OF VICTOR GOMEZ; DECLARATION OF PHILIP MAINOLFI; DECLARATION OF KURTIS PAUL KLOCKE** |

Defendant Todd Christian Hartman, through undersigned counsel, files his reply to the government's opposition to his motion to suppress evidence.

　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　HILARY POTASHNER
　　　　　　　　　　　　　　　　　Federal Public Defender

DATED: October 2, 2015　　　By　*/s/ Cuauhtemoc Ortega & Andrea Jacobs*
　　　　　　　　　　　　　　　　　CUAUHTÉMOC ORTEGA
　　　　　　　　　　　　　　　　　ANDREA JACOBS
　　　　　　　　　　　　　　　　　Deputy Federal Public Defenders

# REPLY

## I. INTRODUCTION

Defendant Todd Christian Hartman moves to suppress his statements to law enforcement on February 5, 2015, and all evidence obtained as a result of the statements, because the statements were procured in violation of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The government opposes the motion. (Government's Opposition to Defendant's Motion to Suppress Evidence ("Gov. Opp."), Docket No. 35). In its opposition, the government does not appear to contest that Mr. Hartman was interrogated, only that the interrogation was not custodial. Under *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008), Mr. Hartman's interrogation was custodial in nature and his statements, and all evidence stemming from them, must be suppressed.

## II. ARGUMENT

### A. Factual Disputes

The government filed two declarations from law enforcement officers with its opposition; these declarations contain factual assertions that differ in some important respects from Mr. Hartman's own recitation of the facts. Mr. Hartman will be better positioned to address the declarations of Detective David Syvock of the Newport Beach Police Department and Special Agent Kim Speakman of Department of Homeland Security after he has had an opportunity to cross examine them.

As they currently stand, some aspects of the declarations are troublesome. For example, Det. Syvock states that he saw Mr. Hartman exit his residence in shorts and a t-shirt, contrary to Mr. Hartman's assertion that he was in his underwear only. (Gov. Opp., Declaration of David Syvock ¶¶ 5-7). Det. Syvock also says he never physically restrained Mr. Hartman, and that he did not see any neighbors watching as Mr. Hartman was on the patio. (*Id.*). After receiving Det. Syvock's declaration, a defense investigator spoke to people in Mr. Hartman's community. (*See* Declaration of Victor

1

Gomez ("Gomez Decl."), attached herewith).  Two neighbors state that Mr. Hartman was removed from his home in nothing but his underwear.  (*See* Declaration of Philip Mainolfi and Declaration of Kurtis Paul Klocke ("Klocke Decl."), attached herewith).  The neighbors made these statements independently of each other.  (Gomez Decl. ¶ 3).  One of the neighbors remembers seeing that Mr. Hartman's hands were "either handcuffed or held behind his back as officers escorted him out of the . . . home."  (Klocke Decl. ¶ 3).[1]

The defense investigator also spoke to Theresa Bard, with the Orange County Sheriff's Department.  (Gomez Decl. ¶ 4).  Officer Bard was present for part of the search of Mr. Hartman's home.  (*Id.*).  She contradicts Det. Syvock's version of events, and bolsters Mr. Hartman's version.  She recalls seeing Mr. Hartman being walked out of his home and onto the outdoor deck wearing boxers or pajama pants, with no shirt.[2]  (*Id.*).

Equally troublesome is Det. Syvock's assertion that his gun "was concealed" during Mr. Hartman's interviews.  (Syvock Decl. ¶ 14).  This is patently contradicted by the photographs submitted by Mr. Hartman with his motion, which show not only that Det. Syvock's gun is plainly visible as Mr. Hartman stands next to him in the interview room, but that Det. Syvock has *his hand* on the gun in front of Mr. Hartman.  (Defendant's Motion to Suppress, Docket No. 26, Exhibit C (second photograph)).

Det. Syvock's rebutted assertions raise questions about his credibility generally.  The government derides Mr. Hartman's statements as "self-serving," but a law

---

[1] Mr. Hartman's hands were not handcuffed.  Mr. Hartman, though, presents the witness accounts as the witnesses recounted them.  The fact that the witness thought Mr. Hartman may have been handcuffed, however, reflects the level of restraint that was applied to Mr. Hartman's hands by law enforcement.

[2] The defense attempted to obtain a declaration from Officer Bard, as detailed in Gomez Decl. ¶ 4.  If it is received, the defense will file it.  Otherwise, the defense will subpoena Officer Bard to elicit her statements under oath and make her available to the government for cross examination.

2

enforcement witness is not without incentive to provide biased accounts--particularly when he stands accused of violating a defendant's constitutional rights.

**B.     Legal Disputes**

    **1.     *Craighead* not *Hernandez* Controls**

The governments cites to *United States v. Hernandez*, 476 F.3d 791 (9th Cir. 2007), and the factors set forth therein for determining if a defendant is in custody. (Gov. Opp. at 10-11). *Hernandez* dealt with the search of a vehicle at a port of entry to the United States by Customs and Border Protection. 476 F.3d at 794. The case relies on *United States v. Butler*, 249 F.3d 1094 (9th Cir. 2001), which also dealt with a vehicle search at a port of entry. A "border search" is much different than an in-home interrogation. "The home occupies a special place in the pantheon of constitutional rights." *Craighead*, 539 F.3d at 1073. For this reason, the Ninth Circuit set forth context-specific criteria in *Craighead* for *Miranda* challenges in the context of the home. *Id.* Because much of this motion involves applying law to facts, defendant submits that following the rubric set forth in *Craighead* more closely aligns with Ninth Circuit law.

The question under *Craighead* was whether defendant's home was turned into a "police-dominated atmosphere" during the execution of the search warrant. *Id.* at 1083. That is the question here, too. To make this determination, the Court considers:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

3

*Id.* at 1084. Each factor, for the reasons set forth in his previously filed motion, supports a finding that Mr. Hartman's home became a police dominated atmosphere, and that such atmosphere created a *de facto* custodial setting.

### 2. *Craighead* is Not Distinguishable, It Supports a Finding of Custody

The government attempts to distinguish *Craighead* factually but does not address each of the above factors in turn, and whether they created a "police-dominated atmosphere," *id.* at 1083, possibly because many of the factors present in this case go beyond the facts of *Craighead*. Mr. Hartman will avoid rehashing his legal arguments in reply. A few clarifications are warranted, however.

(a) The government states that the defendant in *Craighead* was taken into a "back storage *closet*." (Gov. Opp. at 13 (emphasis added)). This appears to be an exaggeration. Nothing in the *Craighead* opinion refers to a "closet," only a storage room. *Craighead*, 539 F.3d at 1078-79, 1086.

(b) The government claims that Mr. Hartman did not tell Detective Syvock that he wanted to leave. (Gov. Opp. at 13). Nothing in the *Craighead* decision indicates that Craighead expressed his desire to leave, or that such an assertion is necessary to a finding of custody. In fact, it seems odd that a defendant who believes he is in custody would ask the very officers holding him in custody for permission to leave. Custody means you cannot leave. Though "perhaps not everyone in [Mr. Hartman's position] would have felt restrained" under the same circumstances, that is not the test. *Craighead*, 539 F.3d at 1086. The test is whether it was "objectively reasonable" for Mr. Hartman to feel he "was under guard." *Id.* It was objectively reasonable for Mr. Hartman to feel he was "under guard" when his tiny apartment was overrun by up to fourteen law enforcement officers, both inside and outside of his home. A defense investigator measured the size of Mr. Hartman's apartment. It approximately measures

4

a paltry 612 square feet--the entirety of it can probably fit inside Courtroom 10A. (Gomez Decl. ¶ 2).

The fact that Det. Syvock told Mr. Hartman he was not under arrest and free to leave is insufficient if the "context" in which such statements were made dictated otherwise to defendant. *Craighead*, 539 F.3d at 1084. The *Craighead* court made a custody finding even though defendant was specifically told he would not be arrested, *no matter what he said*, and that he was free to leave. *Id.* at 1078.

The government states that unlike in *Craighead*, Mr. Hartman had a "clear method of egress" out of the interrogation room. (Govt. Opp. at 13). But there is no requirement that there be a physical impediment to exiting the interrogation site to a finding of custody. Here, there were up to twelve additional law enforcement officers on the other side of the interrogation room's door, both inside the apartment and outside keeping a perimeter. Those officers had earlier aimed a powerful gun at Mr. Hartman, and exposed him to the public in his underwear. It was certainly objectively reasonable if Mr. Hartman felt the crowd of officers waiting on the other side of the door presented as great of an impediment, or a greater impediment, to his leaving, than the *single* officer standing against the door in *Craighead*. Nearly half the number of officers participated in the search of Craighead's home (eight), than in the search of Mr. Hartman's home.[3] *Id.*

(c) The government claims that Det. Syvock used a "calm tone" and that his "questioning was not aggressive." (Gov. Opp. at 11). It is understandable that an officer would attempt to present professionally when he is surreptitiously producing a

---

[3] Defendant has requested to inspect and photograph the large gun Agent Speakman pointed at Mr. Hartman. The government has attempted to assist defendant with this effort, but the Department of Homeland Security has not yet approved the request. Mr. Hartman will subpoena Agent Speakman to bring the gun to the hearing if it is not made available for inspection and photographing prior to then.

5

video he knows will be reviewed by defense counsel, the Court and possibly a jury. Det. Syvock is experienced enough to know that his behavior will be scrutinized.

The Court, however, will see for itself when it reviews the video that Det. Syvock becomes confrontational at certain points of his interrogation. He accuses Mr. Hartman of being "an opportunist" child molester, of lacking self-control, and of being a liar. He reminds him of a past investigation against him. He tells Mr. Hartman that he is going to find people he knows and question them about their interactions with him. Concededly, some of these statements occur toward the end of the interview, after Det. Syvock has already succeeded in eliciting incriminating statements from Mr. Hartman. But they are nonetheless probative of Det. Syvock's demeanor around Mr. Hartman when the camera was not rolling.

Even if the Court finds that the detective's tone was "calm," *calmly* outlining for a defendant the breadth of the investigation against him--an investigation that the defendant reasonably might expect will imminently cost him his freedom--can be just as effective at getting a defendant to "succumb to police pressure to incriminate himself" as aggression. *Craighead*, 539 F.3d 1086.

(d) The government describes Mr. Hartman as not appearing "intimidated, distressed or anxious to terminate the interview" in the video; the government posits that Mr. Hartman was "relaxed." (Govt. Opp. at 11, 13). No one is in a position to judge how Mr. Hartman was feeling shortly after having a gun pointed at him, being taken out of his home nearly nude, and having his home overrun by law enforcement officers, other than himself. There is no uniform "standard" for measuring a person's mental state from their outward appearance. Mr. Hartman could have been "intimated, distressed," and "anxious" to terminate his interrogation, yet tried to remain stoic out of fear, embarrassment, or trauma. Agent Speakman in his declaration states that "suspects in child exploitation investigations have committed suicide when confronted by law enforcement." (Speakman Decl. ¶ 6). Mr. Hartman might not have been

suicidal when he was confronted by police, but based on Agent Speakman's declaration, and common sense, it follows that police raids in the home are traumatic events.  Even knowing that an invasive law enforcement encounter can in some instances provoke suicidal responses from individuals, officers here capitalized on Mr. Hartman's vulnerable mental state to extract a confession out of him.

(e) The government states that Mr. Hartman never asked that his mother be present during his interview.  (Govt. Opp. at 13).  There is no requirement that a defendant ask for the presence of another person to meet the isolation requirement of *Craighead*.  A defendant could have an objectively reasonable belief that persons not involved with the investigation are not allowed to be present in a closed-door interview. The "crucial factor" at issue here is "isolation from the outside world." *Craighead*, 539 F.3d at 1086; *see also id.* at 1087 ("[T]he law enforcement technique of isolating the suspect from family and friends is one of the distinguishing features of a custodial interrogation." ).  Any person would have felt isolated from the outside world in a closed-door interview with two officers, and with up to twelve additional law enforcement officers saturating the home and keeping a perimeter.

### III.  CONCLUSION

There was no reason to not give Mr. Hartman *Miranda* admonishments, other than the fact that law enforcement in this case became intent on causing Mr. Hartman to incriminate himself.  Officers in this case viewed *Miranda* as an obstacle to be skirted, rather than as a sacrosanct right of the people.

//
//
//
//
//
//

7

For the foregoing reasons, Mr. Hartman respectfully requests that the Court suppress any and all statements that he made to law enforcement officers on February 5, 2015, and all evidence that was obtained as a result of those statements.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED: October 2, 2015          By  */s/ Cuauhtemoc Ortega & Andrea Jacobs*
CUAUHTÉMOC ORTEGA
ANDREA JACOBS
Deputy Federal Public Defenders