# EXHIBIT A

U.S. v. Todd Christian Hartman

SA CR 15-00063-JLS

*[Summation Brief Re Motion to Compel Discovery]*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE JOSEPHINE L. STATON, JUDGE PRESIDING

UNITED STATES OF AMERICA,        )
                                 )
          PLAINTIFF,             )
                                 )
     vs.                         ) SACR NO. 15-00063-JLS
                                 ) VOLUME I
TODD CHRISTIAN HARTMAN,          )
                                 )
          DEFENDANT.             )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, OCTOBER 27, 2015

9:03 A.M.

DEBORAH D. PARKER, CSR 10342
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
411 WEST FOURTH STREET
SUITE 1-053
SANTA ANA, CALIFORNIA 92701
(657) 229-4305
transcripts@ddparker.com

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

        ANDRE BIROTTE, JR.
        UNITED STATES ATTORNEY

        DENNISE D. WILLETT
        ASSISTANT UNITED STATES ATTORNEY
        CHIEF, CRIMINAL DIVISION

        ANNE C. GANNON
        SANDY N. LEAL
        ASSISTANT UNITED STATES ATTORNEYS
        UNITED STATES DISTRICT COURT
        8000 RONALD REAGAN FEDERAL BUILDING
        SANTA ANA, CALIFORNIA 92701
        (714) 338-3500

    FOR THE DEFENDANT, TODD CHRISTIAN HARTMAN:

        SEAN K. KENNEDY
        FEDERAL PUBLIC DEFENDER

        ANDREA L. JACOBS
        CUAUHTEMOC ORTEGA
        DEPUTY FEDERAL PUBLIC DEFENDERS
        411 WEST FOURTH STREET
        SUITE 7110
        SANTA ANA, CALIFORNIA 92701
        (714) 338-3400

    FOR THE L.A. COUNTY SHERIFF'S DEPARTMENT:

        RINA M. MATHEVOSIAN
        LAW OFFICES OF NELSON & FULTON
        EQUITABLE PLAZA
        3435 WILSHIRE BOULEVARD
        SUITE 2800
        LOS ANGELES, CALIFORNIA 90010
        (213) 365-2703

```
                        I N D E X


DEFENDANT'S WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

  TAMI LOEHRS                       10       36         55
```

4

| | | |
|---|---|---|
| | 1 | **SANTA ANA, CALIFORNIA; TUESDAY, OCTOBER 27, 2015; 9:03 A.M.** |
| | 2 | THE CLERK:  Calling Calendar Item No. 1, |
| | 3 | SACR 15-00063(A)-JLS, United States of America versus Todd |
| | 4 | Christian Hartman. |
| 09:03:20 | 5 | Counsel. |
| | 6 | MS. GANNON:  Good morning, Your Honor. |
| | 7 | Anne Gannon, on behalf of the United States. |
| | 8 | MS. LEAL:  Sandy Leal, on behalf of the United |
| | 9 | States. |
| 09:03:35 | 10 | THE COURT:  Good morning. |
| | 11 | MR. ORTEGA:  Good morning, Your Honor. |
| | 12 | Cuauhtemoc Ortega and Andrea Jacobs, on behalf of |
| | 13 | Mr. Hartman. |
| | 14 | THE COURT:  Good morning. |
| 09:03:37 | 15 | MR. ORTEGA:  Your Honor, we would request that |
| | 16 | Mr. Hartman's hands be unshackled so he can take notes. |
| | 17 | THE COURT:  And have you addressed that with the |
| | 18 | marshals? |
| | 19 | MR. ORTEGA:  I did ask and they did ask me to ask |
| 09:03:48 | 20 | the Court. |
| | 21 | THE MARSHAL:  Your Honor, we would like to be on |
| | 22 | the record if the Court prefers, that's fine.  We just want |
| | 23 | it on the record. |
| | 24 | THE COURT:  Oh, that's fine.  Then, if there is no |
| 09:03:57 | 25 | specific concern that the marshal has specific to this |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

5

| | | |
|---|---|---|
| 09:04:03 | 1 | individual, than that's fine. |
| | 2 | The Court will order that he be unshackled. |
| | 3 | MR. ORTEGA:  Thank you, Your Honor. |
| | 4 | MS. MATHEVOSIAN:  Good morning, Your Honor. |
| 09:04:13 | 5 | Rina Mathevosian for the L.A. County Sheriff's |
| | 6 | Department. |
| | 7 | I'm here on a motion to quash. |
| | 8 | THE COURT:  Oh, good morning. |
| | 9 | And I think I left that material back in my |
| 09:04:22 | 10 | chambers.  It should be right on my desk where all this was. |
| | 11 | *(Pause.)* |
| | 12 | THE COURT:  All right.  So to begin with, let's |
| | 13 | address the motion to quash -- I guess, the objection and |
| | 14 | application to quash defendant's subpoena *duces tecum* for |
| 09:05:30 | 15 | personnel records of David Syvock. |
| | 16 | So that is the motion made by the sheriff's |
| | 17 | department, correct? |
| | 18 | MS. MATHEVOSIAN:  Yes, Your Honor.  Thank you. |
| | 19 | Your Honor, the subpoena decuss tecum is overly broad.  It's |
| 09:05:46 | 20 | a subpoena requesting all documents regarding any instances |
| | 21 | of misconduct or dishonesty for the records of |
| | 22 | Deputy Syvock. |
| | 23 | There is no showing that any of these records are |
| | 24 | relevant.  For example, this could include records of |
| 09:06:04 | 25 | discourtesy or excessive force, and there's no showing that |

09:06:09   1   it's relevant to any of the facts in this case.

2          If the court is inclined to order disclosure of

3   any records, we would ask for an in-camera hearing, and we

4   would also ask for a protective order to be issued.

09:06:26   5          THE COURT:  All right.  Well, I think by limiting

6   it to instances of misconduct or acts of dishonesty, that's

7   as narrow as they can be without leaving something out.

8   It's hard to know without seeing the records specifically

9   how to specify that.  Presumably, what you did was look in

09:06:44  10   his personnel file, correct, in terms of all documents,

11   et cetera?

12          MS. MATHEVOSIAN:  Yes, Your Honor.

13          We did look in his personnel file.  However, this

14   deputy is no longer with the L.A. County Sheriff's

09:06:53  15   Department and any records that may exist are more than --

16   are 10 years old, and I'm not sure if the custodian of

17   records actually has the entire complaint.

18          THE COURT:  You brought with you, though, what you

19   did have, right?

09:07:10  20          MS. MATHEVOSIAN:  The custodian of records is

21   bringing with her what she does have.  She's supposed to be

22   arriving shortly.

23          THE COURT:  All right.  So there was a search made

24   and whatever she has is going to be produced today?

09:07:24  25          MS. MATHEVOSIAN:  That's correct.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:07:24  1          THE COURT:  And you're just saying it may be

2    incomplete because some of the records may have been

3    destroyed.

4          MS. MATHEVOSIAN:  That's correct, Your Honor.

09:07:32  5    However, I would ask that the court conduct an in-camera

6    hearing to determine whether the records that we do have are

7    relevant to this case.  I have no personal knowledge of this

8    case, so I'm not sure what's relevant and what's not.  I

9    think that the Court is in the position to conduct an

09:07:49 10    in-camera hearing to determine any relevancy.

11          THE COURT:  That would be correct.  So when that

12    person arrives -- is the subject of the subpoena, will he be

13    testifying today?

14          MS. GANNON:  Yes, Your Honor.  Also, at this time,

09:08:07 15    the Government would like to invoke the witness rule.  I see

16    actually multiple defense witnesses in the courtroom, I

17    believe.

18          THE COURT:  All right.  Anyone who is anticipated

19    to be a witness or who is here as a witness should remain

09:08:20 20    outside the courtroom until you're called in.  That's true

21    on either side:  The defense side or the prosecution side.

22    And it is the duty of the attorneys on both sides to monitor

23    the courtroom and make sure that no one does come in.

24          Yes, Mr. Ortega?

09:08:39 25          MR. ORTEGA:  Your Honor, we do have our

8

09:08:41 1   investigator here, who I understand is not going to be

2   cross-examined.

3         May he stay in the --

4         THE COURT:  He's not going to be either

09:08:47 5   cross-examined or examined directly?

6         MR. ORTEGA:  He's not going to be examined

7   directly, and I understood that he's not going to be

8   cross-examined.  But if anything has changed, we'll ask him

9   to step out.

09:09:00 10         THE COURT:  All right.  So did you anticipate

11   cross-examining him?

12         MS. GANNON:  Not at this time, Your Honor.

13         There is one issue that may become relevant.  The

14   Government proposes that, perhaps, during the testimony of

09:09:16 15   Theresa Bard he be asked to step out of the courtroom.

16         THE COURT:  All right.  We'll limit it that way.

17   Just remind both the Court and defense counsel at that time

18   so that we can address it.

19         All right.  Then, when -- when do you anticipate

09:09:38 20   having -- is it Detective or Officer Syvock testify?

21         MS. GANNON:  Your Honor, that is during the motion

22   to suppress.  The Government was going to propose to the

23   Court, just as a suggestion, that the motion to compel be

24   heard first, because it's my understanding the defense's

09:10:02 25   expert is here and as these things go, I believe she's being

9

| 09:10:08 | 1 | paid a substantial hourly rate. |
| | 2 | THE COURT: Right. We do, usually, do take those |
| | 3 | facts into consideration in addition. Because we don't have |
| | 4 | any documents to review from the L.A. Sheriff's Department |
| 09:10:18 | 5 | yet, it would be appropriate to wait on the motion to |
| | 6 | suppress. |
| | 7 | So let's begin with the motion to compel |
| | 8 | discovery. Is there any -- is there any testimony or |
| | 9 | evidentiary hearing that's necessary on the motion to |
| 09:10:35 | 10 | exclude the expert testimony of David McCain, or is that |
| | 11 | simply -- |
| | 12 | I'm trying to remember now whether we just left |
| | 13 | that on calendar because all the papers hadn't been filed, |
| | 14 | or what that was. |
| 09:10:49 | 15 | MS. GANNON: That's correct, Your Honor. The |
| | 16 | Government submits on its papers. |
| | 17 | THE COURT: All right. Okay. So we're only |
| | 18 | having testimony on the other two motions, correct? |
| | 19 | All right. Then, let's begin with the motion to |
| 09:10:58 | 20 | compel discovery. |
| | 21 | And it is defendant's motion. |
| | 22 | MR. ORTEGA: Your Honor, at this time, we're not |
| | 23 | going to elicit further direct examination. |
| | 24 | We're submitting her affidavit, so I'll get |
| 09:11:11 | 25 | Ms. Loehrs to take the stand. |

10

| | |
|---|---|
| 09:11:13 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:12:08 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:12:32 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 09:12:36 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 09:12:50 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 09:13:01 | 25 |

1          (Pause.)

2               THE CLERK:  You can stop right there.

3               Raise your right hand.

4          TAMI LOEHRS, DEFENDANT'S WITNESS, SWORN

5               THE WITNESS:  Yes, I do.

6               THE CLERK:  Step over.  Step on to the back.

7          If you can, please, state your full name, spelling

8     your last for the record.

9               THE WITNESS:  Tami Loehrs, L-O-E-H-R-S.

10              THE CLERK:  Thank you.

11              THE COURT:  And when you're ready, you may

12    inquire.

13              MS. GANNON:  Thank you, Your Honor.

14                    CROSS-EXAMINATION

15    BY MS. GANNON:

16    Q    Ms. Loehrs, did you prepare an affidavit in this case,

17    United States versus Todd Christian Hartman?

18    A    Yes.

19    Q    And the subject matter of your affidavit was some

20    opinions regarding the computer evidence in this case; is

21    that correct?

22    A    Correct.

23    Q    Did you personally go to Long Beach, California and

24    examine the digital data in this case?

25    A    No.

11

| | | |
|---|---|---|
| 09:13:01 | 1 | Q    Who did that examination, if you know? |
| | 2 | A    My associate, Michele Bush. |
| | 3 | Q    And does she work for your company? |
| | 4 | A    Yes. |
| 09:13:12 | 5 | Q    And is that -- Lor -- I'm sorry.  Is it Loehrs? |
| | 6 | A    Loehrs. |
| | 7 | Q    Loehrs & Associates? |
| | 8 | A    Yes. |
| | 9 | Q    And do you have a copy of her CV here with you? |
| 09:13:25 | 10 | A    It's on our website.  I don't have it printed, but it's |
| | 11 | on our website. |
| | 12 | Q    So -- but you didn't bring that with you today? |
| | 13 | A    No.  Again, I can pull it up from our website, but I |
| | 14 | didn't bring it in paper form. |
| 09:13:38 | 15 | Q    So our opinions in your affidavit are based on the exam |
| | 16 | that she conducted? |
| | 17 | A    No. |
| | 18 | Q    So you didn't rely on any of the data that she obtained |
| | 19 | in her review in Long Beach? |
| 09:13:49 | 20 | A    Well, she went to Long Beach to collect the data that |
| | 21 | was then brought back to the lab that I analyzed. |
| | 22 | Q    Did she generate any reports as a result of her |
| | 23 | examination? |
| | 24 | A    No. |
| 09:14:01 | 25 | Q    Did you generate any reports as a result of your |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

12

| | | |
|---|---|---|
| 09:14:04 | 1 | examination? |
| | 2 | A    No. |
| | 3 | Q    Your data review? |
| | 4 | A    No. |
| 09:14:08 | 5 | Q    Now, in your declaration, you cited two cases and |
| | 6 | indicated there were other cases that are brought to light |
| | 7 | when you characterized "as serious concerns with regard to |
| | 8 | CPS software." |
| | 9 | Isn't that true? |
| 09:14:26 | 10 | A    Yes. |
| | 11 | Q    And CPS is the Child Protection System? |
| | 12 | A    Yes. |
| | 13 | Q    And your concerns were that the software was going |
| | 14 | beyond what was, quote, publicly available information; |
| 09:14:41 | 15 | isn't that correct? |
| | 16 | A    That's my thought, yes. |
| | 17 | Q    And how many cases have you been involved in where you |
| | 18 | have raised the reliability of the software, not just CPS, |
| | 19 | but all types of software used by law enforcement in |
| 09:14:56 | 20 | peer-to-peer investigations? |
| | 21 | A    There's been a lot.  I don't have a specific number. |
| | 22 | But there's been many I've had concerns with the software. |
| | 23 | Q    And you've submitted declarations in numerous cases |
| | 24 | regarding this issue? |
| 09:15:09 | 25 | A    Correct. |

13

| | | |
|---|---|---|
| 09:15:16 | 1 | Q    Now, you cited a case, the *Crow* case; is that correct? |
| | 2 | A    Correct. |
| | 3 | Q    And -- now, you didn't say where that case was from, |
| | 4 | but isn't it true that that case is from the District of |
| 09:15:28 | 5 | New Mexico? |
| | 6 | A    Yes. |
| | 7 | Q    And isn't it true that you conducted a computer |
| | 8 | forensic exam as part of that case? |
| | 9 | A    I did a preliminary exam. |
| 09:15:42 | 10 | Q    So you conducted a preliminary exam of the seized |
| | 11 | evidence in that case? |
| | 12 | A    Correct. |
| | 13 | Q    And you were not able to locate the actual child |
| | 14 | pornography images that were at issue in that case on the |
| 09:15:57 | 15 | defendant's computer. |
| | 16 | Isn't that true? |
| | 17 | A    I believe so. |
| | 18 | Q    Now, that's not the case in this particular |
| | 19 | prosecution, is it? |
| 09:16:06 | 20 | A    That's correct. |
| | 21 | Q    So the content of all six of the downloaded files were |
| | 22 | on Defendant Hartman's computer. |
| | 23 | Isn't that true? |
| | 24 | A    That's correct. |
| 09:16:15 | 25 | Q    Now, you also cited the -- I believe it's the *O'Casio* |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:16:19   1   case?

  2   A    Yes.

  3   Q    And once again you didn't note in your affidavit where

  4   that case occurred, did you?

09:16:27   5   A    No.

  6   Q    But, in fact, it occurred in the Western District of

  7   Texas, didn't it?

  8   A    That's correct.

  9   Q    Isn't it true that the child pornography case images

09:16:38 10   that were downloaded and the subject of that case were also

11   not found on the defendant's computer.

12          Isn't that true?

13   A    I believe that's true.

14   Q    Now, would you agree that there is a fundamental

09:16:49 15   difference between the Hartman case here and both of those

16   cases because the images weren't found on the defendant's

17   computer?

18   A    No, I actually think this case is very similar to *Crow*.

19   Q    But you just testified that the images in *Crow* were not

09:17:04 20   found on the defendant's computer.

21          Isn't that true?

22   A    The images were not found.  That's correct.

23   Q    Now, did you have the opportunity to review the

24   software as a result of those cases?

09:17:17 25   A    The court ordered that --

09:17:19  1    Q    I'm asking you a "yes" or "no" question.  Did you

      2    review the software in those cases?

      3    A    Well, it's kind of a -- a maybe, because I tried, but I

      4    wasn't actually provided with the software, so I don't know

09:17:30  5    how to answer that.

      6    Q    So you did not actually review, personally, the

      7    software in those cases?

      8    A    I personally saw the CPS software in the *Crow* matter.

      9    Q    On a disk, or --

09:17:47 10    A    Through --

     11    Q    -- were you given a copy of it?

     12    A    Through a video camera at HSI in Tucson.

     13    Q    So you were allowed to observe the operations of the

     14    CPS software?

09:17:58 15    A    No, I got to see a -- I got to see the software pulled

     16    up.  They never did anything with it.

     17    Q    Now, in your affidavit, you stated that those cases

     18    settled.

     19              Isn't that true?

09:18:11 20    A    That's correct.

     21    Q    In fact, those two defendants pleaded guilty, didn't

     22    they?

     23    A    I'm not involved in that process.  I honestly don't

     24    know.

09:18:18 25    Q    So what did you mean by "settled"?

16

| | | |
|---|---|---|
| 09:18:21 | 1 | A    The attorney called me and says *The case has settled.* |
| | 2 | *You're done*, so we closed it. |
| | 3 | Q    And, typically -- |
| | 4 | MS. GANNON:   Your Honor, I'll withdraw the |
| 09:18:28 | 5 | question. |
| | 6 | BY MS. GANNON: |
| | 7 | Q    So, in fact, there's never been a finding by a court |
| | 8 | that it had, quote, serious concerns about the software? |
| | 9 | A    I'm unaware of any. |
| 09:18:42 | 10 | Q    So that's your opinion, correct? |
| | 11 | A    No.   I'm unaware of any opinions by the court that they |
| | 12 | have issues with the software. |
| | 13 | Q    But it's your opinion that there are serious concerns |
| | 14 | with the software? |
| 09:18:55 | 15 | A    I don't think it's just my opinion.  I think that it's |
| | 16 | based on testing, analysis, research, so I don't think it's |
| | 17 | just an opinion. |
| | 18 | Q    But you haven't, personally, conducted any testing, |
| | 19 | have you? |
| 09:19:07 | 20 | A    Of law enforcement software? |
| | 21 | Q    Correct. |
| | 22 | A    No, I have not been provided any. |
| | 23 | Q    Rather, it was just in these two of numerous cases |
| | 24 | where the child pornography was not ultimately found on the |
| 09:19:20 | 25 | defendant's computer that the court was willing to let you |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

| | | |
|---|---|---|
| 09:19:23 | 1 | examine the software. |
| | 2 | Isn't that true? |
| | 3 | A    That is correct. |
| | 4 | Q    Is there any peer review research supporting your view |
| 09:19:33 | 5 | that there are serious concerns? |
| | 6 | A    I believe there is. |
| | 7 | Q    Did you cite that in your affidavit? |
| | 8 | A    No, I have not. |
| | 9 | Q    Did you bring copies of that research with you here |
| 09:19:46 | 10 | today? |
| | 11 | A    No.  The last time I tried to submit that it was |
| | 12 | rejected by the Court, so I still have the affidavits from |
| | 13 | peer review. |
| | 14 | Q    Was that before this judge? |
| 09:19:56 | 15 | A    No.  That was for the other case. |
| | 16 | Q    It was not even in this district? |
| | 17 | A    No. |
| | 18 | Q    In fact, it was not in the circuit? |
| | 19 | A    I don't know which courts are in the circuit. |
| 09:20:07 | 20 | Q    Fair enough.  To your knowledge, has a court ever |
| | 21 | granted a suppression motion based on these, quote, serious |
| | 22 | concerns that you have? |
| | 23 | A    I have no idea. |
| | 24 | Q    But to your knowledge, that's never occurred? |
| 09:20:24 | 25 | A    Again, that's a part I'm not involved in.  That's the |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:20:27  1  legal aspect.  I don't know who has filed suppression

2  motions and won.  That would be the attorneys.

3  Q    But the fact remains that you have never been given a

4  copy of the law enforcement software in these peer-to-peer

09:20:42  5  investigations?

6  A    That is correct.

7  Q    Now, how many investigations have you conducted that

8  involved peer-to-peer investigations where law enforcement

9  used a downloading software known as ShareazaLE?

09:20:59  10  A    I have no idea.  I've been involved in hundreds of

11  cases with peer-to-peer.  I don't know how many involved

12  ShareazaLE.  Numerous.

13  Q    Now, in those cases, do you know of any situation where

14  the evidence suggested the government's use of that

09:21:22  15  software, ShareazaLE, to download files went beyond publicly

16  available data?

17  A    I'm sorry.  Can you repeat that?

18  Q    Do you know of any cases where the evidence proved

19  ShareazaLE went beyond publicly available data?

09:21:44  20  A    Approved, no.

21  Q    But this is a theory that you have?

22  A    Again, it's through testing and analysis.  Yes, it's a

23  hypothesis.

24  Q    But you haven't actually tested the software.

09:21:54  25       Isn't that true?

19

09:21:56  1   A    I've been asking.  That's correct.  It has not been

2   provided.

3   Q    Now, to your knowledge, has any other computer forensic

4   exam or non-law enforcement computer examiner ever been

09:22:12  5   allowed to access software such as Peer Spectre, PCS and

6   ShareazaLE?

7   A    I believe I'm actually working with the attorney in the

8   *Buziak* matter, and I believe his expert was given with the

9   software, but I believe they lost it before it was given to

09:22:28  10  him.  So I don't know that he was ever actually able to look

11  at it.

12  Q    Now, your aware that ShareazaLE has, in fact, been

13  beta-tested.

14            Isn't that true?

09:22:40  15  A    I heard testimony about some, quote, beta testing, but

16  I disagree with the testing.

17  Q    But you weren't present for the testing, correct?

18  A    I was present for the testimony describing the testing.

19  Q    Now, in your declaration, you stated that four of the

09:22:57  20  files that were downloaded in this case during the

21  undercover investigation were not included in a list of what

22  you refer to as, quote, publicly available, end quote,

23  files.

24            Isn't that true?

09:23:08  25  A    Correct.

20

| | | |
|---|---|---|
| 09:23:09 | 1 | Q    And the remaining two files were found to be, quote, |
| | 2 | publicly available but not -- had not been shared since May |
| | 3 | of 2014. |
| | 4 | Isn't that true? |
| 09:23:19 | 5 | A    Correct. |
| | 6 | Q    Now, was this -- in your affidavit -- maybe I missed |
| | 7 | it -- did you state where you found within the computer data |
| | 8 | this publicly available list? |
| | 9 | A    No. |
| 09:23:35 | 10 | Q    This list data that you referenced, is it from a file |
| | 11 | known as known.met? |
| | 12 | A    Yes. |
| | 13 | Q    And that's dot M-E-T for the court reporter? |
| | 14 | A    Correct. |
| 09:23:49 | 15 | Q    Now, this data reflects the status and contents of the |
| | 16 | computer as of the day it was seized. |
| | 17 | Isn't that true? |
| | 18 | A    Correct. |
| | 19 | Q    And not the day the downloads occurred? |
| 09:24:01 | 20 | A    Correct. |
| | 21 | Q    So it's possible that the data changed from the date |
| | 22 | that the downloads occurred to the date that the computer |
| | 23 | was seized? |
| | 24 | A    Not with respect to that file. |
| 09:24:16 | 25 | Q    But some of the other data on the computer could have |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

| | | |
|---|---|---|
| 09:24:19 | 1 | changed? |
| | 2 | A    Well, sure, data can change. |
| | 3 | Q    Now -- so in your declaration you were referring to the |
| | 4 | emuleknown.met files. |
| 09:24:30 | 5 | Isn't that true? |
| | 6 | A    Correct. |
| | 7 | Q    In fact, weren't there actually two programs that had |
| | 8 | been installed on the defendant's computer:  EMule and a |
| | 9 | variation known as aMule? |
| 09:24:41 | 10 | A    It's actually the same.  But, yes, I saw both of them. |
| | 11 | Q    So it's your testimony here today that eMule and aMule |
| | 12 | are the same software? |
| | 13 | A    Yes. |
| | 14 | Q    Isn't it true that they're actually variations of a |
| 09:24:55 | 15 | peer-to-peer software? |
| | 16 | A    Again -- it's, essentially, the same software.  It has |
| | 17 | similar system files.  It's the same name.  It's like |
| | 18 | LimeWire and FrostWire.  They're, essentially, the same.  Do |
| | 19 | they have variations?  Of course.  Just like eMule has |
| 09:25:13 | 20 | different variations of its own, so. |
| | 21 | Q    Right.  But the computer distinguishes.  They have some |
| | 22 | files under a eMule folder structure and they have different |
| | 23 | files under an aMule file structure. |
| | 24 | Isn't that true? |
| 09:25:27 | 25 | A    Correct.  I'm familiar. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

22

| | | |
|---|---|---|
| 09:25:28 | 1 | Q    And, in fact, this publicly available list that you're |
| | 2 | referring to was part of the aMule file structure? |
| | 3 | A    I am not sure.  I would have to look at the forensics. |
| | 4 | Q    So you didn't state in your affidavit that there were |
| 09:25:45 | 5 | these two different variations of the software, did you? |
| | 6 | A    No. |
| | 7 | Q    So you just used eMule as shorthand? |
| | 8 | A    No, I don't think I stated any of my forensic findings |
| | 9 | in my affidavit. |
| 09:25:59 | 10 | Q    So these weren't findings that you submitted to the |
| | 11 | Court? |
| | 12 | A    They are forensic findings, but I didn't provide the |
| | 13 | details of those forensic findings in the affidavit. |
| | 14 | Q    And why didn't you do that? |
| 09:26:09 | 15 | A    Because I usually do that through a report.  I didn't |
| | 16 | think it was necessary to put all my forensic findings in |
| | 17 | the affidavit. |
| | 18 | Q    So you didn't think it was important for this judge to |
| | 19 | have all of the information that could be relevant to her |
| 09:26:20 | 20 | determination whether there was a serious concern about how |
| | 21 | the software operated in this case? |
| | 22 | A    Yes.  And, again, my opinions are based on the |
| | 23 | forensics.  If I put all my forensics in there, the |
| | 24 | affidavit could be 100 pages long. |
| 09:26:34 | 25 | Q    Really, wasn't it a fundamental difference of one |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

| | |
|---|---|
| 09:26:36 | 1 |

letter to be clear to use "aMule" instead of "eMule"?

2  A    No, because now you're getting into my findings, and we

3  haven't discussed what my findings are.

4           I was aware of aMule and eMule.  I was aware of

09:26:49  5  the system files.  I just don't have all those details in my

6  affidavit.

7  Q    Now, in your --

8           THE COURT:  One moment.  Begin the question again,

9  please.

09:27:00  10  BY MS. GANNON:

11  Q    In your experience, isn't it common for individuals who

12  view child pornography to use more than one -- excuse me --

13  type or variation of file sharing program?

14  A    Sure.

09:27:16  15  Q    For example, you reference "LimeWire."  That's one

16  version of peer-to-peer software.

17           Isn't that true?

18  A    Yes.

19  Q    And isn't it also common for these individuals who view

09:27:29  20  child pornography to delete images and/or software multiple

21  times?

22  A    Sure.

23  Q    And in your involvement with these cases, have you

24  reviewed reports containing interviews with individuals who

09:27:45  25  view child pornography?

24

| | | |
|---|---|---|
| 09:27:46 | 1 | A    Yes. |
| | 2 | Q    And sometimes don't they admit that they delete and |
| | 3 | reinstall software, because they feel guilty about viewing |
| | 4 | child pornography? |
| 09:27:55 | 5 | A    Yes. |
| | 6 | Q    And they're concerned that they might be caught or |
| | 7 | discovered? |
| | 8 | A    Yes. |
| | 9 | Q    And this multiple installation and deletion of |
| 09:28:05 | 10 | programs, that can sometimes lead to somewhat more complex |
| | 11 | computer forensics. |
| | 12 |         Isn't that true? |
| | 13 | A    That's correct. |
| | 14 | Q    And such is the problem, I guess, we're having here |
| 09:28:15 | 15 | with distinguishing between eMule and aMule; isn't that |
| | 16 | correct? |
| | 17 | A    I'm not having a problem distinguishing between the |
| | 18 | two.  That was you that put that out there.  I understand |
| | 19 | the difference between aMule and eMule, and I saw both on |
| 09:28:28 | 20 | the computer. |
| | 21 | Q    Then why didn't you clarify that in your affidavit? |
| | 22 | A    I didn't put anything about eMule in my affidavit. |
| | 23 | Q    Do you have the affidavit with you? |
| | 24 | A    Not in front of me, no. |
| 09:28:47 | 25 | Q    Would it refresh your recollection to look at your |

25

|  |  |  |
|---|---|---|
| 09:28:49 | 1 | affidavit? |
|  | 2 | A    Yes. |
|  | 3 |        MS. GANNON:  Your Honor, may I approach the |
|  | 4 | witness? |
| 09:29:07 | 5 |        THE COURT:  Yes, you may. |
|  | 6 |        MS. GANNON:  Your Honor, I'm handing the witness |
|  | 7 | the affidavit. |
|  | 8 |      (Pause.) |
|  | 9 | BY MS. GANNON: |
| 09:29:26 | 10 | Q    If you could, please, review paragraph 14. |
|  | 11 | A    Correct. |
|  | 12 | Q    Do you see reference there to "eMule"? |
|  | 13 | A    Yes. |
|  | 14 | Q    And so, in fact, your affidavit did reference eMule? |
| 09:29:35 | 15 | A    Let me clarify that. |
|  | 16 | Q    Yes or no.  Did your affidavit reference eMule? |
|  | 17 | A    Yes. |
|  | 18 | Q    Now, you've made claims in other criminal prosecutions |
|  | 19 | that law enforcement software accessed nonpublicly available |
| 09:29:54 | 20 | files. |
|  | 21 |        Isn't that true? |
|  | 22 | A    Correct. |
|  | 23 | Q    And several courts have disagreed with your opinion on |
|  | 24 | this subject. |
| 09:30:00 | 25 |        Isn't that true? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

26

| | | |
|---|---|---|
| 09:30:01 | 1 | A     Yes. |
| | 2 | Q     And that was in some cases because the Courts found |
| | 3 | that you didn't consider all the facts. |
| | 4 |           Isn't that true? |
| 09:30:11 | 5 | A     I'm not sure what the basis of their opinion was |
| | 6 | entirely. |
| | 7 | Q     So, specifically, are you familiar with the *Robson* |
| | 8 | case? |
| | 9 | A     Yes. |
| 09:30:21 | 10 | Q     And isn't it true that the court there expressed |
| | 11 | concerns about your opinion, because you didn't take into |
| | 12 | account that the child pornography was on the roommate's |
| | 13 | computer that shared the router with the defendant? |
| | 14 | A     Yes. |
| 09:30:35 | 15 | Q     And are you familiar with the *Moran* case? |
| | 16 | A     Yes. |
| | 17 | Q     And isn't it true that the Court there was concerned |
| | 18 | that you didn't consider the incomplete files would show as |
| | 19 | available for sharing in that case? |
| 09:30:50 | 20 | A     I'm actually the one that said they do show as |
| | 21 | available for sharing. |
| | 22 | Q     Now, are you familiar with a company currently known as |
| | 23 | Child Rescue Coalition? |
| | 24 | A     No. |
| 09:31:03 | 25 | Q     Are you familiar with a company known as "TRO"? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

| | | |
|---|---|---|
| 09:31:06 | 1 | A    I've heard of it.  I'm not familiar with it. |
| | 2 | Q    Are you aware that TLO is the company that developed |
| | 3 | CPS -- Child Protection Systems -- and Peer Spectre? |
| | 4 | A    No, I believe TLO -- and then, again, this is based on |
| 09:31:25 | 5 | testimony I personally heard that TLO is a company that |
| | 6 | houses servers that hold the software.  And Peer Spectre, I |
| | 7 | believe, was actually written by William Wiltse, and I think |
| | 8 | there's a lot of people involved in creating that software, |
| | 9 | so I don't think TLO is solely responsible for creating that |
| 09:31:47 | 10 | software. |
| | 11 | Q    Is it your understanding that Peer Spectre is part of |
| | 12 | the CPO suite of tools? |
| | 13 | A    Yes. |
| | 14 | Q    And that these two systems automate the process of |
| 09:31:59 | 15 | sending out queries of files on peer-to-peer networks? |
| | 16 | A    Correct. |
| | 17 | Q    And, specifically, they're looking for terms known to |
| | 18 | be associated with child pornography? |
| | 19 | A    I believe that's one aspect. |
| 09:32:15 | 20 | Q    And another part of this tool is that it uses geo |
| | 21 | location technology once it identified a suspect file? |
| | 22 | A    Correct. |
| | 23 | Q    And it does that to narrow search results to specific |
| | 24 | geographic areas of interest? |
| 09:32:35 | 25 | A    Correct. |

28

| | | |
|---|---|---|
| 09:32:36 | 1 | Q    And geo locating an IP or Internet protocol address |
| | 2 | that's publicly available technology. |
| | 3 |        Isn't that true? |
| | 4 | A    Yes. |
| 09:32:43 | 5 | Q    So anyone can go on the Internet and enter an IP |
| | 6 | address and obtain at least some general information about |
| | 7 | where that IP address is currently assigned to? |
| | 8 | A    Correct. |
| | 9 | Q    And that tool, are you familiar, also identifies which |
| 09:33:03 | 10 | peer-to-peer users have the most files with names or hash |
| | 11 | values indicative of child phonography available for |
| | 12 | sharing? |
| | 13 | A    I was not aware of that. |
| | 14 | Q    Now, in your affidavit you also reference something |
| 09:33:14 | 15 | known as "Peer Block"? |
| | 16 | A    Correct. |
| | 17 | Q    And you stated that it relies on Internet protocol or |
| | 18 | IP addresses manually entered or what's known as black lists |
| | 19 | that are available on-line. |
| 09:33:34 | 20 |        Isn't that true? |
| | 21 | A    Correct. |
| | 22 | Q    And is an IP address a specific value that's assigned |
| | 23 | to individual routers that access the Internet? |
| | 24 | A    That's -- it's an address for a router.  That's one way |
| 09:33:52 | 25 | of using an IP address. |

29

| | | |
|---|---|---|
| 09:33:54 | 1 | Q    And you stated in your affidavit that a review of the |
| | 2 | system files for this application revealed that the user had |
| | 3 | enabled this program to block certain IP addresses. |
| | 4 |      Isn't that true? |
| 09:34:11 | 5 | A    Correct. |
| | 6 | Q    And those certain IP addresses you stated were |
| | 7 | associated with peer-to-peer file sharing? |
| | 8 | A    Correct. |
| | 9 | Q    And isn't it true that the lists were actually designed |
| 09:34:22 | 10 | to stop IP addresses that are designed to limit peer-to-peer |
| | 11 | sharing? |
| | 12 | A    I have no idea.  I haven't tested Peer Block. |
| | 13 | Q    So are you familiar that with the fact that certain |
| | 14 | companies -- actually, let me withdraw that question. |
| 09:34:43 | 15 |      So are you aware that peer-to-peer file sharing |
| | 16 | can involve files other than child pornography? |
| | 17 | A    Yes. |
| | 18 | Q    It can involve files, video files that contain |
| | 19 | television shows? |
| 09:34:56 | 20 | A    Yes. |
| | 21 | Q    And movies? |
| | 22 | A    Yes. |
| | 23 | Q    And that people use peer-to-peer file sharing to obtain |
| | 24 | copyrighted material without paying for it? |
| 09:35:09 | 25 | A    Yes. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

30

| | | |
|---|---|---|
| 09:35:10 | 1 | Q    And there are companies that are interested in stopping |
| | 2 | this practice? |
| | 3 | A    I would assume. |
| | 4 | Q    Such as movie studios? |
| 09:35:20 | 5 | A    Yes. |
| | 6 | Q    And other individuals with a financial interest in the |
| | 7 | copyrighted material? |
| | 8 | A    Sure. |
| | 9 | Q    So are you familiar that some of Peer Block's lists are |
| 09:35:42 | 10 | designed to prevent companies through their IP addresses |
| | 11 | from knowing that you're downloading television shows? |
| | 12 | A    Again, I don't know.  I haven't -- I didn't write Peer |
| | 13 | Block.  I haven't tested it. |
| | 14 | Q    Now, are you familiar that law enforcement uses |
| 09:35:57 | 15 | undercover accounts as part of their peer-to-peer |
| | 16 | investigations? |
| | 17 | A    I'm not aware of their accounts. |
| | 18 | Q    But you're -- are you familiar with the technique of |
| | 19 | using an undercover account? |
| 09:36:11 | 20 | A    I'm not sure what you mean by "undercover account," |
| | 21 | because peer-to-peer you don't really need an account. |
| | 22 | Q    Let me rephrase the question:  Certain Internet |
| | 23 | protocol addresses, as we have discussed, you can query and |
| | 24 | find out who it's assigned to, which company or organization |
| 09:36:34 | 25 | it's assigned to, correct? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

| | | |
|---|---|---|
| 09:36:34 | 1 | A    You can get the Internet Service Provider. |
| | 2 | Q    Or isn't it true that in certain circumstances, you can |
| | 3 | put in an IP address, and it would tell you that this was |
| | 4 | assigned to, say, the Department of Justice? |
| 09:36:48 | 5 | A    Publicly?  I don't know.  I guess if it was static |
| | 6 | maybe; but, typically, you get the Internet Service |
| | 7 | Provider; and then, from there you have to subpoena who it |
| | 8 | actually belonged to. |
| | 9 | Q    Right.  For individuals who, say, have residential |
| 09:37:05 | 10 | accounts, that would be the case, correct? |
| | 11 | A    Correct.  And I don't know if I put in the Department |
| | 12 | of Justice, if it would give me the Internet Service |
| | 13 | Provider or the Department of Justice. |
| | 14 | Q    But are you -- would it be problematic in your opinion |
| 09:37:22 | 15 | for -- let me rephrase the question:  Now, you reference a |
| | 16 | static IP address.  Is there a different kind of IP address |
| | 17 | known as "dynamic"? |
| | 18 | A    Yes. |
| | 19 | Q    And what is that? |
| 09:37:38 | 20 | A    That's an IP address that changes. |
| | 21 | Q    And in your opinion, would it be important for someone |
| | 22 | who was downloading child pornography to know that the |
| | 23 | person that was downloading files from them was a member of |
| | 24 | law enforcement? |
| 09:38:01 | 25 | A    I would think if they were downloading child |

32

| | | |
|---|---|---|
| 09:38:04 | 1 | pornography, they would want to know.  I don't know how they |
| | 2 | would know, but -- |
| | 3 | Q    So are you familiar that law enforcement uses |
| | 4 | undercover IP addresses that don't resolve back to their |
| 09:38:15 | 5 | police department? |
| | 6 | A    Again, I'm unaware of that. |
| | 7 | Q    You've never seen that in search warrant affidavits in |
| | 8 | cases you've reviewed? |
| | 9 | A    They usually just say -- they don't say anything about |
| 09:38:25 | 10 | their IP addresses.  They just say they conducted an |
| | 11 | undercover investigation. |
| | 12 | Q    Now, have you been paid as part of your work in this |
| | 13 | case? |
| | 14 | A    Yes. |
| 09:38:38 | 15 | Q    And what is the hourly rate that you are charging in |
| | 16 | this case? |
| | 17 | A    200. |
| | 18 | Q    And, approximately, how many hours have you worked on |
| | 19 | this case? |
| 09:38:52 | 20 | A    20. |
| | 21 | Q    And does that include your associate's work, or just |
| | 22 | your work? |
| | 23 | A    That includes my associate's work. |
| | 24 | Q    Because you didn't travel to Long Beach, did you? |
| 09:39:07 | 25 | A    No. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

33

| | | |
|---|---|---|
| 09:39:08 | 1 | Q     And you didn't actually forensically obtain the |
| | 2 | evidence from the defendant's computer in this case, |
| | 3 | correct? |
| | 4 | A     Correct. |
| 09:39:16 | 5 | Q     You relied on her work as part of this investigation? |
| | 6 | A     I relied on her collection of the data, yes. |
| | 7 | Q     And have you ever been hired by the government or |
| | 8 | prosecution in a child pornography case to provide opinions? |
| | 9 | A     I was on one occasion in Georgia. |
| 09:39:35 | 10 | Q     And which prosecution entity was that? |
| | 11 | A     It was the County of Forsyth. |
| | 12 | Q     Have you ever been hired by the Department of Justice? |
| | 13 | A     No. |
| | 14 | Q     And when was the last time you testified in federal |
| 09:39:52 | 15 | court? |
| | 16 | A     That would be on my CV.  I just testified a couple |
| | 17 | weeks ago, I think, but I don't know if it was federal. |
| | 18 | Again, that's why my CV is there.  I honestly don't remember |
| | 19 | my last testimony in federal court. |
| 09:40:11 | 20 | Q     Have you recently been testifying less often in federal |
| | 21 | court? |
| | 22 | A     I testify all the time.  No, I don't think there's |
| | 23 | anything between state and federal. |
| | 24 | Q     But, no, I'm asking you about federal court.  Have you |
| 09:40:24 | 25 | testified less often in federal court over the last, say, |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

34

09:40:28  1  two years than you did previously?

2  A    I honestly have no idea.  I have not gone in and

3  calculated that.  It's on my CV.  I mean, you could just add

4  them up and then --

09:40:39  5  Q    You don't have any recollection of how often you're

6  testifying in federal court?

7  A    I don't count how many times I've testified over the

8  last two years in federal court versus state court.  I just

9  keep my testimony on my CV so that there's a record of it.

09:40:53  10  Q    But you're aware --

11         MR. ORTEGA:  Objection, Your Honor.  Asked and

12  answered.

13         THE COURT:  Sustained.

14  BY MS. GANNON:

09:40:59  15  Q    Isn't it true that the federal judges' concerns about

16  some of your opinions has resulted in fewer federal cases in

17  which you've been retained?

18         MR. ORTEGA:  Objection, Your Honor.  Foundation.

19         THE COURT:  Sustained.

09:41:16  20  BY MS. GANNON:

21  Q    Now, Ms. Loehrs, wouldn't you agree that it's important

22  to be objective in reviewing computer data in any case?

23  A    Yes.

24  Q    And isn't it true that you previously had a Face Book

09:41:37  25  page?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

35

09:41:37  1  A    Yes.

2  Q    And on that Face Book page, you posted or endorsed some

3  disparaging remarks about the Federal Bureau of

4  Investigation?

09:41:50  5  A    I made a joke on my private Face Book page with my

6  family.

7  Q    And it was regarding the Federal Bureau of

8  Investigation.

9        Isn't that true?

09:41:57  10  A    Yes.  It was a joke about the FBI.

11  Q    And that expressed your views and opinions about the

12  Federal Bureau of Investigation.

13        Isn't that true?

14  A    No, this was actually a joke, after I walked out of

09:42:07  15  trial.

16  Q    And you said that they shouldn't be trusted?

17  A    No, that's not what I said.

18  Q    What did you say?

19  A    I said -- and I don't remember the exact quote, because

09:42:16  20  this was, I think, six years ago.  I think I put something

21  about they have a saying, FBI, something about the most

22  trusted; and then, I flipped that around.  I -- honestly,

23  it's been six years.  I don't remember the exact quote, but

24  I took their words and I flipped it around.

09:42:36  25  Q    But the sentiment of the statement was that the FBI

36

| 09:42:40 | 1 | couldn't be trusted. |
| | 2 | Isn't that true? |
| | 3 | MR. ORTEGA:  Objection, Your Honor.  Asked and |
| | 4 | answered and relevance. |
| 09:42:46 | 5 | THE COURT:  Well, I'll give her an opportunity to |
| | 6 | answer the question, which I don't think she's done yet. |
| | 7 | THE WITNESS:  The sentiment came when I walked out |
| | 8 | of court and a jury member asked the judge -- |
| | 9 | BY MS. GANNON: |
| 09:42:57 | 10 | Q   I'm not asking you for the explanation.  I'm asking |
| | 11 | what the sentiment of what you actually posted, not the back |
| | 12 | story. |
| | 13 | A   That's the sentiment. |
| | 14 | The sentiment is:  The FBI lied on the stand and |
| 09:43:07 | 15 | everyone unanimously agreed that they lied, so I walked out |
| | 16 | of court and put a joke about the FBI on my Face Book.  That |
| | 17 | was the sentiment. |
| | 18 | MS. GANNON:  Your Honor, no further questions. |
| | 19 | THE COURT:  Anything on redirect? |
| 09:43:24 | 20 | MR. ORTEGA:  Yes, Your Honor. |
| | 21 | REDIRECT EXAMINATION |
| | 22 | BY MR. ORTEGA: |
| | 23 | Q   Good morning. |
| | 24 | A   Good morning. |
| 09:43:38 | 25 | Q   To your knowledge, is the FBI involved in this matter? |

09:43:40  1    A    No.

       2    Q    You were asked about your associate traveling to

       3    Long Beach.

       4    A    Yes.

09:43:49  5    Q    Can you explain what the difference between what your

       6    associate, Michele Bush, did and what you did was, to

       7    provide some context?

       8    A    Yes.  She went out to actually run forensic processes,

       9    so using our tools that she's trained in.  She connected to

09:44:06  10   the evidence, ran forensic processes that would collect

       11   data.

       12           MS. GANNON:  Objection, Your Honor.  Lack of

       13   foundation.  She wasn't present at the exam.

       14           THE COURT:  Sustained.

09:44:15  15   BY MR. ORTEGA:

       16   Q    Did you provide Ms. Bush with any instructions

       17   regarding what to collect from Long Beach?

       18   A    Ms. Bush is actually my daughter.  And she's been

       19   involved with this business since she was 12.  I've trained

09:44:27  20   her.  She's been working with my company for years.  I know

       21   exactly what she did and we talk about every detail of the

       22   exam.  In fact, she called me from the exam.

       23           So she collects the data, using the forensic

       24   tools, and exports that and brings that back to the lab so

09:44:43  25   that we can then analyze it.  And we actually analyze it

38

| | | |
|---|---|---|
| 09:44:47 | 1 | together. |
| | 2 | Q    Did you have everything you needed with you back in |
| | 3 | your lab to render the opinions in your affidavit? |
| | 4 | A    Yes. |
| 09:44:59 | 5 | Q    Now, you were asked about aMule and eMule. |
| | 6 | A    Yes. |
| | 7 | Q    Can you explain what the difference between those two |
| | 8 | is? |
| | 9 | A    Again, I don't know the back story on -- why eMule |
| 09:45:12 | 10 | changed to aMule, but it's, essentially, the same software. |
| | 11 | It uses the same system files.  It does essentially the same |
| | 12 | thing.  It's a different version.  And, again, I like to |
| | 13 | compare it to FrostWire and LimeWire.  They said that those |
| | 14 | two applications were different, but they have the same |
| 09:45:29 | 15 | essential source code. |
| | 16 | Q    And you saw that aMule was present on the computer in |
| | 17 | this case, correct? |
| | 18 | A    Correct. |
| | 19 | Q    Now, the fact that -- well, let me just back up a |
| 09:45:38 | 20 | little.  The prosecutor said that the files that you |
| | 21 | referenced were present in the aMule file; is that correct? |
| | 22 | A    Actually, I believe the folder where the files are at |
| | 23 | is eMule backslash incoming.  That's where the files were |
| | 24 | found. |
| 09:45:57 | 25 | The aMule that you see happens with the system |

39

09:46:01 1   files that are sort of buried under the Windows folders.  So

2   the folder itself where everything was found was called

3   eMule; but if you look at the system files behind that

4   folder, it's called aMule.

09:46:14 5   Q    And when we talk about whether something is publicly

6   available and when you talk about that in your affidavit,

7   what do you mean by "publicly available"?

8   A    I mean that files that have been specifically

9   identified by the system as files available to be shared.

09:46:33 10   So they are in a shared folder based on that software

11   settings.

12   Q    So eMule has a -- it develops a set of default folders,

13   correct?

14   A    Correct.

09:46:48 15   Q    And are all the files that are in the eMule default

16   folders necessarily publicly available for sharing?

17   A    Not necessarily.  It depends on what's been identified

18   as shareable.

19   Q    And what would be some of the factors that distinguish

09:47:02 20   files that are publicly available from files that are not?

21   A    Specifically, in this case, the eMule system files, the

22   configuration file identified a default downloads folder as

23   the shared location for files.  Whereas, the files

24   themselves were found in an eMule incoming folder.  So

09:47:25 25   they're both folders associated with the eMule file sharing,

| | | |
|---|---|---|
| 09:47:28 | 1 | but one has been identified as sharing and one has not. |
| | 2 | Q    Okay.  You were asked if you've testified your -- |
| | 3 | personally tested -- that is Peer Spectre and Shareaza, and |
| | 4 | I believe your answer was "No," correct? |
| 09:47:47 | 5 | A    Correct. |
| | 6 | Q    And why is that? |
| | 7 | A    Because it's never been provided to me. |
| | 8 | Q    Is it your understanding that it's proprietary law |
| | 9 | enforcement software? |
| 09:47:55 | 10 | A    That's my understanding. |
| | 11 | Q    You were asked about your testimony in the *Crow* case? |
| | 12 | A    Yes. |
| | 13 | Q    Cross-examination.  And I think you were going to |
| | 14 | explain why you believe that case was similar to this case, |
| 09:48:08 | 15 | but you didn't have an opportunity to. |
| | 16 | So why is it similar to this case? |
| | 17 | A    Well, while I didn't find the actual images in that |
| | 18 | case, meaning the pictures, the chargeable pictures.  I |
| | 19 | found the file names.  I found test fragments that indicate |
| 09:48:24 | 20 | where those files were prior to them being deleted, and |
| | 21 | those files were in nonshared locations. |
| | 22 | And I also explained in that case that I had |
| | 23 | carved images from unallocated space, knowing that they had |
| | 24 | been deleted and the two actual images that had been |
| 09:48:43 | 25 | downloaded may have been there, but I was never shown what |

09:48:45  1   those images were.  So even if I had gone through the

2   200,000 images that I recovered, I wouldn't have been able

3   to identify which two were the undercover, because they

4   don't have file names associated with them and I was never

09:48:56  5   shown the images.  So I found the file names and the file

6   paths which indicated they weren't being shared, but I

7   couldn't match the physical image to them.

8   Q     Thank you.

9         Now, just getting back to the issue of testing,

09:49:15 10   the government asked you about whether you were aware that

11   Shareaza or Shara-ra-za had been beta-tested.

12   A     Yes.

13   Q     What is beta testing, if you know?

14   A     Yes.  In software development, beta testing is the

09:49:30 15   testing of software and, typically, it's by peer review

16   third parties are putting the software out for free for

17   people to test and use.  It's done before the software is

18   launched, like as a commercial product, and being used.

19         So the beta testing happens by a multitude of

09:49:51 20   different people and that's how they pick out the bugs and

21   decide if it's functioning properly, if it's reliable,

22   et cetera.

23   Q     So to your understanding, has Peer Spectre or

24   ShareazaLE undergone any other testing aside from this beta

09:50:10 25   testing that was referred to?

42

| | | |
|---|---|---|
| 09:50:11 | 1 | A     No.   Actually, the beta testing that was specifically |
| | 2 | referred to, why I disagreed with it, is because Wiltse |
| | 3 | tested the Peer Spectre.   It wasn't tested by other people, |
| | 4 | and he only tested it by comparing it to publicly available |
| 09:50:26 | 5 | software and saying that it produced the same results. |
| | 6 | That's not testing a piece of software to validate its |
| | 7 | validity. |
| | 8 | Q     And just to clarify, who is "Wiltse"? |
| | 9 | A     Sorry, Detective Wiltse.   He wrote Peer Spectre. |
| 09:50:43 | 10 | Q     So you mentioned on cross-examination that you weren't |
| | 11 | present or involved when the beta testing itself was |
| | 12 | conducted, correct? |
| | 13 | A     Correct. |
| | 14 | Q     Do you know who was? |
| 09:50:55 | 15 | A     And, again, I would have to go back to his testimony. |
| | 16 | I don't know that there was anybody else involved. |
| | 17 | Q     Are you familiar with the program EnCase? |
| | 18 | A     Yes. |
| | 19 | Q     And what is that? |
| 09:51:04 | 20 | A     EnCase is -- it's one of the world leader forensic |
| | 21 | tools that we use in the industry to do forensics. |
| | 22 | Q     Are you aware whether law enforcement uses EnCase? |
| | 23 | A     They do. |
| | 24 | Q     Do you have any certifications related to EnCase? |
| 09:51:18 | 25 | A     Yes.   I'm EnCase certified, and I have taken their |

43

09:51:21  1   training.

2   Q    And by comparison, can you tell us a little bit about

3   how EnCase, or -- I should ask you first:  Do you know

4   whether EnCase undergoes testing that is supplemental to

09:51:35  5   beta testing?

6   A    EnCase has been rigorously tested all over the world.

7   It's continued to be tested even by the examiners who use

8   it.  We're taught when we're certified that we can't just

9   use a tool.  We have to know how that tool works, and we

09:51:52  10  have to test and validate that tool before we can come to a

11  conclusion after doing forensics, and --

12       Go ahead.

13  Q    If you can just tell us, briefly, how is EnCase tested.

14       When you talk about testing, what do you mean?

09:52:08  15  A    So, for example, I've actually tested EnCase on -- I've

16  pulled information from digital images from a camera.  And I

17  let EnCase run a process on those to tell me when those

18  images were created.

19       EnCase can sometimes pull a create date from when

09:52:25  20  the image was actually put on the computer and not the exit

21  data (sic) of when the image was actually taken.  So there's

22  been instances where I've tested EnCase and the data that's

23  been spit out is actually inaccurate, and I have to explain

24  why that's inaccurate.  So we regularly find our tools, even

09:52:45  25  tools like EnCase, are not always reliable until you've

09:52:49  1    tested them and validated them.

2    Q    Are you aware -- excuse me.  Are you aware whether

3    EnCase has been tested by independent third parties?

4    A    Sure.  We're all independent third parties.

09:53:03  5    Q    Suppose that you had access to Peer Spectre and

6    Shareaza, what kind of testing would you perform on those

7    programs?

8    A    I would set up test machines in a lab environment that

9    had different types of operating systems, different types of

09:53:22  10   software.  Just various different systems.  Every system is

11   unique.  And then I would run the software against those

12   systems.  And once I've run the software, I would look at

13   the results and compare it and analyze it to determine if

14   it's identifying files that were specifically not shared

09:53:40  15   that I know were not shared, if it was identifying files

16   that didn't exist or weren't compete.  So you just run the

17   software on different types of systems, analyze it and then

18   come to your conclusion.

19   Q    Is it possible that through testing Peer Spectre and

09:53:59  20   Shareaza, we could obtain some clarity about whether these

21   programs can access files that are not made publicly

22   available for sharing?

23   A    Yes.

24   Q    Now, I want to direct your attention -- just one

09:54:22  25   second.

09:54:31  1          Did you have an opportunity to review the

2    Government's supplemental opposition to defense's motion to

3    compel?

4    A    Yes.

09:54:48  5    Q    I'm going to direct your attention to Exhibit B.

6              MR. ORTEGA:  May I approach, Your Honor, to

7    provide a copy?

8              THE COURT:  Of Exhibit B to the supplemental

9    response?

09:54:59 10          MR. ORTEGA:  Yes, Your Honor.

11          THE COURT:  Yes.

12          *(Pause.)*

13          MR. ORTEGA:  I'm looking at the very first page

14    after the letters to counsel, Your Honor, and I'll put it up

09:55:33 15    on the ELMO.

16          MS. GANNON:  Your Honor, point of clarification.

17    Have these been marked as exhibits?

18          THE COURT:  I think we're going to have to have

19    more than Exhibit B to the -- to the supplemental response,

09:55:45 20    because we need to know for the record what pages.

21          MR. ORTEGA:  Okay, Your Honor.  I think we left

22    off our exhibit binder at "I," so I'll mark this as

23    Exhibit J.

24          THE COURT:  And identify, again, for the record

09:55:58 25    what you're marking.

| | |
|---|---|
| 09:56:00 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:56:45 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:56:55 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 09:57:18 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 09:57:28 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 09:57:41 | 25 |

1    MR. ORTEGA:  I can provide you a copy, Your Honor.

2    *(The document was published in open court.)*

3    *(Pause.)*

4  BY MR. ORTEGA:

5  Q    Did you have a chance to review this document?

6  A    Yes.

7  Q    Now, I want to -- well, first of all, what is this

8  document?

9  A    This was submitted with the Government's opposition,

10  and I believe this is a printout that ShareazaLE produces.

11  Q    And are you aware of when Mr. Hartman's Internet

12  service was set up?

13  A    Yes.  According to the, again, the Government's

14  discovery --

15    MS. GANNON:  Objection, Your Honor.  Lack of

16  personal knowledge.  Foundation.

17    THE COURT:  Sustained.

18  BY MR. ORTEGA:

19  Q    Let me try it this way:  Did you review documents

20  produced by the Government in the discovery from Time Warner

21  Cable?

22  A    Yes, I did.

23  Q    Okay.  Did those documents reflect a date or rather a

24  year when the Internet service and Mr. Hartman's home was

25  established?

09:57:42   1          MS. GANNON:  Objection, Your Honor.  Hearsay.

       2          THE COURT:  I'm going to allow her to the extent

       3   she relied on this information in forming her opinion to

       4   identify it for the Court.

09:57:51   5          THE WITNESS:  Yes.  It was May of 2011.

       6   BY MR. ORTEGA:

       7   Q    Now, directing your attention to what we're going to

       8   mark as Exhibit J.  The very first line says:  *This IP has*

       9   *been observed in CPS between the dates December 23rd, 2009*

09:58:16  10   *at 2:23:19 a.m. and November 6, 2014.*

      11          Do you see that?

      12   A    Yes.

      13   Q    Now, why would, if you know -- why would the Shareaza

      14   be observing an IP address in 2009 before it was

09:58:37  15   established?

      16   A    Well, the IP address would have been established

      17   because the IP address belongs to an Internet Service

      18   Provider.  The account for the Hartmans wasn't set up until

      19   2011 and IP addresses constantly change, because they're

09:58:53  20   dynamic.  So this IP address could have been assigned to

      21   numerous accounts over the years, hundreds of different

      22   customers of that Internet Service Provider could have had

      23   this IP address over the course of those five years.

      24   Q    Okay.  And do you see on the third line where it says:

09:59:11  25   *This IP has been associated with the following GUIDs?*

48

09:59:15  1    A    Yes.

       2    Q    What is a "GUID"?

       3    A    A "GUID" is an identifier for a specific installation

       4    of a software program.  So when you install something like

09:59:29  5    eMule, it gets a GUID when it's installed.

       6    Q    Do you have any idea why there would be so many GUIDs

       7    listed here?

       8    A    These would all be unique installations of software, so

       9    I have no idea who these are associated with.

09:59:46 10    Q    Does this report tell you where --

      11         MR. ORTEGA:  Well, I'll rephrase it, Your Honor.

      12    BY MR. ORTEGA:

      13    Q    If you'll go down to the bottom of the document --

      14    A    Yes.

09:59:55 15    Q    -- do you see where it reads "completed downloads"?

      16    A    Yes.

      17    Q    And there's a file name?

      18    A    Correct.

      19    Q    Does this report tell you where in the computer this

10:00:15 20    file was observed or located?

      21    A    No.

      22    Q    And are you aware when this -- the investigation in

      23    this case began?

      24    A    I don't remember the exact date.

10:00:45 25    Q    Let me ask it this way:  Do you remember when

*DEBORAH D. PARKER, U.S. COURT REPORTER*

49

|  |  |  |
|---|---|---|
| 10:00:48 | 1 | Detective Syvock tried to or started running searches that |
| | 2 | resulted in Mr. Hartman's computer? |
| | 3 |     MS. GANNON:  Objection, Your Honor.  Lack of |
| | 4 | personal knowledge.  Foundation. |
| 10:01:00 | 5 |     THE COURT:  Sustained. |
| | 6 | BY MR. ORTEGA: |
| | 7 | Q    Now, you testified on cross-examination regarding -- |
| | 8 | you were asked rather about the issue of multiple |
| | 9 | installations and re-installations. |
| 10:01:27 | 10 |     Can you elaborate on how that affects your |
| | 11 | analysis of the data here? |
| | 12 | A    Well, certainly, when software is installed and |
| | 13 | uninstalled and reinstalled, data gets lost.  It makes it |
| | 14 | more difficult to forensically recover some of that data. |
| 10:01:47 | 15 | It depends on what the applications are, how they are |
| | 16 | uninstalled.  Sometimes, if you uninstall an application, it |
| | 17 | doesn't actually get rid of all the system files behind it, |
| | 18 | so those remain but you have an uninstalled application; |
| | 19 | other times, it does.  It certainly makes it more |
| 10:02:04 | 20 | complicated to forensically recover everything. |
| | 21 |     MR. ORTEGA:  May I have just a moment, Your Honor? |
| | 22 |     THE COURT:  Yes. |
| | 23 |     *(Pause.)* |
| | 24 | BY MR. ORTEGA: |
| 10:02:49 | 25 | Q    Directing your attention to the six files that were at |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

50

| | | |
|---|---|---|
| 10:02:53 | 1 | issue in the search warrant affidavit, do you recall the |
| | 2 | dates on when Detective Syvock attempted to download those |
| | 3 | files? |
| | 4 |         MS. GANNON:  Objection, Your Honor.  Calls for |
| 10:03:06 | 5 | hearsay. |
| | 6 |         THE COURT:  I'm not sure what you are asking her |
| | 7 | when you recall the dates, because she doesn't have any |
| | 8 | personal information of that. |
| | 9 |         MR. ORTEGA:  May I rephrase, Your Honor? |
| 10:03:20 | 10 |         THE COURT:  Yes, you may. |
| | 11 | BY MR. ORTEGA: |
| | 12 | Q    Did you review an affidavit prepared by |
| | 13 | Detective Syvock, describing the downloads he purports to |
| | 14 | have made in this investigation? |
| 10:03:31 | 15 | A    I did. |
| | 16 | Q    And did that affidavit describe the dates where |
| | 17 | Detective Syvock says he attempted to make the downloads? |
| | 18 | A    Yes, it did. |
| | 19 | Q    Do you recall what those dates are? |
| 10:03:44 | 20 | A    I don't off the top of my head, but I believe I put |
| | 21 | them in my affidavit. |
| | 22 | Q    Would it refresh your recollection to take a look at |
| | 23 | your affidavit? |
| | 24 | A    Yes. |
| 10:03:54 | 25 |         MR. ORTEGA:  May I approach, Your Honor? |

| | | |
|---|---|---|
| 10:03:55 | 1 | MS. GANNON:  Your Honor, the Government would |
| | 2 | object.  The search warrant is attached to the Government's |
| | 3 | supplemental briefing as Exhibit A, so the Court, if there |
| | 4 | is a issue, can review that.  As an issue for argument, it |
| 10:04:05 | 5 | seems improper to have this witness testify as to the |
| | 6 | contents of another witness' declaration. |
| | 7 | THE COURT:  Well, what she's doing is giving me |
| | 8 | the basis of her opinion, and the basis for her opinion is |
| | 9 | going to rest in part presumably on the date she was given |
| 10:04:21 | 10 | by the detective for when he downloaded the files.  So an |
| | 11 | expert can rely on material that is hearsay.  If I have a |
| | 12 | jury, I sometimes worry about having that hearsay |
| | 13 | information in front of them, but certainly not here and not |
| | 14 | in these circumstances. |
| 10:04:36 | 15 | So the objection is overruled. |
| | 16 | You may show her her affidavit, if that will |
| | 17 | refresh her recollection. |
| | 18 | *(The document was published in open court.)* |
| | 19 | THE WITNESS:  Yes, that's much better. |
| 10:05:05 | 20 | BY MR. ORTEGA: |
| | 21 | Q    Does that refresh your recollection? |
| | 22 | A    Yes, it does. |
| | 23 | Q    Do you recall what the dates referenced in the |
| | 24 | affidavit were? |
| 10:05:10 | 25 | A    Yes.  On October 16th of 2014, he downloaded five files |

52

| | | |
|---|---|---|
| 10:05:18 | 1 | and on November 23, 2014, he downloaded one file. |
| | 2 | Q    And do you recall if the downloads were completed on |
| | 3 | those dates? |
| | 4 | A    According to the logs, they were not. |
| 10:05:31 | 5 | Q    Okay.  And what do you mean by that? |
| | 6 | A    Well, subsequent to the affidavits, logs were produced |
| | 7 | that I reviewed.  I believe they are Exhibit B of the |
| | 8 | Government's opposition.  Those logs indicate that these |
| | 9 | files were actually not even started -- the download |
| 10:05:53 | 10 | process -- until months later. |
| | 11 | MR. ORTEGA:  Okay.  I'm going to place another |
| | 12 | excerpt from the exhibit, Your Honor, and we'll mark it as |
| | 13 | Exhibit K? |
| | 14 | THE COURT:  A? |
| 10:06:25 | 15 | MR. ORTEGA:  K. |
| | 16 | THE COURT:  Of course, after J. |
| | 17 | Yes, you may do so. |
| | 18 | MR. ORTEGA:  And, actually, if I may approach and |
| | 19 | provide the Court and the witness a copy. |
| 10:06:33 | 20 | *(The document was published in open court.)* |
| | 21 | BY MR. ORTEGA: |
| | 22 | Q    I placed Exhibit K on the ELMO. |
| | 23 | Is this the logs you were referring to a minute |
| | 24 | ago? |
| 10:07:20 | 25 | A    Yes. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

53

| | | |
|---|---|---|
| 10:07:24 | 1 | Q    Now, if I could direct your attention to the bottom of |
| | 2 | the page. |
| | 3 |     Do you see one of the images that was identified |
| | 4 | by Detective Syvock in this affidavit reflected in this |
| 10:07:43 | 5 | document? |
| | 6 | A    Yes.  The file name, yes. |
| | 7 | Q    And which image is that? |
| | 8 | A    The Kidcam-Mirey. |
| | 9 | Q    And in his affidavit when -- according to his |
| 10:07:53 | 10 | affidavit, when was that downloaded by him? |
| | 11 | A    I don't know.  I think I would need his affidavit for |
| | 12 | the specific file. |
| | 13 | Q    Was it either in October or November? |
| | 14 | A    I believe it was October 16th, but it's one of them. |
| 10:08:09 | 15 | It's either October 16th, or the November date. |
| | 16 | Q    And what does this document reflect in terms of when it |
| | 17 | was downloaded? |
| | 18 | A    Well, again, according to this document, it says: |
| | 19 | Download transfer started, but the date is 12/30/2014, and |
| 10:08:27 | 20 | it repeats over and over.  So it looks like it starts at |
| | 21 | 11:22, and it says:  Download transfer started.  And then it |
| | 22 | says it started again at 16:39 and again at 16:43. |
| | 23 |     MS. GANNON:  I'm going to object to this line of |
| | 24 | questioning.  This is not contained in the declaration as |
| 10:08:46 | 25 | outside the scope of the current motion.  The government has |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

| | |
|---|---|
| 10:08:49 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:09:03 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:09:21 | 10 |
| | 11 |

1  had no opportunity to respond to these specific allegations.

2          THE COURT:  When were these documents provided to

3  the defense?

4          The exhibit that is referenced here, it has --

5  it's filed with the Court on Friday, so I'm not sure how

6  they could have provided you with information about this.

7  Unless I'm mistaken, this all goes to the general subject, I

8  think.

9          MS. GANNON:  Your Honor, it was -- there was --

10  the initial disclosure was October 15th -- I'm sorry.  The

11  initial disclosure was on September 23rd.  There was some

12  problems with a few of the files and the government provided

13  all of these logs, the ones that had the issues on

14  October 15th.

15          THE COURT:  All right.  I'm going to allow the

16  questioning.

17  BY MR. ORTEGA:

18  Q    And my last question on this document is on the second

19  page, if you would turn the page.

20  A    (Witness so complies.)  Yes.

21  Q    Does this document reflect when the download was

22  completed?

23  A    Yes.  It looks like 16:46.

24  Q    And on what date?

25  A    Again, on 12/30/2014.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:10:11 | 1  | Q    Thank you.                                              |
|          | 2  |      Now, you were asked about some -- rather, you were     |
|          | 3  | asked about what types of cases you're retained in.  Do you  |
|          | 4  | ever turn down cases that the defense brings to your office? |
| 10:10:30 | 5  | A    I don't think I've ever turned down a case.            |
|          | 6  | Q    But do you -- when you conduct -- you were asked about |
|          | 7  | being fair and objective.                                    |
|          | 8  | A    Yes.                                                    |
|          | 9  | Q    Do you try to be fair and objective when you prepare   |
| 10:10:45 | 10 | your affidavits that are going to be submitted to a court?   |
|          | 11 | A    I try to be fair and objective on all cases I'm hired  |
|          | 12 | on.  I'm not just hired on child pornography cases.  I'm     |
|          | 13 | hired in civil matters where I do the analysis for both      |
|          | 14 | sides, so I have to be fair and objective.                   |
| 10:11:02 | 15 |      MR. ORTEGA:  Thank you, Your Honor.                     |
|          | 16 |      No further questions.                                   |
|          | 17 |      THE COURT:  Anything on recross?                        |
|          | 18 |      MS. GANNON:  Yes, Your Honor.                           |
|          | 19 |      Thank you.                                              |
| 10:11:08 | 20 |                RECROSS-EXAMINATION                           |
|          | 21 | BY MS. GANNON:                                               |
|          | 22 | Q    Now, you were asked some questions about eMule versus  |
|          | 23 | aMule.                                                        |
|          | 24 |      Do you recall that?                                     |
| 10:11:24 | 25 | A    Yes.                                                    |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

56

| | | |
|---|---|---|
| 10:11:25 | 1 | Q    Isn't it true that in this case on Mr. Hartman's hard |
| | 2 | drive, there were actually two executable files, one for |
| | 3 | eMule and one for aMule; isn't that correct? |
| | 4 | A    I don't know the details of all the forensic data.  I |
| 10:11:43 | 5 | could certainly go in and confirm that. |
| | 6 | Q    And your testimony was that eMule in this situation had |
| | 7 | content of child pornography files? |
| | 8 | A    A folder under "eMule incoming" contained child |
| | 9 | pornography files. |
| 10:12:02 | 10 | Q    The actual images were found in that eMule incoming |
| | 11 | folder? |
| | 12 | A    Correct. |
| | 13 | Q    And six of those files corresponded with the files that |
| | 14 | were downloaded in this case? |
| 10:12:14 | 15 | A    Correct. |
| | 16 | Q    And isn't it true that the aMule system files, as you |
| | 17 | called them, had no content? |
| | 18 | A    Not the system files.  No, that's incorrect. |
| | 19 | Q    They did not have content? |
| 10:12:32 | 20 | A    I never said the system files did not have content. |
| | 21 | Q    But when you referenced this list of publicly available |
| | 22 | files and these dates that you put in your affidavit, that |
| | 23 | list only had the file name, correct? |
| | 24 | A    No.  That list has a lot of information in it. |
| 10:12:51 | 25 | Q    My question is:  Were you able to access the content, |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

57

| | | |
|---|---|---|
| 10:12:56 | 1 | the actual child pornography image from this list? |
| | 2 | A    No. |
| | 3 | Q    So it was a string of information including the file |
| | 4 | name but no image? |
| 10:13:09 | 5 | A    Correct. |
| | 6 | Q    Now, isn't it true in this case -- excuse me -- the |
| | 7 | eMule actual software had been deleted?  Isn't that true? |
| | 8 | A    I'm actually not sure. |
| | 9 | Q    And was the aMule software deleted? |
| 10:13:31 | 10 | A    Again, based on the forensic, I'm not sure. |
| | 11 | Q    And you testified that you've billed approximately 20 |
| | 12 | hours in this case already? |
| | 13 | A    Correct. |
| | 14 | Q    How much time have you spent versus your daughter? |
| 10:13:44 | 15 | A    Well, she spent a day in Long Beach, and I spent |
| | 16 | several days in the lab working on -- again, to clarify, I |
| | 17 | have billed 20 hours.  I have worked more than 20 hours. |
| | 18 | Q    But of those 20 hours that you billed, how many are |
| | 19 | attributable to your work versus your daughter's work? |
| 10:14:05 | 20 | A    About half. |
| | 21 | Q    So she was able to travel to Long Beach, review the |
| | 22 | computer and travel back -- she resides in Tucson? |
| | 23 | A    Correct. |
| | 24 | Q    And that required 10 hours of her time? |
| 10:14:20 | 25 | A    I don't charge for travel.  We don't even include that. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

58

10:14:22   1    I'm only including the time she spent in front of the

           2    evidence and the time she spent with the evidence back at

           3    the lab.

           4    Q     But in the past you've billed the federal government

10:14:30   5    for travel.

           6              Isn't that true?

           7    A     I have never in 16 years billed anyone for travel time,

           8    ever.  Not once.

           9    Q     Do you recall a case in Wyoming where you submitted a

10:14:40  10    bill for $10,000?

          11    A     Yes.  That was for my time.

          12    Q     Didn't you actually testify that part of that bill,

          13    which the judge found excessive, was for hotel and travel?

          14              MR. ORTEGA:  Objection, Your Honor.  Relevance.

10:14:55  15              THE COURT:  At this point, I guess it goes to

          16    credibility.

          17              I'll allow it in just for that purposes.

          18              THE WITNESS:  Those were travel expenses.  I

          19    always charge for the expense of a hotel, a car, an airline.

10:15:06  20    I do not charge for our time to travel to a location.

          21    BY MS. GANNON:

          22    Q     But in that case you submitted a bill for $10,000 for,

          23    approximately, three days of work?

          24    A     No.  I submitted a bill for $10,000 for, approximately,

10:15:20  25    30 hours' worth of work, plus travel expenses.  That was

| | | |
|---|---|---|
| 10:15:24 | 1 | previously approved by the court. |
| | 2 | Q    But that approval was withdrawn once the judge saw the |
| | 3 | bill. |
| | 4 |      Isn't that true? |
| 10:15:33 | 5 | A    I don't know what happened with that judge when I |
| | 6 | submitted the bill.  The approval was there.  I did the |
| | 7 | work, and I submitted the bill based on the approval. |
| | 8 | Q    But isn't it true that when you testified at that trial |
| | 9 | and you testified before a jury that the judge made you |
| 10:15:47 | 10 | stop? |
| | 11 |      The judge called a recess and admonished you |
| | 12 | regarding your testimony, because it referenced the fact |
| | 13 | that he had withdrawn his approval for the billing? |
| | 14 |      MR. ORTEGA:  Objection, Your Honor.  Relevance. |
| 10:16:04 | 15 |      THE COURT:  Sustained. |
| | 16 | BY MS. GANNON: |
| | 17 | Q    Now, you testified that in your opinion this case is |
| | 18 | similar to the *Crow* case. |
| | 19 |      Isn't that true? |
| 10:16:19 | 20 | A    Correct. |
| | 21 | Q    And isn't it true, though, that the concern in the *Crow* |
| | 22 | case was that law enforcement did not, in fact, get the |
| | 23 | content of the images that were downloaded from the |
| | 24 | defendant's computer? |
| 10:16:33 | 25 | A    That was one of the issues. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

60

| | | |
|---|---|---|
| 10:16:35 | 1 | Q    And that's not an issue in this case because the |
| | 2 | content of the images was actually found in the defendant's |
| | 3 | computer here? |
| | 4 | A    That's correct. |
| 10:16:43 | 5 | Q    Now, are you a software engineer? |
| | 6 | A    No. |
| | 7 | Q    And do you have any training in software development? |
| | 8 | A    Yes.  I have a degree in information systems.  I took |
| | 9 | programming. |
| 10:16:54 | 10 | Q    But was that specific to commercial software |
| | 11 | development? |
| | 12 | A    No, I have never developed commercial software. |
| | 13 | Q    Have you ever been retained by a commercial software |
| | 14 | company to conduct testing? |
| 10:17:07 | 15 | A    No. |
| | 16 | Q    Now, you testified about these documents Exhibits J and |
| | 17 | K that the defense provided you. |
| | 18 |      Isn't it true that the ShareazaLE summary report, |
| | 19 | which I believe is Exhibit J, the dates and times for the |
| 10:17:36 | 20 | download of this Kidcam-Mirey-12Y file are consistent with |
| | 21 | the more detailed logs in Exhibit K? |
| | 22 | A    I'm not sure what you're referring to. |
| | 23 | Q    So let's look at Exhibit J about halfway down the page. |
| | 24 |      Do you see where it says "last received"?  Towards |
| 10:18:08 | 25 | the right-hand side of the page. |

| | | |
|---|---|---|
| 10:18:11 | 1 | THE COURT:  You don't have a single copy to put on |
| | 2 | the ELMO, so that you can just point to it? |
| | 3 | MS. GANNON:  I'm sorry, Your Honor.  I think |
| | 4 | that -- actually, what we have here is, there's two |
| 10:18:22 | 5 | different files being referenced. |
| | 6 | Your Honor, it's a matter I'll leave for argument. |
| | 7 | BY MS. GANNON: |
| | 8 | Q   Now, do you still have Detective Syvock's affidavit in |
| | 9 | front of you? |
| 10:18:50 | 10 | A   No.  I've never been given that. |
| | 11 | Q   Weren't you given that to refresh your recollection? |
| | 12 | A   I was given my affidavit. |
| | 13 | Q   Okay.  Now, do you recall reviewing Detective Syvock's |
| | 14 | affidavit? |
| 10:19:04 | 15 | A   Yes. |
| | 16 | Q   And you were asked some questions about the dates and |
| | 17 | times that the files were downloaded according to the |
| | 18 | affidavit? |
| | 19 | A   Yes. |
| 10:19:14 | 20 | Q   And isn't it true that Detective Syvock provided |
| | 21 | detail, start and last received information for each of the |
| | 22 | files? |
| | 23 | A   Again, I would have to look at his affidavit. |
| | 24 | Q   Now, you testified that a G-U-I-D -- is that also known |
| 10:19:34 | 25 | as an "GUID"? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

62

|          |    |   |                                                              |
|----------|----|---|--------------------------------------------------------------|
| 10:19:36 | 1  | A | Yes.                                                         |
|          | 2  | Q | And a different GUID is generated each time there's a       |
|          | 3  |   | unique installation of peer-to-peer software.               |
|          | 4  |   | Isn't that true?                                            |
| 10:19:45 | 5  | A | Correct.                                                    |
|          | 6  | Q | And so for an individual who deletes and reinstalls         |
|          | 7  |   | multiple times, they're going to have different GUIDs?      |
|          | 8  | A | Correct.                                                    |
|          | 9  | Q | And in Exhibit J that you were shown, there were            |
| 10:20:02 | 10 |   | numerous GUIDs listed that had been associated with the     |
|          | 11 |   | IP address?                                                 |
|          | 12 | A | Correct.                                                    |
|          | 13 | Q | And the date range at the top of that report you were       |
|          | 14 |   | asked about was 12/23/2009 to 11/6/2014; is that correct?   |
| 10:20:18 | 15 | A | Correct.                                                    |
|          | 16 | Q | And do you know why this summary report reflects that       |
|          | 17 |   | date range?                                                 |
|          | 18 | A | I don't know anything about the ShareazaLE software so,     |
|          | 19 |   | no.                                                         |
| 10:20:27 | 20 | Q | So isn't it possible that they're not referring to --       |
|          | 21 |   | I'll back up.                                               |
|          | 22 |   | Each GUID does not have a date and time that it             |
|          | 23 |   | was observed.                                               |
|          | 24 |   | Isn't that true?                                            |
| 10:20:37 | 25 | A | That is correct in this report.                             |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

63

| | | |
|---|---|---|
| 10:20:38 | 1 | Q    So there's just a date range? |
| | 2 | A    Correct. |
| | 3 | Q    And isn't it possible that 12/23/2009 is the date that |
| | 4 | this software started operating? |
| 10:20:48 | 5 | A    Well, it specifically says:  This IP has been observed |
| | 6 | in CPS between the dates 12/23/2009, so it's specifically |
| | 7 | referring to that IP address. |
| | 8 | Q    But isn't it possible that 12/23/19 (sic) was when CPS |
| | 9 | became operational? |
| 10:21:09 | 10 | A    Again, I don't know anything about CPS, but the way |
| | 11 | this is stated is that that IP has been observed from |
| | 12 | 12/23/2009.  So I'm associating that date with that IP |
| | 13 | address. |
| | 14 | Q    But there's no indication that that IP address was |
| 10:21:29 | 15 | found by CPS on a date prior to 2011? |
| | 16 | A    It doesn't specify.  It just says between 2009 and |
| | 17 | 2014.  I don't know what else to tell you. |
| | 18 | Q    Now, have you reviewed all the ShareazaLE logs that the |
| | 19 | Government has provided in this case? |
| 10:21:49 | 20 | A    Not in detail, no, because I just received those. |
| | 21 | Q    And based on your limited review, have you identified |
| | 22 | any irregularities? |
| | 23 | A    I've seen some things that I would want answered, but I |
| | 24 | can't pull anything out specifically, unless I went through |
| 10:22:09 | 25 | them. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:22:10  1            MS. GANNON:  Your Honor, no additional questions.

2            THE COURT:  Anything further on direct?

3            MR. ORTEGA:  No, Your Honor.

4            THE COURT:  May this witness be excused?

10:22:17  5            MR. ORTEGA:  Yes, Your Honor.

6            MS. GANNON:  Yes, Your Honor.

7            THE COURT:  You may step down.  You are excused.

8    Thank you.

9            Are there any more witnesses on this motion?

10:22:29  10           MS. JACOBS:  Your Honor, I didn't know if it was

11   possible when I do my cross of Detective Syvock, with

12   respect to the motion to suppress if I can also ask him

13   questions with respect to his downloading and use of the

14   software since he is the person --

10:22:47  15           THE COURT:  Seems like it would be much more

16   appropriate to have it done in the context of this motion,

17   if we're going to address that.  So that would need to be

18   done in this motion now and we'll separate out the

19   testimony.

10:23:02  20           MS. GANNON:  Your Honor, the government would

21   strenuously object.

22           I received notification that this was the

23   defense's intention on this, this morning.  There has been

24   nothing in their motions specific to Detective Syvock.  And

10:23:16  25   when the defense asked the Government for more information

| | |
|---|---|
| 10:23:19 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:23:36 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:23:49 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 10:24:03 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 10:24:25 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 10:24:43 | 25 |

about which software was used, the Government provided that

information.   There's been no deficiency in this -- the

Government's concern is just another attempt at a fishing

expedition, which is why the government is opposing this

motion to compel in the first place.

        If they had specific concerns and requests for

information, they could have easily asked them of the

Government and the Government could have had an opportunity

to respond and brief the Court.   Your Honor, this is -- I

feel that this is extremely inappropriate because of the

lack of notice in this case.

        THE COURT:   Was notice just provided this morning?

        MS. JACOBS:   Your Honor, I didn't think I needed

notice, because he was already going to be available today,

and he is the percipient witness.   And I did raise this in

my motion that he is the individual who used the software

and in his affidavit, as we've brought up in our motion, he

didn't even say in the search warrant affidavit that he used

ShareazaLE.   We didn't find that out until later, so I think

it would be very relevant to see what his understanding is

and how he utilized program.

        I can make argument about it, obviously, but he is

one person that used the program.   And as Ms. Loehrs

testified, we don't know how the program works.

        THE COURT:   I'm not sure.   So you want to ask him

10:24:46  1    how the program works?

2              MS. JACOBS:  How he used it in this case.

3              THE COURT:  You want to ask, specifically, how he

4    used this program.

10:24:54  5              MS. JACOBS:  Yes.  And his understanding of how it

6    works.

7              THE COURT:  All right.

8              MS. GANNON:  Your Honor, that is substantially

9    outside the scope of what they filed and what they are

10:25:03  10   requesting.  They are asking the software -- I mean, that's

11   the -- part of the issue is the lack of clarity of the

12   request.  It's a moving target.  You know, it's the -- they

13   want the actual physical copy of the software so that their

14   expert can review it.  Now, they want more information on

10:25:19  15   how it works.

16             The Government often in these cases works with

17   defense counsel when asked, you know, for specific

18   information about, you know, how is the file downloaded,

19   what occurred at this time?

10:25:30  20             The Government can, you know, make efforts to, you

21   know, for example, demonstrate the software to the defense.

22   These types of requests have not been made.  Instead, they

23   escalated it to the Court as opposed to trying to work it

24   out, because, as the government is submitting, they want an

10:25:50  25   opportunity to get a preview of the trial testimony.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

67

| | |
|---|---|
| 10:25:54 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:26:31 | 5 |

THE COURT:  One moment.

(Pause.)

THE COURT:  I agree with the Government in terms of what the scope of the motion was.  It appears that what the motion was aimed at was that in order to effectively cross-examine Detective Syvock at trial on how Peer Spectre works and its reliability, Mr. Hartman must be provided access to the software and its technical specifications. And then the basis for the motion was really the -- the more expert testimony relating to whether or not the software is reliable and what its technical specifications are.  So for that reason, I'm going to deny the request to have him testify.

Again, perhaps, that is something that you want to see if you can work out with the Government to the extent that there are issues that can be resolved in discovery that way.  But I think this motion is different than what would require the testimony of Detective Syvock.

Other than Detective Syvock, I guess I was thinking of whether or not there was any other expert who was going to be testifying, anybody for the Government, anyone like that?

MS. GANNON:  No, Your Honor.

MS. JACOBS:  Your Honor, could I clarify something for the record?

```
10:27:47   1              THE COURT:  Yes.
           2              MS. JACOBS:  We did ask the Government for more
           3    information on these programs, and they provided us with
           4    that log.  And then, the reason we had to file the motion,
10:27:57   5    was because they wouldn't provide us with anything
           6    additional.  Today is the first offer we had which was made
           7    to the Court that they would do a demonstration for us.  So
           8    I think it is unfair to make the accusation that -- you
           9    know, I want to correct the record, basically, that we have
10:28:14  10    asked them.  We were denied.  And that's why this motion
          11    came up.
          12              And in one of my footnotes in the initial motion
          13    to compel, I did just raise that if the Court would have an
          14    evidentiary hearing and the Government were upon expert, we
10:28:31  15    would want to cross-examine them, but since they haven't and
          16    they don't want to make Detective Syvock available for
          17    cross-examination here, we'll let the Court's decision rest.
          18              THE COURT:  Let me ask before we go on:  In this
          19    particular motion, is the Government offering a
10:28:52  20    demonstration of the software to the defense, before I issue
          21    a ruling, which I won't do from the bench, right now.  I
          22    would obviously review everything that's been submitted and
          23    all the testimony that I have and hear argument and then
          24    take it under submission.
10:29:07  25              MS. GANNON:  Your Honor, something I've discussed
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

|  |  |  |
|---|---|---|
| 10:29:09 | 1 | with the individual agents and they believe that's possible. |
|  | 2 | I would need to confer with Counsel for the agencies, |
|  | 3 | because they may have concerns.  It's my understanding that |
|  | 4 | it has been done in the past.  Certainly in other cases, |
| 10:29:21 | 5 | I've provided screen captures. |

THE COURT:  It appeared from the testimony of the witness we just had that she had not observed it necessarily operationally but in some capacity before.

MS. GANNON:  Yes, Your Honor.

I think, you know -- I'm not trying to be difficult, but if there's a specific concern about -- you know, we're concerned that it was pulling information from multiple users, we can provide some more information about how ShareazaLE is specifically designed to only download from only one individual.  If there's a concern that the login data it not correct, we can potentially address this, but this was all technical --

THE COURT:  I think the concern probably is best outlined in the affidavit or declaration of the expert which is that the publicly available list differ from what was identified as publicly available.  Those are the issues that she's raising and so anything in terms of how the software works with regard to what's publicly available versus not because clearly this goes to the underlying transportation charges as opposed to the possession charge.  And that's why

*DEBORAH D. PARKER, U.S. COURT REPORTER*

70

it's significant.

So that's something that if you can work to narrow what that issue is and address that, what I'm going to do then at this point is this:  I'm going to take the matter -- well, I'm going to have you meet and confer over that issue and see if there can be demonstration that's arranged that's acceptable to both sides, in terms of protecting whatever proprietary interest there are, at the same time providing the defense with the information it needs.  And then, if that can't happen, what I would like for whatever reason or if it's not to the satisfaction of both sides, then by a week from today, I want you to not only apprise me of that, but in lieu of doing any kind of closing argument here, because this is technical information in any event, provide me with your, essentially, closing argument or your synthesis of the oral testimony that I heard today and the documentary that I have, no more than 10 pages.  I don't think anything more than that would be necessary, particularly if you have any exhibits.  And then, at the point that you've submitted that -- and that is only if you haven't reached an agreement -- then, at the point you have submitted that, it will be taken under submission by the Court and then I will issue a ruling.  So that way, we don't have to come back and revisit anything.

All right.  What we're going to do now is, I'm

71

| | | |
|---|---|---|
| 10:32:06 | 1 | going to take a break so that my court reporter has a break. |
| | 2 | I'm going to also -- |
| | 3 | Just before we do that, though, let me ask, Ms. -- |
| | 4 | is it? -- Mathevosian, do we have the custodian of records |
| 10:32:21 | 5 | present? |
| | 6 | MS. MATHEVOSIAN:  Yes, we do. |
| | 7 | THE COURT:  Good.  We gave you ample time to have |
| | 8 | her come here, right, with the entire motion we just heard. |
| | 9 | And so, did she bring with her -- I assume it's |
| 10:32:30 | 10 | the individual sitting -- who is sitting next to you? |
| | 11 | MS. MATHEVOSIAN:  Yes, Your Honor. |
| | 12 | THE COURT:  And if you could identify her for the |
| | 13 | record, please. |
| | 14 | MS. MATHEVOSIAN:  Silvia Sigala. |
| 10:32:38 | 15 | THE COURT:  All right.  And this is the custodian |
| | 16 | of records for the Los Angeles County Sheriff's Department? |
| | 17 | MS. MATHEVOSIAN:  That is correct. |
| | 18 | THE COURT:  And did she bring with her records |
| | 19 | that would be responsive to the subpoena? |
| 10:32:48 | 20 | MS. MATHEVOSIAN:  Yes, she did, Your Honor. |
| | 21 | THE COURT:  Okay.  And then what I would like to |
| | 22 | do is be provided with those records.  I can review those in |
| | 23 | camera and then make a determination as to whether they are |
| | 24 | responsive and appropriate for disclosure or not. |
| 10:33:05 | 25 | MS. MATHEVOSIAN:  Yes, Your Honor. |

72

10:33:06  1           THE COURT:  So I'll do that during the break in

       2   chambers; and then, I'll come back out.  And if I have any

       3   questions about the documents, then we'll address that on

       4   the record but in a closed courtroom with no one present.

10:33:18  5           All right.  So if you would like to provide those

       6   documents to my clerk; and then, we'll be in recess and

       7   those will be brought back to me.

       8           When we come back, we will hear the next motion,

       9   which is the motion to suppress.

10:33:33 10           THE CLERK:  All rise.

      11       (At 10:33 a.m., recess was taken.)

      12

      13                         -oOo-

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

CERTIFICATE

    I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:   October 29, 2015

 

                _____/s/DEBORAH D. PARKER_____
                DEBORAH D. PARKER, OFFICIAL REPORTER

# EXHIBIT B

U.S. v. Todd Christian Hartman

SA CR 15-00063-JLS

*[Summation Brief Re Motion to Compel Discovery]*



**RE: Meet & Confer re: Motion to Compel** 📄
Cuauhtemoc Ortega   to: Gannon, Anne (USACAC)                    11/02/2015 02:11 PM
Cc:  "Andrea Jacobs (Andrea_Jacobs@fd.org)", "Leal, Sandy
     (USACAC)"

The crux of our discovery motion is that we need to know how Peer Spectre and Shareaza LE are coded
to navigate files on suspect computers, since our evaluator found that the software accessed files that did
not appear available for sharing. We need the software to obtain that answer.  But if you think that can be
demonstrated to us with a demo, we're open to your suggestions.

_____

Cuauhtemoc Ortega
Deputy Federal Public Defender
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 7110
Santa Ana, CA, 92701-4598
Tele. (714) 338-4500
Facs. (714) 338-4520

   "Gannon, Anne (USACAC)"      The government's offer was for the def...        11/02/2015 01:18:18 PM

| | |
|---|---|
| From: | "Gannon, Anne (USACAC)" <Anne.Gannon@usdoj.gov> |
| To: | Cuauhtemoc Ortega <Cuauhtemoc_Ortega@fd.org> |
| Cc: | "Andrea Jacobs (Andrea_Jacobs@fd.org)" <Andrea_Jacobs@fd.org>, "Leal, Sandy (USACAC)" <Sandy.Leal@usdoj.gov> |
| Date: | 11/02/2015 01:18 PM |
| Subject: | RE: Meet & Confer re: Motion to Compel |

The government's offer was for the defense to articulate which aspect of the
software's operation (suspect IP identification, file identification, file
download) is the crux of the discovery motion. The goal being to resolve the
motion without the need for a court ruling by providing a demonstration.
Based on a specific request, I could have work with agency counsel about the
possibility of a demonstration.  Providing a demonstration of all aspects of
the Shareaza LE software and PeerSpectre tool is overly broad.

-----Original Message-----
From: Cuauhtemoc Ortega [mailto:Cuauhtemoc_Ortega@fd.org]
Sent: Monday, November 02, 2015 11:53 AM
To: Gannon, Anne (USACAC)
Cc: Andrea Jacobs (Andrea_Jacobs@fd.org); Leal, Sandy (USACAC)
Subject: RE: Meet & Confer re: Motion to Compel

Thank you.  Have you spoken to the interested parties and their counsel about
a demonstration of the software, as discussed at the hearing? Can you
tell us what the demo would show?   We don't think a demo will be
sufficient to resolve this motion, but in order to make that determination we
need an idea of what the demo would show.

_____

Cuauhtemoc Ortega
Deputy Federal Public Defender

Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 7110
Santa Ana, CA, 92701-4598
Tele. (714) 338-4500
Facs. (714) 338-4520


From:          "Gannon, Anne (USACAC)" <Anne.Gannon@usdoj.gov>
To:            Cuauhtemoc Ortega <Cuauhtemoc_Ortega@fd.org>
Cc:            "Andrea Jacobs (Andrea_Jacobs@fd.org)" <Andrea_Jacobs@fd.org>,
               "Leal, Sandy (USACAC)" <Sandy.Leal@usdoj.gov>
Date:          11/02/2015 11:46 AM
Subject:       RE: Meet & Confer re: Motion to Compel


At this time, the government is not willing to facilitate this request.

-----Original Message-----
From: Cuauhtemoc Ortega [mailto:Cuauhtemoc_Ortega@fd.org]
Sent: Monday, November 02, 2015 11:42 AM
To: Gannon, Anne (USACAC)
Cc: Andrea Jacobs (Andrea_Jacobs@fd.org); Leal, Sandy (USACAC)
Subject: Re: Meet & Confer re: Motion to Compel

Our narrowed request is for an installable copy of Peer Spectre and Shareaza
LE, to be produced under a protective order providing that the defense not
circulate or disclose the software, and return it to the government at the
conclusion of this case.


_____

Cuauhtemoc Ortega
Deputy Federal Public Defender
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 7110
Santa Ana, CA, 92701-4598
Tele. (714) 338-4500
Facs. (714) 338-4520


From:          "Gannon, Anne (USACAC)" <Anne.Gannon@usdoj.gov>
To:            "Cuauhtemoc Ortega (Cuauhtemoc_Ortega@fd.org)"
               <Cuauhtemoc_Ortega@fd.org>, "Andrea Jacobs
               (Andrea_Jacobs@fd.org)" <Andrea_Jacobs@fd.org>
Cc:            "Leal, Sandy (USACAC)" <Sandy.Leal@usdoj.gov>
Date:          11/02/2015 11:04 AM
Subject:       Meet & Confer re: Motion to Compel


I wanted to check in to determine whether you were planning on making a more
narrow discovery request re: the undercover software in Hartman that we might
be able to facilitate.  I believe the meet and confer deadline is tomorrow
and, if we don't reach an agreement, the briefing is due Friday.

Thanks,

# EXHIBIT C

U.S. v. Todd Christian Hartman

SA CR 15-00063-JLS

*[Summation Brief Re Motion to Compel Discovery]*



**@Time Warner Cable®**

November 25, 2014

SA Ronald Perez
DHS/ICE-Santa Ana
34 Civic Center Plaza, 4th Floor
Santa Ana, CA 92701

**Re:** Legal Process Dated 11/19/2014 Requesting Time Warner Cable Subscriber Records
**Target Details:** 76.172.3.11

We have conducted a search of our records in response to the above referenced legal process issued at your request.
Pursuant to the specific obligations imposed by 18 U.S.C. §2703, this letter is to advise you that the following records are enclosed:

- Subscriber Info
- Service Details

If you would like to discuss this matter with us, please contact me at (703) 345-2656 between the hours of 8:30 AM
and 5:30 PM EST/EDT. When calling, please reference the TWC case number # 1484 to enable us to retrieve
your legal process and this letter from our files for the contact. It is Time Warner Cable's Record Retention policy
to destroy our files relating to this request three years from the date of our response.

Respectfully,

Sean Harris
Subpoena Analyst
Law Enforcement Response Operations Center
Time Warner Cable
http://www.timewarnercable.com/SubpoenaCompliance SubpoenaInquiry@twcable.com





**SUBSCRIBER RECORD**

| Target Details | 76.172.3.11 |
|---|---|
| Subscriber Name: | Judy Hartman |
| Subscriber Address: | ████████████, Newport Beach, CA 92663-3178 |
| Service Type - RR HSD | Activate Date: 5/21/2011    Deactivate Date: Still Active |
| User Name or Features: | ████████████@roadrunner.com |
| Phone number: | ████████████ |



Time Warner Cable / 13820 Sunrise Valley Drive Herndon, VA 20171 / Tel: (703) 345-3422 Fax: (704) 697-4911

0037

# EXHIBIT D

<u>U.S. v. Todd Christian Hartman</u>

SA CR 15-00063-JLS

*[Summation Brief Re Motion to Compel Discovery]*

1    Wm. Michael Whelan, Jr., ESQ. (CA Bar No. 112190)
     95 S. Market Street, Suite 300
2    San Jose, California 95113
     (650) 319-5554 telephone
3    (415) 874-7082 facsimile
     whelanlaw@gmail.com
4
     Graham E. Archer (CA Bar No. 262464)
5    95 S. Market Street, Suite 300
     San Jose, California 95113
6    (408) 596-9451 telephone
     (408) 596-5657
7    graham@garcher.com

8    Attorneys for Defendant
     MAX BUDZIAK
9                   IN THE UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                          SAN JOSE DIVISION

12

13   UNITED STATES OF AMERICA          Case No. CR-08-00284-RMW

14          Plaintiff,                 **Defendant Budziak's Status**
                                       **Memorandum re: Inspection of**
15   vs.                               **Government Software**

16
     MAX BUDZIAK,
17
            Defendant.
18

19

20

21
            By and through his counsel, defendant Max Budziak submits the following status report
22
     regarding the inspection of the eP2P software ordered produced by the Ninth Circuit and this
23
     Court.
24
            On October 5, 2012, the Ninth Circuit Court of Appeals remanded this matter for further
25
26   proceedings with instructions to determine whether characteristics of the eP2P software used by

27   the FBI to investigate Mr. Budziak could have affected the course of Mr. Budziak's case.

28

                                             -1-

On February 18, 2014, this Court issued an order[1] compelling the Government to produce the eP2P software used in its investigation of Mr. Budziak in both executable and source code format, as well as setting conditions for its review. The Court set a status date of May 8, 2014, by which time defense investigation of the software was to be completed.

Beginning shortly prior to the issuance of the February 18 order, and continuing to the date of filing of this report, defense counsel has inquired by e-mail, phone and in person of the Government regarding the inspection of the software.

By way of letter dated today, April 24, 2014, the Government has provided the following information:

- The FBI has searched for, and is unable to find the source code for the version of eP2P software (v1.4.6) used in the investigation of Mr. Budziak.

- The Government is prepared to make available to the defense the following:
    - An executable copy of eP2P version 1.4.6
    - Source code for eP2P version 1.7.4
    - Features documentation for eP2P version 1.5

As of the filing of this memorandum, the Government has not indicated if or where this software is currently available to be reviewed. Even if the software were made immediately available, I will be unavailable to participate in the inspection process, as I am attending a CJA training in San Diego from April 27 to May 2.

Dated: April 24, 2014

/s/ _____
Graham E. Archer
Attorney for Defendant Max Budziak

---

[1] Docket No. 248.

-2-

Memorandum re Protective Order

# EXHIBIT D

<u>U.S. v. Todd Christian Hartman</u>

SA CR 15-00063-JLS

*[Summation Brief Re Motion to Compel Discovery]*

1   Wm. Michael Whelan, Jr., ESQ. (CA Bar No. 112190)
    95 S. Market Street, Suite 300
2   San Jose, California  95113
    (650) 319-5554 telephone
3   (415) 874-7082 facsimile
    whelanlaw@gmail.com
4
    Graham E. Archer (CA Bar No. 262464)
5   95 S. Market Street, Suite 300
    San Jose, California 95113
6   (408) 596-9451 telephone
    (408) 596-5657
7   graham@garcher.com
8   Attorneys for Defendant
    MAX BUDZIAK
9                    IN THE UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                          SAN JOSE DIVISION

12

13   UNITED STATES OF AMERICA             Case No. CR-08-00284-RMW

14          Plaintiff,                    **Defendant Budziak's Status**
                                          **Memorandum re: Inspection of**
15   vs.                                  **Government Software**

16

17   MAX BUDZIAK,

18          Defendant.

19

20

21
             By and through his counsel, defendant Max Budziak submits the following status report
22
     regarding the inspection of the eP2P software ordered produced by the Ninth Circuit and this
23
     Court.
24
             On October 5, 2012, the Ninth Circuit Court of Appeals remanded this matter for further
25
26   proceedings with instructions to determine whether characteristics of the eP2P software used by

27   the FBI to investigate Mr. Budziak could have affected the course of Mr. Budziak's case.

28
                                          -1-

On February 18, 2014, this Court issued an order[1] compelling the Government to produce the eP2P software used in its investigation of Mr. Budziak in both executable and source code format, as well as setting conditions for its review. The Court set a status date of May 8, 2014, by which time defense investigation of the software was to be completed.

Beginning shortly prior to the issuance of the February 18 order, and continuing to the date of filing of this report, defense counsel has inquired by e-mail, phone and in person of the Government regarding the inspection of the software.

By way of letter dated today, April 24, 2014, the Government has provided the following information:

- The FBI has searched for, and is unable to find the source code for the version of eP2P software (v.1.4.6) used in the investigation of Mr. Budziak.

- The Government is prepared to make available to the defense the following:

  - An executable copy of eP2P version 1.4.6

  - Source code for eP2P version 1.7.4

  - Features documentation for eP2P version 1.5

As of the filing of this memorandum, the Government has not indicated if or where this software is currently available to be reviewed. Even if the software were made immediately available, I will be unavailable to participate in the inspection process, as I am attending a CJA training in San Diego from April 27 to May 2.

Dated: April 24, 2014

/s/
Graham E. Archer
Attorney for Defendant Max Budziak

[1] Docket No. 248.

-2-

Memorandum re Protective Order

# EXHIBIT E

<u>U.S. v. Todd Christian Hartman</u>

SA CR 15-00063-JLS

*[Summation Brief Re Motion to Compel Discovery]*

*E-FILED *

## CRIMINAL MINUTE ORDER

JUDGE:  Ronald M. Whyte                    REPORTER: Lee-Anne Shortridge

DATE:   June 5, 2014                       TIME: 2:00 pm   *(Time: 13 mins.)*

CRIMINAL NO.: CR-08-00284-RMW

TITLE: UNITED STATES OF AMERICA   -v- MAX BUDZIAK  (P) (C)
        APPEARANCES:

PLTF:  AUSA: J. Nedrow                     DEFT: M. Whelan & G. Archer

COURT ACTION: RESENTENCING

Hearing Held.  The Court heard from the parties and grants the government's motion to dismiss the two distribution charges (Counts 1 and 2).  Defendant's motion for discovery remedy is denied on the basis that the discovery has essentially been satisfied under the circumstances.  The Court resentenced the defendant to a term of time served as to Count 3. Upon release from custody, the defendant shall be placed on supervised release for a period of 5 years with the same special conditions of supervision previously imposed.  The defendant shall pay a special assessment in the amount of $100, which shall be due immediately.  The Court did not impose a fine and restitution.  See Amended Judgment for specifics.

/s/ Jackie Garcia
       JACKIE GARCIA
       **Courtroom Deputy**