HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
CUAUHTÉMOC ORTEGA (Bar No. 257443)
(E-Mail: cuauhtemoc_ortega@fd.org)
ANDREA JACOBS (Bar No. 236892)
andrea_jacobs@fd.org
Deputy Federal Public Defenders
411 West Fourth Street, Suite 7110
Santa Ana, California  92701-4598
Telephone:  (714) 338-4500
Facsimile:  (714) 338-4520

Attorneys for Defendant
TODD CHRISTIAN HARTMAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>TODD CHRISTIAN HARTMAN,<br><br>　　　　　Defendant. | Case No. SA CR 15-00063-JLS<br><br>**SUMMATION BRIEF RE MOTION TO SUPPRESS EVIDENCE; EXHIBIT A-B** |

　　　Defendant Todd Christian Hartman hereby files his summation brief in support of his motion to suppress evidence.

　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　HILARY POTASHNER
　　　　　　　　　　　　　　　　　Federal Public Defender


DATED: November 13, 2015　　　By　*/s/ Andrea Jacobs & Cuauhtémoc Ortega*
　　　　　　　　　　　　　　　　　Andrea Jacobs & Cuauhtémoc Ortega
　　　　　　　　　　　　　　　　　Deputy Federal Public Defenders

## SUMMATION BRIEF

The question presented in Todd Christian Hartman's motion to suppress is "whether the circumstances of [his] interrogation effected a police-dominated atmosphere." *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008) . One that would have caused a reasonable person to feel he was not free to terminate the interrogation and leave. *Id.* at 1088. The answer is yes.[1]

### A. Number of Law Enforcement; Whether They Were Armed

Detective David Syvock confirmed that there were 14 law enforcement officers present at the execution of the search warrant. (Ex. B, RT at 153). It is nearly twice the number of those present in *Craighead*. 539 F.3d at 1085. This factor weighs heavily in the defense's favor. The government argues that "defendant was never in the presence of all" officers, because some were outside. (Govt. Brief at 8). Mr. Hartman, however, was *aware* that a large number of officers were present, because he saw them when they made entry and when he was brought out onto the deck. (Ex. B, RT at 207 ("I knew from before I came in the room that there were multiple armed officers that were blocking the exits")). Not all of the officers could be inside Mr. Hartman's apartment because they didn't fit, according to Det. Syvock. (*Id.* at 137 ("I don't think all the 14 or 15 could fit in the residence. It's quite small.")). But even if only half the officers were inside, they would have easily saturated the small apartment.

The officers, including Det. Syvock, were armed. The fact that they were armed was noticeable to Mr. Hartman and eyewitnesses. (Ex. A, RT at 98; Ex. B, RT at 206). Det. Syvock stated in his declaration that his gun was concealed during the interrogation, but then at the hearing backtracked and said that it wasn't concealed.

---

[1] Attached as Exhibit A is the transcript for the proceedings held on October 27, 2015 ("Ex. A, RT"), with the exception of the testimony of defense expert Tami Loehrs, That portion of the transcript was previously filed with the defendant's Summation Brief Re Motion to Compel Discovery Pursuant to Fed. R. Crim. P. 16; Exhibits A-E. (Docket No. 68). Attached as Exhibit B is the transcript of the proceedings held on October 28, 2015. ("Ex. B, RT").

(Ex. B, RT at 139). Such a concession was necessary, since the very first seconds of the video-taped interrogation show Det. Syvock's gun visibly attached to his waist. Det. Syvock stated on direct that he normally conceals his weapon "so that it doesn't create an environment that makes people uncomfortable." (*Id.* at 135). His admission that the presence of guns makes people "uncomfortable" is key, since the video shows his gun was plainly visible to anyone in his presence during the interrogation.[2] (*Id.*).

Agents made entry into the Hartman home with guns, including a long arm. Agent Kim Speakman was carrying an M-4 that he estimated measured 2.5 feet or more in length. (*Id.* at 186-87). He agreed that the purpose of such a powerful weapon was to make defendant "stop in [his] tracks," to "help control the situation." (*Id.* at 188-89). But he was unaware of any security concerns that would have warranted the guns-drawn entry, even though his colleagues had previously visited Mr. Hartman at his home. (*Id.* at 192). The government argues that the use of the long gun is a non-issue because "defendant saw the rifle *before* Det. Syvock made it clear that defendant was free to leave."[3] But that is precisely the reason why the issue of the long gun is relevant. The "context" in which defendant was told he was free to leave, *Craighead*, 539 F.3d at 1084, was after law enforcement made entry into his home with what looks like military-grade armament. Mr. Hartman was scared to death when he saw the gun. (Ex. B, RT at 206; *see also id.* at 196 ("[Mr. Hartman] was shocked. He was startled," per Agent Speakman)). To a lay person, the gun looks terrifying. Any person would, at minimum, become "uncomfortable," to use Det. Syvock's words, when targeted with an M-4. And with good reason: Agent Speakman testified that he uses the M-4 rifle because it is a more "accurate" tool to shoot down a suspect. (*Id.* at 188). The use of firearms, including a long gun, is inapposite with Det. Syvock's general claim that he

---

[2] The video was government's exhibit 4 at the hearing. (Ex. B, RT at 137).

[3] *See* Government's Post-Hearing Supplemental Briefing Opposing Defendant's Motions to Suppress Evidence and Compel Discovery (hereinafter, "Govt. Brief"), Docket No. 69, at 5-6 (emphasis added).

was trying to create a relaxed environment. To the contrary, it makes sense that someone could believe they were "under guard," *Craighead*, 539 F.3d at 1086, and not free to leave, after witnessing such a display of force against them in their own home.

**B.     Restraint of Defendant & Isolation**

Mr. Hartman described in his declaration that his hands were held behind his back as he was taken out of his home. This is consistent with a witness's account that Mr. Hartman's hands appeared restrained behind his back. (Ex. A, RT at 98). It would make sense that a defendant's hands would be restrained to control his movement until officers can decide where to place him. The restraint may have been temporary, but it's still relevant because restrained hands to the ordinary person are synonymous with arrest. Mr. Hartman was also told to put his hands up, which is also be associated with arrest by lay persons. (Ex. B, RT at 197).

Det. Syvock isolated Mr. Hartman from others by placing him in a closed door bedroom; Mr. Hartman was ordered where to sit. Det. Syvock claims that he did not know Mr. Hartman's mother was on the premises. (*Id.* at 154). This is not credible. She provided him with a key to the apartment. (*Id.* at 130). And an eye witness recalls seeing Mr. Hartman's mother on the premises when officers were making entry into the home. (Ex. A, RT at 86). Mr. Hartman was aware that his mother was nearby, and that law enforcement had contacted her, because law enforcement officers were discussing this in his presence. (Ex. B, RT at 209). But he did not believe he could ask that his mom be present during his initial interactions with officers or during the interrogations. (*Id.* at 209). The belief that officers might purposefully be keeping people away from a "crime scene," or that they might be keeping witnesses isolated from one another, is reasonable. Nobody told Mr. Hartman his mom could be present for support.

Det. Syvock placed Mr. Hartman in a closed-door room to facilitate the incrimination process. Mr. Hartman didn't ask to be placed in a closed door room. Det. Syvock concedes this was his idea. (*Id.* at 171 ("Q: Why did you close the door then? A: For privacy. Q: Did he want the door closed? A: I wanted the door closed for

4

privacy."). Tellingly, at one point in the interview, Det. Syvock leaves the interrogation room and closes the door behind him, leaving Mr. Hartman shut inside. (*Id.* at RT 177 ("Q: Why did you close the door when you left the room?  A: I have no idea why I closed the door.  Q: Did you tell Todd he could leave at that point?  A: No.")).  If Mr. Hartman was free to leave, the door didn't need to be closed.  The door was closed to create an atmosphere of dominance over Mr. Hartman.

## C. Whether Defendant Was Told He Was Free to Leave and the Context

Mr. Hartman was told he was free to leave only after 14 law enforcement officers set up a perimeter and overtook his residence, which Det. Syvock described as "quite small." (*Id.* at 137).  A reasonable person would not have felt free to get up, open the door while in the middle of an interview with armed officers, and walk out of the apartment, past other officers who had, minutes prior, found it necessary to seize him with firearms and draw him out of his house nearly nude within sight of his neighbors. Especially not so, when, as the video shows occurred with Mr. Hartman, the person is told he is being investigated for a crime *before* he is told he is free to leave.

The layout of the apartment is also relevant.  Det. Syvock testified that this was a particularly difficult search warrant to execute because "access to the residence is limited" to a small "breezeway" on the ground level, followed by a set of stairs up to the door.  (*Id.* at 127-128).  A person would have felt his movement more restricted in Mr. Hartman's apartment than in a home with easy access and multiple exits.

Mr. Hartman did not cause the interrogation to take place.  On direct exam, Det. Syvock testified that Mr. Hartman "expressed to [him] that he was willing to be interviewed." (Ex. B, RT at 134).  This is an exaggeration, given the interaction captured on video.  Det. Syvock concedes that he asked Mr. Hartman, "Hey Todd, do you want to come back in here?," referring to the bedroom. (*Id.* at 170).  Det. Syvock acknowledges that Mr. Hartman simply says, "I guess." (*Id.*).  The phrase, "I guess," signals reluctance and compliance with authority not "willingness."  Det. Syvock also confusingly described receiving a suspect's express, versus implicit, consent to

5

interview. (*Id.* at 174-75). He says that Mr. Hartman's consent to be interviewed was "implicit" for some of the interviews, and that for others he "*would* have" received the consent off camera, even though he had a camera at hand and ready. (*Id.* at 174-76 (emphasis added)). It would seem simpler to just issue *Miranda* advisements.

Mr. Hartman did not believe he could leave because he was unsure of the chain of command, given the multiple agencies present. He assumed Det. Syvock was not in charge because he was with a local police department. (*Id.* at 207). The presence of multiple agencies was relevant to the Court in *Craighead*. 539 F.3d at 1085. The government states that "the officers present were part of a single task force which a reasonable person would have felt had a coordinated authority." (Govt. Brief at 8). This point is undermined by Det. Syvock's testimony that he could not remember who was in charge of assigning roles during the search warrant execution, even when presented with a list of the involved officers. (Ex. B, RT at 156). Later on he stated that he was in charge, "absolutely." (*Id.* at 157). But he didn't convey this information to Mr. Hartman. (*Id.*). It is reasonable for a person to assume, as Mr. Hartman did, that a local agency is subservient to a federal agency, and that a local officers' statements about his freedom to leave might not carry weight with other agencies-- particularly since Mr. Hartman had tried to leave the premises and was told not to. (*Id.* at 204-205).

The circumstances in which Mr. Hartman was told he was free to leave dictated otherwise to him. He was under guard by 14 officers, isolated, and confronted with evidence that he had broken the law. Mr. Hartman thought that if he got up and left the interview room, "they were just going to put handcuffs on me." (*Id.* at 207). Anyone in his shoes would have thought the same.

**D.    Conclusion**

For the foregoing reasons, Mr. Hartman respectfully requests that the Court grant his motion to suppress.

6