**EXHIBIT B**

(TO SUMMATION BRIEF RE MOTION TO SUPPRESS EVIDENCE;

EXHIBIT A-B)

U.S. v. Todd Christian Hartman

SA CR 15-00063-JLS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE JOSEPHINE L. STATON, JUDGE PRESIDING

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACR NO. 15-00063-JLS |
| | ) |
| TODD CHRISTIAN HARTMAN, | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

WEDNESDAY, OCTOBER 28, 2015

2:00 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

                ANDRE BIROTTE, JR.
                UNITED STATES ATTORNEY

                DENNISE D. WILLETT
                ASSISTANT UNITED STATES ATTORNEY
                CHIEF, CRIMINAL DIVISION


                ANNE C. GANNON
                SANDY N. LEAL
                ASSISTANT UNITED STATES ATTORNEYS
                UNITED STATES DISTRICT COURT
                8000 RONALD REAGAN FEDERAL BUILDING
                SANTA ANA, CALIFORNIA 92701
                (714) 338-3500


    FOR THE DEFENDANT, TODD CHRISTIAN HARTMAN:

                SEAN K. KENNEDY
                FEDERAL PUBLIC DEFENDER

                ANDREA L. JACOBS
                CUAUHTEMOC ORTEGA
                DEPUTY FEDERAL PUBLIC DEFENDERS
                411 WEST FOURTH STREET
                SUITE 7110
                SANTA ANA, CALIFORNIA 92701
                (714) 338-3400

I N D E X

| DEFENDANT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THERESA BARD | 120 | 123 | | |
| DAVID SYVOCK | | 124 | 138 | 180 |
| KIM LEE SPEAKMAN, JR. | 184 | 194 | | |
| TODD HARTMAN | 202 | 210 | 238 | 240 |

E X H I B I T S

| PLAINTIFF'S EXHIBITS: | | IDENTIFICATION | EVIDENCE |
|---|---|---|---|
| 2 | OVERHEAD VIEW OF RESIDENCE | | 125 |
| 3 | DEPICTION OF HARTMAN RESIDENCE | | 127 |
| 4 | CLIPS FROM VIDEO | | 243 |

E X H I B I T S

| DEFENDANT'S EXHIBITS: | | IDENTIFICATION | EVIDENCE |
|---|---|---|---|
| A | OPERATIONS PLAN FOR SEARCH WARRANT | | 153 |
| F | PHOTOGRAPH | | 185 |
| G | PHOTOGRAPH | | 187 |
| I | CLIPS FROM VIDEO | | 243 |

```
              1        SANTA ANA, CALIFORNIA; WEDNESDAY, OCTOBER 28, 2015;

              2                          2:01 P.M.

              3                          -oOo-

              4        (The following proceedings were had in open

              5        court:)

              6            THE COURT:  All right.  Good afternoon.

              7            We are back on the continuation of the motion to

              8    suppress.  We began yesterday with the testimony of the

              9    third-party witnesses.

02:01:22     10            Let me ask:  Who else do we have as witnesses

             11    today?

             12            MR. ORTEGA:  Your Honor, we're calling

             13    Theresa Bard from the Orange County Sheriff's Department.

             14    She should be relatively quick.

02:01:36     15            THE COURT:  Okay.  And that's all, or anyone else?

             16            MR. ORTEGA:  Three more.

             17            THE COURT:  Three more.

             18            MR. ORTEGA:  Detective Syvock.  Agent Speakman

             19    from Homeland Security; and then, if the Government wishes

02:01:50     20    to cross-examine Mr. Hartman, Mr. Hartman.

             21            THE COURT:  All right.  And so other than the

             22    witnesses who have been identified, does the government

             23    intend to put on any witnesses?

             24            MS. GANNON:  No, Your Honor.

02:02:02     25            THE COURT:  All right.  And so, what is your time
```

| | | |
|---|---|---|
| 02:02:06 | 1 | estimate for this? |
| | 2 | I asked it at the outset, and I think -- I think |
| | 3 | you might have said an hour and a half. We've gone into it |
| | 4 | a little bit already, but -- |
| 02:02:20 | 5 | MR. ORTEGA: My direct on Officer Bard will, |
| | 6 | probably, be five to seven minutes. Detective Syvock, 45 |
| | 7 | minutes. Agent Speakman 10 to 15 minutes, give or take. |
| | 8 | THE COURT: All right. |
| | 9 | MR. ORTEGA: And Mr. Hartman will largely be |
| 02:02:41 | 10 | determined by the government's cross-examination. |
| | 11 | THE COURT: All right. What's your time estimate |
| | 12 | on that? |
| | 13 | MS. GANNON: Say approximately 40 minutes, |
| | 14 | Your Honor. |
| 02:02:51 | 15 | THE COURT: All right. Okay. We should be able |
| | 16 | to get through this today then. |
| | 17 | And so, you may call your first witness. |
| | 18 | MR. ORTEGA: Your Honor, may we have Mr. Hartman |
| | 19 | unshackled? |
| 02:03:02 | 20 | THE COURT: Yes. As was the case yesterday. |
| | 21 | *(Pause.)* |
| | 22 | MR. ORTEGA: Your Honor, Defendant calls Theresa |
| | 23 | Bard. |
| | 24 | *(Pause.)* |
| 02:03:58 | 25 | THE COURT: If you can stop at the end of counsel |

02:04:01  1    table.

       2              Raise your right hand to be sworn.

       3              THERESA BARD, DEFENDANT'S WITNESS, SWORN

       4              THE WITNESS:  I do.

02:04:09  5              THE CLERK:  Step forward.

       6         *(Pause.)*

       7              THE CLERK:  If you can, please, state your name,

       8    spell your first and the last for the record.

       9              THE WITNESS:  Theresa Bard, T-H-E-R-E-S-A B-A-R-D.

02:04:39 10              THE COURT:  You may inquire.

      11              MR. ORTEGA:  Thank you, Your Honor.

      12                        DIRECT EXAMINATION

      13    BY MR. ORTEGA:

      14    Q    Good afternoon.

02:04:42 15    A    Good afternoon.

      16    Q    Where are you employed?

      17    A    The Orange County Sheriff's Department.

      18    Q    And where were you employed in February 2015?

      19    A    The Orange County Sheriff's Department.

02:04:52 20    Q    Did you participate in the execution of a search

      21    warrant at the home of Todd Hartman?

      22    A    Yes.

      23    Q    And do you remember the date?

      24    A    I believe it was the 5th or 7th of February.

02:05:03 25    Q    Of this year?

| | |
|---|---|
| 02:05:04 | 1 |

```
02:05:04    1   A    Correct.

            2   Q    And at what time did you arrive to the -- to the area

            3   where the search warrant was going to be executed?

            4   A    I couldn't tell you the exact time, but I know it was

02:05:15    5   near 7:00 o'clock.

            6   Q    And had the search commenced at that point?

            7   A    No.

            8   Q    What did you see when you arrived?

            9   A    I was on one of the main streets.  And I was with one

02:05:28   10   of my partners over there at the time.  And then I was

           11   escorted to an alley.  And I stood in the alley, and I just

           12   saw numerous people standing around with their vests on.

           13   Q    Did you hear law enforcement say anything?

           14   A    When they did a knock-and-notice, yes.

02:05:45   15   Q    What did you hear?

           16   A    I just heard them do the knock-and-notice and announce

           17   who they were.

           18   Q    And did you see defendant at any point while you were

           19   in the area?

02:05:56   20   A    No.

           21   Q    Did you see defendant exit his home?

           22   A    No.

           23   Q    Did you see defendant on the balcony?

           24   A    Yes.

02:06:07   25   Q    What was the defendant wearing?
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
02:06:09   1   A    From what I remembered, it might have been shorts or
           2   boxers, or pajamas -- bottoms.
           3   Q    And this -- excuse me.  This was while he was outside
           4   on the balcony, correct?
02:06:19   5   A    Correct.
           6   Q    Did he have a shirt on?
           7   A    Not that I recall.
           8   Q    So you don't recall seeing him wearing a shirt?
           9   A    Not at that time, no.
02:06:28  10   Q    At some point did you see someone provide him with a
          11   shirt?
          12   A    Yes.
          13   Q    And was he provided with a shirt because he wasn't
          14   wearing a shirt?
02:06:41  15   A    I don't know, because I was not part of the
          16   conversation.
          17   Q    Did you see Mr. Hartman exit the home, or did you see
          18   him when he was already on the balcony?
          19   A    He was already on the balcony.
02:06:54  20   Q    It was at that time you say he might or might not have
          21   a shirt on, correct?
          22   A    Yes.
          23        MR. ORTEGA:  Thank you.
          24        No further questions.
02:07:01  25        THE COURT:  Anything on cross-examination?
```

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 02:07:05 | 1  |      MS. LEAL:  Yes.               |

02:07:05  1         MS. LEAL:  Yes.

       2              CROSS-EXAMINATION

       3  BY MS. LEAL:

       4  Q    Officer Bard, good morning -- good afternoon.

02:07:13  5  A    Good afternoon.

       6  Q    When you were in the alley, did you have a gun?

       7  A    Yes.

       8  Q    And what type of gun?  Was it an assault rifle, a

       9  shotgun, or a handgun?

02:07:25 10  A    No, it was my handgun.  My department-issued handgun.

      11  Q    Did you have it holstered, or did you have it out?

      12  A    I had it out to low-ready position.

      13  Q    Were you at the bottom of the stairwell in the alley,

      14  or at a different location in the alley?

02:07:39 15  A    I was approximately a house or two away from the -- the

      16  house that they were serving the search warrant, and I was

      17  at the bottom in the alley.

      18  Q    Where there any bystanders outside?

      19  A    Not that I saw.

02:07:54 20  Q    Did you have any interaction with any of the neighbors?

      21  A    No.

      22              MS. LEAL:  Thank you.

      23              THE COURT:  Anything further on direct?

      24              MR. ORTEGA:  No, Your Honor.  Thank you.

02:08:02 25              THE COURT:  May this witness be excused?

```
02:08:04   1              MR. ORTEGA:  Yes, Your Honor.

           2              MS. LEAL:  Yes, Your Honor.

           3              THE COURT:  You may step down.  You are excused.

           4              THE WITNESS:  Thank you, Your Honor.

02:08:11   5              THE COURT:  Defendant may call its next witness.

           6              MS. JACOBS:  We would call Detective Syvock.

           7         (Pause.)

           8              THE CLERK:  Sir, if you can stop at the end of

           9    counsel table.

02:09:34  10              Raise your right hand to be sworn.

          11              DAVID SYVOCK, PLAINTIFF'S WITNESS, SWORN

          12              THE WITNESS:  Yes, I do.

          13              THE CLERK:  Please step forward.

          14         (Pause.)

02:10:00  15              THE CLERK:  Sir, if you can, please, state your

          16    name, spelling your first and your last for the record.

          17              THE WITNESS:  David Syvock; DAVID, S-Y-V -- as in

          18    Victor -- O-C-K.

          19              THE CLERK:  Thank you.

02:10:17  20              THE COURT:  All right.  You may inquire.

          21              MS. GANNON:  Thank you, Your Honor.

          22                        CROSS-EXAMINATION

          23    BY MS. GANNON:

          24    Q    Detective Syvock, who do you currently work for?

02:10:24  25    A    Newport Beach Police Department.
```

02:10:26 1    Q    And were you involved in the investigation of an

2    individual named Todd Christian Hartman?

3    A    Yes, I was.

4    Q    And were you present for the execution of a search

02:10:34 5    warrant at his residence, on February 5th, 2015?

6    A    Yes, I was.

7    Q    Now, I would like you to take a look at -- there should

8    be some manila folders in front you -- what's been marked as

9    Government's Exhibit 2.

02:10:50 10   A    *(Witness so complies.)*

11   Q    And do you recognize Exhibit 2?

12   A    Yes, I do.

13   Q    And what is it?

14   A    That's an overhead view of Mr. Hartman's residence.

02:11:06 15   Q    Is this a fair and accurate depiction of the overhead

16   view of his residence and the surrounding area?

17   A    Yes, it is.

18        MS. GANNON:  Your Honor, the Government would move

19   to admit Exhibit 2.

02:11:17 20        THE COURT:  Any objection?

21        MS. JACOBS:  No objection.

22        THE COURT:  Exhibit 2 is admitted.

23        *(Plaintiff's Exhibit 2 received in evidence.)*

24        MS. GANNON:  And permission to publish,

02:11:25 25   Your Honor?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:11:25  1      THE COURT:  Once it's admitted, since there's no

2  jury here, you have automatic and unlimited permission to

3  publish.

4      MS. GANNON:  Thank you, Your Honor.  I think it's

02:11:32  5  a habit.

6      THE COURT:  I know.

7  BY MS. GANNON:

8  Q    Detective Syvock, can you describe where on this

9  photograph defendant's residence is located?

02:11:41 10  A    In reference to where the "A" is, that's his balcony;

11  and then, his front door is directly to the left of that.

12  So that whole back portion of the lighter gray roof, past

13  the "A" would be his residence in the upstairs unit.

14  Q    And using this photograph, can you describe how an

02:12:01 15  individual would enter the residence?

16  A    Yeah.  If you're looking to the right of the "A"

17  towards the front of that house, there's two houses side by

18  side.  One, I guess just to the north of -- which has a

19  darker gray roof.  There's a walkway, and you can see some

02:12:20 20  lighter patio furniture -- some white patio furniture right

21  in front of that house to give you reference.

22      In between those two houses, there is a walkway.

23  And just about halfway up the walkway, there's stairs that's

24  used to access the residence.

02:12:38 25  Q    Now, if I could ask you to take a look at what's been

02:12:41   1   marked as Government's Exhibit 3.

           2   A    *(Witness so complies.)*

           3   Q    And do you recognize that document?

           4   A    Yes.

02:12:56   5   Q    And what is it?

           6   A    That's also a depiction of Mr. Hartman's residence.

           7   It's actually two houses together.  The front house is

           8   occupied by other people that I don't know who they are; and

           9   then, his residence, you can see the balcony just above the

02:13:13  10   roof of the front house.

          11   Q    Is there a balcony and deck in front of the front door?

          12   A    Yes, there is.

          13        MS. GANNON:  Your Honor, the Government moves to

          14   admit Government's Exhibit 3.

02:13:22  15        THE COURT:  Any objection?

          16        MS. JACOBS:  No, Your Honor.

          17        THE COURT:  Exhibit 3 is admitted.

          18        *(Plaintiff's Exhibit 3 received in evidence.)*

          19   BY MS. GANNON:

02:13:29  20   Q    Now, was this a difficult location to execute a search

          21   warrant at?

          22   A    Very much so, yes.

          23   Q    And why was that?

          24   A    Well, one, the access to the residence is limited,

02:13:41  25   based by the small breezeway between the two houses.  That

02:13:47  1    problem was compounded by the fact that you have to climb a

          2    set of stairs.  Directly at the top of those stairs, puts

          3    you in front of a large window and then the door is directly

          4    to the right of that.  So there's very little location for

02:14:03  5    the entry team to be concealed upon entry to that location.

          6    Q    And are you aware if incident or the execution of the

          7    search warrant or an arrest warrant involving child

          8    exploitation suspects have become violent?

          9    A    Yes.

02:14:22 10    Q    And have they become violent as a result of law

         11    enforcement action or the result of actions taken by the

         12    suspects?

         13    A    Actions taken by the suspects.

         14    Q    Now, when you executed this search warrant, did the

02:14:41 15    members of law enforcement there have specific roles to play

         16    in the execution?

         17    A    Yes.

         18    Q    And is there something known has an "entry team"?

         19    A    Yes.

02:14:49 20    Q    And also a parameter team?

         21    A    That's correct.

         22    Q    And what's the role of the parameter team?

         23    A    The "parameter team" is responsible for all the area

         24    outside of the residence, making sure that the entry team is

02:15:04 25    safe upon approach and while they're making contact at the

129

| | | |
|---|---|---|
| 02:15:08 | 1 | front door. |
| | 2 | Q    And do you recall in this case how many members of the |
| | 3 | search warrant team were part of the parameter team? |
| | 4 | A    Not specifically.  I would guess four or five. |
| 02:15:24 | 5 | Q    Now, what was your role with regard to the execution of |
| | 6 | this search warrant? |
| | 7 | A    I was going to be conducting the interview. |
| | 8 | Q    And so, when the team was preparing -- part of the team |
| | 9 | was preparing to enter the residence, where were you |
| 02:15:39 | 10 | located? |
| | 11 | A    I would have been to the rear of the -- what we call |
| | 12 | the stack, the line of entry personnel. |
| | 13 | Q    And why weren't you at the front of the stack? |
| | 14 | A    Well, my personal reason for it is if I'm going to be |
| 02:15:55 | 15 | conducting the interview, the last thing I want is to have a |
| | 16 | negative contact with the individual that I'm going to be |
| | 17 | interviewing and the opportunity for a negative contact |
| | 18 | would occur upon entry.  Therefore, I place myself at the |
| | 19 | rear so that the first contact I have with him is a more |
| 02:16:12 | 20 | comfortable, relaxed environment. |
| | 21 | Q    And do you know who the first person in this stack or |
| | 22 | line of officers to enter was? |
| | 23 | A    On this one, it would have been either Special Agent |
| | 24 | Perez or Special Agent Speakman. |
| 02:16:29 | 25 | Q    And were you able to see their position from where you |

02:16:32  1   were standing?

          2   A      Yes.

          3   Q      Upon entry when they entered?

          4   A      Yes.

02:16:37  5   Q      And where were they standing?

          6   A      Special Agent Perez had a key for the front door, so he

          7   would have been standing directly to one side of the door.

          8          Special Agent Speakman would have been to the

          9   other side of the door.

02:16:56 10   Q      And do you know how a key to the residence was

         11   obtained?

         12   A      Yes.  I obtained it from Mr. Hartman's mother.

         13   Q      And why did you do that?

         14   A      Well, to assist us in the entry so that in the event

02:17:09 15   that nobody opened the door, we didn't have to force entry.

         16   Q      And does forced entry sometimes involve damage to

         17   property?

         18   A      Yes, it does.

         19   Q      And as part of the execution of the search warrant, did

02:17:25 20   you ultimately make contact with Mr. Hartman?

         21   A      Yes, I did.

         22   Q      And if you could tell us about how that contact

         23   occurred.

         24   A      Special Agent Perez would have made what we call "knock

02:17:36 25   and announce" where we knock on the front door and announce

| | | |
|---|---|---|
| 02:17:39 | 1 | our presence as police officers.  And once that is done, the |
| | 2 | door is opened and orders will be given once the door is |
| | 3 | opened, again, announcing our presence.  Once that happened |
| | 4 | in this case, I heard Special Agent Speakman giving |
| 02:17:57 | 5 | instructions to somebody inside the house. |
| | 6 | At that point, I moved up in the stack knowing |
| | 7 | that I was going to be making contact with somebody, and I |
| | 8 | made contact with Mr. Hartman right at the threshold of the |
| | 9 | front door. |
| 02:18:10 | 10 | Q    And did you enter the residence at that time? |
| | 11 | A    No, I did not. |
| | 12 | Q    And what happened after you made contact with |
| | 13 | Mr. Hartman at the threshold of the residence? |
| | 14 | A    We walked to the balcony outside the residence and then |
| 02:18:25 | 15 | the entry team gained entry and secured the residence. |
| | 16 | Q    And do you recall what Mr. Hartman was wearing at that |
| | 17 | time? |
| | 18 | A    I know that he had on a pair of what I thought were |
| | 19 | dark-colored athletic shorts, almost like basketball shorts. |
| 02:18:44 | 20 | I can't recall if -- what he was wearing on top.  But I do |
| | 21 | remember that it was cool out and whatever he was wearing I |
| | 22 | felt that he would be uncomfortable, so I requested somebody |
| | 23 | give us a sweatshirt for him to put on. |
| | 24 | Q    And was he given a sweatshirt at that time? |
| 02:19:01 | 25 | A    Yes, he was. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:19:03  1   Q     And, approximately, how long were you on the deck with

        2   Mr. Hartman?

        3   A     Anywhere from 10 to 15 minutes at the most.

        4   Q     And did you have a conversation with him on the deck?

02:19:18  5   A     Yes, I did.

        6   Q     And what did you talk to him about?

        7   A     I introduced myself.  I let him know why we were there.

        8   I explained to him that we were conducting an investigation

        9   involving child pornography and that an IP address had led

02:19:35 10   us to the location.  I let him know that nobody is under

       11   arrest and he's free to leave.

       12   Q     And if you could describe the defendant's body language

       13   and apparent emotional state to the extent that you could

       14   tell at that time.

02:19:51 15   A     He was very relaxed.

       16           MS. JACOBS:  Objection, Your Honor.  Speculation.

       17           THE COURT:  Sustained.

       18   BY MS. GANNON:

       19   Q     Now, later on did you conduct an interview of

02:20:02 20   Mr. Hartman inside the residence?

       21   A     Yes, I did.

       22   Q     And was that video -- was that interview recorded?

       23   A     Yes, it was.

       24   Q     Was Mr. Hartman's demeanor and body language on the

02:20:21 25   deck the same or different as his body language and demeanor

02:20:26   1   inside during the interview?

2          MS. JACOBS:  Objection.  Calls for speculation.

3          THE COURT:  Well, if it's just body language and

4   demeanor as opposed emotional state, which was the last

02:20:36   5   question, I'll allow this question.

6          Overruled.

7          THE WITNESS:  It was the same.

8   BY MS. GANNON:

9   Q    Now, the search warrant -- I guess I'll back up a

02:20:45  10   question.

11          So when this interaction with Mr. Hartman occurred

12   on the deck, did you have your gun drawn at that time?

13   A    No.

14   Q    And was he handcuffed while on the deck?

02:20:59  15   A    No.

16   Q    Was he physically restrained in any way on the deck?

17   A    No.

18   Q    The search warrant, was that executed approximately

19   7:00 a.m.?

02:21:11  20   A    Yes.

21   Q    And with state search warrants, is that the earliest in

22   the morning you can execute a state search warrant without

23   special permission?

24   A    Yes.

02:21:22  25   Q    And this occurred February, correct?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:21:24 1    A    February 5th.

2    Q    And was the -- had the sun fully risen?  Was it bright

3    outside, or was it dim?

4    A    No, it was daylight.

02:21:44 5    Q    So you said you were on the deck for approximately 10

6    to 15 minutes.

7         What happened after you were with Mr. Hartman on

8    the deck?

9    A    One point I went inside and set up the video recorder

02:21:58 10   in the room where we were going to conduct the interview.

11   Q    And had Mr. Hartman expressed to you that he was

12   willing to be interviewed?

13   A    Yes.

14   Q    And what were you wearing when you initially contacted

02:22:17 15   Mr. Hartman on the deck?

16   A    When I initially contacted him, I had my raid vest on,

17   which is a black bulletproof vest that has police markings

18   on it, and I would have been wearing, probably, a pair of

19   jeans.

02:22:33 20   Q    And did you change your clothes prior to your interview

21   with Mr. Hartman inside the residence?

22   A    Yes, I did.

23   Q    What were the clothes that you changed into?

24   A    I put on a polo shirt.

02:22:48 25   Q    And why did you do that?

| | | |
|---|---|---|
| 02:22:52 | 1 | A    Because I didn't want to conduct an interview wearing |
| | 2 | clothes that had police markings.  I wanted to make the |
| | 3 | interview as comfortable as possible, and I felt that if I |
| | 4 | had a shirt on that didn't have the police logos and |
| 02:23:05 | 5 | indications, it would be a more relaxed environment. |
| | 6 | Q    And where did this interview take place within the |
| | 7 | residence? |
| | 8 | A    It was in a bedroom to the rear of location which was |
| | 9 | identified as his mother's bedroom. |
| 02:23:19 | 10 | Q    Do you have a typical practice regarding displaying or |
| | 11 | concealing your firearm during an interview? |
| | 12 | A    For the same reasons that I previously just described. |
| | 13 | As far as my clothing, I typically will conceal my weapon so |
| | 14 | that it doesn't create an environment that makes people |
| 02:23:37 | 15 | uncomfortable. |
| | 16 | Q    In this case, did you have an opportunity to review the |
| | 17 | video of the interview, after you submitted your |
| | 18 | declaration? |
| | 19 | A    Yes, I did. |
| 02:23:51 | 20 | Q    Was the firearm concealed in a holster but visible |
| | 21 | outside your shirt during this interview? |
| | 22 | A    Yes, it was. |
| | 23 | Q    And do you know why that happened? |
| | 24 | A    After watching the video, I don't even think I realized |
| 02:24:05 | 25 | that my shirt had got hung up on my gun and therefore |

02:24:09  1  exposing my weapon.

2  Q    Now, why didn't you interview Mr. Hartman in a more

3  public place?

4  A    Well, for a number of reasons.  The biggest reason in

02:24:19  5  this case is the topic that we were going to be discussing.

6  I didn't want to discuss these issues in front of his

7  neighbors that could overhear what we were talking about,

8  you know -- I mean, that make it uncomfortable for him,

9  obviously, to talk about those, but also the concern that if

02:24:40  10  they found out we were conducting an investigation related

11  to child pornography, I would be in fear that it could cause

12  some risk of retribution towards him by his neighbors; so,

13  therefore, we choose to do it in some place that's not

14  public.

02:24:54  15  Q    And when you interviewed the defendant in this bedroom,

16  who was present in the room?

17  A    It was myself and my partner, Detective Christian

18  O'Donnell.

19  Q    Now, are you aware that there were approximately 14

02:25:15  20  members of law enforcement assigned to the execution of this

21  search warrant?

22  A    Yes.

23  Q    And were all 14 agents and officers ever to your

24  knowledge in the unit at the same time?

02:25:27  25  A    Not to my knowledge.  I don't think all 14 or 15 could

| | | |
|---|---|---|
| 02:25:30 | 1 | fit in the residence.  It's quite small. |
| | 2 | MS. GANNON:  Your Honor, the Government previously |
| | 3 | submitted a DVD containing the interview of |
| | 4 | Defendant Hartman.  It's my understanding that there had |
| 02:25:45 | 5 | been some issues with the Court's ability to play that |
| | 6 | interview. |
| | 7 | The Government proposes admitting what's been |
| | 8 | marked as Government's Exhibit 4 under seal as an exhibit to |
| | 9 | this hearing and to play the first six minutes of the |
| 02:26:04 | 10 | interview which the Government contends is particularly |
| | 11 | crucial, unless the Court has had an opportunity to view it. |
| | 12 | THE COURT:  I have not because of the technical |
| | 13 | difficulties, so -- |
| | 14 | MS. GANNON:  Could the Government play that first |
| 02:26:19 | 15 | six minutes now? |
| | 16 | THE COURT:  Yes. |
| | 17 | Any objection? |
| | 18 | MS. JACOBS:  No objection. |
| | 19 | THE COURT:  All right.  You may proceed. |
| 02:26:34 | 20 | (The videotape was played.) |
| | 21 | THE COURT:  Oh, I see I'm not the only one who |
| | 22 | experiences technical difficulties. |
| | 23 | MS. GANNON:  I apologize, Your Honor.  I did try |
| | 24 | it before coming upstairs. |
| 02:27:39 | 25 | (Pause.) |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:27:51 1    MS. GANNON:  Your Honor, since I appear to be

2    having difficulties, perhaps we could go to

3    cross-examination; and then, I can resolve the issue.

4         This is the end of the Government's questions?

02:28:00 5    THE COURT:  That's all you had?

6         MS. GANNON:  Yes, Your Honor.

7         THE COURT:  All right.  Then, let's do that.

8                    REDIRECT EXAMINATION

9    BY MS. JACOBS:

02:28:24 10   Q    Good afternoon, Detective Syvock.

11   A    Good afternoon.

12   Q    I'm thinking of it like a Honda Civic, because I was

13   mispronouncing it before.

14   A    Well, it's, actually, Siv-vock (phonetic), so --

02:28:35 15   Q    Oh, it is Siv-vock.

16   A    And that's common.  "Civic" is common, so.

17   Q    Okay.  You just testified that even though you put in

18   your declaration that your weapon was concealed and in fact

19   was not on -- during your interview of Mr. Hartman?

02:28:50 20   A    That's correct.

21   Q    Because you know the difference between a concealed

22   weapon and a holstered weapon, right?

23   A    I do.

24   Q    Now, you also testified that you just realized upon

02:29:03 25   looking at the video after submitting your declaration that

02:29:08   1    it was, in fact, visible and holstered?

  2    A    After reviewing the video, I could see that it was not

  3    in fact concealed, but it was holstered.

  4    Q    Do you remember during your interview or immediately

02:29:23   5    prior to your interview of Hartman actually, physically,

  6    touching your weapon?

  7    A    I saw in the video that I did. I touched the bottom

  8    portion of my weapon, which I commonly do to know where my

  9    weapon is on my body.

02:29:37 10    Q    And that didn't remind you, oh, my weapon is visible to

11    Mr. Hartman?

12    A    No. Because even if I had my shirt over the top, the

13    barrel, the bottom barrel portion I would be able to feel

14    underneath my shirt, so --

02:29:50 15    Q    But you still realized that it being on your hip knew

16    that it was likely visible to Mr. Hartman?

17    A    Well, it would have been visible underneath my clothes.

18    I mean, he would have seen that I had something there. I

19    don't know that he would have been able to determine it was

02:30:03 20    a gun or not.

21    Q    Okay. Now, prior to -- I want to talk about your

22    preparation for the --

23    Well, actually, before I even get there, I just

24    have in my notes --

02:30:16 25    MS. JACOBS: Your Honor, I want to assert for the

02:30:18  1    record, make sure all *Jencks* have been provided that would

2    be in Detective Syvock's possession.

3              MS. GANNON:  Yes, Your Honor.  His reports and the

4    *Jencks* that is required under the rule have been provided.

02:30:33  5              MS. JACOBS:  Okay.

6              THE COURT:  Thank you.

7    BY MS. JACOBS:

8    Q    Detective Syvock, I want to talk about the preparation

9    for the search of Mr. Hartman's apartment.

02:30:40  10             Prior to the search warrant execution on

11   February 5th, you did some background investigation on

12   Mr. Hartman?

13   A    Yes.

14   Q    You were aware of the Fullerton Police investigation of

02:30:54  15   him in 2010?

16   A    I was.

17   Q    When did you become aware of that investigation?

18   A    It was sometime during the course.  It would have been

19   after I identified the IP address as coming back to his

02:31:09  20   residence and when we served the search warrant.  I don't

21   know exactly when during that time period I discovered it.

22   Q    Okay.  And prior to the execution of the search

23   warrant, did you speak to anyone from the Fullerton Police

24   Department about that investigation?

02:31:27  25   A    I believe I did, yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:31:29   1   Q    Did they send you any reports?

           2   A    I did get a copy of the report.

           3   Q    What other background investigation did you do in

           4   preparation for your interrogation of Mr. Hartman?

02:31:41   5   A    I mean, I would have done a criminal history which

           6   would have indicated the report.  I would have checked his

           7   driver's license.  We typically check the residence or the

           8   individual to see if they had any weapons registered to him.

           9   Q    And were there any weapons registered to him?

02:31:57  10   A    No.

          11   Q    Did you look into whether Mr. Hartman was employed?

          12   A    No.

          13   Q    So prior to the search, you did not know he was not

          14   employed?

02:32:08  15   A    I did not know that he was not employed.

          16   Q    When you went to Mr. Hartman's home on February 5th,

          17   you believed he was the one who had distributed the child

          18   pornography on the peer-to-peer network about two months

          19   before?

02:32:23  20   A    I had an indication that he was.

          21   Q    You believed he was?

          22   A    Well, there were two people living in the house.

          23   Q    You thought maybe his mother, Judy Hartman, was

          24   distributing child pornography?

02:32:35  25   A    There's always a possibility.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:32:37　1　Q　When you stopped her on her way to work, how come you

2　didn't question her about the child pornography then?

3　A　Because at that point -- I told her the same thing that

4　I told him what we were there for.  And at that point, my

02:32:50　5　role was to get the key so that we could make access into

6　the house and then further the investigation from that

7　point.

8　Q　Did you share your investigation with her?

9　A　I told her what we were there for.

02:33:00　10　Q　And did you ask her if she wanted to speak to you about

11　the child pornography?

12　A　Not specifically at that time, I did not.

13　Q　Did you interview her at any time during that day?

14　A　I did not.

02:33:10　15　Q　Okay.  So at the time of the execution of the search

16　warrant, you were aware of the 2010 Fullerton incident,

17　right?

18　A　Correct.

19　Q　But you were not sure if you believed Mr. Hartman was

02:33:30　20　the one involved in distributing child pornography?

21　A　No.  What I said was, I had a pretty good indication

22　that he was, but I would never rule out the other person in

23　the house until after we finished the investigation.

24　Q　Did you believe he was engaging in a crime?

02:33:46　25　A　Yes.

02:33:48  1    Q    Was your goal to get a confession out of him that

         2    morning?

         3    A    My goal was to find out if there were any other

         4    children that were in danger.

02:33:59  5    Q    And you believed he was the one that would know that,

         6    correct?

         7    A    I don't know if he would know it or not.  I know that

         8    if he was involved in trading child pornography that he

         9    would be one that could tell us if he was accessing or

02:34:15 10    contacting children.

        11    Q    Did you ask Ms. Hartman if she was accessing or

        12    contacting children?

        13    A    I did not.

        14    Q    Did you do any pre-search investigation on Ms. Hartman?

02:34:28 15    A    I think I ran her DMV.  I don't know if I did a

        16    criminal history on her or not.

        17    Q    Now, you said you wanted to find out if any children

        18    were being harmed.

        19         Why did you share your investigation with

02:34:53 20    Mr. Hartman, instead of Ms. Hartman?

        21    A    Well, he was the first person that I would have gone

        22    to, because my indications are that he would be the one most

        23    likely, so I shared my investigation with him first and he

        24    admitted to it.  Therefore, I knew it was him.

02:35:10 25    Q    And sharing your investigation with a suspect is a

| | | |
|---|---|---|
| 02:35:14 | 1 | police tactic to get them to talk, right? |
| | 2 | A It's what I do in my investigations, because I had |
| | 3 | nothing to hide as to how we got there. So I wanted him to |
| | 4 | fully understand the scope of the investigation. |
| 02:35:24 | 5 | Q Is that something you also learned in training? |
| | 6 | A It's something that I developed over the years of doing |
| | 7 | these types of investigations. |
| | 8 | Q But do you learn it in training? |
| | 9 | A I don't know specifically if I had training telling me |
| 02:35:41 | 10 | to share my investigation. It's the way that I do my |
| | 11 | interviews and investigations. I don't have anything to |
| | 12 | hide as to how we got to his house, so I was willing to |
| | 13 | share my investigation with him. |
| | 14 | Q And my question is: In your training, have you been |
| 02:35:57 | 15 | told that you should share your investigation with suspects |
| | 16 | so that they will start talking? |
| | 17 | A Not always. |
| | 18 | Q You weren't always trained on that? |
| | 19 | A No, we weren't. |
| 02:36:08 | 20 | Q Sometimes you were? |
| | 21 | A We weren't trained to specifically tell them to -- what |
| | 22 | our investigation -- when you do an interview, you take the |
| | 23 | scope of the investigation and find the best way of |
| | 24 | introducing the material. Sometimes you don't tell them how |
| 02:36:25 | 25 | you did your investigation and you find out what they want |

02:36:27  1  to say first and it's not later until the interview that you

2  share your investigation.

3  Q    Okay.

4  A    In this case, I shared it immediately with him.

02:36:35  5  Q    Now, with respect to the Fullerton Police Department,

6  again, can you tell me the names of the individuals you

7  spoke with?

8  A    I can't.  I don't remember.

9  Q    Would they be in your notes?

02:36:47 10  A    I don't think so.  I don't know who I spoke to over

11  there, if I talked to somebody, specifically, or I just had

12  a records clerk send a fax over to get us a copy of the

13  Fullerton report.

14  Q    I believe when I asked you the question if you spoke

02:37:02 15  with someone at the Fullerton PD, you said "yes"?

16  A    And that could have been calling over the records

17  person to find out how to get a copy of the report.  I don't

18  know if I spoke directly to one of the investigator,

19  handling the case or not.

02:37:14 20  Q    Would it be in your notes whether you did?

21  A    It could be.

22  Q    Do you take notes when you're doing background

23  investigative work?

24  A    I do.

02:37:25 25  Q    Okay.  So you, probably, still have a copy of those

02:37:28  1   somewhere?

       2   A    You know, if I have the notes, I would have a copy of

       3   it somewhere, yes.

       4   Q    Okay.  And you said that you had indications that

02:37:35  5   Mr. Hartman was involved with the distribution of child

       6   pornography.

       7          What were those indications?

       8   A    Well, the fact that --

       9          MS. GANNON:  I'm going to object.  This is outside

02:37:46 10   the scope of the motion.

      11          MS. JACOBS:  But he testified to it.  He said he

      12   had indications.  I'm asking what they were.

      13          THE COURT:  Well, he testified to it, because you

      14   asked.  It's not that the other side opened the door to it.

02:37:59 15          So, the objection is sustained.

      16          MS. JACOBS:  Doesn't it go to his motive, though,

      17   in going to do the search warrant?

      18          MS. GANNON:  His motive is irrelevant.

      19          THE COURT:  Sustained.

02:38:10 20   BY MS. JACOBS:

      21   Q    A few months before the search warrant execution, you

      22   went to Mr. Hartman's home to figure out who lived there,

      23   right?

      24   A    Yes.

02:38:25 25   Q    So at the time of the search in February, you knew only

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:38:28  1  two people lived at the residence?

        2  A    Yes.

        3  Q    Mr. Hartman?

        4  A    Correct.

02:38:33  5  Q    And his mother?

        6  A    Correct.

        7  Q    And you knew it was a small apartment?

        8  A    I didn't know how small.  I only went to the front

        9  door.  I didn't go inside the residence at that point.

02:38:45 10  Q    Could you tell it was one of those sort of split condo

       11  units?

       12  A    I knew it was an upstairs unit, and that's all I knew.

       13  I didn't go inside the house.

       14  Q    Were you aware of the approximate square footage before

02:38:59 15  executing the search warrant?

       16  A    I don't believe so.

       17  Q    What would you estimate it to be?

       18          MS. GANNON:  Objection, Your Honor.

       19          Calls for speculation.  Relevance.

02:39:07 20          THE COURT:  Overruled.

       21          If you can give an estimate.

       22          THE WITNESS:  I have no idea.

       23  BY MS. JACOBS:

       24  Q    Maybe less than 600 square feet?

02:39:16 25  A    I don't know.

02:39:19  1  Q    But you would agree that it was a small apartment?

2  A    After we got inside, I would agree it was a small

3  apartment.

4  Q    Before the search warrant, did you get any information

02:39:30  5  on -- I'm trying to think of the word.  But, basically, the

6  parameters of the apartment, how many bedrooms it was?

7  A    I didn't know how many bedrooms the apartment was,

8  prior to the search warrant.

9  Q    So before you execute search warrants normally you

02:39:46  10  don't do any investigation on the size or the layout of the

11  home to be searched?

12  A    There's cases where we're able to get information on

13  houses that will tell us what the square footage is.  In

14  this case, I don't know that we did that.

02:40:05  15  Q    But you could determine at least from the outside that

16  it was small?

17          MS. GANNON:  Objection, Your Honor.

18          Relevance.  Asked and answered.

19          MS. JACOBS:  I didn't ask if he could tell it from

02:40:13  20  the outside.

21          THE COURT:  Wait for a ruling when there's an

22  objection.  No argument.

23          The objection is overruled.

24          THE WITNESS:  Could you repeat the question?

25  ////

BY MS. JACOBS:

Q    I said could you tell from the outside that the apartment was small?

A    I could tell from the outside that the apartment -- that the apartment was small, but I didn't have any idea what size it was.

Q    Okay.  How long should it take to do a protective sweep of an apartment that small?

A    There's no set amount of time.

Q    In your experience?

A    It depends on a number of factors:  What's inside the house, what they have to search.

So to set a time frame, I have no -- we're not going to rush it.  We're going to take our time to do a sweep of the house.

Q    And there's several purposes of a protective sweep, right?

A    Well, the number one purpose is for protection to make sure there's nobody else inside the house.

Q    Right.  Officer safety?

A    Correct.

Q    Another purpose is to search for weapons?

A    Correct.

Q    And you knew there were no weapons, going into the search, correct?

02:41:18  1   A    No.

2   Q    There were no registered weapons, going into the

3   search?

4   A    That's correct.  That doesn't mean there were no

02:41:26  5   weapons.

6   Q    I agree with that.

7   A    Thank you.

8   Q    And another reason is to protect --

9        I'm sorry.  Another reason for protective sweep is

02:41:32 10   to check for other occupants?

11   A    Correct.

12   Q    And you knew there were only two occupants that lived

13   permanently in the house, correct?

14   A    Correct.

02:41:43 15   Q    And one was on her way to work?

16   A    Correct.

17   Q    So that leaves, probably, just one person left in the

18   small apartment?

19   A    Unless there were guests that we didn't know about.

02:41:55 20   Q    Correct.

21        Now, prior to the knock-and-announce, I believe

22   you testified there were officers lined up, going up the

23   steps to the Hartman residence?

24   A    Correct.

02:42:16 25   Q    And you were at the bottom of those steps?

```
02:42:19   1   A     Yes.

           2   Q     And the officers on the steps, right before the

           3   knock-and-announce, did they all have their guns drawn?

           4   A     Yes.

02:42:31   5   Q     And how many officers do you remember were on those

           6   steps?

           7   A     Well, including the two at the front door and,

           8   probably, one on the landing, that's three.  There would

           9   have been, maybe, four -- three or four more on the steps

02:42:46  10   still.

          11   Q     Did they all had their guns drawn?

          12   A     Yes.

          13   Q     And your gun was drawn?

          14   A     Yes.

02:42:51  15   Q     So someone coming out of that the apartment would have

          16   seen officers pointing guns at them?

          17   A     Yes.

          18   Q     How many different agencies?

          19   A     There were at least three, including Newport Beach.

02:43:12  20   Q     Do you know all of the ones besides the Newport Beach,

          21   obviously?

          22   A     There's Department of Homeland Security, and I believe

          23   Orange County Sheriff's Department was represented as well.

          24   Q     And that's it?

02:43:24  25   A     I don't know if any of the -- if we had anybody from
```

02:43:27  1  the FBI with us that day or not.  I don't believe so.  And

2  that would have been all.

3  Q    And did each officer who was present that day have a

4  weapon on them?

02:43:39  5  A    Yes.

6  Q    And how many total officers were present, again?

7  A    Well, if there were seven in the stack and I think I

8  testified there were four others, so that would be 11.

9  Q    Could I have you look -- there's an exhibit binder,

02:44:01 10  black --

11  A    The black one?

12  Q    Yes.

13        Can you look at Exhibit A?

14  A    *(Witness so complies.)*

02:44:13 15  Q    Have you seen this document before?  I'll put it on the

16  ELMO.

17        *(The exhibit was displayed on the screen.)*

18  BY MS. JACOBS:

19  Q    Have you seen this before?

02:44:18 20  A    Yes, I have.

21  Q    What is this?

22  A    That's a portion of the operations plan for the search

23  warrant.

24  Q    Now, were all of these individuals actually present on

02:44:29 25  the day of the search warrant execution?

153

02:44:41  1   A     Yes.

2   Q     So how many were there present, then?

3   A     There's 14.

4   Q     Okay.  Thank you.

02:44:54  5         MS. JACOBS:  Your Honor, I would like to admit

6   exhibit -- Defense Exhibit A.

7               THE COURT:  Any objection?

8               MS. GANNON:  No, Your Honor.

9               THE COURT:  Exhibit A is admitted.

02:45:01 10         *(Defendant's Exhibit A received in evidence.)*

11   BY MS. JACOBS:

12   Q    Okay.  I may have missed this on your direct, but

13   during the search, how many officers were spread out through

14   the apartment?

02:45:16 15   A     I don't know.  I wasn't part of that group.  I was

16   standing on the balcony with Mr. Hartman.  I don't know how

17   many people actually went in during the search.

18   Q    Were you in the apartment for part of the search while

19   you interviewed Mr. Hartman?

02:45:29 20   A     I was in the back bedroom, but the door was closed, so

21   I don't know who was in the house.

22   Q    Okay.  And then, were you aware while you were on the

23   balcony of officers also standing outside the house?

24   A     I believe there were officers outside the house on the

02:45:46 25   balcony and down the stairs as well.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:45:49  1  Q    And was there purpose to stand guard over who came and

       2  went?

       3  A    No.

       4  Q    What was their purpose?

02:45:55  5  A    Just security of the scene.

       6  Q    And is part of keeping the scene secure keeping track

       7  of who goes and who comes?

       8  A    Well, in this case, it's more to make sure that we

       9  don't have people coming from outside the residence and

02:46:11 10  coming into the scene.

      11  Q    And did you see any of the officers standing outside

      12  with Ms. Hartman?

      13  A    No.

      14  Q    Were you aware that Ms. Hartman was on the premises

02:46:27 15  during the search?

      16  A    No.

      17  Q    Who decided on the number of officers who were going to

      18  execute the search warrant?

      19  A    It's decided prior to the search warrant, based on the

02:46:40 20  size of location, the type of entry we have to make.  It's

      21  determined at that point how many officers we're going to

      22  take.

      23  Q    But for this one, who made that decision?

      24  A    You know, I would have to look and see who wrote up the

02:46:54 25  operations plan, but it was -- it would have been whoever

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:46:58  1    wrote up the operations plan would have picked who was going

2    on it.

3    Q    So you didn't write up the operations plan?

4    A    I did not.

02:47:07  5    Q    Now, in your declaration in this case, you said that

6    one of your roles during the search warrant was to provide

7    the parameter security, correct?

8    A    Correct.

9    Q    And what were your other designated roles?

02:47:21 10    A    To conduct the interview.

11    Q    Any others?

12    A    That was it.

13    Q    The person who did the operation plan, was that also

14    the person in charge of assigning their people -- other

02:47:34 15    people their roles during the execution?

16    A    That would be correct.

17    Q    Was that person present at your -- I guess your pre-op

18    meeting early that morning?

19    A    Yes.

02:47:47 20    Q    You just don't remember who it was?

21    A    I don't remember.

22    Q    So you weren't the person in charge of the search

23    warrant execution?

24    A    There were two roles at the search warrant briefing:

02:47:59 25    One is to go over the operations plan.  One is to go over

02:48:03  1   the scope of the investigation so the search team knows what

        2   they're looking for once they go into the house.

        3          My job was to cover the portion of the scope of

        4   the investigation.

02:48:13  5   Q    And once you're actually there and everyone is doing

        6   their roles, who's the lead?

        7   A    It would have been whoever wrote up the operations plan

        8   or the group supervisor that was in the room during the

        9   execution of the search warrant.

02:48:28 10   Q    So if you look at Exhibit A, again, would you be able

       11   to remember who that person was?

       12          MS. GANNON:  Objection, Your Honor.

       13          Asked and answered.

       14          THE COURT:  Overruled.

02:48:36 15          He said he couldn't remember.  She's asking if

       16   this could refresh his recollection.

       17          THE WITNESS:  I still don't know, based on that

       18   because that's not a complete portion -- that's not a

       19   complete operations plan.  It doesn't have all the pages to

02:48:57 20   it.

       21   BY MS. JACOBS:

       22   Q    Were there additional people that aren't on that list

       23   that were present?

       24   A    No.  But there's other pages that would indicate who

02:49:05 25   prepared the document and that would give me a better idea

02:49:11  1    who was in charge of the people outside the room.

2    Q    So you just don't remember if you had a question that

3    day who you would go and ask your question to?

4    A    The question regarding what?

02:49:21  5    Q    Anything that happened that day?

6    A    Well, if I had a question regarding the forensics, I

7    would go to the forensic examiner.  If I had a question

8    about if there were any problems with the entry, I would

9    talk to some of the other people.  There was nobody,

02:49:34 10   specifically, I would have gone to, to ask a question.

11   Q    Okay.  So then there were multiple agencies during the

12   search warrant execution but no one was really in command of

13   everyone?

14   A    The group supervisor is in command.  I mean, he's

02:49:51 15   ultimately in charge.  But I wouldn't necessarily go to him

16   to ask a question regarding the investigation.  I was in

17   charge of the investigation.

18   Q    Okay.  You were in charge of the investigation?

19   A    Absolutely.

02:50:05 20   Q    Okay.  Did you tell that to Mr. Hartman?

21   A    I don't know if I specifically told him that I was in

22   charge.  I told him what my role was.

23   Q    Okay.  When Mr. Hartman exited the apartment, I think

24   you had said you heard --

02:50:26 25              Well, let me ask you this first:  You said you

| 02:50:28 | 1 | heard Agent Speakman give Mr. Hartman some instructions and |
| | 2 | then you started walking towards the top, towards the door? |
| | 3 | A    That's not what I said. |
| | 4 | Q    Okay.  What did you say? |
| 02:50:42 | 5 | A    I said that I heard Special Agent Speakman giving |
| | 6 | somebody direction inside the house.  I didn't know who it |
| | 7 | was. |
| | 8 | Q    Okay.  And so when the person walked through the |
| | 9 | threshold of the doorway, you saw that this was Mr. Hartman? |
| 02:50:56 | 10 | A    Correct. |
| | 11 | Q    And did Mr. Hartman have his hands up? |
| | 12 | A    I don't believe so. |
| | 13 | Q    Did you hear Agent Speakman tell the person in the |
| | 14 | apartment to put their hands up? |
| 02:51:11 | 15 | A    Yes. |
| | 16 | Q    Now, in your declaration, you state that Mr. Hartman |
| | 17 | was wearing, I believe, shorts and a T-shirt, correct? |
| | 18 | A    Correct. |
| | 19 | Q    But today you say it may have just been shorts? |
| 02:51:35 | 20 | A    No, I don't -- today what I said was, I can't be |
| | 21 | certain what he had on on top.  I don't know if it was a |
| | 22 | T-shirt or not.  I can't say specifically.  I know what he |
| | 23 | was wearing didn't seem sufficient for the cool temperature. |
| | 24 | Q    Okay.  Why didn't you put that in your declaration that |
| 02:51:51 | 25 | you weren't sure what he had on his top half? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

| | | |
|---|---|---|
| 02:51:57 | 1 | A    At the time I wrote the declaration, I believe he was |
| | 2 | wearing a T-shirt.  There's been some time since I wrote the |
| | 3 | declaration, so I have given it more thought.  I couldn't |
| | 4 | say for sure that he was wearing a T-shirt, a tank top, no |
| 02:52:10 | 5 | shirt.  But what I can say is that whatever he was wearing, |
| | 6 | I didn't feel that it was sufficient for the cool weather, |
| | 7 | so I requested something else for him to wear. |
| | 8 | Q    Have you had discussions with the U.S. Attorney's |
| | 9 | Office in this case about what Mr. Hartman was wearing that |
| 02:52:25 | 10 | morning after submitting your declaration? |
| | 11 | A    I don't know if we talked about it, after the |
| | 12 | declaration. |
| | 13 | Q    Did you hear about any testimony that happened |
| | 14 | yesterday about what Mr. Hartman was wearing on |
| 02:52:40 | 15 | February 5th? |
| | 16 | A    No. |
| | 17 | Q    And did you see any of the filings in this case? |
| | 18 | A    No. |
| | 19 | Q    Okay.  Would you agree, though, that as an officer, |
| 02:53:02 | 20 | you're supposed to notice what people are wearing? |
| | 21 | A    It's kind of vague. |
| | 22 | Q    Well, do you think you would notice if someone was |
| | 23 | not -- was naked? |
| | 24 | A    I would notice if somebody was completely naked, |
| 02:53:18 | 25 | because we've had that happen before. |

02:53:22  1  Q    What about if someone was just in their underwear?

       2  A    I don't know that I would necessarily take notice to

       3  that to where I would remember over a period of time.  It's

       4  not something that I would feel as significant.

02:53:40  5  Q    Now, in your declaration, you also state that -- and

       6  you said it today, I believe -- that you never physically

       7  restrained Mr. Hartman?

       8  A    That's correct.

       9  Q    But you never even moved his hands behind his back?

02:53:54 10  A    I did not put his hands behind his back.

      11  Q    If you had physically restrained Mr. Hartman, is this

      12  something that you would have had to report to a supervisor?

      13  A    If I placed handcuffs, I would have had to include it

      14  in my report.

02:54:11 15  Q    So it wouldn't be a use of force to physically put

      16  hands behind someone's back?

      17  A    Newport Beach Department policy is if we place

      18  handcuffs on somebody, it's considered a use of force.  The

      19  escorting of somebody is not necessarily considered the use

02:54:28 20  of force.

      21  Q    Is escorting someone -- is part of escorting someone

      22  putting their hands behind their back?

      23  A    I don't think I understand the question.

      24  Q    So you don't have to handcuff someone to have their

02:54:43 25  hands behind their back, right?

02:54:49  1            So, for example, you could put my hands behind my

2    back and hold them there, but I don't have handcuffs on?

3    A    Correct.

4    Q    So that's my question.  You don't have to handcuff

02:54:59  5    someone to physically restrain them, correct?

6    A    Correct.

7    Q    And so, if you physically restrain someone, that's not

8    a use of force?

9    A    If I put somebody's hands behind their back -- for

02:55:13 10    instance, if I was conducting a pat-down search, no, it's

11    not a use of force.

12    Q    And you've gotten in trouble for not reporting

13    use-of-force incidents, correct?

14            MS. GANNON:  Objection, Your Honor.

02:55:25 15            Improper 608(b) and under 403, I believe, the

16    defense is attempting to get into the incident, which is

17    over 25 years old, that was the subject of the Government's

18    earlier briefing.

19            THE COURT:  That was the subject of, excuse me?

02:55:37 20            MS. GANNON:  The Government's earlier briefing and

21    filing.

22            Any probative value is substantially outweighed by

23    the prejudicial effect of an incident that occurred over 25

24    years ago.

02:55:51 25            THE COURT:  I think because of the age of the

02:55:54  1    incident, that's true.

2              I'm not going to allow that in.

3    BY MS. JACOBS:

4    Q    All right.  Let's shift to your experience with child

02:56:00  5    pornography cases.  You have experience with these types of

6    cases, right?

7    A    Yes, I do.

8    Q    How many child pornography cases -- when I say "child

9    pornography," I'm talking about a broad spectrum, so

02:56:16 10    anything from possession to distribution.

11             How many of these types of cases have you -- that

12    you have investigated have been federally prosecuted?

13    A    This is the first one.

14             MS. GANNON:  Objection, Your Honor.  Relevance.

02:56:33 15             THE COURT:  Sustained.

16             What we're looking for here at this hearing is

17    whether a reasonable person would have believed they were

18    free to leave at the time; and so, that's -- and the factors

19    that the defense so ably outlined in the brief that they

02:56:49 20    filed.  So those are the factors that I'll be considering

21    today.

22    BY MS. JACOBS:

23    Q    How many search warrant executions have you done in

24    child pornography cases?

02:57:01 25             MS. GANNON:  Objection, Your Honor.  Relevance.

02:57:06  1          THE COURT:  Sustained.

2          MS. GANNON:  Your Honor, in the declarations that

3    were submitted, there is discussion about -- and what he

4    testified to today, there is discussion about why -- and I

02:57:22  5    believe the prosecutor elicited out of him that they have to

6    have so many people at a search warrant for these types of

7    cases, because child pornography defendants have shot at

8    law enforcement or committed suicide.

9          THE COURT:  You should have objected, because that

02:57:37 10    was irrelevant as well.  They may need 50 officers there,

11    but if it appears to a reasonable person that they are in

12    custody because there are 50 officers there, that's the

13    issue.

14          So it didn't matter.  And that was irrelevant, but

02:57:49 15    there was no objection.

16          MS. JACOBS:  Okay.

17    BY MS. JACOBS:

18    Q    Okay.  So we established that you met Mr. Hartman once

19    before the search warrant execution, correct?

02:58:25 20    A    Yes.

21    Q    You went to his house to see who lives there?

22          MS. GANNON:  Objection, Your Honor.

23          Relevance and asked and answered.

24          THE COURT:  Sustained.

25    ////

*DEBORAH D. PARKER, U.S. COURT REPORTER*

BY MS. JACOBS:

Q    And when you visited Mr. Hartman there, you lied to him and told him that you were there to investigate credit card fraud?

        MS. GANNON:  Objection, Your Honor.

        The same objection:  Relevance and asked and answered.

        MS. JACOBS:  Your Honor, this goes to his -- one of my follow-up questions, I think you'll see where this goes, but to his impressions of the defendant, whether he would have been a danger during the search.

        THE COURT:  Again, as I was explaining earlier -- which I don't do, again, when we're in front of a jury, but we're not now.

        So the question is going to be whether a reasonable person would have believed that they were free to leave or not free to leave, so I look at the objective circumstances of the number of officers, et cetera, not whether this officer -- this detective chose to have a lot of people there because he thought he was dangerous. Whatever he thought doesn't really matter.  It's whether an objective person would have -- a reasonable person, objectively, would have believed that they were not free to leave because of the environment, the circumstances.

        So that's what's key, not why there were so many

02:59:47   1   people there.

          2           MS. JACOBS:  But is it -- is it relevant to see

          3   what the officer's impressions were as to how his attitude

          4   toward the defendant was?

02:59:57   5           THE COURT:  I think you need to ask your direct

          6   questions, first, about the environment, itself.  Ask those

          7   questions.  Then, if you think there's something else that

          8   you still need to get at, we'll address that.  But, really,

          9   it's -- it's all about the facts as to what happened.

03:00:13  10           That's why I'm having an evidentiary hearing,

         11   because there were differences in facts that were presented

         12   about how the search warrant was executed, how the interview

         13   was conducted, what was said and what was done.  Those are

         14   the things that we need to address.

03:00:28  15           MS. JACOBS:  Okay.  Can I get into Miranda with

         16   him?

         17           THE COURT:  Go ahead and ask your questions.  If

         18   there is an objection, we'll see.

         19   BY MS. JACOBS:

03:00:36  20   Q   Well, I would like to discuss your understanding of

         21   Miranda.

         22           MS. GANNON:  Objection, Your Honor.  Relevance.

         23           THE COURT:  Yes.  Sustained.

         24   BY MS. JACOBS:

03:01:00  25   Q   Okay.  So you interviewed Mr. Hartman three times on

```
03:01:03   1    February 5th, correct?

           2    A    Correct.

           3    Q    And only two of those interviews were recorded?

           4    A    Actually, there were three recordings of the

03:01:21   5    interviews.  If you're considering the contact on the front

           6    balcony as an interview, then that would have been four.

           7    Q    So -- okay.  Let's break it down.  So the first one

           8    would have been on the balcony?

           9    A    Yes.

03:01:34  10    Q    And then, when was the second one?

          11    A    When we entered the room.

          12    Q    The bedroom?

          13    A    Correct.

          14    Q    Okay.  I have a video of that.

03:01:44  15              And then, that one ended, correct?

          16    A    Correct.

          17    Q    Mr. Hartman went back on to the sofa in the living

          18    room?

          19    A    I don't know if he left the room at that time, or I

03:01:56  20    left the room and came back in.

          21    Q    Okay.  And so, whichever one of you left the room, then

          22    you come back and conduct a third interview?

          23    A    Yes.

          24    Q    And when was the fourth?

03:02:13  25    A    After that, Mr. Hartman left and went out on to the
```

03:02:17 1  sofa and there was some additional information that came up

2  related to his involvement with another individual, and I

3  had asked him if he would come back in and talk about that.

4  So that would have been the fourth one, so there's three on

03:02:34 5  video and then the other is on the balcony which is real

6  brief.

7  Q    Okay.  And why wasn't the first interview on the

8  balcony recorded?

9  A    Recorded?

03:02:45 10 Q    Correct.

11 A    Because we don't wear body cams when we do entries, so

12 there was no recording at that point.

13 Q    Do you wear a lapel microphone for the interviews?

14 A    No.  I had a key fob video recorder.

03:02:59 15 Q    Okay.  So was there anything to catch your voice for

16 the video recording?  Or just you speak loudly, and it

17 picked up on --

18 A    The video recording includes audio as well.

19 Q    Okay.  So what I'm trying to get at:  Was there

03:03:13 20 anything that would have made your voice louder on the

21 recording?

22 A    No.

23 Q    No.  Okay.  Now, was -- you said that you thought

24 Mr. Hartman wanted to talk to you.  But was there anything

03:03:32 25 he said that made you think maybe he -- he wasn't very eager

03:03:37   1   to talk to you?

       2   A    There was no indication that he wasn't eager to talk to

       3   me.  He was very relaxed from the first contact I had with

       4   him all the way through the last contact I had with him.

03:03:48   5   Q    Do you remember him, when you first said *Do you want to*

       6   *go into the room and speak*?, him saying, *All right, I guess*?

       7   A    No.

       8   Q    Okay.  Let me --

       9         I would like to play, Your Honor -- we have clips

03:04:02  10   from the Government's video, so it's the same video.  We'll

      11   have to file, I think, the exhibit under seal, but I would

      12   like to play some clips from that.  It's Exhibit D -- I.

      13   Exhibit I, 1 through 6.

      14         THE COURT:  Do you have those?

03:04:22  15         MS. JACOBS:  We have them all ready to go.

      16         THE COURT:  All right.  And you do intend to ask

      17   questions about the clips?

      18         The only reason I ask is that at some point, I am

      19   going to figure out how to work all of this.  It's all going

03:04:33  20   to be admitted, and I am going to listen to all of it, watch

      21   anything I'm provided with.  So you needn't worry that you

      22   have to show me now; but if you're going to ask questions,

      23   go ahead.

      24         MS. JACOBS:  I am.

03:04:44  25       *(Pause.)*

03:04:52  1          MS. JACOBS:  And just so you know, Your Honor, in

       2   the defense binder, under Exhibit I, we do have the CD taped

       3   on there with the six clips.

       4          THE COURT:  Okay.  Thank you.

03:05:03  5          MS. JACOBS:  Okay.  So, Mr. Ortega, if you can

       6   play clip No. 1.

       7   BY MS. JACOBS:

       8   Q    And I'd like you to -- when you look at the screen,

       9   Detective Syvock, there's a time stamp, and it's going to

03:05:18 10   say like 7:15 in the morning and about 25 seconds.  That's

      11   when you go back into the living room to ask Mr. Hartman to

      12   join you.

      13      (The videotape was played.)

      14   BY MS. JACOBS:

03:06:14 15   Q    Could you hear the All right, I guess?

      16   A    If you could play it again.  I don't know that I could

      17   understand what he said.  But it sound like he possibly said

      18   I guess.

      19   Q    We'll play it again for you.

03:06:27 20      (The videotape was played.)

      21          THE WITNESS:  It sounds like that's what he says.

      22   BY MS. JACOBS:

      23   Q    That doesn't sound very eager to you, does it?

      24          MS. GANNON:  Objection, Your Honor.  Relevance.

03:06:58 25          THE COURT:  Overruled.

03:06:59  1    THE WITNESS:  I'm not sure what the context was

2 when he said *I guess.*  I don't know what -- in reference, I

3 can't see where we were at at that point or anything like

4 that, so I don't know what the reference was.

03:07:10  5 Q Did you hear right before he said that, you tell Todd

6 to come back in the room with you?

7 A I heard myself say, *Hey, Todd, do you want to come back*

8 *in here* and then something in between that and then him say

9 *I guess.*

03:07:28 10    MS. JACOBS:  I don't know if I said this,

11 previously, Your Honor.  But for the record, that was clip 1

12 of Exhibit I.

13 BY MS. JACOBS:

14 Q We're possibly going to stay on this clip, but since

03:07:38 15 you just -- actually, I don't think have gotten to that.

16    Do you remember when Mr. Hartman did come in the

17 room, join you in the room that you told him where he had to

18 sit?

19 A I remember requesting -- suggesting that he sit closest

03:07:54 20 to the door.

21 Q And he didn't want to sit there initially, correct?

22 A I don't remember what he -- where he wanted to sit.

23    MS. JACOBS:  Can we play clip 1, again?  You can

24 start from where we're at, right now.

03:08:07 25    (*The videotape was played.*)

BY MS. JACOBS:

Q    So he wanted to sit in a different seat, correct?

A    Well, there was some discussion back and forth as to where we were going to sit.  I don't know that that meant he wanted to sit in one place over the other.

As I stated, I preferred that he sit closest to the door so that he had the ability to leave if he chose to.

Q    Why did you close the door, then?

A    For privacy.

Q    Did he want the door closed?

A    I wanted the door closed for privacy.

Q    You wanted the door closed?

A    Correct.

Q    Now, did you also want him to sit in that seat close to the door because with that seat, he would have been in range of the video camera?

A    I wanted him to sit closest to the door so that in the event that he wanted to leave -- and so that there was no misunderstanding that he was closest to the door -- I wasn't blocking him.  I placed the video camera so that it would be in that seat, knowing that that's where he was going to sit.

Q    Did you tell Mr. Hartman he was being videotaped?

A    No.

Q    Why not?

A    Because there's no reason to.  I don't have to tell him

03:09:35  1    that he's being recorded.

       2    Q    Is it because you wanted to get a confession out of him

       3    and most people don't talk when they know they're being

       4    filmed?

03:09:43  5    A    No.  It's because I wanted an accurate depiction as to

       6    what occurred in the room while I conducted my interview.

       7    Q    Well, didn't you have the other deputy there to be able

       8    to be a witness to the accurate depiction of what was going

       9    on?

03:09:53 10                MS. GANNON:  Object, Your Honor.  Relevance.

      11                THE COURT:  Sustained.

      12    BY MS. JACOBS:

      13    Q    Now, the purpose of videotaping this was also to

      14    collect evidence against Mr. Hartman, correct?

03:10:15 15                MS. GANNON:  Objection, Your Honor.  Relevance.

      16                THE COURT:  I'll allow it.  Overruled.

      17                THE WITNESS:  It's to document the information

      18    that was discussed in the room so that if there was any

      19    question about what was said, there's a videotape that

03:10:33 20    explains exactly what was said in the room.

      21    BY MS. JACOBS:

      22    Q    And the other deputy could also do that as well,

      23    correct?

      24    A    They could.  Sure.

03:10:41 25    Q    Okay.  And you said you told Hartman he was not under

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:10:48  1  arrest, correct?

2  A     Correct.

3  Q     And he could leave his home?

4  A     Correct.

03:10:52  5  Q     But before you told him that, during the recorded video

6  at least, you accused him of downloading child pornography?

7  A     That's not correct.

8          MS. JACOBS:  Can you play Clip 2?

9          It's Clip 2 of Exhibit I, Your Honor.

03:11:14  10  (*The videotape was played.*)

11  BY MS. JACOBS:

12  Q     So prior to giving him that advice, you accused him of

13  downloading child pornography on a peer-to-peer network?

14  A     Actually, prior to giving him that admonishment, he had

03:13:05  15  already admitted to downloading.  We were just furthering

16  that conversation from the patio where he was already

17  admonished again that he was free to leave.

18          So we were continuing our discussion from the

19  front patio where he had already admitted to using eDonkey.

03:13:22  20  Q     And we don't have your advisement of that interview

21  recorded, do we?

22  A     No.

23  Q     Now, when you get consent -- and in your declaration

24  you said that you got consent before each of the interviews,

03:13:41  25  correct?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
03:13:47   1              I can show you your declaration, if it would

           2   refresh your memory.

           3   A    It would.

           4   Q    You're giving me a puzzled look.

03:13:52   5   A    Yeah, it would.

           6   Q    Okay.

           7              MS. JACOBS:  Your Honor, may I approach?

           8              THE COURT:  Yes, you may.

           9              THE WITNESS:  Thank you.

03:14:07  10        (Pause.)

          11   BY MS. JACOBS:

          12   Q    For the record, is that your declaration?

          13   A    Yes, it is.

          14   Q    It's your signature on the second page of the

03:14:24  15   declaration?

          16   A    Yes, it is.

          17   Q    Now, to make these earlier and quicker, I'll direct

          18   your attention to paragraph 10.

          19              So did you get his consent before each interview?

03:14:42  20   A    Yes.

          21   Q    When you get consent, do you get it explicitly?

          22   A    Not necessarily always explicitly.  It can be implied

          23   as well.

          24   Q    What do you mean by "implied consent"?

03:14:56  25   A    Well, if I'm doing an interview and I'm explaining what
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:14:58 1  the investigation is about and I continue the discussion and

2  the individual I'm talking to engages in that conversation,

3  then I take that as an implied consent to continue the

4  conversation.

03:15:08 5  Q   Okay.  So you don't always ask: *Do I have consent to*

6  *talk to you?*

7  A   I may ask, *Do you want to talk to me?*  So that's --

8  that's the two ways that I would get it.

9  Q   And the first consent for the first interview -- I'll

03:15:25 10  just call it the first consent -- that was not recorded.

11          So did you get that in writing?

12  A   No.

13  Q   Did you get any consent in writing that day?

14  A   No.

03:15:38 15  Q   And then the second interview that we just saw, was

16  that a example of implicit consent?

17  A   Yes.

18  Q   And -- now I don't know if you would call this the

19  third or the fourth interview, but I'm going to call it the

03:15:56 20  third, and I'll show it to you.  But did you --

21          I don't think you got consent for the subsequent

22  interviews, did you?

23  A   I would have to look at the interviews.  Like I said,

24  it was a continuation, so I don't -- I don't know if I

03:16:12 25  specifically asked him or said, *Hey, do you want to talk to*

03:16:15 1    *me?  Or Can I talk to you back here about something else?*

2    Q    Okay.  Maybe we'll watch, and you can tell me what kind

3    of consent it is.

4              This is clip 5, starting at 7:56.  I'll tell you

03:16:32 5    when to stop it.

6              *(The videotape was played.)*

7              MS. JACOBS:  Can you stop it, right there?

8    BY MS. JACOBS:

9    Q    Now, the camera is in a different angle, you'll notice,

03:16:43 10   and it looks like it's partially blocked; is that correct?

11   A    Correct.

12   Q    So what interview is this to you and from your memory?

13   A    This would be the last interview.  The

14   fourth interview.

03:16:55 15   Q    Okay.  And is this the start of the fourth interview?

16   A    It's when we enter the room, yeah.

17   Q    Okay.  So would you have given consent -- ask for

18   consent at the start of this interview?

19   A    There would have been discussion.  He was sitting out

03:17:09 20   on the couch, and I would have -- and I got additional

21   information at this point about another person that he may

22   have had involvement with that I wanted to discuss with him,

23   so I approached him out in the -- I guess, the living room

24   and would have asked him if he wanted to come back and talk

03:17:27 25   to me about it.  It wouldn't necessarily be on the video.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:17:30  1  Q    Okay.  So the consent wasn't recorded, again, then?

         2  A    No.

         3  Q    Okay.  Now, do you remember in this fourth interview

         4  that you left the room at some point?

03:17:44  5  A    I don't remember.

         6  Q    Okay.  Well, let's play it.

         7        And when we get there, I'll ask if you want me to

         8  have it played the whole time you're gone, or you can take

         9  my representation of -- that it was about three minutes, so

03:17:58 10  just let me know if you want to stop the video.

        11        MS. JACOBS:  This is clip 5.

        12        (The videotape was played.)

        13  BY MS. JACOBS:

        14  Q    Do you want me to stop it?

03:19:46 15  A    I don't know what the question is going to be, so --

        16  Q    Do you remember leaving the room at that point?

        17  A    I remember that I left the room.  There might have been

        18  other times I left the room as well.

        19  Q    Why did you close the door when you left the room?

03:19:59 20  A    I have no idea why I closed the door.

        21  Q    Did you tell Todd he could leave at that point?

        22  A    No.

        23  Q    And you told Todd during this interview that you

        24  believed that he should have been -- actually, I don't think

03:20:25 25  you told him this, but you believed that Todd should have

*DEBORAH D. PARKER, U.S. COURT REPORTER*

| | |
|---|---|
| 03:20:28 | 1 |

03:20:28  1  been charged in the Fullerton case, correct?

2        MS. GANNON:  Objection, Your Honor.  Relevance.

3        THE COURT:  This is as to what he told him?

4        MS. JACOBS:  That he believed that Todd should

03:20:38  5  have been charged in the Fullerton case.

6        THE COURT:  You're asking him what he told the

7  defendant?

8        MS. JACOBS:  Yes.

9        THE COURT:  All right.  I'll allow it.

03:20:45 10        Overruled.

11        THE WITNESS:  I don't remember if I told him that.

12        MS. JACOBS:  Can you play clip 5 at -- now it's

13  marker -- it's not the time stamp.  It's actually the time

14  marker, 550, if you can get there.

03:21:03 15  BY MS. JACOBS:

16  Q    I'm, basically, fast-forwarding through the time period

17  that you've left the room and shut the door.

18       (*The videotape was played.*)

19  BY MS. JACOBS:

03:22:40 20  Q    So you believed he should have been charged in the

21  Fullerton case and you let that be known to him?

22        MS. GANNON:  Objection, Your Honor.

23        That misstates the evidence.

24        THE COURT:  The clip will speak for itself.

25  ////

03:22:52   1   BY MS. JACOBS:

           2   Q    You knew it was likely that you were going to recommend

           3   this case for prosecution, correct?

           4          MS. GANNON:  Objection, Your Honor.  Relevance.

03:23:04   5          THE COURT:  Sustained.

           6   BY MS. JACOBS:

           7   Q    Why not give Mr. Hartman his Miranda rights that day,

           8   if you thought -- if you, going in there, believed he was

           9   guilty of the Fullerton case and he was downloading child

03:23:17  10   pornography?

          11          MS. GANNON:  Objection, Your Honor.  Relevance.

          12   His belief as to Miranda is irrelevant.

          13          THE COURT:  Sustained.

          14   BY MS. JACOBS:

03:23:28  15   Q    When you were interviewing Mr. Hartman -- when you

          16   weren't interviewing Mr. Hartman, there were only two places

          17   he could be right within the house?

          18   A    No.

          19   Q    No.

03:23:43  20          MS. JACOBS:  Can you play clip No. 4?

          21       (The videotape was played.)

          22   BY MS. JACOBS:

          23   Q    Mr. Hartman could only be on the couch or outside on

          24   the balcony; is that correct?

03:24:30  25   A    No.  What I said was, I couldn't have him in areas that

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
03:24:34    1    had not yet been searched.  There was a bedroom.  There was
            2    a kitchen area.
            3            So what I -- I had given him a couple of
            4    suggestions; but I think at the end, it clearly says that I
03:24:43    5    told him you can't be anywhere in the house that hasn't been
            6    searched.
            7    Q    So he could have been in the kitchen?  That would have
            8    been no problem to you?
            9    A    If there was room in there and it had been searched.
03:24:53   10            MS. JACOBS:  Okay.  And that's all I have,
           11    Your Honor.
           12            THE COURT:  Anything on redirect?
           13            MS. GANNON:  A few questions, Your Honor.
           14                        RECROSS-EXAMINATION
03:25:09   15    BY MS. GANNON:
           16    Q    Detective, you were asked some questions about
           17    searching a computer and whether you have a suspect going
           18    into the execution of the search warrant.
           19            Does the search of a computer assist law
03:25:36   20    enforcement in indicating who might have been using that
           21    computer at a given date and time?
           22    A    Yes, it does.
           23    Q    And so, conducting a search warrant before an arrest,
           24    is that typical in certain cases involving child
03:25:53   25    exploitation?
```

03:25:55  1    A    It's very common in child exploitation cases.

      2    Q    And is that because an individual's computer could be

      3    used by a house guest?

      4    A    Correct.

03:26:06  5    Q    Or is there something known as unsecured Wi-Fi?

      6    A    Yes.

      7    Q    And what is that?

      8    A    Wi-Fi now -- for the majority of them nowadays come

      9    with a security lock on them.  That hasn't always been the

03:26:21 10    case.  And if your Wi-Fi isn't secured, then people in the

      11   surrounding area, if they're close enough in proximity to

      12   your Wi-Fi, they could gain access of your Wi-Fi and

      13   ultimately use your same IP address.

      14   Q    So is that another reason why it is important to look

03:26:38 15    at the computer and the evidence on the computer before

      16   making a final determination on who was responsible for

      17   conduct on that computer?

      18   A    It's partly.

      19   Q    Or, I guess, associated with that IP address?

03:26:51 20    A    That's correct.

      21   Q    Now, you were asked about what's been admitted as

      22   Defense Exhibit A.  Let me go ahead and put that back up on

      23   the document camera.

      24        Do you see this last column here that says

03:27:09 25    "Assignments"?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:27:10  1    A    Yes.

        2    Q    And does each member of a search team have a particular

        3    assignment?

        4    A    Yes.

03:27:17  5    Q    And if you know, what does "ET" stand for?

        6    A    "Entry Team."

        7    Q    And for other individuals, does it say "parameter"?

        8    A    Yes.

        9    Q    And do you -- does it also say "ST"?

03:27:30  10   A    Yes.

        11   Q    Do you know what that stands for?

        12   A    "Search Team."

        13   Q    And so, for you -- about half, three-quarters of the

        14   way down, what does it say in the "Assignment" column?

03:27:44  15   A    It says "Parameter" and "Interview."

        16   Q    And what about for "K. Fox"?

        17   A    "Parameter" and "Interview."

        18   Q    And is "O'Connell" (sic) her maiden name?

        19   A    "O'Donnell" is her maiden name.

03:28:06  20   Q    So that's the same individual?

        21   A    Yes.

        22   Q    Now, you were asked some questions about when you left

        23   the room and there were some questions about a Fullerton

        24   investigation.

03:28:22  25             Was that towards the beginning or the end of the

                    *DEBORAH D. PARKER, U.S. COURT REPORTER*

03:28:25  1  interview?

2  A    The discussion about the Fullerton would have been

3  towards the tail end of the interviews.

4  Q    And in preparing your declaration in this case, did the

03:28:39  5  Government specifically -- did I provide you with a copy of

6  the defendant's declaration?

7  A    Yes, you did.

8  Q    And did I provide you with a full copy of the defense's

9  legal brief?

03:28:50  10  A    No.

11       MS. GANNON:  Your Honor, no additional questions.

12       THE COURT:  Anything further on cross?

13       MS. JACOBS:  No, Your Honor.

14       THE COURT:  May this witness be excused?

03:28:59  15       MS. JACOBS:  Yes.

16       MS. GANNON:  Yes, Your Honor.  Thank you.

17       THE COURT:  You may step down.  You're excused.

18       THE WITNESS:  Shall I leave this up here?

19       THE COURT:  Is that the declaration?

03:29:07  20       THE WITNESS:  Yes.

21       THE COURT:  Yes, just leave it there for now.

22  We'll get that later.

23       You may call your next witness.

24       MR. ORTEGA:  Your Honor, we call

03:29:15  25  Agent Kim Speakman.

03:29:49  1      (Pause.)

          2          THE CLERK:  Sir, go ahead and step through the

          3  railing.  Stop at the end of counsel table.

          4          Raise your right hand to be sworn.

03:30:16  5      KIM LEE SPEAKMAN, JR., DEFENDANT'S WITNESS, SWORN

          6          THE WITNESS:  I do.

          7          THE CLERK:  Step forward, please.

          8      (Pause.)

          9          THE CLERK:  Sir, if you could, please, state your

03:30:37 10  full name, spelling your first and your last for the reason.

         11          THE WITNESS:  Kim -- K-I-M -- Lee Speakman,

         12  S-P-E-A-K-M-A-N, Jr.

         13          THE COURT:  You may inquire.

         14          MR. ORTEGA:  Thank you, Your Honor.

03:30:51 15                   DIRECT EXAMINATION

         16  BY MR. ORTEGA:

         17  Q    Good afternoon.

         18  A    Hi, sir.

         19  Q    I would like to ask you a few questions about your

03:30:57 20  declaration.

         21  A    Yes, sir.

         22  Q    There's a binder in front of you, a black binder

         23  labeled Defendant's Exhibits.

         24          Can you turn to exhibit -- what's been marked as

03:31:06 25  Exhibit F.

03:31:07  1   A     Yes, sir.  Okay.

       2   Q     Do you recognize this document?

       3   A     Yes, sir.

       4   Q     What is it?

03:31:17  5   A     It's my government-issued M-4.

       6   Q     Was the photograph taken by you?

       7   A     Yes, sir.

       8         MR. ORTEGA:  Your Honor, move to admit Exhibit F.

       9         THE COURT:  Any objection?

03:31:31 10        MS. LEAL:  None, Your Honor.

      11         THE COURT:  It will be admitted.

      12      (Defendant's Exhibit F received in evidence.)

      13   BY MR. ORTEGA:

      14      (The document was published in open court.)

03:31:40 15   BY MR. ORTEGA:

      16   Q   Now, was this the weapon that you had in your

      17   possession on February 2nd -- sorry, on February 5th, 2015,

      18   during the search warrant execution?

      19   A     Yes, sir.

03:31:54 20   Q     And did you have this weapon -- can you describe to me

      21   how you were holding this weapon?

      22   A     At which point?

      23   Q     At the point where you were about to make entry into

      24   the home.

03:32:03 25   A     At that time, I had both hands on the rifle, and I was

03:32:08  1    pointing it towards the door.

2    Q    And is that a ruler that's depicted in the photo next

3    to the weapon?

4    A    Yes, sir.

03:32:17  5    Q    And is the unit of measurement inches?

6    A    Yes, sir.

7    Q    And did you place that by the gun?

8    A    I did.  Yes, sir.

9    Q    For lack of a better term, how tall would you

03:32:26 10    estimate --

11    A    I thought you would ask that.  It looks about

12    five inches tall and then, maybe, three or four feet long,

13    perhaps.

14    Q    I direct your attention to what's been marked as

03:32:43 15    Exhibit G.

16    A    Yes, sir.  Got it.

17    Q    Is this also a photograph of your M-4?

18    A    Yes, sir.

19    Q    And did you take this picture?

03:32:54 20    A    Yes, sir.

21         MR. ORTEGA:  Your Honor, move to admit Exhibit G

22    into evidence.

23         THE COURT:  Any objection?

24         MS. LEAL:  None, Your Honor.

03:33:02 25         THE COURT:  Exhibit G is admitted.

03:33:03  1        (Defendant's Exhibit G received in evidence.)

        2   BY MR. ORTEGA:

        3   Q    And I notice you placed the ruler horizontally across

        4   the gun.

03:33:19  5             How long do you estimate that that gun is?

        6   A    Maybe two-and-a-half feet, approximately.

        7   Q    Now, was this gun pointed at Mr. Hartman?

        8   A    Yes, sir.

        9   Q    Did you ever touch Mr. Hartman's body with the gun?

03:33:34 10   A    No, sir.

       11   Q    Why didn't you use a handgun?

       12   A    During search warrants, our typical standard operating

       13   procedure is to have long guns at the front of the stack.

       14   Q    And why is that?

03:33:48 15   A    It helps in officer safety and helps establish control

       16   over the house.

       17   Q    How does it help establish control?

       18   A    You're not really sure what's going to be on the other

       19   side of the door, and you can't anticipate how people are

03:34:00 20   going to react when you enter their house uninvited, so it's

       21   always -- we're always trained to have a long gun at the

       22   front of the stack.

       23   Q    What is the difference between a long gun and a handgun

       24   in this context?

03:34:16 25   A    How do you mean?

DEBORAH D. PARKER, U.S. COURT REPORTER

03:34:17  1    Q    Let me rephrase that.

        2    A    Sure.

        3    Q    What difference does it make that it's a long gun

        4    versus a handgun when you're entering a home?

03:34:24  5    A    The long gun is a more accurate weapon for one.

        6    Q    And when you say "accurate weapon," what do you mean?

        7    A    For the accuracy purposes when you fire both weapons --

        8    and I'm not an expert in any of this stuff.  I qualified

        9    with both weapons, but the accuracy is much better with the

03:34:45 10    rifle.

       11    Q    Is the point of using a long gun also to cause the

       12    person who's on the other side of the door to kind of

       13    take -- have a moment of shock when they see the large

       14    weapon?

03:34:59 15    A    I think it helps establish safety for both sides -- for

       16    both parties.

       17    Q    It helps establish safety because the person has a

       18    sudden state of paralysis when they see such a large weapon,

       19    right?

03:35:11 20    A    I don't know about "paralysis," but it does help

       21    control the situation.

       22    Q    And how does it "help control the situation"?

       23    A    When you go into someone's house, you don't know how

       24    they're going to react, so you want to establish control and

03:35:23 25    have -- without having fighting between the parties.  And a

03:35:31  1   long gun, the biggest point is, you don't know what's going

2   to be on the side, what firepower they might have, what

3   weapons they night produce.  You have no idea what -- how

4   they're going to react to your -- to the situation.

03:35:44  5   Q    So the point of this gun is to make them stop in their

6   tracks?

7   A    Yes.

8   Q    Thank you.

9        You participated in an operational briefing at

03:35:55 10   around 6:30 a.m., correct?

11   A    Yes, sir.

12   Q    And was Detective Syvock present for that?

13   A    Yes, sir.

14   Q    And was detective -- Agent Perez present for that?

03:36:06 15   A    Yes, sir.

16   Q    So if the meeting was at 6:30 a.m., when do you

17   estimate you made entry into the home?

18   A    After 7:00 o'clock -- 7:00 a.m.

19   Q    7:00 a.m.?

03:36:19 20   A    Or shortly thereafter?

21   Q    Okay.  You state in your declaration that you put your

22   gun back in your car, after you secured the residence,

23   correct?

24   A    Correct.

03:36:30 25   Q    So around what time would you have put your gun back in

```
03:36:33   1   the car?

           2   A    Approximately -- because I wasn't keeping track of

           3   time, I don't know.  So I would say, approximately --

           4   7:15 a.m., approximately.

03:36:54   5   Q    7:15.

           6        I'm going to play a clip from Exhibit I, labeled

           7   Exhibit -- excuse me, Clip 6.

           8        If you could look at your screen, it's going to be

           9   in front you of.

03:37:15  10        And the clip is going to be a little garbled at

          11   first, but it will get clearer.

          12   A    Okay.

          13        (The videotape was played.)

          14   BY MR. ORTEGA:

03:37:35  15   Q    Did you see the person outside of the door?

          16   A    Yes, briefly.

          17   Q    Was that you?

          18   A    I don't believe so.  I'll double-check.

          19   Q    Do you want us to play the clip one more time?

03:37:45  20   A    Yes, sir.

          21        (The videotape was played.)

          22        THE WITNESS:  That appears to be Agent Scott

          23   Whitmire.

          24   BY MR. ORTEGA:

03:38:04  25   Q    Is he holding a long gun?
```

03:38:07    1    A    No, sir.

            2    Q    Can you tell what the object in his hand is?

            3    A    I would have to play it again.

            4              Could we play it one more time?

03:38:14    5    Q    Yes.

            6    A    Sorry.

            7         (*The videotape was played.*)

            8    BY MR. ORTEGA:

            9    Q    Can you tell what item he's holding in his hand?

03:38:37   10    A    No, sir, I cannot.

           11    Q    Now, you mentioned that long gun is necessary for

           12    officer safety.  Were you aware on that day that

           13    Detective Syvock had previously met Mr. Hartman?

           14    A    Had previously -- I'm sorry?

03:38:56   15    Q    That Detective Syvock had previously met Mr. Hartman at

           16    his home?

           17    A    I'm not sure if I was aware of that.

           18    Q    He didn't tell you that he had already had an encounter

           19    with Mr. Hartman at his home?

03:39:09   20    A    I don't recall that, to my knowledge.

           21    Q    Did Agent Perez tell you that he had previously had an

           22    encounter with Mr. Hartman at his home?

           23    A    I don't recall.

           24    Q    So you don't remember knowing whether the officers who

03:39:25   25    were executing the search warrant with you had previously

```
03:39:30    1    interacted with the defendant?

            2    A    Sir, I'm sorry.  I don't recall that.  I'm sorry.

            3    Q    So they didn't tell you that Mr. Hartman -- there was

            4    any security concerns with him, correct, based on their

03:39:42    5    previous encounter with him?

            6    A    I do remember that no weapons were registered and there

            7    was nothing that comes to my mind, right now, that was of

            8    concern.

            9    Q    They didn't tell you that -- about any problems they

03:39:58   10    encountered with him the first time they met him at his

           11    residence?

           12              MS. LEAL:  Objection.  Relevance.

           13              THE COURT:  Sustained.

           14    BY MR. ORTEGA:

03:40:08   15    Q    So based on the operational meeting you had at

           16    6:30 a.m., you still felt it was necessary to go in with the

           17    M-4?

           18    A    Yes, sir.

           19    Q    You mentioned in your declaration that in child

03:40:31   20    pornography cases defendants sometimes commit suicide or

           21    engage in gunfire.

           22              How many times has this happened in this

           23    jurisdiction?

           24              MS. LEAL:  Objection.  Relevance.

03:40:43   25              THE COURT:  If he submitted it in his declaration,
```

193

03:40:45 1   it may go to his credibility.

2            Overruled.

3            THE WITNESS:  In this specific jurisdiction, I

4   know one of our -- he was a postal inspector, and he was

03:41:00 5   executing a search warrant, I believe, in this jurisdiction.

6   When they made entry, the suspect did commit suicide.

7            On another occasion -- actually, last week, or

8   maybe a week or two ago, there was a case that involved an

9   Orange County person.  That person was trading child

03:41:17 10  pornography with another individual in San Diego.  When

11  authorities made contact with that individual, they escorted

12  him to his house -- or to his residence.  I'm not sure if it

13  was a house or apartment.  When they were escorting him to

14  that location, he committed suicide in front of the law

03:41:37 15  enforcement officers that was -- that were escorting him.

16  Q    Did this engage the officers at gunfire?

17  A    I don't know.  The second one, no, I believe he just

18  took his own life.

19  Q    Were you present for any of those instances?

03:41:50 20  A    No, sir.

21  Q    What was Mr. Hartman wearing when you saw in his home?

22  A    Initially, he was wearing -- it was either boxer

23  shorts, or shorts and no -- no shirt.

24           MR. ORTEGA:  Nothing further, Your Honor.

03:42:11 25           THE COURT:  Cross-examination, as if on direct.

194

```
03:42:20   1              CROSS-EXAMINATION
           2   BY MS. LEAL:
           3   Q    Agent Speakman, can you take us through from -- you
           4   said you were at the front of the stack when you were making
03:42:32   5   entry at Mr. Hartman's residence, correct?
           6   A    Yes, ma'am.
           7   Q    So you're at the front of the stack and you have your
           8   shotgun?
           9   A    A rifle.
03:42:40  10   Q    Rifle, sorry.  You're the only one with a rifle?
          11   A    Yes, ma'am.
          12   Q    Everyone else has handguns?
          13   A    Yes.  Yes, ma'am.
          14   Q    And behind you are approximately how many law
03:42:51  15   enforcement agents?
          16   A    In the stack, I believe it was eight individuals on the
          17   entry team.
          18   Q    And then, there's a parameter team that's not in the --
          19   on the stairwell but somewhere in the alley in the streets?
03:43:06  20   A    In the alley in the streets and I believe on the patio.
          21   Q    Did someone knock on the door?
          22   A    Yes, ma'am.
          23   Q    And who was that?
          24   A    Agent Ron Perez.
03:43:17  25   Q    Does anyone answer the door?
```

03:43:19    1    A    No, ma'am.

2    Q    Did you wait -- did you all wait a few minutes after

3    you knocked -- not a few minutes. A few seconds?

4    A    Yes.

03:43:27    5    Q    And there was no response?

6    A    No, ma'am.

7    Q    What did Officer Perez or Agent Perez do next?

8    A    He used a key obtained from Mr. Hartman's mother to

9    open the front door.

03:43:40  10    Q    And you're in front of the door well with Special Agent

11    Perez.

12          Are you sharing the door well area?

13    A    I'm the first person there and Agent Perez is right

14    behind me and everybody else is behind him.

03:43:53  15    Q    He's opening the door with the key, so is he to your

16    side somehow?

17    A    Yes. Well, he reached around, opened the door and the

18    door opened; and then, I'm the first person there.

19    Q    So if someone is in the house, you're the first person

03:44:05  20    they see?

21    A    Yes, ma'am.

22    Q    And you're holding your gun in front of you?

23    A    Yes, ma'am.

24    Q    And who do you see in the house?

03:44:11  25    A    Mr. Hartman.

03:44:12  1    Q    And about how close is Mr. Hartman to you, initially?

         2    A    Approximately, give or take, maybe from you to me,

         3    roughly.  Approximately.

         4    Q    So the house has a hallway/entryway type space?

03:44:30  5    A    Yes.

         6    Q    And he's near the end of it, the far end?

         7    A    Towards the back of the home.

         8    Q    Okay.  Do you say something or does Special Agent Perez

         9    say something to announce your presence?

03:44:42 10    A    Initially, Ron Perez does the knock-and-announce.

        11    Q    By "announce," what does he say?

        12    A    *Police with a search warrant.  Open the door.*

        13    Q    So you now have made eye contact with Mr. Hartman.  Do

        14    you say anything to him?

03:44:56 15    A    Yes.

        16    Q    What do you say?

        17    A    I first said, *Police.  Don't move.*

        18    Q    Did he comply?

        19    A    Yes.

03:45:02 20    Q    Did he say anything to you?

        21    A    No, ma'am.

        22    Q    What was his demeanor?

        23    A    He was shocked.  He was startled.  You could tell.  It

        24    looked like he'd just woken up.

03:45:14 25    Q    Did you say anything else?

03:45:15 1   A   Yes.

2   Q   What did you say next?

3   A   That -- I told him to put his hands in the air.

4   Q   Did he comply?

03:45:21 5   A   Yes.

6   Q   What did you do after that?

7   A   I told him to put his hands up higher.

8   Q   And did he comply, again?

9   A   Yes, ma'am.

03:45:29 10  Q   Did you give any other instructions at that point?

11  A   At that point, I directed him to come towards me.

12  Q   And you still have the gun pointing at him, correct?

13  A   Yes, ma'am.

14  Q   And does he approach you?

03:45:38 15  A   Yes.

16  Q   And does he exit the door, the door-well area?

17  A   He exits the door on my left side.

18  Q   Does the gun remain pointed at him as he's going to the

19  door, or is the gun still pointed inside the home in the

03:45:55 20  event someone is there?

21  A   As he's coming towards me, my gun was still directed on

22  him.  And then, when he got to -- pretty close proximity, my

23  main concern is what's beyond him and what else could

24  possibly be in the house, so then I direct my attention

03:46:08 25  towards the rest of the house while the people behind me

*DEBORAH D. PARKER, U.S. COURT REPORTER*

198

03:46:11  1    give directions to Mr. Hartman.

2    Q    So he exits the residence to your side and the gun is

3    now facing in the home?

4    A    Yes, ma'am.

03:46:21  5    Q    And he is going out to that patio deck area?

6    A    Yes.  Correct.

7    Q    Is that your entire interaction with him?

8    A    Yes.

9    Q    And then do you go into the home?

03:46:32 10    A    Yes.

11    Q    And you search the -- or secured the home as

12    participate of the entry team?

13    A    Then the entry team made entry into the house and

14    secured the house.

03:46:40 15    Q    Did you go through every room?

16    A    Yes.

17    Q    And after -- about how long does it take to secure the

18    residence, approximately?

19    A    Maybe a couple of minutes and then we also do a

03:46:50 20    secondary sweep, just in case somebody missed something.

21    Q    Did you do that?

22    A    Yes.

23    Q    And then after you've completed that, where do you and

24    your M-4 go?

03:47:02 25    A    Then I put the M-4 back in my vehicle.

```
03:47:05   1    Q    Do you see Mr. Hartman as you're leaving, going down
           2    the stairwell to your vehicle?
           3           Do you see him still on the patio, or is he in the
           4    home, if you recall?
03:47:16   5    A    I believe he's still on the patio.
           6    Q    At no point the gun touches Mr. Hartman?
           7    A    No, ma'am.
           8    Q    Did you see Mr. Hartman handcuffed?
           9    A    No.
03:47:32  10    Q    Did anyone put his arms behind his back that you saw?
          11    A    That I saw, no.
          12    Q    When you came back to the home, back up the stairwell
          13    after you put your M-4 away, do you have your handgun?
          14    A    Yes, ma'am.
03:47:53  15    Q    Is that holstered?
          16    A    Yes.
          17    Q    And when you go back in, are you going in to do what?
          18    Interview Mr. Hartman, or something else?
          19    A    No, I was assigned to the search team that day.
03:48:02  20    Q    Do you go in and search the location?
          21    A    Yes, ma'am.
          22    Q    Do you see Mr. Hartman as you're searching?
          23    A    As I'm searching, I don't recall seeing him.
          24    Q    Did there come an instance where Ms. Hartman is present
03:48:18  25    in the residence?
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:48:19  1    A    Yes.

       2    Q    And where is she in the residence?

       3    A    In the living room.

       4    Q    Do you recall how soon after you started searching that

03:48:25  5    she returned to the home?

       6    A    I do not.

       7    Q    Do you -- at some point, does Mr. Hartman and

       8    Mrs. Hartman, are they in the living room together?

       9    A    At some point they were in the living room together.

03:48:39 10    I'm just not sure when.

      11    Q    But while law enforcement is still there, conducting

      12    their search?

      13    A    Yes.

      14    Q    Does Mr. Hartman ever talk to you?

03:48:50 15    A    No.  No, ma'am.

      16         MS. LEAL:  One moment.

      17         (Pause.)

      18    BY MS. LEAL:

      19    Q    Can you tell me, Special Agent Speakman, what -- is

03:49:12 20    there ever a time when it's a --

      21         Is it good to have a gun pressed against a target

      22    during a search warrant?

      23    A    No.

      24    Q    Why not?

03:49:25 25    A    It would be very unsafe to give your weapon over to

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:49:28 1  somebody.  You're just asking them to grab it.  That would

2  be very unacceptable.

3          MS. LEAL:  Nothing further.

4          THE COURT:  Anything on recross?

03:49:44 5          MR. ORTEGA:  No, Your Honor.

6          THE COURT:  May this witness be excused?

7          MR. ORTEGA:  Yes, Your Honor.

8          MS. LEAL:  Yes, Your Honor.

9          THE COURT:  You may step down.  You are excused.

03:49:51 10          THE WITNESS:  Thank you, Your Honor.

11      *(Pause.)*

12          THE COURT:  And at this time, any further

13  witnesses by the defense?

14          MR. ORTEGA:  Just Mr. Hartman, Your Honor.

03:50:07 15          THE COURT:  Do you plan on asking him questions on

16  direct first, or no?

17          MR. ORTEGA:  Yes, Your Honor.  It will probably be

18  about five to 10 minutes.

19          THE COURT:  All right.

03:50:17 20          MR. ORTEGA:  My client asks if he might be able to

21  take a short bathroom break, Your Honor.

22          THE COURT:  We can do that.

23          You have about five to 10 minutes.  You think you

24  have about 40?

03:50:26 25          MS. GANNON:  Yes, Your Honor.  I'll try to make it

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:50:28  1  as brief as possible.

2        THE COURT:  All right.  We'll take a 10-minute

3  recess; and then, we'll come back at 4:00 o'clock and

4  continue.

03:50:35  5        Hopefully, we can take care of everything in 10

6  minutes.

7        *(Recess taken from 3:50 p.m. to 4:01 p.m.)*

8        THE COURT:  All right.  You may begin your -- did

9  we swear the witness, yet?

04:01:04  10        THE CLERK:  No, we did not, Your Honor.

11        THE COURT:  Okay.  Yes.

12        THE CLERK:  Please raise your right hand.

13        TODD HARTMAN, DEFENDANT'S WITNESS, SWORN

14        THE WITNESS:  Yes.

04:01:15  15        THE CLERK:  Please state your full name.

16        THE WITNESS:  My name is Todd Hartman, T-O-D-D

17  H-A-R-T-M-A-N.

18        THE COURT:  You may inquire.

19        MR. ORTEGA:  Thank you, Your Honor.

04:01:25  20                    DIRECT EXAMINATION

21  BY MR. ORTEGA:

22  Q    Good afternoon, Mr. Hartman.

23        I'm just going to ask you a couple of questions:

24        Did you ask Detective Syvock to talk to him about

04:01:33  25  his investigation?

04:01:34  1    A    No, I did not.

       2    Q    Can you bring that microphone a little closer to you?

       3    A    No, I did not.

       4    Q    Have you had a chance to review the video recording of

04:01:48  5    your interrogation with Detective Syvock?

       6    A    I have.

       7    Q    Other than the times on that video recording, how many

       8    times did you speak to Detective Syvock?

       9    A    Three times outside the videos.

04:02:01 10    Q    Okay.  And when were those times?

      11    A    The first time was on the front balcony when I was in

      12    my underwear.  The second time was inside the house, but

      13    before he -- before that first video, and the third time was

      14    he just said a few words before he left, after the last

04:02:19 15    video.

      16    Q    And at any of those times, were you administered

      17    Miranda rights?

      18    A    No, I was not.

      19    Q    Or rather were you advised of your Miranda rights?

04:02:30 20    A    No, I was not.

      21    Q    Did he tell you why he was there during those times?

      22    A    Yes, he did.

      23    Q    What did he tell you?

      24    A    When he first spoke to me, he introduced himself as

04:02:48 25    part of a human trafficking task force with Homeland

04:02:52  1   Security, and he told me that he was investigating

2   suspicious activity, IP address from October, regarding the

3   downloading of child pornography.

4   Q    Now, before the first video recorded entry, did he

04:03:12  5   bring up the Fullerton investigation from 2010?

6   A    Yes, he did.

7   Q    What did he say about that investigation?

8   A    He told me that he had looked me up and that he had

9   seen -- heard about that case, and he felt that I was guilty

04:03:31 10   and had gotten away with it.

11   Q    Now, in your declaration, you mentioned that at some

12   point you needed to go to the restroom, correct?

13   A    That's correct.

14   Q    Did you actually tell the officers that you needed to

04:03:44 15   go to the restroom?

16   A    I did not say that I needed to go to the restroom.

17   Q    Did you try to leave to go to the restroom?

18   A    I did try to leave.

19   Q    How many times?

04:03:52 20   A    Twice.

21   Q    Why didn't you leave?

22   A    I was rebuked by officers both times that I tried to

23   leave.

24   Q    So as to the first time, can you tell me when that

04:04:03 25   happened and how you were rebuked?

04:04:05  1    A    The first time when I was still outside on the front

2    patio and Detective Syvock had gone inside, I needed to use

3    the restroom and there was a nearby park, so I thought I

4    could go there and use the restroom.  When I approached the

04:04:22  5    top of the stairs, the officer blocking the top of the

6    stairs -- I asked if I could get by him and he told me that

7    I could not and so I went back to standing on the deck.

8    Q    Did you tell him that you needed to use the restroom?

9    A    No, I did not.

04:04:37  10   Q    Why didn't you tell him?

11   A    I was intimidated by the officers there, as well as the

12   fact that it was kind of embarrassing.

13   Q    And when was the second time you tried to go to the

14   restroom?

04:04:47  15   A    The second time was after the first recorded interview,

16   and I was in the living room.  I tried to leave through the

17   front door and the officer blocking the front door pointed

18   back the way I had come and told me that I couldn't go that

19   way.

04:05:08  20   Q    And did you tell him that you needed to go to the

21   restroom?

22   A    I did not.

23   Q    Why not?

24   A    The same reason:  I was intimidated and kind of

04:05:15  25   embarrassed about it.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:05:18  1  Q     You mentioned in your declaration that when

       2  Agent Speakman came into the home, the gun he was holding

       3  touched your chest.

       4  A     That's correct.

04:05:29  5  Q     Did it, in fact, touch your chest?

       6  A     It did.

       7  Q     Why do you have such a clear memory of that?

       8  A     Well, that's the only time in my life I've ever had a

       9  gun touch me.  I remember the feel of it.  The hard metal is

04:05:43 10  cold, pressed against my naked chest.  And I was in fear of

      11  my life.  I very vividly remembered that.

      12  Q     Now, did you see that the other officers -- excuse me.

      13        Were the other officers that you saw when they

      14  came in through the door and when they were on the stairs,

04:06:04 15  did you see whether they were armed?

      16  A     Yes.  I could see the other officers on the stairs,

      17  including the Detective Syvock, holding guns out.

      18  Q     And just to clarify, are you saying that

      19  Detective Syvock had his gun drawn?

04:06:21 20  A     Yes.

      21  Q     Did you know how many law enforcement agencies were

      22  present at the search warrant execution?

      23  A     I didn't know exactly how many, but I knew there was

      24  more than one.

04:06:32 25  Q     And how do you know that?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:06:34  1  A    When Detective Syvock introduced himself, he said he

       2  was part of a task force with Homeland Security, and that's

       3  when I noticed the -- the vests with the Homeland Security

       4  initials on it, the "HSI."

04:06:50  5  Q    Did you have a sense for who was in charge of the

       6  search warrant execution?

       7  A    No one informed me of who was in charge, but when I

       8  heard that Homeland Security task force, I assumed that it

       9  was the Homeland Security.

04:07:06 10  Q    So did you believe that Detective Syvock was in charge

      11  or not in charge?

      12  A    I didn't think he was in charge, no.

      13  Q    Why not?

      14  A    Because he's part of Newport Beach Police, and I

04:07:17 15  figured that the larger federal agency would be in charge.

      16  Q    And at some point on the video recording that you

      17  watched previously, Detective Syvock tells you that you can

      18  leave.

      19       Why didn't you leave?

04:07:35 20  A    I didn't really feel I could leave.  I felt if I left

      21  the room that they were just going to put handcuffs on me,

      22  and I knew from before I came in the room that there were

      23  multiple armed officers that were blocking the exists, so I

      24  didn't think I'd actually be able to get very far.

04:07:53 25  Q    The door in the bedroom, there was no officer against

04:07:56 1    the door, was there?

2    A    Not on the inside of the door, no.

3    Q    So why didn't you just get up and open the door and

4    leave?

04:08:05 5    A    I was intimidated.  I didn't know what the protocol was

6    in that case, so I was trying to not do anything on my own.

7    Q    And what was causing you to be intimidated?

8    A    Well, having a gun put to my chest is one of those

9    things and seeing the guns on all the officers as well was

04:08:26 10   also very intimidating.

11   Q    And Detective Syvock told you that you were not under

12   arrest, correct?

13   A    That is correct.

14   Q    Did you believe that you were not under arrest?

04:08:36 15   A    That is not what I believe, no.

16   Q    Were you -- did you believe that you were going to

17   jail?

18   A    I did, yes.

19   Q    Did you feel relaxed, during your interrogation by

04:08:50 20   Detective Syvock?

21   A    No, I certainly did not.

22   Q    At some point, you asked Detective Syvock for a glass

23   of water.  Why did you -- did you ask him for a glass of

24   water because you had -- did you feel you had a rapport with

04:09:10 25   him, or why did you ask him for a glass of water?

04:09:11 1      Why not just get it on your own?

2  A    Well, I didn't know if I could get a glass of water on

3  my own, since I was told I couldn't move around, and I

4  didn't want to do anything to excite the officers there to

04:09:22 5  make anything worse.  I just -- I didn't feel free to just

6  get up and go get a glass of water.

7  Q    And why didn't you -- going back to the restroom issue,

8  briefly, why didn't you use the restroom in your apartment?

9  A    That goes back to not knowing what the protocol is

04:09:38 10 there.  The bathroom is centrally located, and I didn't know

11 if I closed the door, if people would start freaking out and

12 kick in the door, or shoot me, or whatever.  I didn't want

13 to chance anything, as well as the fact that being in a tiny

14 apartment, using the restroom there anyone can see, or hear,

04:09:59 15 or smell what's going on in there which is, again, very

16 embarrassing.

17 Q    Were you aware that your mother had been contacted by

18 law enforcement that morning?

19 A    Yes.  I heard when I was on the front deck, one of the

04:10:12 20 officers that was out there made a comment about calling my

21 mom.  I said that she was on her way to work or was at work

22 and he said that she was not, that she had gotten her.

23 Q    Okay.  And why didn't you ask that she be present

24 during the interview?

04:10:31 25 A    I didn't know that I could ask that.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:10:38 1   Q    You mentioned in your declaration that you heard

2   someone tell your mom, *What are you his attorney?*

3           Was that person Detective Syvock?

4   A    No.  I believe it was an officer standing next to

04:10:50 5   Detective Syvock.

6   Q    But you have a clear recollection of that statement

7   being made?

8   A    Yes.

9   Q    And why do you have such a clear recollection?

04:10:59 10  A    I remember that it upset my mother quite a bit, so I

11  remembered it.

12           MR. ORTEGA:  Nothing further, Your Honor.

13           THE COURT:  All right.  Cross-examination.

14                    CROSS-EXAMINATION

04:11:12 15  BY MS. GANNON:

16  Q    Good afternoon, Mr. Hartman.

17           The apartment where you were living with your

18  mother at the time that this search warrant was executed is

19  near the beach; isn't that correct?

04:11:28 20  A    That's correct.

21  Q    Approximately two blocks away from the ocean on the

22  Balboa Peninsula?

23  A    Yes.

24  Q    And it's also near a shopping center; isn't that right?

04:11:41 25  A    That's correct.

04:11:41   1   Q    And your familiar with both of these areas:  The beach

       2   and the shopping center?

       3   A    Yes.

       4   Q    And you said during the interview that you were

04:11:50   5   concerned about your neighbor seeing you while the agents

       6   were executing the search warrant.

       7        Do you remember that?

       8   A    Yes, I recall that.

       9   Q    And isn't it true that when you walk down the outside

04:12:02  10   stairs from your apartment, you can go right out to the

      11   main street or you can go left and down the alleyway that's

      12   hidden from the street?

      13   A    That's correct.

      14   Q    So you could have walked down the alleyway from where

04:12:18  15   any neighbors would have been on the main street; isn't that

      16   true?

      17   A    On the main street, yes.  The alley is between all the

      18   houses, though.

      19   Q    So it's a situation where the garages face an alleyway;

04:12:29  20   isn't that right?

      21   A    And people's windows.

      22   Q    Now, when Detective Syvock told you that you were free

      23   to leave, you could have gone and walked on the breach;

      24   isn't that right?

04:12:42  25   A    I was not dressed for the weather and had no shoes.

04:12:45  1    Q    At that point, by the time that you were being

2    interviewed in your mom's bedroom, you had been given a

3    sweatshirt.

4            Isn't that true?

04:12:55  5    A    Yes.

6    Q    And you were wearing basketball shorts?

7    A    Running shorts.  They're shorter than basketball

8    shorts.

9    Q    And you could have asked for a pair of shoes.

04:13:04 10            Isn't that true?

11    A    I suppose.

12    Q    But you didn't ask for a pair of shoes?

13    A    I didn't ask, no.

14    Q    And are you familiar with a Starbucks coffee in Lido

04:13:17 15    Village?

16    A    No.

17    Q    Now, you were in bed when law enforcement knocked on

18    your door.

19            Isn't that true?

04:13:26 20    A    That's true.

21    Q    And they were opening the door before you could open

22    it.

23            Isn't that true?

24    A    That is not true.

04:13:34 25    Q    But they were using the key to open the door before you

213

| | |
|---|---|
| 04:13:37 | 1 | arrived at the front door? |
| | 2 | A    I was unaware a key at all until after they had left. |
| | 3 | Q    They were opening the door -- I guess, law enforcement |
| | 4 | opened the door; isn't that correct? |
| 04:13:47 | 5 | A    No, I opened the door. |
| | 6 | Q    Your testimony here today is that you opened the door? |
| | 7 | A    Yes. |
| | 8 | Q    And the first agent you saw had a rifle-styled firearm? |
| | 9 | A    Yes.  I saw a rifle. |
| 04:14:03 | 10 | Q    And you were told to raise your hands? |
| | 11 | A    Yes. |
| | 12 | Q    And then, you were told by this agent holding the rifle |
| | 13 | to raise your hand higher -- raise your hands higher. |
| | 14 |         Isn't that true? |
| 04:14:15 | 15 | A    That's correct. |
| | 16 | Q    And you were directed to walk past these officers and |
| | 17 | onto the deck; isn't that correct? |
| | 18 | A    I was never told to walk past anyone. |
| | 19 | Q    Were you directed to proceed towards the officers? |
| 04:14:27 | 20 | A    I was standing in the doorway and pushed outside. |
| | 21 | Q    And once you were outside, most of the officers entered |
| | 22 | your apartment. |
| | 23 |         Isn't that true? |
| | 24 | A    I have no idea how many officers were there at the |
| 04:14:43 | 25 | time. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:14:44  1   Q     You saw several officers enter the apartment as you

2   proceeded onto the deck?

3   A     And I could see several officers outside as well.

4   Q     Yes or no, Mr. Hartman?

04:14:52  5         Did you see officers enter the apartment while you

6   were --

7   A     Officers entered the apartment, yes.

8   Q     And you had contact with Detective Syvock on that deck,

9   correct?

04:15:02  10  A     That's correct.

11  Q     And the first contact you had with him was on that

12  deck, correct?

13  A     That is incorrect.

14  Q     In your declaration you said that you had contact with

04:15:15  15  him inside the residence?

16  A     In the doorway of the residence.

17  Q     Now, approximately, how long were you on the deck

18  before the interview in your mom's room?

19  A     I have -- my memories of time are very askew in that.

04:16:00  20  Q     Do you recall that in your declaration, you said that

21  it was approximately 15 minutes?

22  A     Yes.  I believe I initially said 10 to 15 minutes.

23  Q     Now, in your declaration, you said that when you were

24  told to raise your hands higher you were adjacent to the

04:16:33  25  kitchen area.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
04:16:34   1          Do you recall that?

           2   A     I was in the kitchen area.

           3   Q     So you weren't at the front door.  You were in the

           4   kitchen area?

04:16:41   5   A     The front door opens into the kitchen.

           6   Q     So when Detective Syvock approached you, you were

           7   already outside on the deck, correct?

           8   A     I was standing in the doorway.

           9   Q     And agents were moving past you into the apartment?

04:17:04  10   A     As I was pushed outside, agents then went inside.

          11   Q     Now, who was in your mom's bedroom when you were being

          12   interviewed?

          13   A     Detective Syvock, and as I understand it, K. Fox.

          14   Q     So it was a female officer?

04:17:22  15   A     Yes.

          16   Q     And during your conversation with Detective Syvock in

          17   your mom's room, he made it clear to you that you were not

          18   under arrest?

          19   A     Yes.

04:17:32  20   Q     And that you could walk out at any time?

          21   A     Yes.

          22   Q     And when he made these statements, you nodded, correct?

          23   A     Yes.

          24   Q     And you nodded because you understood that you could

04:17:44  25   walk out at any time?
```

216

04:17:46  1   A      No.  I nodded as a -- well, no.

2   Q      But you nodded?

3   A      I did not.

4   Q      And you didn't say, *Wait, I need to use the restroom*?

04:17:56  5   A      No.

6   Q      And you didn't say, *Wait, when we were out on the deck*

7   *a few minutes ago, I tried to leave and someone wouldn't let*

8   *me*?

9   A      I didn't say anything.

04:18:06  10   Q      And you never asked Detective Syvock to use the

11   restroom down the street?

12   A      No.

13   Q      And you nodded because you had had a prior conversation

14   with Detective Syvock on the deck when he also told you that

04:18:19  15   you were free to leave.

16          Isn't that true?

17   A      He did not tell me I was free to leave.

18   Q      He told you that you were not under arrest; isn't that

19   correct?

04:18:26  20   A      Yes.  He told me I was not under arrest.

21   Q      Now, going back to the conversation in your mom's room,

22   after Detective Syvock reiterated that you could leave, he

23   explained to you that if you left, you could tell the

24   officers how to secure your property.

04:18:42  25          Do you remember that?

04:18:43   1    A     Yes.

           2    Q     And he made it clear that if you left, the apartment

           3    would be taken care of and locked up.  Is that your

           4    understanding?

04:18:55   5    A     I don't know if that was clear, no.

           6    Q     But he said that they would secure the property, if you

           7    left?

           8    A     I guess so.

           9    Q     Do you have a recollection of that happening or not?

04:19:05  10    A     A vague recollection.

          11          MS. GANNON:  Your Honor, I won't play any clips,

          12    but I would draw the Court's attention to the video with

          13    regard to that issue.

          14          THE COURT:  All right.  Very well.  I'll make a

04:19:18  15    note of that.

          16    BY MS. GANNON:

          17    Q     Now, during this whole time, you were the person in the

          18    room sitting closest to the door, correct?

          19    A     That's correct.

04:19:26  20    Q     And no one was blocking that door, correct?

          21    A     No.

          22    Q     In fact, you were sitting so close to the door, you

          23    could reach out and touch the door handle; isn't that

          24    correct?

04:19:35  25    A     That's correct.

04:19:36  1   Q     Now, Detective Syvock said he was interested in why you

2   were looking at child pornography.

3               Do you remember that?

4   A     I guess.

04:19:49  5   Q     Yes or no, Mr. Hartman?  I don't want you to speculate.

6   A     Not clearly, no.

7   Q     Do you remember that he said he wanted to understand

8   why you were looking at child pornography?

9   A     Yes.

04:19:59  10  Q     And you proceeded to tell him about looking at child

11  pornography?

12              MR. ORTEGA:  Objection, Your Honor.

13              This goes to the elements of the offense and not

14  to the suppression issue.

04:20:09  15             THE COURT:  Sustained.

16  BY MS. GANNON:

17  Q     And Detective Syvock asked if you had anywhere you

18  needed to go.

19              Do you remember that?

04:20:18  20  A     Yes.

21  Q     And you said "No"?

22  A     Yes.

23  Q     And he asked you if he was holding you up at all and

24  you said "No"?

04:20:26  25  A     That's correct.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:20:27   1    Q    And at that time, you didn't say that you needed to use

  2    the restroom?

  3    A    No, I did not.

  4    Q    And you continued to answer questions?

04:20:34   5    A    Yes.

  6    Q    Now, you said you were embarrassed about asking to use

  7    the restroom inside the apartment.

  8          Isn't it true that Detective Syvock asked you

  9    questions about masturbating to images of child pornography?

04:20:54 10          MR. ORTEGA:  Objection, Your Honor.

11          Relevance and goes to the elements of the offense.

12          MS. GANNON:  Your Honor, may I be heard on this

13    issue?

14          THE COURT:  No.  Sustained.

04:21:00 15    BY MS. GANNON:

16    Q    Now, in your declaration, you said that you, quote,

17    firmly believe that you were under arrest.

18          Do you remember that?

19    A    Yes.

04:21:09 20    Q    And that you were -- you also firmly believed that you

21    were not free to leave?

22    A    Yes.

23    Q    Isn't it true that no one said that you were under

24    arrest?

04:21:18 25    A    That is true.

220

| | | |
|---|---|---|
| 04:21:18 | 1 | Q    And no one said that you were not free to leave? |
| | 2 | A    Said, no. |
| | 3 | Q    And you were never handcuffed? |
| | 4 | A    That is correct. |
| 04:21:28 | 5 | Q    And, in fact, Detective Syvock told you in your mom's |
| | 6 | bedroom, quote:  *If you want to get out and walk out of here* |
| | 7 | *right now, please do*, end quote. |
| | 8 |           Do you remember that? |
| | 9 | A    Yes. |
| 04:21:41 | 10 | Q    And quote:  *You don't have anyplace to go, right now,* |
| | 11 | and you answered "No," correct? |
| | 12 | A    Correct. |
| | 13 | Q    And quote, *I'm not holding you up or anything, right?*, |
| | 14 | end quote.  Answer, "No." |
| 04:21:54 | 15 |           Do you remember that? |
| | 16 | A    Yes. |
| | 17 | Q    Later when Detective Syvock asked you if you had any |
| | 18 | questions for the officers you said "No." |
| | 19 |           Isn't that true. |
| 04:22:02 | 20 | A    That's true. |
| | 21 | Q    And you didn't ask him, *Am I under arrest?* |
| | 22 |           You never asked him that, did you? |
| | 23 | A    No. |
| | 24 | Q    And you didn't ask him what happens when I go to jail, |
| 04:22:13 | 25 | did you? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

221

| | | |
|---|---|---|
| 04:22:14 | 1 | A    No. |
| | 2 | Q    And you didn't ask him *When is my court date?,* did you? |
| | 3 | A    No. |
| | 4 | Q    That's because you didn't think that you were going to |
| 04:22:21 | 5 | that -- jail that day, did you? |
| | 6 | A    That's incorrect. |
| | 7 | Q    Now, in your declaration you also said that you firmly |
| | 8 | believed that you were not free to refuse to answer |
| | 9 | questions. |
| 04:22:34 | 10 |       Do you remember that? |
| | 11 | A    I'm sorry.  Can you repeat that? |
| | 12 | Q    In your declaration, you said that you firmly believed |
| | 13 | that you were not free to refuse to answer questions? |
| | 14 | A    Yes. |
| 04:22:45 | 15 | Q    And isn't it true that you answered Detective Syvock's |
| | 16 | questions? |
| | 17 | A    Yes. |
| | 18 | Q    And you never told him that you didn't want to answer |
| | 19 | his questions? |
| 04:22:54 | 20 | A    Yes. |
| | 21 | Q    And didn't Detective Syvock tell you that he wanted to |
| | 22 | share his investigation with you? |
| | 23 | A    Yes. |
| | 24 | Q    And that they could, quote:  *Hopefully, get an* |
| 04:23:07 | 25 | *understanding from you as to why you were viewing child* |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:23:09    1    *pornography*?

            2    A    Yes.

            3    Q    And that he would like to hear from you if you didn't

            4    mind sharing it with him.

04:23:16    5              Do you recall that?

            6    A    Vaguely, yeah.

            7    Q    So Detective Syvock was, in fact, inviting you to have

            8    a conversation with him.

            9              Isn't that true?

04:23:27   10    A    I don't think so.

           11    Q    He was asking you to share about this topic.

           12              Isn't that true?

           13    A    I'm not sure.

           14    Q    And he wasn't demanding that you answer any questions,

04:23:47   15    was he?

           16    A    Not during the interview -- the recorded interview, no.

           17    Q    When did he demand that you answer questions?

           18    A    When I was first interviewed inside before the video

           19    interview, I was not asked if I wanted to answer questions.

04:24:10   20    I was told to go here and there and to answer questions.

           21    Q    Did he explain to you that your physical movements

           22    within the apartment were of concern because the apartment

           23    hadn't been searched yet.

           24              Isn't that true?

04:24:25   25    A    That is correct.

04:24:26  1    Q    But he told you you were free to leave?

       2    A    Yes.

       3    Q    Multiple times?

       4    A    Yes.

04:24:30  5    Q    Now, in your declaration, you said that between

       6    interviews when your mom asked if you were under the

       7    obligation to answer the officer's questions, an officer

       8    said, quote, *What?  Are you his attorney,* end quote.

       9            Do you recall that in your declaration?

04:24:45 10    A    Yes.

      11    Q    And the officer who supposedly said this wasn't

      12    Detective Syvock, was it?

      13    A    No.

      14    Q    And there was, approximately, seven minutes between

04:24:54 15    your first interview in your mom's bedroom which lasted

      16    approximately 30 minutes and the second interview.

      17            Isn't that true?

      18    A    Yes.

      19    Q    And when the interview began again, you didn't ask

04:25:09 20    Detective Syvock about whether you were obligated to answer

      21    questions, did you?

      22    A    No.

      23    Q    And you didn't ask him anything about getting an

      24    attorney, did you?

04:25:18 25    A    No.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:25:19 1    Q    And Detective Syvock was the officer that you spent

2    almost the entire time with.

3              Isn't that true?

4    A    Yes.

04:25:25 5    Q    And he was the person who was providing you information

6    about why they were there, correct?

7    A    Yes.

8    Q    And what was going on, correct?

9    A    I don't know that he provided me information on what

04:25:37 10   was going on.  Just what he was investigating.

11   Q    But providing information that they would be searching

12   the house and what would happen if you decided to leave?

13   A    I wasn't given very specific details on that, no.

14   Q    He generally said that they would make efforts to

04:25:55 15   secure the property, if you decided to leave?

16   A    Yes.

17   Q    Now, after the interview, you chose to stay on the

18   couch instead of leave the apartment.

19             After the very last interview happened, you

04:26:09 20   decided to stay on the couch; isn't that correct?

21   A    Yes.

22   Q    And when the officers finished their search, where were

23   you?

24   A    On the couch.

04:26:19 25   Q    And were you arrested that day?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

| | | |
|---|---|---|
| 04:26:21 | 1 | A    No. |
| | 2 | Q    So you didn't leave the apartment with the officers at |
| | 3 | the conclusion of the search, did you? |
| | 4 | A    No. |
| 04:26:29 | 5 | Q    And you were wearing the sweatshirt that we see in the |
| | 6 | video from the time the officers gave it to you until they |
| | 7 | left; isn't that correct? |
| | 8 | A    Yes. |
| | 9 | Q    And you were never escorted by the officers down the |
| 04:26:39 | 10 | stairs, approximately, 45 minutes after the officers |
| | 11 | arrived? |
| | 12 | A    No. |
| | 13 | Q    Now, in your declaration, you said that you suffer from |
| | 14 | insomnia. |
| 04:26:48 | 15 |     Do you recall that? |
| | 16 | A    Yes. |
| | 17 | Q    And the search warrant was executed, approximately, |
| | 18 | 7:00 a.m., on February 5th. |
| | 19 |     Isn't that true? |
| 04:26:55 | 20 | A    Yes. |
| | 21 | Q    And your declaration states that the last time you |
| | 22 | slept was on February 2nd from, approximately, 12:00 o'clock |
| | 23 | a.m. to 4:00 a.m. |
| | 24 |     Do recall that in your declaration? |
| 04:27:09 | 25 | A    Yes. |

04:27:10  1    Q    And so you're testifying that you did not sleep at all

2    the evening of February 2nd through the morning of

3    February 3rd, correct?

4    A    I believe so.

04:27:24  5    Q    I'm not asking you to speculate.

6    A    No, I'm trying to figure out, the evening of

7    February 2nd -- it was a Monday -- I didn't sleep from

8    Monday morning until -- was it? -- until the time that they

9    came.

04:27:41 10    Q    So are you testifying that you were awake for,

11    approximately, 75 hours with no sleep?

12    A    Yes.

13    Q    And you didn't even take a nap during that time period?

14    A    I tried to.

04:27:53 15    Q    But were you able to sleep at all during that time

16    period?

17    A    No.

18    Q    And were you under the influence of a stimulant that

19    kept you awake that long?

04:28:03 20    A    No.

21    Q    And you didn't tell Detective Syvock that you had been

22    awake for 75 hours, did you?

23    A    No.

24    Q    Were you under the influence of any drugs that kept you

04:28:13 25    up for 75 hours?

04:28:19 1  A    Not that I'm aware of.  I had some alcohol the night

2  before.

3  Q    Actually, I was going to ask you about that.  So you

4  said that you consumed alcohol several hours before the

04:28:29 5  officers arrived at your house.

6        When did you drink that alcohol?

7  A    Wednesday night maybe around 10:00 p.m.

8  Q    So that was the night before the search warrant?

9  A    Yes.

04:28:43 10  Q    And what did you drink?

11  A    I had a couple of 32-ounce beers.

12  Q    And you didn't tell Detective Syvock that you had

13  consumed alcohol the night before, did you?

14  A    No.

04:28:57 15  Q    And during the interview -- you've had an opportunity

16  to watch the video, correct?

17  A    During, what?

18  Q    Sorry.  You've had an opportunity to watch the video

19  recorded interview, correct?

04:29:07 20  A    Yes.

21  Q    And in that video, you are not slurring your words, are

22  you?

23  A    No.

24  Q    And you were able to understand what Detective Syvock

04:29:16 25  was asking you?

04:29:17  1    A    Mostly.

       2    Q    And you provided information that was responsive to his

       3    questions?

       4    A    Mostly.

04:29:28  5    Q    Now, you were currently housed at the Santa Ana Jail;

       6    is that correct?

       7    A    Yes.

       8    Q    And you are aware that your phone calls are recorded at

       9    that facility, aren't you?

04:29:38 10    A    Yes.

      11    Q    And that they are subject to monitoring.

      12         Isn't that true?

      13    A    Yes.

      14    Q    And you've had some telephone calls with several

04:29:47 15    people, including friends and your sister and your mother.

      16         Isn't that true?

      17         MR. ORTEGA:  Objection, Your Honor.  Relevance.

      18         THE COURT:  What is the relevance?

      19         MS. GANNON:  Your Honor, there's a couple of

04:29:56 20    instances where the Government believes it shows a tendency

      21    to exaggeration and, also, there is an incident where the

      22    Government feels that the defendant was not truthful with

      23    what happened at the last status conference.  So it goes to

      24    his credibility.

04:30:21 25         THE COURT:  I'll allow it.

229

BY MS. GANNON:

Q    Now, in one of those conversations that occurred after the last status conference, I believe it was late July, in this case, you told one of your friends that you were transported like Hannibal Lecter.

Isn't that true?

A    Yes.

Q    And that's a character from the movie and the book, "Silence of the Lambs"; isn't that right?

A    Yes.

Q    That individual in the movie wears a straitjacket and a face mask and is wheeled on a dolly when he's transported; correct?

A    I don't know.

Q    Have you seen the movie, "Silence of the Lambs"?

A    I've seen part of it.

Q    So when you said that you were transported by "Hannibal Lecter," what did you mean?

A    I mean that I was changed up where my movement was restricted, as if I a violent criminal like Hannibal Lecter.

Q    So, Mr. Hartman, isn't it true that you're aware that when Hannibal Lecter is transported in the movie, he's wearing a face mask.

Isn't that true?

MR. ORTEGA:  Objection, Your Honor.  Relevance.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:31:22  1          THE COURT:  Sustained.

2   BY MS. GANNON:

3   Q    Mr. Hartman, would you agree that by telling someone

4   that you were transported like Hannibal Lecter, that that's

04:31:35  5   an exaggeration?

6              MR. ORTEGA:  Objection, Your Honor.  Relevance.

7              THE COURT:  Overruled.

8              You can answer.

9              Can you repeat that?

04:31:39 10   BY MS. GANNON:

11   Q    Would you agree that when you told someone that you

12   were transported like Hannibal Lecter, that that was an

13   exaggeration?

14   A    No.

04:31:52 15   Q    You also spoke with one of your friends about the U.S.

16   Marshals Service who transports you.

17              Isn't that true?

18   A    I don't know that it was the Marshals Service, no.

19   Q    But you mentioned that the people transported you from

04:32:06 20   Santa Ana Jail to your court hearings.

21              Do you remember a conversation with a friend about

22   that?

23   A    Vaguely.

24   Q    And do you remember that you were concerned that these

04:32:16 25   individuals would use excessive force against you?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:32:22  1    A    I don't know if I put it in those terms.

2    Q    You were concerned about how you would be treated by

3    them; isn't that correct?

4    A    In what context?

04:32:29  5    Q    When you were being transported from the jail to court

6    hearings.

7    A    I did not feel that being transported put me in danger.

8    Q    In fact, the people that have transported you between

9    the jail and the courthouse have never mistreated you,

04:32:47 10    correct?

11         MR. ORTEGA:  Objection, Your Honor.  Relevance.

12         THE COURT:  Sustained.

13    BY MS. GANNON:

14    Q    Now, at the status conference in late July when this

04:32:53 15    trial was initially continued, after that hearing you were

16    pretty upset, were you?

17         MR. ORTEGA:  Objection, Your Honor.  Relevance.

18         THE COURT:  Yes.  Sustained.

19         I think, so far most of this has been irrelevant,

04:33:02 20    so I'm going to ask you to move on.

21    BY MS. GANNON:

22    Q    Now, Mr. Hartman, have you had weapons training?

23    A    No.

24    Q    Did you tell one of your friends in a phone call that

04:33:18 25    you had weapons training?

04:33:19    1    A      What do you mean by "weapons"?

            2    Q      Firearms training.

            3    A      I have never fired a weapon in my life.

            4    Q      Have you ever handled a firearm?

04:33:27    5    A      No.

            6    Q      Have you ever had any self-defense training?

            7    A      Yes.

            8    Q      And if you could, please, tell us about that.

            9           MR. ORTEGA:  Objection, Your Honor.  Relevance.

04:33:37   10           THE COURT:  Sustained.

           11           MS. GANNON:  Your Honor, I believe it goes to his

           12    state of mind as to the fear that he purportedly felt during

           13    these circumstances.

           14           THE COURT:  Sustained.

04:33:45   15    BY MS. GANNON:

           16    Q    Mr. Hartman, did you feel that the officers' tactics in

           17    entering your apartment were improper?

           18           MR. ORTEGA:  Objection, Your Honor.  Irrelevant.

           19           THE COURT:  Sustained.

04:34:11   20    BY MS. GANNON:

           21    Q    Now, on the day the search warrant, you were wearing

           22    black shorts when you first saw the officers at the door,

           23    correct?

           24    A      I'm sorry.  Can you repeat that?

04:34:34   25    Q    On the day the search warrant was executed, you were

233

04:34:38  1  wearing black shorts when you first saw the officers at the
        2  front door, correct?

        3  A    No.

        4  Q    What color were the shorts that you were wearing?

04:34:45  5  A    I was in my underwear.

        6  Q    What color were your underwear?

        7  A    I don't recall the color of my underwear, but I do not

        8  own any black underwear.

        9  Q    But they were a shorts-style underwear?

04:34:58 10  A    Boxer briefs, yes.

        11  Q    Now, you said -- you testified that you were pushed

        12  outside with the rifle, correct?

        13  A    Not with the rifle, no.

        14  Q    But your testimony is that you were pushed outside.

04:35:31 15        Isn't that true?

        16  A    Yes.

        17  Q    But isn't it also true in your declaration you said you

        18  were pushed into the house with the rifle?

        19  A    I was already inside the house.

04:35:42 20  Q    So what is it, Mr. Hartman:  Were you pushed inside the

        21  house with a rifle, or were you pushed out of the house by

        22  the agents?

        23  A    Both.

        24  Q    But you didn't put in your declaration that you were

04:35:58 25  pushed outside of the house by the agents.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:36:01  1          Isn't that true?

       2  A    I suppose not.

       3  Q    Now, when you asked Detective Syvock for water, he

       4  said, *Absolutely.*

04:36:15  5          Do you remember that?

       6  A    Yes.

       7  Q    And you were given a glass of water.

       8          Isn't that true?

       9  A    Yes.

04:36:24  10  Q    So at that point when Detective Syvock responded to

      11  your request for water, why didn't you ask him to use the

      12  restroom?

      13  A    Again, it goes to the issue of me being embarrassed

      14  about it, and I believe he was aware of it.

04:36:43  15  Q    But you discussed other sensitive matters that morning

      16  with Detective Syvock, didn't you?

      17          MR. ORTEGA:  Objection, Your Honor.  Relevance and

      18  vague.

      19          THE COURT:  I'll allow it.

04:36:56  20          THE WITNESS:  Can you repeat that?

      21  BY MS. GANNON:

      22  Q    Did you discuss other sensitive matters with

      23  Detective Syvock that morning?

      24  A    Yes.

04:37:01  25          MS. GANNON:  And, Your Honor, I would just ask the

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
04:37:02   1    court -- draw the Court's attention to the video with regard

           2    to this issue.

           3              THE COURT:  Yes.

           4    BY MS. GANNON:

04:37:10   5    Q    Now, during the interview which is recorded -- and

           6    you've reviewed that recording -- your legs were crossed,

           7    correct?

           8    A    Yes.

           9    Q    And you were kind of leaning back in your chair?

04:37:23  10    A    Yes.

          11    Q    And you weren't wringing your hands at all, were you?

          12    A    No.

          13    Q    And the female officer that was in the room hardly said

          14    anything to you, did she?

04:37:36  15    A    No.

          16    Q    Mr. Hartman, you enjoy playing video games, don't you?

          17    A    Yes.

          18    Q    Would some of those games be considered fantasy games?

          19              MR. ORTEGA:  Objection, Your Honor.  Relevance.

04:37:55  20              THE COURT:  Sustained.

          21    BY MS. GANNON:

          22    Q    Mr. Hartman, you know you're facing some serious

          23    charges in this case?

          24              MR. ORTEGA:  Objection, Your Honor.  Relevance.

04:38:07  25              THE COURT:  Overruled.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:38:08   1              THE WITNESS:  I'm aware.

           2  BY MS. GANNON:

           3  Q    And at the status conference that occurred before you

           4  submitted the declaration in this case, the judge explained

04:38:15   5  the mandatory minimum and maximum terms of imprisonment that

           6  you are facing in this case.

           7              Isn't that true?

           8  A    I don't believe it was the judge that said it; but I

           9  heard it, yes.

04:38:27  10  Q    And at the time you submitted your declaration, you

          11  knew that the interview with Detective Syvock had been

          12  recorded?

          13  A    I'm sorry.  When?

          14  Q    At the time that you submitted your declaration in

04:38:40  15  connection with this suppression motion, you knew that the

          16  interviewed had been recorded?

          17  A    At that time, yes.

          18  Q    And you also are aware that -- if this case proceeds to

          19  trial, the way to keep the jury from -- or the judge from

04:38:58  20  considering your statements that were recorded is to prevail

          21  in this motion to suppress.

          22              Isn't that true?

          23  A    I now understand that, yes.

          24  Q    And you understood that before you submitted your

04:39:10  25  declaration, didn't you?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

237

04:39:10  1    A    No, I didn't.

       2    Q    So what did you think you were submitting a declaration

       3    for?

       4    A    My attorney asked me --

04:39:19  5         MR. ORTEGA:  Objection, Your Honor.

       6         Going into attorney-client privilege.

       7         THE COURT:  Sustained.

       8    BY MS. GANNON:

       9    Q    Mr. Hartman, you were aware that a motion was being

04:39:26 10    filed to try to keep these statements from the finder of

      11    fact -- or the person who was going to decide your case?

      12         MR. ORTEGA:  Objection, Your Honor.  Relevance.

      13         THE COURT:  Overruled.

      14         THE WITNESS:  At which point?

04:39:40 15    BY MS. GANNON:

      16    Q    Before you submitted the declaration?

      17    A    Not before I submitted the declaration, no.

      18    Q    Why did you think the declaration was being submitted?

      19    A    I did not.

04:39:48 20         MS. GANNON:  Your Honor, may I have a moment?

      21         (Pause.)

      22         MS. GANNON:  No additional questions.

      23         Thank you, Your Honor.

      24         THE COURT:  Anything further on direct

04:40:00 25    examination?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

238

04:40:01  1    MR. ORTEGA:  Just very briefly, Your Honor.

        2              REDIRECT EXAMINATION

        3    BY MR. ORTEGA:

        4    Q    Mr. Hartman, you were asked about why you didn't walk

04:40:14  5    to the beach or the shopping center close to your home.

        6              Why didn't you walk there?

        7    A    Well, like I said, one is, I was not dressed for the

        8    weather and didn't have any shoes.  Another reason, was

        9    because when I did try to leave the property, I was rebuked.

04:40:29 10    Q    And why didn't you ask for a pair of shoes?

       11    A    I was intimidated by the officers there.

       12    Q    And just to clarify the questions that the prosecutor

       13    was asking you about the doorway, did Detective Syvock come

       14    into the doorway and have interactions with you?

04:40:51 15    A    Yes.  Detective Syvock had grabbed my hands behind my

       16    back and led me out further onto the patio.

       17    Q    Was he holding your hands as he led you out?

       18    A    Yes.  He was holding my hands.

       19    Q    Now, you were asked about Detective Syvock telling you

04:41:10 20    that you were free to leave and, apparently, you were

       21    nodding.

       22              Were you nodding because you thought that you were

       23    free to leave?

       24    A    No.

04:41:24 25    Q    And you were asked about telling Detective Syvock that

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:41:28  1    you needed to use the restroom.

2              Why didn't you tell him that you needed to use the

3    restroom?

4    A    One is, I didn't know that -- that was very relevant,

04:41:39  5    as well as the fact that they had actually made comments

6    about the noises that my stomach was making, so I was --

7    assumed that they were aware of it.

8    Q    Who made comments?

9    A    Detective Syvock and the female detective in the room.

04:41:55 10    Q    And what -- very briefly, what were the comments?

11   A    They made comments about the noises from my body make

12   me sound guilty, or like I'm lying.

13   Q    And did you interpret that to mean that they were aware

14   that you needed to go to the restroom?

04:42:11 15    A    Yes.

16   Q    You were asked about whether you felt free to refuse to

17   answer questions.  Did you feel free to refuse to answer

18   questions during the interviews with Detective Syvock?

19   A    No, I did not.

04:42:31 20    Q    And why not?

21   A    I didn't feel free to do anything.  I was just trying

22   to -- to do whatever was -- I mean, people told me stuff to

23   do, and I didn't want to get in trouble with so many armed

24   officers around me.

04:42:47 25    Q    You were asked on cross-examination -- rather, you said

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:42:55   1    that you didn't ask for an attorney during your interview

2    with Detective Syvock, correct?

3    A    Yes.

4    Q    Did Detective Syvock tell you that you could ask for an

04:43:04   5    attorney?

6    A    No.

7    Q    And some reference was made to the fact that you

8    decided to stay on the couch rather than go elsewhere.

9           Why did you stay on the couch?

04:43:21 10    A    I was asked if I wanted to go onto the front patio, and

11    I did not want to go outside of the apartment. And so, the

12    couch was the alternative.

13    Q    Did you feel free to move around the apartment --

14    excuse me.

04:43:36 15           Did you feel free to move about the apartment?

16    A    I was told that I was not free to move about.

17           MR. ORTEGA: Nothing further, Your Honor.

18           THE COURT: Thank you.

19           Anything further on cross?

04:43:49 20           MS. GANNON: A few questions, Your Honor.

21                    RECROSS-EXAMINATION

22    BY MS. GANNON:

23    Q    You just testified that your body was making some

24    noises and that it was your impression that Detective Syvock

04:44:06 25    and the female officer heard these noises.

04:44:09   1         That fact was not in your declaration, was it?

           2    A    No.

           3    Q    And did you testify that the officers told you that

           4    those noises made you sound guilty?

04:44:22   5    A    Yes.

           6    Q    And did both of them say that?

           7    A    I don't recall who said that, but I do recall it being

           8    said.

           9    Q    And was that before or after they told you that you

04:44:36  10    were free to leave?

          11    A    That was before.

          12    Q    So it's your testimony that they told you that you

          13    sounded guilty by the noises in your stomach before they

          14    even interviewed you?

04:44:54  15    A    No, they had interviewed me.  It just wasn't on camera.

          16    Q    And this was out on the deck?

          17    A    No.  This was inside.

          18         MS. GANNON:  Your Honor, no additional questions.

          19         THE COURT:  Anything further?

04:45:05  20         MR. ORTEGA:  No, Your Honor.

          21         THE COURT:  Then, we will conclude the hearing.

          22         There are no further witnesses, correct?

          23         MR. ORTEGA:  Correct, Your Honor.

          24         THE COURT:  I don't think I need any argument from

04:45:16  25    attorneys.  I have all the briefing on the factors.  I have

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:45:20   1    the transcripts.  I will have the exhibits.

       2              Are there any exhibits that have not been admitted

       3    that need to be?

       4              MS. JACOBS:  Exhibit I, Your Honor.

04:45:27   5              THE COURT:  Exhibit I.  And that is?

       6              MS. JACOBS:  The clips from the government's

       7    entire video interview.

       8              MS. GANNON:  Your Honor, I did have one question

       9    about that, whether the audio had been enhanced with those

04:45:40  10    clips?

      11              With that, no objection, Your Honor.

      12              THE COURT:  And there were clips from the

      13    Government's video and then the Government's video itself is

      14    an exhibit; is that correct?

04:45:51  15              MS. GANNON:  Your Honor, I had not moved this copy

      16    in.  It is attached to the Government's opposition.  It's

      17    the same video.  And I provided a new copy yesterday.

      18              THE COURT:  Something has to be admitted, I think,

      19    for me -- as part of an evidentiary hearing.

04:46:06  20              MS. GANNON:  Yes, Your Honor.

      21              The Government would like to admit --

      22              THE COURT:  Is it marked?

      23              MS. GANNON:  It is marked for Exhibit 4 today, and

      24    I provided the clerk with an exhibit list that includes that

04:46:16  25    exhibit.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:46:16 1          THE COURT:  All right.  Then, that will be

2    admitted.

3          THE CLERK:  Exhibit 4 and Exhibit I, Your Honor?

4          THE COURT:  Correct.  Both.

04:46:23 5     *(Plaintiff's Exhibit 4 received in evidence.)*

6     *(Defendant's Exhibit I received in evidence.)*

7          THE COURT:  And I will take the matter under

8    submission; and then, I'll post a written ruling on the

9    docket.

04:46:30 10          Is there something else we need to address?

11          MS. GANNON:  Your Honor, there is just one

12    clarification the Government wanted to make.

13          The Government is still asking for a ruling as to

14    the entire duration of the interview, even though it's

04:46:41 15    expressed in its papers that it only intends to admit

16    certain portions at trial because of the 404(b) issue.

17    There's references to things outside the facts of this case.

18          There is one change in one of the time segments

19    with regard to those clips, and it is the second clip, which

04:47:10 20    is from time stamp on the actual video, 7:00 a.m., 34

21    minutes and 15 seconds.  It should have said 7:38:30.  It's

22    an additional 30 seconds that the Government intends to

23    introduce in its case.

24          THE COURT:  7:38:30.  Is that a stamp, or is that

04:47:37 25    a --

04:47:38 1          MS. GANNON:  It's the stamp actually on the image

2    versus -- as opposed to the counter for the video.

3          THE COURT:  All right.  Anything further?

4          MS. JACOBS:  I just wanted to get clarification

04:47:52 5    about the briefing schedule for the motion to compel.

6          Did you want our briefs to be submitted a week

7    from yesterday, as in this coming Tuesday?

8          THE COURT:  Is that what I said on the record?

9          MS. GANNON:  What you said, Your Honor, is that we

04:48:06 10   should try to meet and confer and arrive at an agreement

11   with regard to --

12         THE COURT:  That part I remember.

13         MS. GANNON:  -- viewing any evidence, and that was

14   by next Tuesday.

04:48:15 15        So my recollection was that you said the briefing

16   would be, potentially, on Friday.

17         THE COURT:  My clerk tells me I said Friday.

18         MS. GANNON:  Okay.

19         MS. JACOBS:  Okay.

04:48:22 20        THE COURT:  No more than 10 pages.

21         MS. JACOBS:  Thank you.

22         MS. GANNON:  Thank you, Your Honor.

23         MR. ORTEGA:  Sorry, Your Honor.

24         THE COURT:  You have something else?  All right.

04:48:29 25        MR. ORTEGA:  I just wanted --

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
04:48:31   1              THE COURT:  I thought you were getting up to go.
           2              MR. ORTEGA:  Your Honor, I'm sorry.
           3              Did you want to address the issue of the jury pool
           4    size?
04:48:39   5              THE COURT:  Yes.
           6              And my clerk had also passed me a note, asking me
           7    to ask you that, but I thought I had asked you to submit
           8    something, actually, before now.  Maybe I didn't.
           9              So jury pool size.  You're at least going to
04:48:49  10    investigate and get back to me.
          11              MS. GANNON:  We were, Your Honor.  I didn't
          12    realize that we were supposed to file anything.
          13              I did speak with Judge Selna's courtroom deputy,
          14    and she said their typical size is 50 to 60 in these types
04:49:02  15    of cases.
          16              I spoke with defense counsel.  Both parties would
          17    be more comfortable with 70, because the one experience I
          18    did have in front of Judge Selna, we came very close to the
          19    last juror.
04:49:13  20              THE COURT:  Okay.  All right.
          21              Thank you for the input.
          22              Anything further?
          23              MR. ORTEGA:  No, thank you, Your Honor.
          24              THE COURT:  Thank you.
04:49:23  25              THE CLERK:  All rise.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:49:32 1        *(At 4:49 p.m., proceedings were adjourned.)*

2

3                          –oOo–

4                        CERTIFICATE

04:49:32 5            I hereby certify that pursuant to Section 753,

6        Title 28, United States Code, the foregoing is a true and

7        correct transcript of the stenographically reported

8        proceedings held in the above-entitled matter and that the

9        transcript page format is in conformance with the

04:49:32 10       regulations of the Judicial Conference of the United States.

11

12       Date:   November 3, 2015

13

14

04:49:32 15                       /s/DEBORAH D. PARKER
16                     DEBORAH D. PARKER, OFFICIAL REPORTER

17

18

19

20

21

22

23

24

25