EILEEN M. DECKER
United States Attorney
DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office
ANNE C. GANNON (Cal. Bar No. 214198)
Assistant United States Attorney
       United States Courthouse
       411 West Fourth Street
       Santa Ana, California 92627
       Telephone: (714) 338-3548
       E-mail:    anne.gannon@usdoj.gov

Attorneys for Respondent
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  SA CR 15-63(B)-JLS |
| Plaintiff, | GOVERNMENT'S MOTION TO RECONSIDER AND/OR AMEND COURT'S NOVEMBER 24, 2015 ORDER |
| v. | |
| TODD CHRISTIAN HARTMAN, | NO HEARING REQUESTED |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorney Anne C. Gannon, hereby moves and respectfully requests that the Court reconsider and amend the November 24, 2015 Order on the Motion to Suppress Evidence filed by defendant TODD CHRISTIAN HARTMAN.

\\
\\
\\
\\
\\
\\
\\

This application is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: December 24, 2015          Respectfully submitted,

                                  EILEEN M. DECKER
                                  United States Attorney

                                  DENNISE D. WILLETT
                                  Assistant United States Attorney
                                  Chief, Santa Ana Branch Office

                                        /s/
                                  ANNE C. GANNON
                                  Assistant United States Attorney

                                  Attorneys for Respondent
                                  UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

I.    INTRODUCTION..................................................... 3

II.   LEGAL STANDARD FOR RECONSIDERATION.............................. 3

III.  FACTUAL AND PROCEDURAL BACKGROUND.............................. 4

IV.  ARGUMENT......................................................... 6

      A. Defendant's Neighbor Did Not Corroborate Defendant's Claim
         that Det. Syvock Restrained Defendant's Hands................. 6

      B. The Evidence in the Record Does Not Support a Factual Finding
         that Two Officers Told Defendant that He Could Not Leave His
         Residence While the Search Warrant Was Being Executed....... 10

      C. The Defense's Claim that Defendant's Mother was Initially at
         the Scene is Not Supported by the Record or Discovery Provided
         to the Defense............................................... 13

      D. The Inconsistencies in Det. Syvock's Testimony Were the Result
         of a Failure to Correctly Recollect Not an Intentional Attempt
         to Mislead the Court......................................... 17

VI. CONCLUSION....................................................... 19

i

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                    <u>PAGE</u>

**<u>FEDERAL CASES:</u>**

<u>Miranda v. Arizona</u>,
        384 U.S. 436 (1966)......................................... 3

<u>United States v. Belgarde</u>,
        300 F.3d 1177 (9th Cir. 2002)............................... 3

<u>United States v. Craighead</u>,
        539 F.3d 1073 (9th Cir. 2008)............................... 16

<u>United States v. Dieter</u>,
        429 U.S. 6 (1976)........................................... 3

<u>United States v. Martin</u>,
        226 F.3d 1042 (9th Cir. 2000)............................... 3

<u>United States v. Thoms</u>,
        684 F.3d 893 (9th Cir. 2012)................................ 19

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

On September 18, 2015, defendant TODD CHRISTIAN HARTMAN ("defendant") filed a motion to suppress arguing that all evidence of statements made by defendant, and evidence derived from those statements, be suppressed because they were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  On September 24, 2015, the government filed its opposition.  On October 2, 2015, defendant filed a reply brief.  On October 27 and 28, 2015, the Court held an evidentiary hearing, including testimony from several witnesses.  On November 24, 2015, the Court entered its ruling granting, in part, and denying, in part, the motion of defendant to suppress evidence ("Court's Order").

## II.   LEGAL STANDARD FOR RECONSIDERATION

A district court has inherent authority to modify, alter, or revoke an order granting a defendant's motion to suppress evidence before the order becomes final.  See United States v. Martin, 226 F.3d 1042, 1049 (9th Cir. 2000); see also United States v. Belgarde, 300 F.3d 1177, 1180 (9th Cir. 2002) ("[a] motion for reconsideration is timely if it is filed within the time for appeal") (citing United States v. Dieter, 429 U.S. 6, 8 (1976)).  The Supreme Court has noted that "giving district courts the opportunity promptly to correct their own alleged errors" avoids "imposing added and unnecessary burdens on the courts of appeal."  Dieter, 429 U.S. at 8; accord Martin, 226 F.3d at 1049 ("The authority of district courts to reconsider their own orders before they become final . . . allow them to correct not only simple mistakes, but also decisions based on shifting precedent, rather than waiting for the time-consuming costly

3

process of appeal.")[1]   This Court recently granted an extension of
the period to file a notice of appeal to December 31, 2015.
Therefore, the Court's Order is not yet final and a motion for
reconsideration may be litigated.

The government requests that the Court entertain this Motion for
Reconsideration because 1) the government contends the Court's Order
relied on erroneous factual findings and 2) unlike the defense, the
government did not have the benefit of having and citing to the
transcripts from the evidentiary hearing at the time it submitted its
supplemental briefing.  Given that oral argument was not permitted in
this case, the supplemental briefing was the only opportunity for the
Government to draw the Court's attention to inconsistencies in the
record and set forth its arguments.

**III. FACTUAL AND PROCEDURAL BACKGROUND**

In its November 24, 2015 Order, the Court in concluding that
defendant was in custody and, therefore, entitled to an advisement of
his Miranda rights, credited the testimony of defendant as to several
points and specifically discredited the testimony of Newport Beach
Police Department Detective David Syvock ("Det. Syvock").  (Court's
Order, pp. 10-11.)  In reaching its decision, the Court noted,
"[w]hether defendant was told by an officer he couldn't leave,
whether he was restrained physically by the interrogating officer at
any point, and whether the interrogating officer was wearing an

_____

[1] Pursuant to the United States Attorneys' Manual, the
government is required to report to the Appellate Section of the
Criminal Division certain adverse decisions.  USAM § 9-2.170.  The
Solicitor General then has the authority to determine "whether, and
to what extent, appeals will be taken by the government to all
appellate courts (including petitions for rehearing en banc and
petitions to such courts for the issuance of extraordinary writs)."
28 C.F.R. § 0.20(b).

unconcealed handgun during the interrogation are all crucial facts in the Court's determination of whether Defendant's statements should be suppressed." (Court's Order, p. 12.) As to the issue of whether defendant's hands were physically restrained by Det. Syvock on the deck prior to the interview, "[t]he Court credits Defendant's testimony because it is corroborated by the testimony of his neighbor, a disinterested third-party witness." (Court's Order, p. 11.) The Court also pointed to inconsistencies in Det. Syvock's declaration about whether his firearm was visible during the interview and whether defendant was wearing a shirt when initially contacted by Det. Syvock. (Court's Order, pp. 10-11.)

The disinterested third-party witness referenced by the Court was defendant's neighbor, Kurtis Klocke. In his declaration, Mr. Kurtis Klocke, stated that "I saw the officers remove an adult male from the Hartman home wearing only boxers. His hands were either handcuffed or held behind his back as officers escorted him out of the Hartman home." (Klocke Decl. ¶ 3.)[2] Mr. Klocke's residence is on the ground floor and defendant lives in the upstairs unit over the garage. (RT 10/27/15 II: 79-80; Exhibit A pp. 4-5, attached hereto.) Upon hearing the knocking on defendant's door, Mr. Klocke poked his head out the side door for approximately 10-15 seconds before law enforcement told him to go inside. (RT 10/27/15 II: 83-84; Ex. A, pp. 8-9.) Mr. Klocke did not see defendant when he peeked his head out the side door. (RT 10/27/15 II: 87; Ex. A, p. 12.) Mr. Klocke then looked out his back window for approximately 10 seconds but did not see defendant. (RT 10/27/15 II: 85, 87, 92; Ex. A, pp. 10, 12,

---

[2] Mr. Klocke's declaration was attached to defendant's 10/2/15 reply brief (docket # 49.)

17.)  Mr. Klocke got ready for work and did not observe what was occurring again until approximately 8:00 a.m. when he was leaving for work.  (RT 10/27/15 II: 85; Ex. A, p. 10.)  He watched for approximately 10 minutes from in front of the house and across the street.  (Id.)  Mr. Klocke claimed to have seen defendant leave his house sometime after 8:00 a.m. with a cop behind him, defendant was naked wearing only his boxers.  (RT 10/27/15 II: 87; Ex. A, p. 12.)  Mr. Klocke said that defendant's hands were behind his back but he could not see any metal handcuffs or plastic ties.  (RT 10/27/15 II: 95; Ex. A, p. 20.)

IV.  **ARGUMENT**

A.  Defendant's Neighbor Did Not Corroborate Defendant's Claim that Det. Syvock Restrained Defendant's Hands.

The Court's factual finding that defendant's neighbor corroborated defendant's testimony regarding whether Det. Syvock restrained defendant's hands behind his back is incorrect.  The neighbor Mr. Klocke's testimony was inconsistent with defendant's version of events both as to time and what occurred.  Defendant claims that his hands were restrained by Det. Syvock when he was initially contacted on the deck at approximately 7:00 a.m.  (Def. Decl. ¶¶ 2-3.)[3]  Mr. Klocke heard law enforcement knocking on defendant's door and initially looked out his side door and back window but did not see defendant.  (RT 10/27/15 II: 83-92; Ex. A, pp. 7-17.)  Mr Klocke did not see defendant until after Mr. Klocke got ready for work and walked across the street, sometime around 8:00 a.m., approximately an hour after law enforcement knocked on defendant's door.  (RT 10/27/15 II: 85-86; Ex. A, pp. 10-11.)  Mr.

---

[3] Defendant's declaration was attached to defendant's September 18, 2015 motion to suppress evidence.  (Docket #26.)

Klocke testified that at approximately 8:00 a.m. when he was standing outside the front of the house, he observed defendant, wearing only boxers, go down the stairs with one police officer in front and two police officers behind him.  (Id.)  It was during this event that Mr. Klocke observed defendant's hands behind his back.  (RT 10/27/15 II: 92-95; Ex. A, pp. 17-20.)  Contrary to Mr. Klock's version of events, defendant testified that he was never escorted by officers down the stairs approximately 45 minutes after the officers arrived.  (RT 10/28/15: 225; Ex. A, p. 51.)  Also, defendant stated that he wore the sweatshirt visible on the video recording from the time the officers gave it to him on the deck until they left.  (Id.)  Therefore, even defendant's own testimony undercuts the reliability of Mr. Klocke's account.  The Court may have been misled by Mr. Klocke's declaration which did not state any timeframe for when he purportedly observed defendant's hands behind his back and the defense's supplemental briefing that only cited to testimony of re-direct examination that was also unclear as to time.  (Klocke Decl. ¶ 3; Def. 11/13/15 Supp. Brief, p. 4 citing RT 10/27/15 II: 98; Ex. A, p. 23.)  Mr. Klocke's testimony does not support defendant's claim because of multiple fundamental discrepancies not merely a failure to assign the event to the correct time.

    Without the corroboration of Mr. Klocke, the government urges the Court to engage in the same consideration of defendant's overall testimony as it did for Det. Syvock.  Specifically, defendant's ability to accurately perceive and recall events after not sleeping for approximately 75 hours (over 3 days) and imbibing 64 ounces of

beer at 10 p.m. the night before the search warrant was executed.[4]
(RT 10/28/15: 226-27; Ex. A, pp. 52-53.)  In addition, defendant's
account differed from Department of Homeland Security ("DHS") Special
Agent ("SA") Speakman in at least two ways that were not previously
addressed by the Court — who opened the door to the residence and
whether SA Speakman pressed a rifle in defendant's chest.  Defendant
claimed in his declaration and during his testimony that he opened
the door to the apartment.  (Def. Decl. ¶ 2; RT 10/28/15: 213; Ex. A,
p. 46.)  SA Speakman testified that SA Perez opened the door with a
key obtained from defendant's mother and defendant was away from the
door towards the rear of the apartment when the door opened.  (RT
10/28/15: 195-96; Ex. A, pp. 34-35.)  Det. Syvock testified that he
obtained the key to the resident from defendant's mother and that SA
Perez had the key at the time of entry.  (RT 10/28/15: 130-31; Ex. A,
pp. 27-28.)  Defendant also claimed that when he went to open the
door he found "an officer pointing a military-style rifle" at him and
the officer "pressed the rifle against [his] chest and "pushed [him]
with the rifle into the house, toward the apartment's kitchen area."
(Def. Decl. ¶ 2.)  At the hearing, defendant testified, "that's the
only time in my life I've ever had a gun touch me.  I remember the
feel of it.  The hard metal is cold, pressed against my naked chest.
And I was in fear of my life.  I vividly remembered that."  (RT
10/28/15: 206; Ex. A, p. 42.)  SA Speakman testified that the M-4

---

[4] The government submits that the video recording does not
reflect any indications of sleep deprivation.  Defendant appears to
understand Det. Syvock's questions and defendant's answers are
responsive.  If defendant's account regarding not sleeping for three
days is credited, his ability to perceive and recall events would be
significantly impaired.  If his account is not credited because it is
inconsistent with the video evidence, his overall credibility should
be questioned.

rifle never touched defendant, the rifle remained pointed inside the residence as defendant walked by to exit through the front door, and that it is not good to have a gun pressed against a target during a search warrant because it would be unsafe to give a weapon over to somebody. "You're just asking them to grab it.  That would be very unacceptable." (RT 10/28/15: 197-201; Ex. A, pp. 36-40.)  The government contends SA Speakman's testimony is more credible as to this point and, therefore, the Court should weigh this inconsistency against defendant as to other aspects of his testimony.

At times, defendant's version of events varied.  For example, in his declaration, defendant said he was pushed with the rifle into the house toward the apartment's kitchen area.  (Def. Decl. ¶ 2.)  On cross-examination, defendant said when he was standing in the doorway, he was pushed outside.  (RT 10/28/15: 213; Ex. A, p. 46.) When confronted with this seeming inconsistency, defendant testified he was both pushed inside the house with a rifle and pushed out of the house by the agents.  (RT 10/28/15: 233; Ex. A, p. 54.)  He admitted that he did not include in his declaration that he was pushed outside of the house by the agents.  (RT 10/28/15: 233-34; Ex. A, pp. 54-55.)

The government also asks the Court to consider and address self-serving and illogical aspects of defendant's testimony.  Defendant claims that he was embarrassed to tell any of the officers that he needed to use the restroom and by his neighbors seeing him in only boxer shorts but defendant calmly discussed viewing child pornography and using it to masturbate.  (RT 10/28/15: 219; Ex. A, p. 47.) Defendant claimed he was too intimidated by the officers to ask for a pair of shoes even though they had provided him with shorts and a

9

sweatshirt.  (RT 10/28/15: 238; Ex. A, p. 56.)  Defendant claimed that he was unsure who was in charge but thought it was Homeland Security, even though, Det. Syvock told defendant that he was part of the Homeland Security taskforce and defendant spent almost the entire time with Det. Syvock.  (RT 10/28/15: 207, 224; Ex. A, pp. 43, 50.)

For all of these reasons, defendant's testimony is suspect and should be given little weight by the Court.

B.  <u>The Evidence in the Record Does Not Support a Factual Finding that Two Officers Told Defendant that He Could Not Leave His Residence While the Search Warrant Was Being Executed</u>.

The Court is also incorrect that defendant testified "he was told by two officers that he could not leave his residence while the search warrant was being executed." (Court's Order, p. 10.)  In his declaration, defendant said that before the interrogation started, he approached the outside stairs leading down from the apartment and "an officer standing by the stairs said I could not leave." (Def. Decl. ¶ 5.)  Defendant also stated in his declaration that between interrogations, he tried to use the public restroom again and on his way out, "an officer stopped me," "pointed his finger to my apartment, indicating to me that I should go back inside the apartment," and said "you can't go this way." (Def. Decl. ¶ 6.)  During his direct examination, defendant elaborated on both incidents.  "The first time when I was still outside on the front patio and Detective Syvock had gone inside, I needed to use the restroom and there was a nearby park, so I thought I could go there and use the restroom.  When I approached the top of the stairs, the officer blocking the top of the stairs - - I asked if I could get by him and he told me that I could not and so I went back to standing on the deck." (RT 10/28/15: 205; Ex. A, p. 41.)  "The second time was

10

after the first recorded interview, and I was in the living room. I
tried to leave through the front door and the officer blocking the
front door pointed back the way I had come and told me that I
couldn't go that way." (Id.) Defendant claims that both times he
attempted to leave it was because he wanted to use the public
restroom. However, defendant admitted he never told any of the
officers that he needed to use the restroom because he was
intimidated and embarrassed. (Id.) On cross-examination, defendant
admitted that no one said that he was under arrest and when asked,
"no one said that you were not free to leave," defendant answered,
"[s]aid, no." (RT 10/28/15: 220; Ex. A, p. 48).

At best, defendant claims that 1) he was told that he could not
go around the officer at the top of the stairs when he was initially
on the deck and 2) that he couldn't go out the front door between the
second and third phases of the interview. The second incident is
irrelevant because it occurred after the portions of the interview
the government is seeking to admit. The government urges the Court
to address the inconsistencies in defendant's story. At 07:19:10 of
the recorded interview, the following exchange occurs:

SYVOCK:    Okay. And I made it clear to you, right? You're not
           under arrest, right?

DEFENDANT: (Nodding)

SYVOCK:    If you want to get up and walk out of here right now,
           please do. I'd like to share my investigation with
           you. If you do leave, just let us know how we can
           secure your house. We're going to do our
           investigation. But like I said, I want to share my
           investigation with you and hopefully get an

11

1          understanding from you as to why you were doing this.

2          Was it curiosity?  I mean do you -- have you gone out

3          and met kids?

4     DEFENDANT: No, no, it's as basically is going to be just

5          curiosity, just --

6     SYVOCK:   Okay.

7     DEFENDANT: -- strange addiction that I've obviously deleted,

8          reinstalled, deleted, reinstalled again.

9     SYVOCK:   Okay.  Well, I'd like to hear about it.  If you don't

10         mind sharing it with me, I'd like to hear about it.

11    DEFENDANT: I've never contacted kids.  I don't --

12    SYVOCK:   Okay.

13    DEFENDANT:I don't -- I don't chat with people.

14    SYVOCK:   So it sounds like you're willing -- you don't have any

15         place to go right now?

16    DEFENDANT: No.

17    SYVOCK:   Okay.  So I'm not holding you up for anything, right?

18    DEFENDANT: No.

19    This exchange ends at time stamp 07:20:18, mere minutes after

20    defendant claims that he needed to use the restroom and an officer

21    blocked him from walking down the stairs.  Defendant never said he

22    needed to use the restroom or that anyone prevented him from walking

23    down the stairs.  Defendant claimed in his declaration that he

24    "firmly believed that [he] was under arrest, not free to leave, and

25    not free to refuse to answer questions."  (Def. Decl. ¶ 7.)  However,

26    on cross-examination, he admitted that he never asked if he was under

27    arrest, never asked what would happen when he went to jail, never

28    asked about when his court date would be, he answered Det. Syvock's

                                    12

1    questions, and never told Det. Syvock that he did not want to answer

2    his questions. (RT 10/28/15: 219-21; Ex. A, pp. 47-49.) On cross-

3    examination, defendant admitted that after the interview he chose to

4    stay on the couch instead of leave the apartment. (RT 10/28/15: 224;

5    Ex. A, p. 50.) This supports a finding that defendant knew he was

6    free to leave and undercuts any claim that he previously was

7    prevented from leaving the apartment.

8         C.   <u>The Defense's Claim that Defendant's Mother was Initially
         at the Scene is Not Supported by the Record or Discovery

9         Provided to the Defense</u>.

10        In its ruling, the Court discussed the "crucial factor" of

11   whether the suspect was isolated from others. (Court's Order, p.

12   16.) The Court found that "Defendant was isolated from his mother,

13   and there is no suggestion in the record that Defendant was at any

14   time given the option of having his mother present during his

15   interrogation. (<u>Id.</u>) In the supplemental briefing, defendant claims

16   that Det. Syvock was not credible when he claimed that he did not

17   know that defendant's mother was on the premises because she provided

18   the key to the apartment. (Def. 11/13/15 Supp. Brief, p. 4.) This

19   statement is not correct because the record reflects that defendant's

20   mother was not initially at the residence. The key was not provided

21   on-scene and the defense was aware of that fact. The defense knew

22   from the discovery and asked the question on cross-examination of

23   Det. Syvock that elicited the testimony that Ms. Hartman was stopped

24   on her way to work to get the key to access the front door.[5]

25   _____

26        [5] A copy of Det. Syvock's report provided in discovery is
     attached hereto as Exhibit B. The report states, "[a]t my request, a
27   Newport Beach Police Officer, driving a marked Newport Beach Police
     SUV stopped [Ms. Hartman] a short distance from the residence. I
     responded to the location and identified myself as a Newport Beach
28   Police Detective and advised [Ms. Hartman] that I had a search
                                       *(footnote cont'd on next page)*

                                      13

1    Q    When you stopped her on her way to work, how come you

2         didn't question her about the child pornography then?

3    A    Because at that point -- I told her the same thing that I

4         told him what we were there for. And at that point, my role

5         was to get the key so that we could make access into the

6         house and then further the investigation from that point.

7  (RT 10/28/15: 142; Ex. A, p. 32.)  The defense also claimed that "an

8  eye witness recalls seeing Mr. Hartman's mother on the premises when

9  officers were making entry into the home." (Def. 11/13/15 Supp.

10 Brief, p. 4.)  Once again this statement is false.  As discussed

11 above, the eye witness, neighbor Kurtis Klocke, testified that it was

12 approximately 8:00 o'clock, when he was standing with defendant's

13 mother across the street, that he saw defendant walk out of the house

14 and the officers lead defendant down the stairs and away.  (RT

15 10/27/15 II: 86; Ex. A, p. 11.)  This was approximately one hour

16 after the entry and even defendant testified that he was never led

17 away from the residence at the conclusion of the search, he was

18 sitting on the couch when the officers left. (RT 10/28/15: 225; Ex.

19 A, p. 51.)  The defense also claimed that defendant

20       was aware that his mother was nearby, and that law
         enforcement had contacted her, because law enforcement
21       officers were discussing this in his presence.  But he did
         not believe he could ask that his mom be present during his
22       initial interactions with officers or during the
         interrogations.  The belief that officers might
23       purposefully be keeping people away from a "crime scene,"
         or that they might be keeping witnesses isolated from one
24       another, is reasonable.  Nobody told Mr. Hartman his mom
         could be present for support.
25
   (Def. 11/13/15 Supp. Brief, p. 4.) (internal citations omitted).  The
26 --------------

27 warrant for her residence, her person and her vehicle.  [Ms. Hartman]
   was cooperative and provided me with the keys to her residence where
28 agents from the task force executed the search warrant."

                                    14

portion of the transcript cited by the defense does not support this
conclusion.

> Q    Were you aware that your mother had been contacted by law
>      enforcement that morning?
>
> A    Yes.  I heard when I was on the front deck, one of the
>      officers that was out there made a comment about calling my
>      mom. I said that she was on her way to work or was at work
>      and he said that she was not, that she had gotten her.
>
> Q    Okay. And why didn't you ask that she be present during the
>      interview?
>
> A    I didn't know that I could ask that.

(RT 10/28/15: 209; Ex. A, p. 44.)  There is nothing in this exchange
indicating that when defendant was on the front deck that his mother
was nearby or that law enforcement was deliberately keeping her away
from the scene.  Det. Syvock testified that he did see any officers
standing outside with defendant's mother and was not aware that she
was on the premises during the search.  (RT 10/28/15: 154; Ex. A, p.
33.)  At some point, defendant's mother returned but defendant would
not have been aware that she was on scene until the break in the
video when defendant left the room at approximately 7:48:30, after
the portion of the interview the government seeks to introduce.[6]  To
the extent the Court relied on the defense's incorrect statement that
defendant's mother was present at the time of law enforcement's
initial entry, the government asks the Court to reconsider the weight
given to the fact defendant's mother was not invited to be present

---

[6] The video recording of the interview was manually filed under
seal in connection with the Government's September 24, 2015
opposition to the motion to suppress.  (Docket # 36.)  It was also
admitted as an exhibit at the evidentiary hearing.

during the interview.  There is a considerable difference in extending the standard to require that law enforcement wait for defendant's mother to return to the property, notify defendant of her presence, and determine whether defendant wanted her present during the interview as opposed to the situation in United States v. Craighead, 539 F. 3d 1073 (9th Cir. 2008), where the individual designated to provide support to the suspect was already on scene but was not provided access to the suspect.  In addition, unlike Craighead, there was no testimony that defendant's mother would not have been permitted to remain with defendant.  539 F.3d at 1087 (FBI agent testified that individual designated for the suspect's emotional support was not permitted to remain because he was "non-law enforcement" and court found this reinforced understanding that the FBI controlled the suspect's environment.)  Based on the record, defendant was the only non-law enforcement individual present at the time the interview began and, therefore, was not deliberatively isolated from anyone.

The government has identified factual issues with three of the criteria the Court identified as crucial in its order.  In addition, the fact that a disinterested third-party does not support defendant's version of events should cause the Court to more closely examine defendant's overall credibility.  For the reasons stated in its previous briefing on the motion, the Government contends the factors weigh in favor of the conclusion that defendant was not in custody at the time of the interview and, therefore, no advisement of his Miranda rights was required.

D. **The Inconsistencies in Det. Syvock's Testimony Were the Result of a Failure to Correctly Recollect Not An Intentional Attempt to Mislead the Court.**

The Court cites and the government concedes two points on which Det. Syvock's declaration was not accurate. The first point was whether Det. Syvock's firearm was concealed during the interview of defendant. The second point was whether defendant was wearing a t-shirt when he was first contacted by Det. Syvock on the deck. The government does not condone these errors but contends that they were the result of a failure to recollect and negligence rather than a deliberate attempt to mislead the Court warranting an adverse credibility finding. As Det. Syvock explained during the hearing, after the entry into the residence, he changed into a polo-style shirt because he did not want to conduct the interview wearing clothes that had police markings in order to create a relaxed environment. (RT 10/28/15: 135; Ex. A, p. 30.) To further that goal, Det. Syvock testified that he typically would conceal his weapon. (Id.) In this case, Det. Syvock was derelict in not watching the video, and instead relying on his common practice, before preparing his declaration. The video plainly shows that while Det. Syvock is wearing a polo shirt, the shirt was tucked inside rather than extended over the holster and, therefore, the firearm remained visible. Det. Syvock knew there was a video recording of the interview. Any attempt to mislead the Court would have been fruitless because of the irrefutable evidence. Upon reviewing the video and being confronted with the other evidence, Det. Syvock readily admitted his mistake. (RT 10/28/15: 134-36; Ex. A, pp. 29-31.) Therefore, while the Court should consider Det. Syvock's lack of diligence, no adverse credibility finding was necessary because

17

the fact was no longer in dispute.

As to what defendant was wearing during his initial contact with law enforcement, the Court noted that the fact was less crucial to its ruling but found it relevant to assessing Det. Syvock's credibility. (Court's Order, p. 12.)  Det. Syvock in his declaration stated that defendant was wearing shorts and a t-shirt. (Det. Syvock Decl. ¶ 7.)[7]  Other witnesses stated that defendant was not wearing a shirt when he exited the residence.  At the hearing, Det. Syvock testified that he was not sure what defendant was wearing on top.  "I can't be certain what he had on on top.  I don't know if it was a t-shirt or not.  I can't say specifically.  I know what he was wearing didn't seem sufficient for the cool temperature."  (RT 10/28/15: 158.)  What is not contested is that Det. Syvock arranged for defendant to receive a sweatshirt due to the cold temperature within minutes of contacting him.  (RT 10/28/15: 212; Ex. A, p. 45.)  Defendant is seen wearing this sweatshirt during the video recorded interview.  Given that (1) Det. Syvock admitted that he was not sure what defendant was initially wearing, (2) defendant's clothing upon initial contact with law enforcement was a relatively minor point, and (3) defendant wore this clothing for a matter of minutes before being given the sweatshirt, the government contends that an adverse credibility finding against Det. Syvock on this point is not necessary.

Finally, whether Det. Syvock restrained defendant's hands behind defendant's back remains a contested fact.  As discussed above, without the neighbor's corroboration, the Court must decide whether

---

[7] Det. Syvock's declaration was attached to the Government's September 24, 2015 opposition to the motion to suppress.  (Docket #35.)

Det. Syvock's or defendant's version is more credible.  The Court may find one version to be more plausible or consistent with other facts without specifically making an adverse credibility finding as to the other party.  In <u>United States v. Thoms</u>, 684 F.3d 893, 904 (9th Cir. 2012), the Ninth Circuit recognized the serious real-world consequences of a negative credibility finding such as the one made here against Det. Syvock.  The government takes its responsibility to present an accurate record seriously and does not take lightly the mistakes in this case.  Given the lack of third-party support for either version of events, the Government asks the Court to amend its Order by eliminating any references to Det. Syvock's testimony being unreliable or lacking credibility.

**V.    <u>CONCLUSION</u>**

For the foregoing reasons, the government respectfully requests that this Court reconsider its ruling on Defendant's motion to suppress and amend its order as to the credibility findings against Det. Syvock.