UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE JOSEPHINE L. STATON, JUDGE PRESIDING

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| vs. ) | SACR NO. 15-00063-JLS |
| ) | VOLUME II |
| TODD CHRISTIAN HARTMAN, ) | |
| ) | |
| DEFENDANT. ) | |
| _____ ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, OCTOBER 27, 2015

9:03 A.M.

DEBORAH D. PARKER, CSR 10342
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
411 WEST FOURTH STREET
SUITE 1-053
SANTA ANA, CALIFORNIA 92701
(657) 229-4305
transcripts@ddparker.com

*DEBORAH D. PARKER, U.S. COURT REPORTER*

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

            ANDRE BIROTTE, JR.
            UNITED STATES ATTORNEY

            DENNISE D. WILLETT
            ASSISTANT UNITED STATES ATTORNEY
            CHIEF, CRIMINAL DIVISION

            ANNE C. GANNON
            SANDY N. LEAL
            ASSISTANT UNITED STATES ATTORNEYS
            UNITED STATES DISTRICT COURT
            8000 RONALD REAGAN FEDERAL BUILDING
            SANTA ANA, CALIFORNIA 92701
            (714) 338-3500

    FOR THE DEFENDANT, TODD CHRISTIAN HARTMAN:

            SEAN K. KENNEDY
            FEDERAL PUBLIC DEFENDER

            ANDREA L. JACOBS
            CUAUHTEMOC ORTEGA
            DEPUTY FEDERAL PUBLIC DEFENDERS
            411 WEST FOURTH STREET
            SUITE 7110
            SANTA ANA, CALIFORNIA 92701
            (714) 338-3400

    FOR THE L.A. COUNTY SHERIFF'S DEPARTMENT:

            RINA M. MATHEVOSIAN
            LAW OFFICES OF NELSON & FULTON
            EQUITABLE PLAZA
            3435 WILSHIRE BOULEVARD
            SUITE 2800
            LOS ANGELES, CALIFORNIA 90010
            (213) 365-2703

*DEBORAH D. PARKER, U.S. COURT REPORTER*

I N D E X

| DEFENDANT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KURTIS KLOCKE | | 79 | 97 | |
| PHILIP MAINOLFI | | 99 | | |

E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| EXHIBITS J AND K EXCERPTS FROM EXHIBIT B TO GOVERNMENT'S SUPPLEMENTAL OPPOSITION | | 79 |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

Exhibit A, p. 3

79

|  |  |  |
|---|---|---|
| 11:30:10 | 1 | *(Defendant's Exhibits J and K received in* |
|  | 2 | *evidence.)* |
|  | 3 | THE COURT:  All right.  Sir, if you could step |
|  | 4 | forward through the door; and then, stop at this end of |
| 11:30:17 | 5 | counsel table. |
|  | 6 | THE CLERK:  Raise your right hand. |
|  | 7 | CURTIS KLOCKE, DEFENDANT'S WITNESS, SWORN |
|  | 8 | THE WITNESS:  Yes, ma'am. |
|  | 9 | THE CLERK:  Step forward. |
| 11:30:30 | 10 | *(Pause.)* |
|  | 11 | THE CLERK:  Sir, if you could, please, state your |
|  | 12 | full name, spelling your last for the record. |
|  | 13 | THE WITNESS:  Kurtis Klocke, K-L-O-C-K-E. |
|  | 14 | THE COURT:  You may inquire. |
| 11:30:54 | 15 | CROSS-EXAMINATION |
|  | 16 | BY MS. LEAL: |
|  | 17 | Q    Good morning, Mr. Klocke. |
|  | 18 | A    Good morning. |
|  | 19 | Q    How do you know Mr. Hartman, Todd Hartman? |
| 11:31:02 | 20 | A    He's my back neighbor.  Lives behind me. |
|  | 21 | Q    Okay.  And when you say "back neighbor," can I have |
|  | 22 | your address? |
|  | 23 | A    217 35th Street, Newport Beach.  I live in the front |
|  | 24 | unit.  He lives in the back.  It's split in half. |
| 11:31:16 | 25 | Q    How long have you lived in that front unit? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

Exhibit A, p. 4

80

| | | |
|---|---|---|
| 11:31:18 | 1 | A    Probably two, two-and-a-half years now. |
| | 2 | Q    Okay.  And may inquire if the Government exhibit book |
| | 3 | is up there, the manila folders. |
| | 4 | A    There's, yeah, Exhibit 1, 2 and 3. |
| 11:31:39 | 5 | Q    Okay.  And you look at Exhibit 2 that's been marked for |
| | 6 | Exhibit 2, identification purposes only. |
| | 7 | A    Okay. |
| | 8 | Q    Do you see that? |
| | 9 | A    Yes. |
| 11:31:50 | 10 | Q    Do you recognize that photograph? |
| | 11 | A    Yep.  That's the top of my house. |
| | 12 | Q    Okay.  And you see there's a -- you see there's a |
| | 13 | letter "A"? |
| | 14 | A    Yep.  Right in front of the patio. |
| 11:32:01 | 15 | Q    So that would be near the back of your unit? |
| | 16 | A    Yes.  That's the very back of mine, start of his. |
| | 17 | That's actually like -- where that "A" is, is the start of |
| | 18 | his patio. |
| | 19 | Q    Okay.  And how do you get to his unit -- |
| 11:32:11 | 20 | A    You either go behind -- |
| | 21 |       THE COURT:  I'm sorry.  I'm going to ask you to |
| | 22 | just slow down a bit in your testimony.  Unlike regular |
| | 23 | conversation, this is, actually, being taken down by a |
| | 24 | court reporter and so you make her life difficult, if you |
| 11:32:29 | 25 | speak quickly. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

81

```
11:32:31   1              THE WITNESS:  Sorry.  I will slow down.
           2              THE COURT:  All right.  So let's re-ask the
           3    question; and then, begin with the answer.
           4    BY MS. LEAL:
11:32:36   5    Q    Mr. Klocke, the unit behind you, how does a person
           6    enter that unit, if you could tell me?
           7    A     In the front, there is a small walkway on the
           8    right-hand side of the house that goes all the way back; and
           9    then, there is a set of stairs that go up the stairs to kind
11:32:53  10    off where you see that "A," patio at.
          11    Q    Okay.  So the stairwell would take you up to the patio
          12    area?
          13    A     Uh-huh.
          14    Q     Is there a door to enter --
11:33:02  15    A     There's a front door, right there, right at the top of
          16    the stairs.
          17    Q    Okay.  Let me finish my sentence first, okay?
          18    A     Sorry.
          19    Q    Okay.  And let's look at what's been marked for
11:33:12  20    identification purposes as Exhibit 3?
          21    A     (Witness so complies.)
          22    Q    Do you recognize Exhibit 3?
          23    A     Yes.
          24    Q    What is that?
11:33:30  25    A     That is the front of my house with that walkway to the
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

82

11:33:35 1   right that I was talking about.

2   Q     Okay.  So that walkway to the right is how you would

3   then reach the back unit; is that correct?

4   A     Yes, ma'am.

11:33:44 5   Q     And you submitted a declaration in this case; is that

6   correct?

7   A     Yes.

8   Q     And you indicated that you saw a police raid at the

9   Hartman home, in February 2015?

11:34:01 10   A     Yes, ma'am.

11   Q     Do you remember the date in February that occurred?

12   A     I don't remember the date, exactly.  I remember what

13   happened.

14   Q     Was it a -- do you know if it was a weekday or a

11:34:11 15   weekend?

16   A     I want to say weekday.  Probably -- I don't know what

17   weekday it was.  I had to wake up to go to work.  It

18   happened around 7:30 in the morning, give or take.

19   Q     What time do you go to work?

11:34:28 20   A     I usually wake up right around that exact time.  Go to

21   work right around 8:00 o'clock, or so.

22   Q     8:00 o'clock?

23   A     Uh-huh.

24   Q     And you're saying that this occurred somewhere around

11:34:37 25   7:30?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

83

| 11:34:38 | 1 | A    Yes. |
|---|---|---|
| | 2 | Q    And was it -- do you recall if it was light out?  Dark |
| | 3 | still? |
| | 4 | A    It was light.  You could see everything fine.  Sun was |
| 11:34:46 | 5 | up. |
| | 6 | Q    Sun was up, okay.  So you -- you said in your |
| | 7 | declaration that you heard some loud knocks and that's when |
| | 8 | you came out of your house? |
| | 9 | A    Yes. |
| 11:34:56 | 10 | Q    When you came out of your house, where did you go? |
| | 11 | A    In this picture? |
| | 12 | Q    Yes. |
| | 13 | A    In that alley, I have a side door about halfway down. |
| | 14 | Q    Okay. |
| 11:35:08 | 15 | A    I poked my head out.  And then when I looked to the |
| | 16 | left, I seen five or six cops, right there. |
| | 17 | Q    Okay.  So -- |
| | 18 | A    At the stairs, going up. |
| | 19 | Q    So you came out of that side door? |
| 11:35:21 | 20 | A    Yes. |
| | 21 | Q    That's about halfway back of your house? |
| | 22 | A    Yes. |
| | 23 | Q    And then, did you just stand right there?  Or did you |
| | 24 | walk? |
| 11:35:27 | 25 | A    I peeked my head out.  Looked.  They told me to go back |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

84

| | | |
|---|---|---|
| 11:35:32 | 1 | inside. |
| | 2 | Q    You so peeked your head out of your doorway? |
| | 3 | A    Yes. |
| | 4 | Q    But you did not exit your house? |
| 11:35:38 | 5 | A    Did not step out. |
| | 6 | Q    So -- and for how long did you do that? |
| | 7 | A    Probably 10 seconds.  Maybe 15 before the cop said go |
| | 8 | back inside. |
| | 9 | Q    Okay.  And did you go to any other area of your house |
| 11:35:53 | 10 | in order to observe what was going on? |
| | 11 | A    Before I went to that door -- I have a back window |
| | 12 | that's in my room that looks at the stairs going up. |
| | 13 | Q    Okay. |
| | 14 | A    I peeked at that to see.  And then, there was cops |
| 11:36:07 | 15 | lined up the whole stairway up. |
| | 16 | Q    Okay.  So let's take this a step back.  You told me |
| | 17 | first that you came out of your house because you heard loud |
| | 18 | knocks? |
| | 19 | A    Yes. |
| 11:36:17 | 20 | Q    Now, before -- are you saying that you went to your |
| | 21 | window before you heard the loud knocks and went out your |
| | 22 | door? |
| | 23 | A    No.  Heard loud knocks.  Went to the door, because I |
| | 24 | thought it was my house.  Peeked out.  Seen them.  Told to |
| 11:36:29 | 25 | go back in.  Went inside.  Peeked out the window because |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

85

11:36:33  1  better view.

2  Q    How long did you peek out of the window for this better

3  view?

4  A    It that was only about 10 seconds, also.

11:36:41  5  Q    And then, did you go to any other part of your house or

6  outside of your house to watch what was going on?

7  A    Not at first.  I got ready.  And then when I was

8  getting ready to leave to work, I went outside in the front

9  door in the front of the house and then kind of observed

11:36:58  10  some more before I left to go to work.

11  Q    When you were leaving at 8:00 o'clock, let's say?

12  A    Around about.  Maybe a little later, because I was a

13  little slower.

14  Q    A little slow that day?

11:37:08  15  A    Well, prasticating.  You know, kind of watch and see.

16  Q    Okay.  So then you went back outside at that point?

17  A    Yes.

18  Q    And did you -- how long did you stay outside to watch

19  what was going on?

11:37:18  20  A    Maybe another 10 minutes.

21  Q    Okay.

22  A    I talked to her -- his mother for a second.  And at

23  that time, I seen him coming out.

24  Q    Okay.  When you say you "seen him coming out," are you

11:37:31  25  referring to Mr. Hartman?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

86

11:37:33  1    A    Yes, ma'am.

2    Q    You saw him at some time after 8:00 o'clock, coming out

3    of his house?

4    A    Yes.

11:37:39  5    Q    And when you -- when he's coming out of his house, are

6    you referring to the door up on top of the deck?

7    A    Yes, ma'am.

8    Q    Okay.  So at 8:00 -- sometime after 8:00, 8:15-ish,

9    he's coming out of the house?

11:37:55  10   A    Yes.

11   Q    And where did you go, if you know?

12   A    Down the stairs.  And then, I don't see where he went

13   after that.

14   Q    Okay.  Was he walking with anyone, or by himself?

11:38:06  15   A    There was a cop behind him.  He was all the way naked

16   in his boxers.  And then, there's one, two -- no, there's

17   one cop in the front and two cops behind him, escorting him

18   down.

19   Q    Down the stairs.  And then to some unknown location?

11:38:22  20   A    Yeah.  Because where I was sitting, I couldn't see if

21   he went left or right; and then, that's when I left.

22   Q    And you made this observation when you were outside the

23   front of your house with Ms. Hartman, Mr. Hartman's mother?

24   A    I wasn't standing next to her, but, yes.  I was out

11:38:38  25   front across the street perfect view, staring directly at

*DEBORAH D. PARKER, U.S. COURT REPORTER*

87

| | | |
|---|---|---|
| 11:38:42 | 1 | the house and everything. |
| | 2 | Q    Okay.  And then, they went somewhere where you couldn't |
| | 3 | see them from the bottom of the stairwell? |
| | 4 | A    Yes, ma'am. |
| 11:38:50 | 5 | Q    So let's go back to when you heard the loud knocking, |
| | 6 | you didn't see Mr. Hartman, correct? |
| | 7 | A    No. |
| | 8 | Q    When you peeked your head out of door of your house, |
| | 9 | that first time when you heard the loud knocking, you didn't |
| 11:39:05 | 10 | see Mr. Hartman at all? |
| | 11 | A    No. |
| | 12 | Q    Okay.  And then, you went back in the house and you |
| | 13 | went to the back window and you looked up at Mr. Hartman's |
| | 14 | residence, correct? |
| 11:39:14 | 15 | A    Yes. |
| | 16 | Q    And you did not see Mr. Hartman again? |
| | 17 | A    No. |
| | 18 | Q    Okay.  It was only about 45 minutes later, do you see |
| | 19 | Mr. Hartman leaving his house, correct? |
| 11:39:24 | 20 | A    Yes.  Maybe 30, 40, somewhere in that zone, yes. |
| | 21 | Q    Okay.  Now, after he left -- after he left going down |
| | 22 | the stairs -- when he was going down the stairs with an |
| | 23 | officer behind him and in front of him, you said he was |
| | 24 | naked just in boxers, correct? |
| 11:39:43 | 25 | A    Yes. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

88

| | | |
|---|---|---|
| 11:39:43 | 1 | Q    And that's the last you saw of him? |
| | 2 | A    Yes. |
| | 3 | Q    So why did you indicate at some point they brought |
| | 4 | clothing for him, in your declaration? |
| 11:39:55 | 5 | A    I said that? |
| | 6 | Q    Maybe I have the wrong one. |
| | 7 |      Sorry, you didn't say that.  I'm sorry. |
| | 8 | A    I was going to say -- |
| | 9 | Q    You didn't say that. |
| 11:40:06 | 10 |      Okay.  At any point, did you see Mr. Hartman in |
| | 11 | anything other than just the boxers? |
| | 12 | A    No. |
| | 13 | Q    Okay.  Now, when they're taking him down the stairs, is |
| | 14 | that when you see the shotgun and the assault rifle? |
| 11:40:27 | 15 | A    I seen those when I peeked through the window, when I |
| | 16 | peeked my head out.  And at that time, I seen weapons all |
| | 17 | the time. |
| | 18 |      They were -- |
| | 19 | Q    I'm not speaking about just weapons.  Specifically, you |
| 11:40:36 | 20 | were -- you referenced a shotgun and an assault rifle. |
| | 21 | A    I seen that when I peeked my head out.  And when I went |
| | 22 | to the window, I could see on the bottom stair, one guy had |
| | 23 | a shotgun.  On the stairs going up, the three or four cops, |
| | 24 | they all had weapons loaded up. |
| 11:40:55 | 25 | Q    So you peeked your head outside that middle door. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

Exhibit A, p. 13

89

| | | |
|---|---|---|
| 11:40:58 | 1 | That's the first time when you hear the knocking? |
| | 2 | A    Yes. |
| | 3 | Q    And at that point, you said at the bottom of the stairs |
| | 4 | you saw someone with a rifle; is that correct? |
| 11:41:06 | 5 | A    Yes. |
| | 6 | Q    At that point, did you see a shotgun? |
| | 7 | A    Not at that second.  The window was when I saw the |
| | 8 | shotgun. |
| | 9 | Q    Okay.  We're just peeking our head out. |
| 11:41:15 | 10 | A    Okay. |
| | 11 | Q    And all we see is a rifle at the bottom of the stairs |
| | 12 | being held by a man or a woman? |
| | 13 | A    I would -- I don't know that, but I would say a man, |
| | 14 | because it looked like they were all men. |
| 11:41:26 | 15 | Q    And at the top of the stairs, was there anyone there? |
| | 16 | A    When I peeked through the -- no, I could not see the |
| | 17 | stairs. |
| | 18 | Q    You couldn't see up the stairs. |
| | 19 | A    No.  I could only -- |
| 11:41:36 | 20 | Q    All you could see is at the bottom of the stairs? |
| | 21 | A    Only this little view on Exhibit No. 3.  That little |
| | 22 | hallway thing, because that's where the start of the stairs |
| | 23 | start. |
| | 24 | Q    Okay.  And it's a shotgun, so it's one of those long |
| 11:41:49 | 25 | guns? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

Exhibit A, p. 14

90

| 11:41:50 | 1 | A    Yeah.  Not like -- |
| | 2 | Q    It's not like a little handgun, but like a long one? |
| | 3 | A    Yes. |
| | 4 | Q    I'm demonstrating, 12 to 24 inches long, something like |
| 11:42:00 | 5 | that? |
| | 6 | A    I would say your normal shotgun.  Pump action. |
| | 7 | Q    Okay.  So you see that.  You go back in the house and |
| | 8 | that's all you observe? |
| | 9 | A    Yes. |
| 11:42:11 | 10 | Q    Go back in the house.  Now, you go to the back window? |
| | 11 | A    Yes. |
| | 12 | Q    What do you see when you're at that back window? |
| | 13 | A    You see the stairs leading up.  And on every other |
| | 14 | stair, there is probably a cop, maybe three or four of them. |
| 11:42:24 | 15 | And then, I can also see like the edge of the house and |
| | 16 | then, that's also where I could see the other cops where I |
| | 17 | peeked out.  So, I could see two cops down there and up the |
| | 18 | stairs, probably, one every other stair.  Maybe at least |
| | 19 | three or four more. |
| 11:42:38 | 20 | Q    Okay.  So you see -- you still see the -- some type of |
| | 21 | law enforcement officer with that shotgun at the bottom of |
| | 22 | the stairs? |
| | 23 | A    Yes. |
| | 24 | Q    And then you see law enforcement going up the stairs? |
| 11:42:51 | 25 | A    Yes. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

91

| 11:42:51 | 1 | Q | On various stairs; is that correct? |

```
11:42:51   1   Q    On various stairs; is that correct?

           2   A    Yes.

           3   Q    And then at the top, is there somebody --

           4        When do we see this assault rifle?

11:42:59   5   A    On the stairs.  They had them.

           6   Q    They all had assault rifles?

           7   A    I want to say one of them did.

           8   Q    One had an assault rifle?

           9   A    Yeah.

11:43:06  10   Q    An assault rifle, can you describe what you mean by

          11   "assault rifle"?

          12   A    A normal longer gun, machine gun with barrel with a

          13   curved clip.  He was not holding it.  It was attached to his

          14   back like a strap that they wear, so it was on his back.

11:43:19  15   And his hand, I want to say was a gun, but I -- handgun, but

          16   I don't know that for sure.

          17   Q    So the weapon that you're describing as an assault

          18   rifle is not being held by the officer?

          19   A    No, it's on his back.

11:43:31  20   Q    It's actually strapped onto his back?

          21   A    Yes.

          22   Q    And then, the other law enforcement that you see on the

          23   stairs, do they have weapons that they're holding in their

          24   hands?  If you know?

11:43:49  25   A    Off the top of my head, I would want to say handguns
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

92

11:43:52   1    only, but I don't know 100 percent because there's a railing

2    that's there, so some people they were higher, I couldn't

3    quite see everything and some were a little lower which I

4    had a better view at, so I don't know if every single one of

11:44:04   5    them were holding a weapon.

6    Q     Okay.  Now, the knock has already occurred.  They've

7    already -- you've heard this shouting.

8          Do you see Mr. Hartman?

9    A     No.

11:44:13  10    Q     Did you ever see Mr. Hartman out on the deck when

11    you're looking at that back window?

12    A     No.

13    Q     So when you say the officers removed an adult male from

14    the home, that's from the front of the house view, seeing

11:44:41  15    Mr. Hartman being brought down the stairs --

16    A     Yes, ma'am.

17    Q     -- about 45 minutes later?  Okay.

18          Is that correct?

19    A     Yes.

11:44:57  20    Q     Were there any other neighbors outside that you

21    observed?

22    A     A couple.

23    Q     Who?

24    A     I do not know.  I did not talk or ask.  Only when (sic)

11:45:08  25    I actually recognized as (sic) name and everything was his

*DEBORAH D. PARKER, U.S. COURT REPORTER*

93

11:45:13  1   mother.

2   Q      Do you know Philip Mainolfi?

3   A      Yes, I do.

4   Q      Did you see him outside?

11:45:18  5   A      No, I did not.

6   Q      Did you see him here today?

7   A      Yes, I did.

8   Q      Have you talked to him about this incident?

9   A      About this?  Yes.

11:45:26  10   Q      When did you talk to him about this?

11   A      The day after -- the day it happened when I came home,

12   we just kind of talked and said, *Did you see this?  Or did*

13   *you see that?  Or what happened?  Or do you even know what*

14   *happened, or why this happened?*  So just basic stuff.

11:45:43  15   Q      Are you friends with Mr. Mainolfi?

16   A      Yes.

17   Q      And like friends, do you go to his house?

18   A      I hang out with him.  I've met him when I moved in to

19   this house, and I hang out with them here and there,

11:45:56  20   randomly.

21   Q      But you didn't see him when you peeked your head out

22   the side of the house, or the back window, or when you were

23   in the front of the house?

24   A      No.

11:46:04  25   Q      And where is his home in relationship to yours?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

94

11:47:35  1    A    In this picture, you're looking --

2    Q    Look at the overview photo, yes.

3    A    In 3 or 2?

4    Q    In --

11:47:37  5    A    Because I can describe it from either/or.

6    Q    Let's do it from 2.

7    A    In picture 2, where you see the A --

8    Q    Yes.

9    A    -- two houses to the right is his, so it's the big long

11:47:41 10    one with the right chimney on the top.  That's his house.

11    Q    Is he the only one who resides at the house, if you

12    know?

13    A    No, he has some roommates, I think two.

14    Q    Is it a -- does it encompass multiple residents within

11:47:46 15    that home, or is it one home?

16    A    It's just one big home.  There's an upper unit and

17    lower unit, and he's in the upper unit.

18    Q    Okay.  Do you know Mr. Hartman, other than as someone

19    residing behind you?

11:47:50 20         Do you have a relationship with him?

21    A    No, I do not.

22    Q    Now, when you said he came down the stairs, you said he

23    was either handcuffed, or his hands were held behind his

24    back by an officer?

11:47:54 25    A    Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

95

11:47:54   1   Q   Could you see metal handcuffs on his wrists?

2   A   No.  I was too far away.

3   Q   Could you see any plastic ties on his wrists?

4   A   No.

11:47:58   5   Q   Did you just see his hands in a position that looked as

6   if they were in the back and you were just speculating as to

7   whether they were handcuffed or tied in some fashion?

8   A   I seen his hands wrapped behind his back, like this

9   (indicating), like a normal.  I couldn't see those bound or

11:48:07   10   not, but they were 100 percent behind his back just like a

11   normal person --

12   Q   Walking with their hands behind their back, like this

13   if I'm walking (indicating).

14   A   That's what it looked like.  Hands behind the back.

11:48:18   15   Q   Holding his hands that you could see?

16   A   That I could not see.  From the distance of my road to

17   there, like I couldn't quite see fine detail like that; and

18   then, there's also those railings that are right there that

19   block it sometimes, depending on where you're looking

11:48:33   20   exactly.

21   Q   And remind me, was the assault -- was the assault

22   weapon or the rifle going down the stairs with him when he's

23   being escorted out?

24   A   Not seeing any weapons going down the stairs.

11:48:47   25   Q   Okay.  And you're certain he didn't have a shirt on?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

96

| 11:48:53 | 1 | A     He only had his boxers. |

```
11:48:53  1   A     He only had his boxers.
          2             MS. LEAL:   One moment.
          3        (Pause.)
          4   BY MS. LEAL:
11:49:18  5   Q     Couple more questions.
          6             You said you saw a battering ram?
          7   A     Yes.
          8   Q     Where did you see that?
          9   A     The stairs.
11:49:25 10   Q     So is that when you're at the back window or when you
         11   first peeked your head out?
         12   A     Window.
         13   Q     The back window.  And where was the battering ram?
         14   A     Not the first guy, but the second guy going up.
11:49:37 15   Q     That was not --
         16   A     Like against the wall, like kind of sitting right
         17   there.
         18   Q     Okay.  And do you recall a later date this year
         19   Mr. Hartman being arrested at his residence?
11:49:50 20   A     Something but not me being there.  I remember hearing
         21   about it.
         22   Q     Okay.  But this was definitely -- this occurred in
         23   February, what you're describing?
         24   A     Yes.  Yes.
11:50:05 25             MS. LEAL:   Nothing further.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

97

| | | |
|---|---|---|
| 11:50:08 | 1 | THE COURT:  All right.  Anything on redirect? |
| | 2 | MS. JACOBS:  Just a couple quick questions. |
| | 3 | REDIRECT EXAMINATION |
| | 4 | BY MS. JACOBS: |
| 11:50:19 | 5 | Q    Good morning, Mr. Klocke. |
| | 6 | A    Hello. |
| | 7 | Q    Just a couple of quick questions:  I believe that you |
| | 8 | said in your testimony today that you saw about five or six |
| | 9 | cops going up the stairs and that was when you did the |
| 11:50:32 | 10 | peek-out? |
| | 11 | A    Yeah.  Well, when I did the peek-out, I only see the |
| | 12 | two on the bottom.  The window is when I seen the other ones |
| | 13 | going up the stairs. |
| | 14 | Q    So when you looked out the window, you saw the five or |
| 11:50:45 | 15 | six? |
| | 16 | A    Yes. |
| | 17 | Q    And when you did the peek-out, you said you saw two |
| | 18 | cops? |
| | 19 | A    Yes. |
| 11:50:54 | 20 | Q    Where were they, again? |
| | 21 | A    In Picture 3.  They were on the ground in that little |
| | 22 | sidewalk, just next to the stairs going up. |
| | 23 | If you look really close to the right, yeah, kind |
| | 24 | of where you're pointing, that's a brick wall. |
| 11:51:17 | 25 | Q    Okay. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

Exhibit A, p. 22

98

| | | |
|---|---|---|
| 11:51:18 | 1 | A    And they were, basically, right there before the stairs |
| | 2 | go up. |
| | 3 | Q    And was it one of those cops that told you to go back |
| | 4 | inside? |
| 11:51:30 | 5 | A    Yes. |
| | 6 | Q    And then, I just want to get a little bit more detail |
| | 7 | on when you saw Mr. Hartman being escorted by the officers. |
| | 8 | Did you say that there was one cop in front of him |
| | 9 | and two cops behind him? |
| 11:51:46 | 10 | A    Yes. |
| | 11 | Q    And did they have guns on them? |
| | 12 | A    In their possession? |
| | 13 | Q    Yes. |
| | 14 | A    But not like holding them out, or nothing like that. |
| 11:51:56 | 15 | Q    Okay. |
| | 16 | A    I would assume that he had them on his side.  I could |
| | 17 | see the very, very top guy.  He had this gun in the holster |
| | 18 | type thing, but I didn't see any guns out at that time. |
| | 19 | Q    Okay.  And when Mr. Hartman had his hands behind his |
| 11:52:11 | 20 | back, did it appear to you that his hands were restrained? |
| | 21 | A    I would say so. |
| | 22 | MS. JACOBS:  Okay.  No further questions. |
| | 23 | Thank you very much. |
| | 24 | THE COURT:  Anything further? |
| 11:52:30 | 25 | MS. LEAL:  Nothing further, Your Honor. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE JOSEPHINE L. STATON, JUDGE PRESIDING

UNITED STATES OF AMERICA,          )
                                   )
          PLAINTIFF,               )
                                   )
     vs.                           ) SACR NO. 15-00063-JLS
                                   )
TODD CHRISTIAN HARTMAN,            )
                                   )
          DEFENDANT.               )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

WEDNESDAY, OCTOBER 28, 2015

2:00 P.M.

DEBORAH D. PARKER, CSR 10342
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
411 WEST FOURTH STREET
SUITE 1-053
SANTA ANA, CALIFORNIA 92701
(657) 229-4305
transcripts@ddparker.com

*DEBORAH D. PARKER, U.S. COURT REPORTER*

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

                        ANDRE BIROTTE, JR.
                        UNITED STATES ATTORNEY

                        DENNISE D. WILLETT
                        ASSISTANT UNITED STATES ATTORNEY
                        CHIEF, CRIMINAL DIVISION

                        ANNE C. GANNON
                        SANDY N. LEAL
                        ASSISTANT UNITED STATES ATTORNEYS
                        UNITED STATES DISTRICT COURT
                        8000 RONALD REAGAN FEDERAL BUILDING
                        SANTA ANA, CALIFORNIA 92701
                        (714) 338-3500

    FOR THE DEFENDANT, TODD CHRISTIAN HARTMAN:

                        SEAN K. KENNEDY
                        FEDERAL PUBLIC DEFENDER

                        ANDREA L. JACOBS
                        CUAUHTEMOC ORTEGA
                        DEPUTY FEDERAL PUBLIC DEFENDERS
                        411 WEST FOURTH STREET
                        SUITE 7110
                        SANTA ANA, CALIFORNIA 92701
                        (714) 338-3400

*DEBORAH D. PARKER, U.S. COURT REPORTER*

I N D E X

DEFENDANT'S WITNESSES:   DIRECT   CROSS   REDIRECT   RECROSS

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THERESA BARD | 120 | 123 | | |
| DAVID SYVOCK | | 124 | 138 | 180 |
| KIM LEE SPEAKMAN, JR. | 184 | 194 | | |
| TODD HARTMAN | 202 | 210 | 238 | 240 |

E X H I B I T S

PLAINTIFF'S EXHIBITS:                IDENTIFICATION   EVIDENCE

| | | IDENTIFICATION | EVIDENCE |
|---|---|---|---|
| 2 | OVERHEAD VIEW OF RESIDENCE | | 125 |
| 3 | DEPICTION OF HARTMAN RESIDENCE | | 127 |
| 4 | CLIPS FROM VIDEO | | 243 |

E X H I B I T S

DEFENDANT'S EXHIBITS:                IDENTIFICATION   EVIDENCE

| | | IDENTIFICATION | EVIDENCE |
|---|---|---|---|
| A | OPERATIONS PLAN FOR SEARCH WARRANT | | 153 |
| F | PHOTOGRAPH | | 185 |
| G | PHOTOGRAPH | | 187 |
| I | CLIPS FROM VIDEO | | 243 |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

Exhibit A, p. 26

130

02:16:32 1    were standing?

2    A    Yes.

3    Q    Upon entry when they entered?

4    A    Yes.

02:16:37 5    Q    And where were they standing?

6    A    Special Agent Perez had a key for the front door, so he

7    would have been standing directly to one side of the door.

8          Special Agent Speakman would have been to the

9    other side of the door.

02:16:56 10    Q    And do you know how a key to the residence was

11    obtained?

12    A    Yes.  I obtained it from Mr. Hartman's mother.

13    Q    And why did you do that?

14    A    Well, to assist us in the entry so that in the event

02:17:09 15    that nobody opened the door, we didn't have to force entry.

16    Q    And does forced entry sometimes involve damage to

17    property?

18    A    Yes, it does.

19    Q    And as part of the execution of the search warrant, did

02:17:25 20    you ultimately make contact with Mr. Hartman?

21    A    Yes, I did.

22    Q    And if you could tell us about how that contact

23    occurred.

24    A    Special Agent Perez would have made what we call "knock

02:17:36 25    and announce" where we knock on the front door and announce

*DEBORAH D. PARKER, U.S. COURT REPORTER*

131

02:17:39  1    our presence as police officers.  And once that is done, the

2    door is opened and orders will be given once the door is

3    opened, again, announcing our presence.  Once that happened

4    in this case, I heard Special Agent Speakman giving

02:17:57  5    instructions to somebody inside the house.

6              At that point, I moved up in the stack knowing

7    that I was going to be making contact with somebody, and I

8    made contact with Mr. Hartman right at the threshold of the

9    front door.

02:18:10 10    Q    And did you enter the residence at that time?

11    A    No, I did not.

12    Q    And what happened after you made contact with

13    Mr. Hartman at the threshold of the residence?

14    A    We walked to the balcony outside the residence and then

02:18:25 15    the entry team gained entry and secured the residence.

16    Q    And do you recall what Mr. Hartman was wearing at that

17    time?

18    A    I know that he had on a pair of what I thought were

19    dark-colored athletic shorts, almost like basketball shorts.

02:18:44 20    I can't recall if -- what he was wearing on top.  But I do

21    remember that it was cool out and whatever he was wearing I

22    felt that he would be uncomfortable, so I requested somebody

23    give us a sweatshirt for him to put on.

24    Q    And was he given a sweatshirt at that time?

02:19:01 25    A    Yes, he was.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

134

| | | |
|---|---|---|
| 02:21:24 | 1 | A    February 5th. |
| | 2 | Q    And was the -- had the sun fully risen?  Was it bright |
| | 3 | outside, or was it dim? |
| | 4 | A    No, it was daylight. |
| 02:21:44 | 5 | Q    So you said you were on the deck for approximately 10 |
| | 6 | to 15 minutes. |
| | 7 | What happened after you were with Mr. Hartman on |
| | 8 | the deck? |
| | 9 | A    One point I went inside and set up the video recorder |
| 02:21:58 | 10 | in the room where we were going to conduct the interview. |
| | 11 | Q    And had Mr. Hartman expressed to you that he was |
| | 12 | willing to be interviewed? |
| | 13 | A    Yes. |
| | 14 | Q    And what were you wearing when you initially contacted |
| 02:22:17 | 15 | Mr. Hartman on the deck? |
| | 16 | A    When I initially contacted him, I had my raid vest on, |
| | 17 | which is a black bulletproof vest that has police markings |
| | 18 | on it, and I would have been wearing, probably, a pair of |
| | 19 | jeans. |
| 02:22:33 | 20 | Q    And did you change your clothes prior to your interview |
| | 21 | with Mr. Hartman inside the residence? |
| | 22 | A    Yes, I did. |
| | 23 | Q    What were the clothes that you changed into? |
| | 24 | A    I put on a polo shirt. |
| 02:22:48 | 25 | Q    And why did you do that? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

135

| | | |
|---|---|---|
| 02:22:52 | 1 | A    Because I didn't want to conduct an interview wearing |
| | 2 | clothes that had police markings.  I wanted to make the |
| | 3 | interview as comfortable as possible, and I felt that if I |
| | 4 | had a shirt on that didn't have the police logos and |
| 02:23:05 | 5 | indications, it would be a more relaxed environment. |
| | 6 | Q    And where did this interview take place within the |
| | 7 | residence? |
| | 8 | A    It was in a bedroom to the rear of location which was |
| | 9 | identified as his mother's bedroom. |
| 02:23:19 | 10 | Q    Do you have a typical practice regarding displaying or |
| | 11 | concealing your firearm during an interview? |
| | 12 | A    For the same reasons that I previously just described. |
| | 13 | As far as my clothing, I typically will conceal my weapon so |
| | 14 | that it doesn't create an environment that makes people |
| 02:23:37 | 15 | uncomfortable. |
| | 16 | Q    In this case, did you have an opportunity to review the |
| | 17 | video of the interview, after you submitted your |
| | 18 | declaration? |
| | 19 | A    Yes, I did. |
| 02:23:51 | 20 | Q    Was the firearm concealed in a holster but visible |
| | 21 | outside your shirt during this interview? |
| | 22 | A    Yes, it was. |
| | 23 | Q    And do you know why that happened? |
| | 24 | A    After watching the video, I don't even think I realized |
| 02:24:05 | 25 | that my shirt had got hung up on my gun and therefore |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

136

02:24:09  1  exposing my weapon.

2  Q    Now, why didn't you interview Mr. Hartman in a more

3  public place?

4  A    Well, for a number of reasons.  The biggest reason in

02:24:19  5  this case is the topic that we were going to be discussing.

6  I didn't want to discuss these issues in front of his

7  neighbors that could overhear what we were talking about,

8  you know -- I mean, that make it uncomfortable for him,

9  obviously, to talk about those, but also the concern that if

02:24:40  10  they found out we were conducting an investigation related

11  to child pornography, I would be in fear that it could cause

12  some risk of retribution towards him by his neighbors; so,

13  therefore, we choose to do it in some place that's not

14  public.

02:24:54  15  Q    And when you interviewed the defendant in this bedroom,

16  who was present in the room?

17  A    It was myself and my partner, Detective Christian

18  O'Donnell.

19  Q    Now, are you aware that there were approximately 14

02:25:15  20  members of law enforcement assigned to the execution of this

21  search warrant?

22  A    Yes.

23  Q    And were all 14 agents and officers ever to your

24  knowledge in the unit at the same time?

02:25:27  25  A    Not to my knowledge.  I don't think all 14 or 15 could

*DEBORAH D. PARKER, U.S. COURT REPORTER*

142

02:32:37 1   Q    When you stopped her on her way to work, how come you
2   didn't question her about the child pornography then?
3   A    Because at that point -- I told her the same thing that
4   I told him what we were there for.  And at that point, my
02:32:50 5   role was to get the key so that we could make access into
6   the house and then further the investigation from that
7   point.
8   Q    Did you share your investigation with her?
9   A    I told her what we were there for.
02:33:00 10  Q    And did you ask her if she wanted to speak to you about
11  the child pornography?
12  A    Not specifically at that time, I did not.
13  Q    Did you interview her at any time during that day?
14  A    I did not.
02:33:10 15  Q    Okay.  So at the time of the execution of the search
16  warrant, you were aware of the 2010 Fullerton incident,
17  right?
18  A    Correct.
19  Q    But you were not sure if you believed Mr. Hartman was
02:33:30 20  the one involved in distributing child pornography?
21  A    No.  What I said was, I had a pretty good indication
22  that he was, but I would never rule out the other person in
23  the house until after we finished the investigation.
24  Q    Did you believe he was engaging in a crime?
02:33:46 25  A    Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

154

02:45:49   1    Q    And was there purpose to stand guard over who came and

2    went?

3    A    No.

4    Q    What was their purpose?

02:45:55   5    A    Just security of the scene.

6    Q    And is part of keeping the scene secure keeping track

7    of who goes and who comes?

8    A    Well, in this case, it's more to make sure that we

9    don't have people coming from outside the residence and

02:46:11  10    coming into the scene.

11    Q    And did you see any of the officers standing outside

12    with Ms. Hartman?

13    A    No.

14    Q    Were you aware that Ms. Hartman was on the premises

02:46:27  15    during the search?

16    A    No.

17    Q    Who decided on the number of officers who were going to

18    execute the search warrant?

19    A    It's decided prior to the search warrant, based on the

02:46:40  20    size of location, the type of entry we have to make.  It's

21    determined at that point how many officers we're going to

22    take.

23    Q    But for this one, who made that decision?

24    A    You know, I would have to look and see who wrote up the

02:46:54  25    operations plan, but it was -- it would have been whoever

*DEBORAH D. PARKER, U.S. COURT REPORTER*

195

03:43:19  1   A    No, ma'am.

2   Q    Did you wait -- did you all wait a few minutes after

3   you knocked -- not a few minutes.  A few seconds?

4   A    Yes.

03:43:27  5   Q    And there was no response?

6   A    No, ma'am.

7   Q    What did Officer Perez or Agent Perez do next?

8   A    He used a key obtained from Mr. Hartman's mother to

9   open the front door.

03:43:40  10  Q    And you're in front of the door well with Special Agent

11  Perez.

12         Are you sharing the door well area?

13  A    I'm the first person there and Agent Perez is right

14  behind me and everybody else is behind him.

03:43:53  15  Q    He's opening the door with the key, so is he to your

16  side somehow?

17  A    Yes.  Well, he reached around, opened the door and the

18  door opened; and then, I'm the first person there.

19  Q    So if someone is in the house, you're the first person

03:44:05  20  they see?

21  A    Yes, ma'am.

22  Q    And you're holding your gun in front of you?

23  A    Yes, ma'am.

24  Q    And who do you see in the house?

03:44:11  25  A    Mr. Hartman.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

196

| | | |
|---|---|---|
| 03:44:12 | 1 | Q    And about how close is Mr. Hartman to you, initially? |
| | 2 | A    Approximately, give or take, maybe from you to me, |
| | 3 | roughly.  Approximately. |
| | 4 | Q    So the house has a hallway/entryway type space? |
| 03:44:30 | 5 | A    Yes. |
| | 6 | Q    And he's near the end of it, the far end? |
| | 7 | A    Towards the back of the home. |
| | 8 | Q    Okay.  Do you say something or does Special Agent Perez |
| | 9 | say something to announce your presence? |
| 03:44:42 | 10 | A    Initially, Ron Perez does the knock-and-announce. |
| | 11 | Q    By "announce," what does he say? |
| | 12 | A    *Police with a search warrant.  Open the door.* |
| | 13 | Q    So you now have made eye contact with Mr. Hartman.  Do |
| | 14 | you say anything to him? |
| 03:44:56 | 15 | A    Yes. |
| | 16 | Q    What do you say? |
| | 17 | A    I first said, *Police.  Don't move.* |
| | 18 | Q    Did he comply? |
| | 19 | A    Yes. |
| 03:45:02 | 20 | Q    Did he say anything to you? |
| | 21 | A    No, ma'am. |
| | 22 | Q    What was his demeanor? |
| | 23 | A    He was shocked.  He was startled.  You could tell.  It |
| | 24 | looked like he'd just woken up. |
| 03:45:14 | 25 | Q    Did you say anything else? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

197

| | | | |
|---|---|---|---|
| 03:45:15 | 1 | A | Yes. |
| | 2 | Q | What did you say next? |
| | 3 | A | That -- I told him to put his hands in the air. |
| | 4 | Q | Did he comply? |
| 03:45:21 | 5 | A | Yes. |
| | 6 | Q | What did you do after that? |
| | 7 | A | I told him to put his hands up higher. |
| | 8 | Q | And did he comply, again? |
| | 9 | A | Yes, ma'am. |
| 03:45:29 | 10 | Q | Did you give any other instructions at that point? |
| | 11 | A | At that point, I directed him to come towards me. |
| | 12 | Q | And you still have the gun pointing at him, correct? |
| | 13 | A | Yes, ma'am. |
| | 14 | Q | And does he approach you? |
| 03:45:38 | 15 | A | Yes. |
| | 16 | Q | And does he exit the door, the door-well area? |
| | 17 | A | He exits the door on my left side. |
| | 18 | Q | Does the gun remain pointed at him as he's going to the |
| | 19 | | door, or is the gun still pointed inside the home in the |
| 03:45:55 | 20 | | event someone is there? |
| | 21 | A | As he's coming towards me, my gun was still directed on |
| | 22 | | him.  And then, when he got to -- pretty close proximity, my |
| | 23 | | main concern is what's beyond him and what else could |
| | 24 | | possibly be in the house, so then I direct my attention |
| 03:46:08 | 25 | | towards the rest of the house while the people behind me |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

198

03:46:11  1    give directions to Mr. Hartman.

2    Q    So he exits the residence to your side and the gun is

3    now facing in the home?

4    A    Yes, ma'am.

03:46:21  5    Q    And he is going out to that patio deck area?

6    A    Yes.  Correct.

7    Q    Is that your entire interaction with him?

8    A    Yes.

9    Q    And then do you go into the home?

03:46:32 10    A    Yes.

11    Q    And you search the -- or secured the home as

12    participate of the entry team?

13    A    Then the entry team made entry into the house and

14    secured the house.

03:46:40 15    Q    Did you go through every room?

16    A    Yes.

17    Q    And after -- about how long does it take to secure the

18    residence, approximately?

19    A    Maybe a couple of minutes and then we also do a

03:46:50 20    secondary sweep, just in case somebody missed something.

21    Q    Did you do that?

22    A    Yes.

23    Q    And then after you've completed that, where do you and

24    your M-4 go?

03:47:02 25    A    Then I put the M-4 back in my vehicle.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

199

| 03:47:05 | 1 | Q | Do you see Mr. Hartman as you're leaving, going down |

03:47:05  1  Q    Do you see Mr. Hartman as you're leaving, going down

2    the stairwell to your vehicle?

3          Do you see him still on the patio, or is he in the

4    home, if you recall?

03:47:16  5  A    I believe he's still on the patio.

6  Q    At no point the gun touches Mr. Hartman?

7  A    No, ma'am.

8  Q    Did you see Mr. Hartman handcuffed?

9  A    No.

03:47:32  10  Q    Did anyone put his arms behind his back that you saw?

11  A    That I saw, no.

12  Q    When you came back to the home, back up the stairwell

13    after you put your M-4 away, do you have your handgun?

14  A    Yes, ma'am.

03:47:53  15  Q    Is that holstered?

16  A    Yes.

17  Q    And when you go back in, are you going in to do what?

18    Interview Mr. Hartman, or something else?

19  A    No, I was assigned to the search team that day.

03:48:02  20  Q    Do you go in and search the location?

21  A    Yes, ma'am.

22  Q    Do you see Mr. Hartman as you're searching?

23  A    As I'm searching, I don't recall seeing him.

24  Q    Did there come an instance where Ms. Hartman is present

03:48:18  25    in the residence?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

Exhibit A, p. 38

200

03:48:19    1    A    Yes.

2    Q    And where is she in the residence?

3    A    In the living room.

4    Q    Do you recall how soon after you started searching that

03:48:25    5    she returned to the home?

6    A    I do not.

7    Q    Do you -- at some point, does Mr. Hartman and

8    Mrs. Hartman, are they in the living room together?

9    A    At some point they were in the living room together.

03:48:39    10   I'm just not sure when.

11   Q    But while law enforcement is still there, conducting

12   their search?

13   A    Yes.

14   Q    Does Mr. Hartman ever talk to you?

03:48:50    15   A    No.  No, ma'am.

16          MS. LEAL:   One moment.

17          (Pause.)

18   BY MS. LEAL:

19   Q    Can you tell me, Special Agent Speakman, what -- is

03:49:12    20   there ever a time when it's a --

21          Is it good to have a gun pressed against a target

22   during a search warrant?

23   A    No.

24   Q    Why not?

03:49:25    25   A    It would be very unsafe to give your weapon over to

*DEBORAH D. PARKER, U.S. COURT REPORTER*

201

| | | |
|---|---|---|
| 03:49:28 | 1 | somebody.  You're just asking them to grab it.  That would |
| | 2 | be very unacceptable. |
| | 3 | MS. LEAL:  Nothing further. |
| | 4 | THE COURT:  Anything on recross? |
| 03:49:44 | 5 | MR. ORTEGA:  No, Your Honor. |
| | 6 | THE COURT:  May this witness be excused? |
| | 7 | MR. ORTEGA:  Yes, Your Honor. |
| | 8 | MS. LEAL:  Yes, Your Honor. |
| | 9 | THE COURT:  You may step down.  You are excused. |
| 03:49:51 | 10 | THE WITNESS:  Thank you, Your Honor. |
| | 11 | *(Pause.)* |
| | 12 | THE COURT:  And at this time, any further |
| | 13 | witnesses by the defense? |
| | 14 | MR. ORTEGA:  Just Mr. Hartman, Your Honor. |
| 03:50:07 | 15 | THE COURT:  Do you plan on asking him questions on |
| | 16 | direct first, or no? |
| | 17 | MR. ORTEGA:  Yes, Your Honor.  It will probably be |
| | 18 | about five to 10 minutes. |
| | 19 | THE COURT:  All right. |
| 03:50:17 | 20 | MR. ORTEGA:  My client asks if he might be able to |
| | 21 | take a short bathroom break, Your Honor. |
| | 22 | THE COURT:  We can do that. |
| | 23 | You have about five to 10 minutes.  You think you |
| | 24 | have about 40? |
| 03:50:26 | 25 | MS. GANNON:  Yes, Your Honor.  I'll try to make it |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

205

04:04:05  1   A     The first time when I was still outside on the front
          2   patio and Detective Syvock had gone inside, I needed to use
          3   the restroom and there was a nearby park, so I thought I
          4   could go there and use the restroom.  When I approached the
04:04:22  5   top of the stairs, the officer blocking the top of the
          6   stairs -- I asked if I could get by him and he told me that
          7   I could not and so I went back to standing on the deck.
          8   Q     Did you tell him that you needed to use the restroom?
          9   A     No, I did not.
04:04:37  10  Q     Why didn't you tell him?
          11  A     I was intimidated by the officers there, as well as the
          12  fact that it was kind of embarrassing.
          13  Q     And when was the second time you tried to go to the
          14  restroom?
04:04:47  15  A     The second time was after the first recorded interview,
          16  and I was in the living room.  I tried to leave through the
          17  front door and the officer blocking the front door pointed
          18  back the way I had come and told me that I couldn't go that
          19  way.
04:05:08  20  Q     And did you tell him that you needed to go to the
          21  restroom?
          22  A     I did not.
          23  Q     Why not?
          24  A     The same reason:  I was intimidated and kind of
04:05:15  25  embarrassed about it.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

206

| | | |
|---|---|---|
| 04:05:18 | 1 | Q   You mentioned in your declaration that when |
| | 2 | Agent Speakman came into the home, the gun he was holding |
| | 3 | touched your chest. |
| | 4 | A   That's correct. |
| 04:05:29 | 5 | Q   Did it, in fact, touch your chest? |
| | 6 | A   It did. |
| | 7 | Q   Why do you have such a clear memory of that? |
| | 8 | A   Well, that's the only time in my life I've ever had a |
| | 9 | gun touch me.  I remember the feel of it.  The hard metal is |
| 04:05:43 | 10 | cold, pressed against my naked chest.  And I was in fear of |
| | 11 | my life.  I very vividly remembered that. |
| | 12 | Q   Now, did you see that the other officers -- excuse me. |
| | 13 | Were the other officers that you saw when they |
| | 14 | came in through the door and when they were on the stairs, |
| 04:06:04 | 15 | did you see whether they were armed? |
| | 16 | A   Yes.  I could see the other officers on the stairs, |
| | 17 | including the Detective Syvock, holding guns out. |
| | 18 | Q   And just to clarify, are you saying that |
| | 19 | Detective Syvock had his gun drawn? |
| 04:06:21 | 20 | A   Yes. |
| | 21 | Q   Did you know how many law enforcement agencies were |
| | 22 | present at the search warrant execution? |
| | 23 | A   I didn't know exactly how many, but I knew there was |
| | 24 | more than one. |
| 04:06:32 | 25 | Q   And how do you know that? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

207

| | | |
|---|---|---|
| 04:06:34 | 1 | A    When Detective Syvock introduced himself, he said he |
| | 2 | was part of a task force with Homeland Security, and that's |
| | 3 | when I noticed the -- the vests with the Homeland Security |
| | 4 | initials on it, the "HSI." |
| 04:06:50 | 5 | Q    Did you have a sense for who was in charge of the |
| | 6 | search warrant execution? |
| | 7 | A    No one informed me of who was in charge, but when I |
| | 8 | heard that Homeland Security task force, I assumed that it |
| | 9 | was the Homeland Security. |
| 04:07:06 | 10 | Q    So did you believe that Detective Syvock was in charge |
| | 11 | or not in charge? |
| | 12 | A    I didn't think he was in charge, no. |
| | 13 | Q    Why not? |
| | 14 | A    Because he's part of Newport Beach Police, and I |
| 04:07:17 | 15 | figured that the larger federal agency would be in charge. |
| | 16 | Q    And at some point on the video recording that you |
| | 17 | watched previously, Detective Syvock tells you that you can |
| | 18 | leave. |
| | 19 |         Why didn't you leave? |
| 04:07:35 | 20 | A    I didn't really feel I could leave.  I felt if I left |
| | 21 | the room that they were just going to put handcuffs on me, |
| | 22 | and I knew from before I came in the room that there were |
| | 23 | multiple armed officers that were blocking the exists, so I |
| | 24 | didn't think I'd actually be able to get very far. |
| 04:07:53 | 25 | Q    The door in the bedroom, there was no officer against |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:09:11   1          Why not just get it on your own?

2      A    Well, I didn't know if I could get a glass of water on

3      my own, since I was told I couldn't move around, and I

4      didn't want to do anything to excite the officers there to

04:09:22   5      make anything worse.  I just -- I didn't feel free to just

6      get up and go get a glass of water.

7      Q    And why didn't you -- going back to the restroom issue,

8      briefly, why didn't you use the restroom in your apartment?

9      A    That goes back to not knowing what the protocol is

04:09:38  10      there.  The bathroom is centrally located, and I didn't know

11      if I closed the door, if people would start freaking out and

12      kick in the door, or shoot me, or whatever.  I didn't want

13      to chance anything, as well as the fact that being in a tiny

14      apartment, using the restroom there anyone can see, or hear,

04:09:59  15      or smell what's going on in there which is, again, very

16      embarrassing.

17      Q    Were you aware that your mother had been contacted by

18      law enforcement that morning?

19      A    Yes.  I heard when I was on the front deck, one of the

04:10:12  20      officers that was out there made a comment about calling my

21      mom.  I said that she was on her way to work or was at work

22      and he said that she was not, that she had gotten her.

23      Q    Okay.  And why didn't you ask that she be present

24      during the interview?

04:10:31  25      A    I didn't know that I could ask that.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

212

| | | |
|---|---|---|
| 04:12:45 | 1 | Q    At that point, by the time that you were being |
| | 2 | interviewed in your mom's bedroom, you had been given a |
| | 3 | sweatshirt. |
| | 4 | Isn't that true? |
| 04:12:55 | 5 | A    Yes. |
| | 6 | Q    And you were wearing basketball shorts? |
| | 7 | A    Running shorts.  They're shorter than basketball |
| | 8 | shorts. |
| | 9 | Q    And you could have asked for a pair of shoes. |
| 04:13:04 | 10 | Isn't that true? |
| | 11 | A    I suppose. |
| | 12 | Q    But you didn't ask for a pair of shoes? |
| | 13 | A    I didn't ask, no. |
| | 14 | Q    And are you familiar with a Starbucks coffee in Lido |
| 04:13:17 | 15 | Village? |
| | 16 | A    No. |
| | 17 | Q    Now, you were in bed when law enforcement knocked on |
| | 18 | your door. |
| | 19 | Isn't that true? |
| 04:13:26 | 20 | A    That's true. |
| | 21 | Q    And they were opening the door before you could open |
| | 22 | it. |
| | 23 | Isn't that true? |
| | 24 | A    That is not true. |
| 04:13:34 | 25 | Q    But they were using the key to open the door before you |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

213

04:13:37  1   arrived at the front door?

2   A    I was unaware a key at all until after they had left.

3   Q    They were opening the door -- I guess, law enforcement

4   opened the door; isn't that correct?

04:13:47  5   A    No, I opened the door.

6   Q    Your testimony here today is that you opened the door?

7   A    Yes.

8   Q    And the first agent you saw had a rifle-styled firearm?

9   A    Yes.  I saw a rifle.

04:14:03  10  Q    And you were told to raise your hands?

11  A    Yes.

12  Q    And then, you were told by this agent holding the rifle

13  to raise your hand higher -- raise your hands higher.

14       Isn't that true?

04:14:15  15  A    That's correct.

16  Q    And you were directed to walk past these officers and

17  onto the deck; isn't that correct?

18  A    I was never told to walk past anyone.

19  Q    Were you directed to proceed towards the officers?

04:14:27  20  A    I was standing in the doorway and pushed outside.

21  Q    And once you were outside, most of the officers entered

22  your apartment.

23       Isn't that true?

24  A    I have no idea how many officers were there at the

04:14:43  25  time.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

219

| 04:20:27 | 1 | Q And at that time, you didn't say that you needed to use |
| | 2 | the restroom? |
| | 3 | A No, I did not. |
| | 4 | Q And you continued to answer questions? |
| 04:20:34 | 5 | A Yes. |
| | 6 | Q Now, you said you were embarrassed about asking to use |
| | 7 | the restroom inside the apartment. |
| | 8 | Isn't it true that Detective Syvock asked you |
| | 9 | questions about masturbating to images of child pornography? |
| 04:20:54 | 10 | MR. ORTEGA: Objection, Your Honor. |
| | 11 | Relevance and goes to the elements of the offense. |
| | 12 | MS. GANNON: Your Honor, may I be heard on this |
| | 13 | issue? |
| | 14 | THE COURT: No. Sustained. |
| 04:21:00 | 15 | BY MS. GANNON: |
| | 16 | Q Now, in your declaration, you said that you, quote, |
| | 17 | firmly believe that you were under arrest. |
| | 18 | Do you remember that? |
| | 19 | A Yes. |
| 04:21:09 | 20 | Q And that you were -- you also firmly believed that you |
| | 21 | were not free to leave? |
| | 22 | A Yes. |
| | 23 | Q Isn't it true that no one said that you were under |
| | 24 | arrest? |
| 04:21:18 | 25 | A That is true. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

220

04:21:18  1    Q    And no one said that you were not free to leave?

2    A    Said, no.

3    Q    And you were never handcuffed?

4    A    That is correct.

04:21:28  5    Q    And, in fact, Detective Syvock told you in your mom's

6    bedroom, quote:  *If you want to get out and walk out of here*

7    *right now, please do*, end quote.

8           Do you remember that?

9    A    Yes.

04:21:41 10    Q    And quote:  *You don't have anyplace to go, right now,*

11   and you answered "No," correct?

12   A    Correct.

13   Q    And quote, *I'm not holding you up or anything, right?*,

14   end quote.  Answer, "No."

04:21:54 15          Do you remember that?

16   A    Yes.

17   Q    Later when Detective Syvock asked you if you had any

18   questions for the officers you said "No."

19          Isn't that true.

04:22:02 20    A    That's true.

21   Q    And you didn't ask him, *Am I under arrest?*

22          You never asked him that, did you?

23   A    No.

24   Q    And you didn't ask him what happens when I go to jail,

04:22:13 25   did you?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

221

| | | |
|---|---|---|
| 04:22:14 | 1 | A    No. |
| | 2 | Q    And you didn't ask him *When is my court date?*, did you? |
| | 3 | A    No. |
| | 4 | Q    That's because you didn't think that you were going to |
| 04:22:21 | 5 | that -- jail that day, did you? |
| | 6 | A    That's incorrect. |
| | 7 | Q    Now, in your declaration you also said that you firmly |
| | 8 | believed that you were not free to refuse to answer |
| | 9 | questions. |
| 04:22:34 | 10 |        Do you remember that? |
| | 11 | A    I'm sorry.  Can you repeat that? |
| | 12 | Q    In your declaration, you said that you firmly believed |
| | 13 | that you were not free to refuse to answer questions? |
| | 14 | A    Yes. |
| 04:22:45 | 15 | Q    And isn't it true that you answered Detective Syvock's |
| | 16 | questions? |
| | 17 | A    Yes. |
| | 18 | Q    And you never told him that you didn't want to answer |
| | 19 | his questions? |
| 04:22:54 | 20 | A    Yes. |
| | 21 | Q    And didn't Detective Syvock tell you that he wanted to |
| | 22 | share his investigation with you? |
| | 23 | A    Yes. |
| | 24 | Q    And that they could, quote:  *Hopefully, get an* |
| 04:23:07 | 25 | *understanding from you as to why you were viewing child* |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

224

| | | |
|---|---|---|
| 04:25:19 | 1 | Q    And Detective Syvock was the officer that you spent |
| | 2 | almost the entire time with. |
| | 3 | Isn't that true? |
| | 4 | A    Yes. |
| 04:25:25 | 5 | Q    And he was the person who was providing you information |
| | 6 | about why they were there, correct? |
| | 7 | A    Yes. |
| | 8 | Q    And what was going on, correct? |
| | 9 | A    I don't know that he provided me information on what |
| 04:25:37 | 10 | was going on.  Just what he was investigating. |
| | 11 | Q    But providing information that they would be searching |
| | 12 | the house and what would happen if you decided to leave? |
| | 13 | A    I wasn't given very specific details on that, no. |
| | 14 | Q    He generally said that they would make efforts to |
| 04:25:55 | 15 | secure the property, if you decided to leave? |
| | 16 | A    Yes. |
| | 17 | Q    Now, after the interview, you chose to stay on the |
| | 18 | couch instead of leave the apartment. |
| | 19 | After the very last interview happened, you |
| 04:26:09 | 20 | decided to stay on the couch; isn't that correct? |
| | 21 | A    Yes. |
| | 22 | Q    And when the officers finished their search, where were |
| | 23 | you? |
| | 24 | A    On the couch. |
| 04:26:19 | 25 | Q    And were you arrested that day? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

225

04:26:21  1    A    No.

2    Q    So you didn't leave the apartment with the officers at

3    the conclusion of the search, did you?

4    A    No.

04:26:29  5    Q    And you were wearing the sweatshirt that we see in the

6    video from the time the officers gave it to you until they

7    left; isn't that correct?

8    A    Yes.

9    Q    And you were never escorted by the officers down the

04:26:39 10    stairs, approximately, 45 minutes after the officers

11    arrived?

12    A    No.

13    Q    Now, in your declaration, you said that you suffer from

14    insomnia.

04:26:48 15         Do you recall that?

16    A    Yes.

17    Q    And the search warrant was executed, approximately,

18    7:00 a.m., on February 5th.

19         Isn't that true?

04:26:55 20    A    Yes.

21    Q    And your declaration states that the last time you

22    slept was on February 2nd from, approximately, 12:00 o'clock

23    a.m. to 4:00 a.m.

24         Do recall that in your declaration?

04:27:09 25    A    Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

226

04:27:10    1    Q    And so you're testifying that you did not sleep at all

            2    the evening of February 2nd through the morning of

            3    February 3rd, correct?

            4    A    I believe so.

04:27:24    5    Q    I'm not asking you to speculate.

            6    A    No, I'm trying to figure out, the evening of

            7    February 2nd -- it was a Monday -- I didn't sleep from

            8    Monday morning until -- was it? -- until the time that they

            9    came.

04:27:41   10    Q    So are you testifying that you were awake for,

           11    approximately, 75 hours with no sleep?

           12    A    Yes.

           13    Q    And you didn't even take a nap during that time period?

           14    A    I tried to.

04:27:53   15    Q    But were you able to sleep at all during that time

           16    period?

           17    A    No.

           18    Q    And were you under the influence of a stimulant that

           19    kept you awake that long?

04:28:03   20    A    No.

           21    Q    And you didn't tell Detective Syvock that you had been

           22    awake for 75 hours, did you?

           23    A    No.

           24    Q    Were you under the influence of any drugs that kept you

04:28:13   25    up for 75 hours?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

227

| | | |
|---|---|---|
| 04:28:19 | 1 | A   Not that I'm aware of.  I had some alcohol the night |
| | 2 | before. |
| | 3 | Q   Actually, I was going to ask you about that.  So you |
| | 4 | said that you consumed alcohol several hours before the |
| 04:28:29 | 5 | officers arrived at your house. |
| | 6 | When did you drink that alcohol? |
| | 7 | A   Wednesday night maybe around 10:00 p.m. |
| | 8 | Q   So that was the night before the search warrant? |
| | 9 | A   Yes. |
| 04:28:43 | 10 | Q   And what did you drink? |
| | 11 | A   I had a couple of 32-ounce beers. |
| | 12 | Q   And you didn't tell Detective Syvock that you had |
| | 13 | consumed alcohol the night before, did you? |
| | 14 | A   No. |
| 04:28:57 | 15 | Q   And during the interview -- you've had an opportunity |
| | 16 | to watch the video, correct? |
| | 17 | A   During, what? |
| | 18 | Q   Sorry.  You've had an opportunity to watch the video |
| | 19 | recorded interview, correct? |
| 04:29:07 | 20 | A   Yes. |
| | 21 | Q   And in that video, you are not slurring your words, are |
| | 22 | you? |
| | 23 | A   No. |
| | 24 | Q   And you were able to understand what Detective Syvock |
| 04:29:16 | 25 | was asking you? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

233

04:34:38   1    wearing black shorts when you first saw the officers at the

2    front door, correct?

3    A      No.

4    Q      What color were the shorts that you were wearing?

04:34:45   5    A      I was in my underwear.

6    Q      What color were your underwear?

7    A      I don't recall the color of my underwear, but I do not

8    own any black underwear.

9    Q      But they were a shorts-style underwear?

04:34:58  10    A      Boxer briefs, yes.

11    Q      Now, you said -- you testified that you were pushed

12    outside with the rifle, correct?

13    A      Not with the rifle, no.

14    Q      But your testimony is that you were pushed outside.

04:35:31  15           Isn't that true?

16    A      Yes.

17    Q      But isn't it also true in your declaration you said you

18    were pushed into the house with the rifle?

19    A      I was already inside the house.

04:35:42  20    Q      So what is it, Mr. Hartman:  Were you pushed inside the

21    house with a rifle, or were you pushed out of the house by

22    the agents?

23    A      Both.

24    Q      But you didn't put in your declaration that you were

04:35:58  25    pushed outside of the house by the agents.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

234

| | | |
|---|---|---|
| 04:36:01 | 1 | Isn't that true? |
| | 2 | A    I suppose not. |
| | 3 | Q    Now, when you asked Detective Syvock for water, he |
| | 4 | said, *Absolutely*. |
| 04:36:15 | 5 | Do you remember that? |
| | 6 | A    Yes. |
| | 7 | Q    And you were given a glass of water. |
| | 8 | Isn't that true? |
| | 9 | A    Yes. |
| 04:36:24 | 10 | Q    So at that point when Detective Syvock responded to |
| | 11 | your request for water, why didn't you ask him to use the |
| | 12 | restroom? |
| | 13 | A    Again, it goes to the issue of me being embarrassed |
| | 14 | about it, and I believe he was aware of it. |
| 04:36:43 | 15 | Q    But you discussed other sensitive matters that morning |
| | 16 | with Detective Syvock, didn't you? |
| | 17 | MR. ORTEGA:  Objection, Your Honor.  Relevance and |
| | 18 | vague. |
| | 19 | THE COURT:  I'll allow it. |
| 04:36:56 | 20 | THE WITNESS:  Can you repeat that? |
| | 21 | BY MS. GANNON: |
| | 22 | Q    Did you discuss other sensitive matters with |
| | 23 | Detective Syvock that morning? |
| | 24 | A    Yes. |
| 04:37:01 | 25 | MS. GANNON:  And, Your Honor, I would just ask the |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

238

04:40:01  1          MR. ORTEGA:  Just very briefly, Your Honor.

          2                    REDIRECT EXAMINATION

          3   BY MR. ORTEGA:

          4   Q    Mr. Hartman, you were asked about why you didn't walk

04:40:14  5   to the beach or the shopping center close to your home.

          6               Why didn't you walk there?

          7   A    Well, like I said, one is, I was not dressed for the

          8   weather and didn't have any shoes.  Another reason, was

          9   because when I did try to leave the property, I was rebuked.

04:40:29 10   Q    And why didn't you ask for a pair of shoes?

         11   A    I was intimidated by the officers there.

         12   Q    And just to clarify the questions that the prosecutor

         13   was asking you about the doorway, did Detective Syvock come

         14   into the doorway and have interactions with you?

04:40:51 15   A    Yes.  Detective Syvock had grabbed my hands behind my

         16   back and led me out further onto the patio.

         17   Q    Was he holding your hands as he led you out?

         18   A    Yes.  He was holding my hands.

         19   Q    Now, you were asked about Detective Syvock telling you

04:41:10 20   that you were free to leave and, apparently, you were

         21   nodding.

         22               Were you nodding because you thought that you were

         23   free to leave?

         24   A    No.

04:41:24 25   Q    And you were asked about telling Detective Syvock that

*DEBORAH D. PARKER, U.S. COURT REPORTER*