HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
ANDREA JACOBS (Bar No. 236892)
(E-Mail: andrea_jacobs@fd.org)
Deputy Federal Public Defender
411 West Fourth Street, Suite 7110
Santa Ana, California  92701-4598
Telephone:  (714) 338-4500
Facsimile:  (714) 338-4520

Attorneys for Defendant
TODD HARTMAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. SA CR 15-63-JLS |
| Plaintiff, | |
| v. | **OPPOSITION TO GOVERNMENT'S MOTION TO RECONSIDER AND/OR AMEND COURT'S NOVEMBER 24, 2015 ORDER** |
| TODD HARTMAN, | |
| Defendant. | |

Defendant Todd Hartman, by and through his counsel of record, Deputy Federal Public Defender Andrea Jacobs, hereby opposes the government's Motion to Reconsider and/or Amend the Court's November 24, 2015 Order.  This opposition is based upon the attached memorandum of points and authorities, the files and records of this case, and such further argument and evidence as the Court may permit.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED:  December 30, 2015          By  /s/ Andrea Jacobs
_____
ANDREA JACOBS
Deputy Federal Public Defender

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.  <u>INTRODUCTION</u>

On November 24, 2015, this Court issued a well-reasoned written Order on the parties' pretrial motions.  <u>See</u> Order Re Pretrial Motions, Dkt. 87.  As part of the Court's decision on defendant Hartman's motion to suppress evidence, the Court exercised its authority to make a credibility determination based on the evidence, testimony, and extensive briefing on the motion.  <u>See</u> Dkt. 87 at 10.  The government, not liking the adverse credibility determination of Newport Beach Police Detective David Syvock, now asks this Court to change its mind, or at least leave out the adverse credibility finding, by complaining that the Court relied on erroneous factual findings. This motion has been extensively litigated both before and after the two-day suppression hearing.  It is no excuse that the government "did not have the benefit of having and citing to the transcripts from the evidentiary hearing at the time it submitted its supplemental briefing," when the government had the same opportunity to order the transcripts as defense counsel did.  <u>See</u> Govt Motion for Reconsideration (Dkt. 97) at 4:7-10.

As Defendant Hartman will demonstrate herein, the Court's factual findings were not erroneous,[1] and, there are additional examples of Detective Syvock's lack of credibility in the record that the Court could have included in its Order.  For these reasons, the Court should deny the government's motion to reconsider and/or amend the Court's November 24, 2015 Order.

---

[1]  The Court stated that Detective Syvock is by the Huntington Beach Police Department, Dkt. 87 at 9, He is employed by the Newport Beach Police Department

## II.  ARGUMENT

A "district court's credibility determinations are given 'special deference.'" United States v. Arreguin, 735 F.3d 1168, 1174 (9th Cir. 2013), *citing* United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir. 2008).  In making an adverse credibility finding, the Court must provide specific, cogent reasons to support her determination, and which go to the heart of the claim.  See Don v. Gonzales, 476 F.3d 738, 741 (9th Cir. 2007).  Trivial discrepancies such as dates cannot support an adverse credibility determination.  Id.

Here, the Court listened to two days of testimony from multiple witnesses, many of which were law enforcement officers and disinterested third parties.  It was from this testimony, and the declarations and evidence submitted, that the Court was able to thoroughly assess these witnesses.  The Court's decision to discredit the testimony of Detective Syvock on a number of points, was not only correct and based on substantial evidence, but went to the heart of the Craighead factors in the motion to suppress.  Put simply, Detective Syvock lacked credibility because his testimony was contradicted by disinterested witnesses, other law enforcement officers, and a video recording.  The government is trying to re-litigate the suppression motion to get a different answer.

This is not a case where a motion for reconsideration is helpful to correct "simple mistakes" in order to assist the Court of Appeal's record.  See Govt Motion for Reconsideration (Dkt. 97) at 3:24-27, *citing* United States v. Martin, 226 F.3d 1042, 1049 (9th Cir. 2000).  Nor is a motion to reconsider necessary here to analyze "shifting precedent" or deal with new case law.  Id.  This motion to reconsider is nothing more than the government's attempt to file yet another closing argument with respect to defendant Hartman's motion, which has already been decided.  The government even attacks counsel for Mr. Hartman, claiming they made false statements to the Court in their briefing (Dkt. 97 at 13, 14, 15).  This assertion is unfounded and wrong.

Mr. Hartman will not address each argument the government makes because these issues have already been litigated and mostly involve the government's biased

3

1  impressions of Mr. Hartman's testimony.[2]  Mr. Hartman responds to the government's

2  factual errors and its attempt to rehabilitate Detective Syvock.

3

4  **A.    Mr. Hartman's Neighbor Corroborated his Testimony.**

5         Mr. Hartman submitted a declaration to the Court in support of his Motion to

6  Suppress.  See Hartman Declaration, Dkt. 26.  In his declaration, Mr. Hartman stated

7  that his hands were restrained by Detective Syvock as he walked out of his home with

8  nothing on but his underwear.  Hartman Declaration at ¶ 3.  Mr. Hartman's declaration

9  was provided to Detective Syvock before Detective Syvock prepared his own

10 declaration.  10/28/15 Tr. at 183:4-7.  Detective Syvock's declaration directly

11 contradicted Mr. Hartman on a number of important points.  One point of contradiction

12 is whether Mr. Hartman was ever restrained by law enforcement.  Mr. Hartman states

13 he was (Hartman Declaration ¶ 3) and Detective Syvock states he was not (Syvock

14 Declaration ¶ 6).  A second point of contradiction was the clothing Mr. Hartman was

15 wearing when he was taken out of his home and restrained.  Mr. Hartman stated he was

16 wearing only underwear (Hartman Decl. ¶ 3) and Detective Syvock stated that Mr.

17 Hartman was wearing "shorts and a t-shirt" (Syvock Decl. ¶ 7).

18        On October 1, 2015, a neighbor of Mr. Hartman, Kurtis Paul Klocke, signed a

19 declaration regarding his recollection from the police raid that occurred at the Hartman

20 home in February 2015.  Mr. Klocke, a disinterested third party witness, corroborated

21 Mr. Hartman's version of events that Mr. Hartman's hands were restrained by a police

22 officer and Mr. Hartman was wearing his underwear.  See Klocke Decl. ¶ 3, Dkt. 49.

23 Mr. Klocke was cross-examined by the government at a hearing on the suppression

24

25 _____

26        [2]  Government counsel alleges that Mr. Hartman's testimony was "self-serving"
   with "illogical aspects."  Dkt. 97 at 9.  That Mr. Hartman's rights were violated does
27 not make his testimony self-serving.  And it was government counsel that went down
   an illogical path with a line of questioning to Mr. Hartman involving the Hannibal
28 Lecter movie "Silence of the Lamb."  See 10/28/2015 Tr. at 229.

4

motion on October 27, 2015.  Mr. Klocke remained consistent with his declaration that Mr. Hartman's hands were placed behind his back, appearing to be restrained, and that Mr. Hartman wore only his underwear.  <u>See</u> 10/27/2015 Tr. at 86 ("he was all the way naked in his boxers.") and 94-95, 98 (Mr. Hartman's hands were held behind his back).

The government attempts to discredit Mr. Klocke through trivial discrepancies as to the specific time Mr. Hartman was physically restrained and in what direction the officers' escorted Mr. Hartman.  Mr. Klocke did not remember the specific date in February 2015 that the police raid occurred.  Mr. Klocke initially testified that the events he witnessed "happened around 7:30 in the morning, *give or take*."  10/27/15 Tr. at 82:17-18 (emphasis added).  This is an accurate time-frame as we know that the officers arrived to the Hartman home around 7:00 a.m.  And Mr. Hartman's first recorded interrogation started just after 7:15 a.m.  Mr. Klocke mentioned that he usually leaves for work around 8:00 a.m., but did not state what time he left for work on February 5, 2015.  <u>Id</u>. at 82.

The government alleges that Mr. Klocke did not see Mr. Hartman until sometime around 8:00 a.m.  This is not entirely accurate.  First, Mr. Klocke testified that the events he witnessed occurred around 7:30, *give or take*.  Based on what Mr. Klocke saw happen, which was corroborated by another third party witness and law enforcement officers, it is evident that Mr. Klocke was off on his original time estimate by about 30 minutes.  Second, it was actually government counsel that kept using the exact time of 8:00 a.m. in her questions to Mr. Klocke.  10/27/15 Tr. at 85-86.

Regardless, the issue is whether Mr. Hartman was restrained and what he was wearing, not the specific time it happened within a one hour window.  The government also attacks Mr. Klocke's corroboration by claiming there was a "fundamental discrepancy" between Mr. Klocke's recollection that Mr. Hartman was escorted downstairs in his underwear and Mr. Hartman's testimony that he was not escorted downstairs.  This is not only another trivial point, but, Mr. Klocke testified on cross-examination that from where he was sitting he thought Mr. Hartman went down the

5

1    stairs but "couldn't see if [Mr. Hartman] went left or right; and then, that's when I left."

2    See 10/27/2015 Transcript at 86.

3           There was no fundamental discrepancy, and certainly nothing misleading,

4    between Mr. Klocke's declaration that Mr. Hartman's hands were restrained by an

5    officer and that he was taken out of the home in his underwear.  Mr. Klocke came

6    across as a reliable, independent witness.  He corroborated Mr. Hartman's testimony

7    with respect to two key points that were disputed by Detective Syvock.  One of these

8    points, Mr. Hartman being taken from the home in his underwear, was also

9    corroborated by three witnesses in addition to Mr. Klocke.  See 10/27/15 Tr. 95-96

10   (second neighbor's testimony that Defendant wore only his boxers and no shirt),

11   10/28/15 Tr. at 122 (Officer Bard's testimony that Defendant wore "shorts or

12   boxers…without a shirt"), and 10/28/15 Tr. at 193 (Agent Speakman's testimony that

13   Defendant was wearing either boxer shorts, or shorts and no shirt).  Therefore, the

14   government is incorrect when it complains that this "disinterested third party does not

15   support defendant's version of events."  See Dkt. 97 at 16:20-21.

16

17   **B.     Mr. Hartman's Claim that his Mother was at the Scene of the Search is**

18          **Supported by the Record.**

19          The government complains that there is insufficient evidence in the record to

20   support Mr. Hartman's claim that his mother was at the scene of the search.  The

21   government is incorrect.  The fact that Ms. Hartman was at her home when the search

22   occurred is not only corroborated by Kurtis Klocke, but also by FBI Agent Speakman.

23   Counsel for Mr. Hartman has never disputed that when Detective Syvock initially

24   approached Ms. Hartman for the key to her residence she was in her vehicle on the way

25   to work.  10/28/15 Tr. at 142.  But that does not mean, nor does the evidence show, that

26   Ms. Hartman did not subsequently turn her car around and drive back to her home and

27   that law enforcement was aware of this.

28

                                              6

1    Mr. Klocke testified that he both saw and spoke with Ms. Hartman outside of the
2    apartment when Mr. Hartman was exiting the residence with law enforcement.  See
3    10/27/15 Tr. 85 ("I talked to her -- his mother for a second.  And at that time, I seen
4    him coming out.").  The only time this can be is between 7:00 a.m. and 7:15 a.m. when
5    Mr. Hartman was taken out of the home in his underwear and before the interrogation
6    started, based on the testimony of others and the time stamped video recording of the
7    interrogation.  Mr. Klocke only saw Mr. Hartman wearing underwear so this is another
8    indication that Ms. Hartman was present outside the residence when the search
9    commenced.

10    Agent Speakman also testified that he saw Ms. Hartman when the agents were
11    conducting a search of the Hartman home.

12    Q:  Did there come an instance where Ms. Hartman is present in the residence?

13    A:  Yes.

14    Q:  And where is she in the residence?

15    A:  In the living room.

16    Q:  Do you recall how soon after you started searching that she returned to the home?

17    A:  I do not.

18    Q:  Do -- at some point, does Mr. Hartman and Mrs. Hartman, are they in the living

19    room together?

20    A:  At some point they were in the living room together.  I'm just not sure when.

21    Q:  But while law enforcement is still there, conducting their search?

22    A:  Yes.

23    10/28/15 Tr. at 199-200.

24    The Court did not solely rely on whether Mr. Hartman's mother was present for
25    the Craighead factor of whether the suspect was isolated from others.  The Court also
26    took note of the fact that Detective Syvock interrogated Mr. Hartman in his mother's
27    bedroom with the door closed, thus isolating Mr. Hartman from others.  Dkt. 87 at 16.
28    Even when Detective Syvock left Mr. Hartman in the interrogation room he made sure

7

1    to close the door, keeping Mr. Hartman in isolation.  10/28/15 Tr. at 177.  From Agent

2    Speakman's testimony, we know that Ms. Hartman was in the apartment during this

3    time period, and it is likely that Detective Syvock saw her during a break in the

4    interrogations.  All of these facts contributed to the Court's finding that Mr. Hartman

5    was isolated from others.

6

7    **C.      The Court Correctly Found that Detective Syvock's Testimony Was Not**

8    **Credible because it was Contradicted by Multiple Witnesses and his**

9    **own Video Recording.**

10         The government wants to explain away Detective Syvock's credibility issues as a

11   lapse in memory.  Detective Syvock's testimony goes beyond a mere memory lapse.  It

12   is clear he finds it difficult to accept responsibility for his actions.  The government

13   points outs that negative credibility findings have "serious real-world consequences" in

14   the hopes this will change the Court's mind.  Dkt. 97 at 19.  Law enforcement must be

15   made aware of consequences when stating mistruths, especially when other law

16   enforcement officers in the same case testify truthfully and accurately.  Lessons are not

17   learned when the government can petition the Court to fix or change an adverse

18   credibility finding.

19         Detective Syvock is a long-time police officer and presumably knows that when

20   he submits a declaration, his statements are made under penalty of perjury.  If he did

21   not remember what Mr. Hartman was wearing on the morning of the search, Detective

22   Syvock had the opportunity to state this or write nothing at all about Mr. Hartman's

23   attire in the declaration.  Instead, Detective Syvock affirmatively contradicted Mr.

24   Hartman's statement that he was wearing only underwear.  Syvock Decl. ¶ 7.  Although

25   Detective Syvock was provided the opportunity during the hearing to explain that he

26   actually was not sure what Mr. Hartman was wearing, this does not take away from the

27   fact that he signed a declaration affirmatively representing something different.

28

In his declaration Detective Syvock also stated that his gun was concealed during the interrogations.  Syvock Decl. ¶ 14.  From the video evidence we know this was not true.  Although the government insists that Detective Syvock "readily admitted his mistake," defense counsel believes the more apt explanation is that he tried to make excuses for himself once caught.  Instead of accepting responsibility for being wrong, Detective Syvock back-pedaled claiming "my shirt had got hung up on my gun and therefore exposing my weapon."  10/28/15 Tr. at 135-36.  From the evidence it appears that Detective Syvock holstered his gun after putting his shirt on.  See Defendant's Suppression Motion, Exhibit C, Dkt. 26.  Detective Syvock also placed his hand directly on his gun during the interrogation but would not admit on cross-examination that this act should have made him realize his gun was exposed.  10/28/15 Tr. at 139.

Additional problem areas for Detective Syvock that show his lack of credibility arose when he was questioned about the size of the Hartman home, the number of officers present for the search, who was in charge of the search operations, and whether Mr. Hartman wanted to speak with him.  When questioned by defense counsel if Detective Syvock was aware of the small size of the Hartman home prior to the search warrant execution, he denied this was the case and stated he was not aware of the small size until "after we got inside."  10/28/15 Tr. at 148.  Then he was asked:

Q:  So before you execute a search warrant normally you don't do any investigation on the size or the layout of the home to be searched?

A:  There's cases where we're able to get information on houses that will tell us what the square footage is.  In this case, I don't know that we did.

Later when asked who decided on the number of officers to be used for the search warrant execution, Detective Syvock accidentally admitted that this decision is made prior to the search warrant and is "based on the size of location."  10/28/15 Tr. at 154.  This made it evident that Detective Syvock was aware of the small size of the Hartman home before the search warrant execution.

1    With respect to the number of officers present to search the home, when

2    questioned by the government, Detective Syvock readily agreed that 14 officers were

3    present.  10/28/15 Tr. at 136.  When questioned by defense counsel, Detective Syvock

4    estimated it was 11 and then had to have his memory refreshed.  10/28/15 Tr. at 152.

5    A more contentious dispute was over who was in charge of the search warrant

6    execution.  10/28/15 Tr. at 154-157.  It became clear that Detective Syvock did not

7    want to accept responsibility over the case.  When asked directly, Detective Syvock

8    could not provide a name: "you know, I would have to look and see who wrote up the

9    operations plan."  10/28/15 Tr. at 154.

10   Q:  The person who did the operations plan, was that also the person in charge of

11   assigning their people -- other people their roles during the execution?

12   A:  That would be correct.

13   Q:  Was that person present at your -- I guess your pre-op meeting early that morning?

14   A:  Yes.

15   Q:  You just don't remember who it was.

16   A:  I don't remember.

17   10/28/15 Tr. at 155.

18   When he was refreshed with a list of all officers present for the search, Detective

19   Syvock still could not answer the question.  10/28/15 Tr. at 156.  Finally, when it was

20   pointed out to him that "there were multiple agencies during the search warrant

21   execution but no one was really in command of everyone," Detective Syvock admitted:

22   A:  I was in charge of the investigation.

23   Q:  Okay.  You were in charge of the investigation?

24   A:  Absolutely.

25   Q:  Okay.  Did you tell that to Mr. Hartman?

26   A:  I don't know if I specifically told him that I was in charge.  I told him what my role

27   was.

28   10/28/15 Tr. at 157.

10

Detective Syvock also appeared less than credible when he stood by the assertion in his declaration that "the interviews were conducted with Hartman only after he indicated that he wanted to talk with me about the investigation."  Syvock Decl. at ¶ 12. During his testimony, Detective Syvock continued to assert that it was Hartman that wanted to speak with him.  10/28/15 Tr. at 134.  On cross-examination, Detective Syvock was confronted with the video of the interrogation when he asked Mr. Hartman if Mr. Hartman would join him in his mother's bedroom to talk.  10/28/15 Tr. at 168-170.  Mr. Hartman responded "alright, I guess."  Yet again, Detective Syvock would not concede that Mr. Hartman's response did not show an eagerness to speak with him. Id.

For all of the above reasons, it was clear that Detective Syvock had credibility problems.  Whereas the other law enforcement witnesses came across credible and testified accurately, Detective Syvock was contradicted by both disinterested third-party witnesses and the evidence.  The Court's credibility findings in its 11/24/15 Order were correctly reached.

## III.  CONCLUSION

For the foregoing reasons, this Court should deny the government's motion to reconsider and/or amend the Court's November 24, 2015 Order.

11