EILEEN M. DECKER
United States Attorney
DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office
ANNE C. GANNON (Cal. Bar No. 214198)
Assistant United States Attorney
    United States Courthouse
    411 West Fourth Street
    Santa Ana, California 92627
    Telephone: (714) 338-3548
    E-mail:    anne.gannon@usdoj.gov

Attorneys for Respondent
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  SA CR 15-63(B)-JLS |
| Plaintiff, | REPLY TO GOVERNMENT'S MOTION TO RECONSIDER AND/OR AMEND COURT'S NOVEMBER 24, 2015 ORDER; EXHIBIT |
| v. | |
| TODD CHRISTIAN HARTMAN, | NO HEARING REQUESTED |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorney Anne C. Gannon, hereby submits its reply brief in support of its December 24, 2015 Motion to Reconsider and/or Amend Court's November 24, 2015 Order on the motion to suppress evidence filed by defendant TODD CHRISTIAN HARTMAN.

\\
\\
\\
\\
\\
\\
\\
\\

The government's motion is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 7, 2016

Respectfully submitted,

EILEEN M. DECKER
United States Attorney

DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office

   /s/
ANNE C. GANNON
Assistant United States Attorney

Attorneys for Respondent
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

On September 18, 2015, defendant TODD CHRISTIAN HARTMAN ("defendant") filed a motion to suppress arguing that all evidence of statements made by defendant, and evidence derived from those statements, be suppressed because they were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  On September 24, 2015, the government filed its opposition.  On October 2, 2015, defendant filed a reply brief.  On October 27 and 28, 2015, the Court held an evidentiary hearing, including testimony from several witnesses.  On November 24, 2015, the Court entered its ruling granting, in part, and denying, in part, the motion of defendant to suppress evidence ("Court's Order").

On December 24, 2015, the government filed a motion for reconsideration and/or to amend the Court's Order.  The motion was based on the government's concern that the Court's Order relied on erroneous factual findings that substantially impacted the legal analysis and the Court's ultimate ruling. In addition, the government asked the Court to reconsider the adverse credibility findings against Detective ("Det.") David Syvock in light of the factual errors.  On December 30, 2015, defendant filed his opposition to the government's motion.  On January 4, 2016, the Court set a briefing schedule for the motion for reconsideration.

\\
\\
\\
\\
\\

## II. ARGUMENT

### A. Defendant's Neighbor Did Not Corroborate Defendant's Claim that Det. Syvock Restrained Defendant's Hands.

Defendant maintains his position that a neighbor, Kurtis Klocke, corroborated his testimony concerning whether Det. Syvock restrained defendant's hands during their initial interaction on the desk outside defendant's home between 7:00-7:15 a.m.  (Opp. at p. 6.) Defendant claims that it was government counsel who used the later time of 8:00 a.m. in her questions to Mr. Klocke.  (Opp. at p. 5.) Defendant claims that his hands were restrained by Det. Syvock when he was initially contacted on the deck at approximately 7:00 a.m. (Def. Decl. ¶¶ 2-3.)[1]  Mr. Klocke's testimony is clear that a significant period of time, approximately 30-40 minutes, elapsed between (1) the sound of knocking alerted him to law enforcement's presence and he looked out his side door and back window and (2) the first time he saw defendant when he walked outside and across the street.  Mr. Klocke testified that the police raid occurred at approximately 7:30 in the morning and he usually left for work around 8:00 a.m.  (RT 10/27/15 II: 82; Exhibit A, attached hereto, p. 1.) The fact that approximately 30-40 minutes elapsed before Mr. Klocke left the house is corroborated by his recollection that he prepared for work inside his residence between the two events and his admission that getting ready for work took him longer than usual.

```
Q    How long did you peek out of the window for this
     better view?

A    It that was only about 10 seconds, also.

Q    And then, did you go to any other part of your house
     or outside of your house to watch what was going on?
```

---

[1] Defendant's declaration was attached to defendant's September 18, 2015 motion to suppress evidence.  (Docket #26.)

4

|    |   |                                                                                                      |
|----|---|------------------------------------------------------------------------------------------------------|
| 1  |   |                                                                                                      |
|    | A | Not at first. I got ready. And then when I was getting                                               |
| 2  |   | ready to leave to work, I went outside in the front                                                  |
|    |   | door in the front of the house and then kind of                                                      |
| 3  |   | observed some more before I left to go to work.                                                      |
| 4  | Q | When you were leaving at 8:00 o'clock, let's say?                                                    |
| 5  | A | Around about. Maybe a little later, because I was a                                                  |
|    |   | little slower.                                                                                       |
| 6  |   |                                                                                                      |
|    | Q | A little slow that day?                                                                              |
| 7  |   |                                                                                                      |
|    | A | Well, prasticating [sic]. You know, kind of watch and                                                |
| 8  |   | see.                                                                                                 |
| 9  | Q | Okay. So then you went back outside at that point?                                                   |
| 10 | A | Yes.                                                                                                 |
| 11 | Q | And did you -- how long did you stay outside to watch                                                |
|    |   | what was going on?                                                                                   |
| 12 |   |                                                                                                      |
|    | A | Maybe another 10 minutes.                                                                            |
| 13 |   |                                                                                                      |
|    | Q | Okay.                                                                                                |
| 14 |   |                                                                                                      |
|    | A | I talked to her -- his mother for a second. And at                                                   |
| 15 |   | that time, I seen him coming out.                                                                    |
| 16 | Q | Okay. When you say you "seen him coming out," are you                                                |
|    |   | referring to Mr. Hartman?                                                                            |
| 17 |   |                                                                                                      |
|    | A | Yes, ma'am.                                                                                          |
| 18 |   |                                                                                                      |
|    | Q | You saw him at some time after 8:00 o'clock, coming                                                  |
| 19 |   | out of his house?                                                                                    |
| 20 | A | Yes.                                                                                                 |
| 21 | Q | And when you -- when he's coming out of his house, are                                               |
|    |   | you referring to the door up on top of the deck?                                                     |
| 22 |   |                                                                                                      |
|    | A | Yes, ma'am.                                                                                          |
| 23 |   |                                                                                                      |
|    | Q | Okay. So at 8:00 -- sometime after 8:00, 8:15-ish,                                                   |
| 24 |   | he's coming out of the house?                                                                        |
| 25 | A | Yes.                                                                                                 |

26  (RT 10/27/15 II: 85-86; Ex. A, pp. 2-3.)

27       When government counsel later asked whether it was about 45

28  minutes later that Mr. Klocke saw defendant leave the house, Mr.

5

Klocke clarified and affirmatively stated, "Maybe 30, 40, somewhere in that zone, yes." (RT 10/27/15 II: 87; Ex. A, p. 4.) The defense's insinuation that Mr. Klocke was merely echoing the facts in the government's questions is incorrect, Mr. Klocke corrected the government's statement as to the timeframe. Based on this testimony, it is impossible that defendant and Mr. Klocke were discussing the same time period when defendant claims Det. Syvock restrained his hands. Mr. Klocke never saw defendant when he initially looked at the door and window to see what was occurring which is the time consistent with defendant's claim. (RT 10/27/15 II: 87, 92; Ex. A., pp. 4-5.)

Defendant claims that the substantive difference in the accounts whether defendant was escorted down the stairs is "another trivial point." (Opp. at p. 5.) The government disagrees. Contrary to Mr. Klocke's version of events, defendant testified that he was never escorted by officers down the stairs approximately 45 minutes after the officers arrived. (RT 10/28/15: 225; Ex. A, p. 12.) Mr. Klocke testified repeatedly that he observed defendant walk down the stairs with multiple officers. (RT 10/27/15 II: 87, 92; Ex. A., pp. 4-5.) It is unclear how or why Mr. Klocke recalls an event that is fundamentally at odds with the testimony of both prosecution and defense witnesses. What the record does support is a finding that his testimony does not corroborate defendant's version of events.

B.  The Record Only Supports a Finding that Defendant's Mother was On Scene No Later Than 7:48:30.

Defendant claims that defendant's mother returned to the residence by 7:15 a.m. because Mr. Klocke saw her when he was standing across the street watching what was occurring. (Opp. at p.

6

7.) As discussed above, Mr. Klocke left his residence and walked across the street at, or a little after, 8:00 a.m. Agent Speakman's testimony regarding defendant's mother returning cited by defendant was not specific as to time. (Id.) Therefore, the only evidence in the record is that defendant's mother was present, and defendant was aware that she was present, when there was a break in the interview and defendant exited the room and joined her in the living room at time stamp 7:48:30 of the video recording.

### C. The Additional Facts Cited By Defendant Do Not Support An Adverse Credibility Finding Against Det. Syvock.

Defendant attempts to bolster his position by claiming that there were additional problem areas with Det. Syvock's testimony including his knowledge about the size of the residence, how many officers were present, who was command of the investigation, and whether defendant indicated he wanted to speak with Det. Syvock. (Opp. at pp. 9-11.) The government contends that none of these matters involve actual factual disputes weighing against Det. Syvock's credibility. As to the size of the house, contrary to defendant's claim, Det. Syvock never denied that the residence was small. Instead, he testified that from the outside that he could tell that the apartment was small, he did not know exactly how small it was before he entered, and he was unable to estimate a specific square footage for the apartment. (RT 10/27/15 II: 147-49; Ex. A, pp. 6-8.) As for the number of officer's present, defendant's own cites to the record reflect that Det. Syvock testified as to the correct number, according to the operations plan, prior to the defense's questions. (Opp. at p. 10.)

The portions of the record cited by the defense do not support the conclusion that "[i]t became clear that Detective Syvock did not

7

want to accept responsibility over the case." (Opp. at p. 10.) In fact, when Det. Syvock was asked whether he was in charge of the investigation, he responded "[a]bsolutely." (RT 10/28/15: 157; Ex. A, p. 11.) As Det. Syvock explained, the person in charge of the tactical side of the operation is separate from the person responsible for the substantive investigation. "There are two roles at the search warrant briefing: One is to go over the operations plan. One is to go over the scope of the investigation so the search team knows what they're looking for once they go into the house. My job was to cover the portion of the scope of the investigation." (RT 10/28/15: 155-56; pp. 9-10.) Finally, as to Det. Syvock's testimony regarding defendant's willingness or eagerness to be interviewed, defendant has not previously claimed that his statements were not voluntary. Defendant cites to one portion of the recording where the audio is of poor quality and disregards the other multiple undisputed portions of the recording when defendant agreed to speak with Det. Syvock. Based on the totality of the evidence, Det. Syvock's perception that defendant was willing to speak with him is supported by the record.

## III. CONCLUSION

For the foregoing reasons and the reasons set forth in its December 24, 2015 motion, the government respectfully requests that this Court reconsider its ruling on Defendant's motion to suppress and amend its order as to the credibility findings against Det. Syvock.